LAW OFFICES OF JOHN BENEDICT
John Benedict, Esq. (Nevada Bar No. 005581)
2190 E. Pebble Road, Suite 260
Las Vegas, Nevada 89123
Telephone: (702) 333-3770
Facsimile: (702) 361-3685
Email: john.benedict.esq@gmail.com

EDELSON LLC
Ryan D. Andrews (*pro hac vice*)
randrews@edelson.com
John C. Ochoa (*pro hac vice*)
jochoa@edelson.com
David D. Dale (*pro hac vice*)
ddale@edelson.com
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

*Attorneys for Plaintiff Flemming Kristensen*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| FLEMMING KRISTENSEN, individually and on behalf of a class of similarly situated individuals, <br><br> Plaintiff, <br><br> v. <br><br> CREDIT PAYMENT SERVICES INC., a Nevada corporation, f/k/a MYCASHNOW.COM INC., ENOVA INTERNATIONAL, INC., an Illinois corporation, PIONEER FINANCIAL SERVICES, INC., a Missouri corporation, LEADPILE LLC, a Delaware limited liability company, and CLICKMEDIA LLC d/b/a NET1PROMOTIONS LLC, a Georgia limited liability company, <br><br> Defendants. | Case No. 2:12-CV-00528-APG-PAL <br><br> CLASS ACTION <br><br> **PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** <br><br> Hon. Andrew P. Gordon <br><br> Magistrate: Hon. Peggy A. Leen |

Plaintiff FLEMMING KRISTENSEN, by and through his undersigned counsel, files this *Motion for Class Certification* pursuant to Federal Rule of Civil Procedure 23.

Dated:  October 31, 2013

Respectfully submitted,

FLEMMING KRISTENSEN, individually and on behalf of a class of similarly situated individuals

By: /s/  John C. Ochoa
    One of Plaintiff's Attorneys

LAW OFFICES OF JOHN BENEDICT
John Benedict, Esq.
Nevada Bar No. 005581
2190 E. Pebble Road, Suite 260
Las Vegas, Nevada 89123
Telephone: (702) 333-3770
Facsimile: (702) 361-3685
john.benedict.esq@gmail.com

EDELSON LLC
Ryan D. Andrews (admitted *pro hac vice*)
randrews@edelson.com
John C. Ochoa (admitted *pro hac vice*)
jochoa@edelson.com
David D. Dale (admitted *pro hac vice*)
ddale@edelson.com350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

*Counsel for Plaintiff*
*FLEMMING KRISTENSEN*

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The online payday loan industry—attracted to an inexpensive way to reach consumers directly—is increasingly turning to text message advertising to market its products.[1]  Lead generators and advertisers promote, via text message, online loan applications that funnel potential customers to the websites of payday lenders.  The use of text message marketing to generate potential borrowers (known as "leads") is an open secret in the industry.  By buying these "dirty leads" generated through text message spam, lenders are able to reap the benefits of cheap, direct marketing to consumers' cellular telephones without having to involve themselves directly in the dubious text message transmissions.  To counter such tactics—and to offer redress to the individuals harmed by such conduct— judicial intervention is necessary on a class-wide basis.

In this case, Defendant Lenders Credit Payment Services, Inc. ("CPS"), Enova International, Inc. ("Enova") and Pioneer Financial Services, Inc. ("Pioneer"), bought dirty leads from LeadPile LLC, a lead broker who touted the benefits of its affiliate marketers' use of text message advertising on its online blog.[2]  Over the course of a two-month period in 2011 and 2012, text message advertisements were transmitted from various 10-digit telephone numbers, known in the industry as "longcodes," to nearly 100,000[3] consumers including Plaintiff Flemming Kristensen.

Kristensen brought the instant action on behalf of himself and a class of similarly

---

[1]   *See* Cloudmark 1Q13: Global eMessaging Threat Report, January-March 2013, *available at* http://www.cloudmark.com/releases/docs/threat_report/Cloudmark_ eMessaging_Threat_Report_1Q13.pdf.

[2]   LeadPile's Marketing Director, Eugen Ilie wrote:  "the text messages (SMS) have always been an interesting and productive way to generate leads . . . . We knew about it, test it with our Offers, and our Publishers are doing it as well . . . ."  *See* SMS and Lead-Gen in a Lead Exchange, Eugen Ilie (July 21, 2008) (attached to the Declaration of John C. Ochoa, ("Ochoa Decl.") as Ex. A.)

[3]   Based on the evidence adduced to date, Plaintiff Flemming Kristensen seeks to certify a smaller subset of the total amount of text message traffic transmitted by Defendants.

situated individuals[4] seeking statutory damages as well as injunctive relief under the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"). Plaintiff seeks certification of a class (the "Class") defined as follows:

> All individuals who were sent a text message from telephone numbers "330-564-6316," "808-989-5389," and "209-200-0084" from December 5, 2011 through January 11, 2012."[5]

This case is a textbook example of a claim suitable for class certification: Each unauthorized text message was sent from a single source, each was sent using a single piece of technology, and each was sent in furtherance of a payday loan program. Such conduct not only provides Plaintiff and the Class members a common claim under the TCPA, but it also raises several common legal and factual questions that are more than appropriate for resolution on a class-wide basis. These common questions include, but are not limited to: (i) whether the equipment used to send the text message satisfies the statutory definition of an automatic telephone dialing system ("ATDS"), (ii) whether Defendants can be held vicariously liable under the TCPA, and (iii) whether Defendants can establish they have obtained prior express consent to send the text messages.

The remaining prongs for certification under Rule 23—numerosity, typicality, adequacy of representation, and superiority—are also undoubtedly satisfied, as the Class contains roughly 100,000 individuals, Plaintiff has the same interests as all of the Class Members, Plaintiff and his counsel have and will continue to adequately represent the Class, and a class action is superior method for adjudicating the nearly identical claims. In the end,

---

[4]  The class definition here has been modified from the definition pleaded in Plaintiff's Amended Complaint, as the evidence collected by Plaintiff supports certification of the refined Class sought through this Motion. (*See* Pl.'s Am. Compl., dkt. 35, ¶ 40.) Altering the class definition as a result of discovery is contemplated by Fed. R. Civ. P. 23(c)(1)(C) (stating that an order certifying a class "may be altered or amended before final judgment") and supported by the caselaw. *See Moeller v. Taco Bell Corp.*, No. 02-cv-5849, 2004 WL 5669683, at *1 (N.D. Cal. Dec. 7, 2004).

[5]  Plaintiff's counsel has evidence of additional longcodes that may have been used to send text messages of this type. (Ochoa Decl. Group Ex. B.) Future discovery may warrant the inclusion of these and possibly other longcodes into the Class definition as well.

if the Court certifies the Class, either all Class Members will be entitled to relief, or no one will.

Accordingly, Plaintiff Flemming Kristensen, by and through his undersigned counsel, and on behalf of thousands of other harassed and frustrated consumers, respectfully moves this Court for an Order certifying this case as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3).

**THE FACTS**

**I.    The Smart Credit Solution Text Message Marketing Scheme From a Consumer's Perspective**

For the thousands of consumers who were sent a text message like the one sent to Mr. Kristensen, the experience was almost identical.  After their cellular telephones buzzed, rang, and/or vibrated to alert them that a text message call had arrived, consumers were greeted to a text message from an unknown telephone number.  The text message read as follows:

> Do You Need up to $5000
> Today? Easy Quick and All Online
> at: www.lend5k.com
> 24 Month Repay, All Cred. Ok
> Reply STOP 2 End[6]

At this point, the TCPA violation was complete—consumers need not contact the companies that spammed them in order to state a claim.  Consumer complaints about these text messages are rampant.  (Ochoa Decl. Group Ex. B.)

Of course, many consumers would simply ignore such messages (and doing so does not affect their TCPA claims).  But clicking on the URL link automatically redirected to an online loan application at The Smart Credit Solution website[7] purportedly sponsored by the "Alpine Select Lenders Network," where the consumer would be prompted to enter his or her personal information to be approved for a loan "in seconds."  (Ochoa Decl. Ex.'s D & E - Interrogatory Answer No. 8.)  If and when consumers submitted their personal information

---

[6]     Ochoa Decl. Ex. C, ¶¶ 10-11.

[7]     The website URL was http://thesmartcreditsolution/securelinkcorp.com  (Ochoa Decl. Ex.'s D & E, Interrogatory Answer No. 8.)

1   and qualified for a loan, they would then be directed to one of the Lender Defendants in this

2   lawsuit, where the transaction would then be completed.  (Ochoa Decl. Ex. E - Interrogatory

3   Answer No. 7 & Ex. F.)

4         The Smart Credit Solution text message scheme, from text message transmission to

5   approved loan, was shockingly quick, and from a consumer's perspective, a seamless flow

6   from text message to lender.

7   **II.    The Defendants and Their Roles in the Text Message Marketing Campaign**

8         In this case, Defendant Lenders CPS, Enova, and Pioneer are short-term lenders who

9   provide their loan services on the Internet.  In an effort to drive interested borrowers to their

10  online storefronts, the Defendant Lenders bought leads from LeadPile and reaped the benefits

11  of this massive text message marketing campaign.  (Ochoa Decl. Ex. F.)  The effectuation of

12  this campaign required multiple parties—each with a distinct role—including a company to

13  send the text messages (AC Referral Systems LLC), another to collection the information

14  from potential qualified borrowers (Click Media), and another to auction off those qualified

15  leads to the individual lenders (LeadPile).

16        While multiple parties were involved, their goal was common and their framework

17  straightforward.  Click Media directed an affiliate marketer—AC Referral Systems—to

18  physically transmit the text messages.  (Ochoa Decl. Ex. C, ¶¶ 3-5; Ex. G.)  Through this

19  arrangement, AC Referral Systems sent text messages *en masse* to consumers via a computer

20  program called "Data Doctor" from ten-digit "longcode" telephone numbers.  (Ochoa Decl.

21  Ex. C, ¶¶ 5-8.)  Data Doctor was a software program which, when paired with a computer

22  and prepaid cellular telephone, allowed AC Referral Systems to (i) copy lists of cellular

23  telephone numbers,[8] (ii) paste them into Data Doctor, (iii) generate the content of the text

24  message it wanted to send, and (iv) transmit the text message to the cellular telephone

25  ────────────────

26  [8]      AC Referral Systems obtained the cellular phone numbers at issue through a company
    called 360 Data Management LLC.  (Ochoa Decl. Ex. C, ¶ 9.)  AC Referral Systems has no
    proof that the cell phone owners consented to receive text messages on behalf of any of the
27  Defendants. (*Id.*)

28

numbers of thousands of individuals without any further human intervention. (Ochoa Decl. Ex. C, ¶ 8.)

AC Referral Systems included in the text messages a URL link to "www.lend5k.com," a website licensed exclusively by AC Referral during the Class period. (Ochoa Decl. Ex. C, ¶¶ 6, 10.)  That website had no content, but automatically redirected consumers to the Smart Credit Solution,[9] a website hosted by Click Media. (*Id.* Ex. C, ¶¶ 5-7, 11; Ex. D; Ex. E - Interrogatory Answer No. 8.)  If and when the loan application at that website was complete, the lead was "bought" by LeadPile pursuant to a contract between LeadPile and Click Media, then almost simultaneously sold to one of the Lender Defendants. (Ochoa Decl. Ex. E - Interrogatory Answer No. 7; Ex. H; Ex. F.)

This marketing scheme proved to be successful.  Lender-Defendant Enova purchased 1,267 leads, Lender-Defendant Pioneer purchased 1,827 leads, and Lender-Defendant CPS purchased 9,181 leads via the Smart Credit Solution.[10] (Ochoa Decl. ¶ 7.)  After the loans were complete, all the entities down the chain would be compensated pursuant to agreements entered into between LeadPile, Click Media, and AC Referral Systems.  (Ochoa Decl. Ex.'s G & H.)

## II.   The Text Messages Were Sent to the Class as Part of the Smart Credit Solution Text Message Campaign.

AC Referral Systems transmitted text messages to 98,779 consumers from longcodes "330-564-6316," "209-200-0084," and "808-989-5389" for the Smart Credit Solution payday loan program.  (Ochoa Decl. Ex. C, ¶¶ 4-6, 10-11; Ex. E – Interrogatory Answer No. 6; Declaration of Shawn Davis ("Davis Decl."), ¶ 25.)  Starting on December 5, 2011, AC Referral sent text messages *en masse* from cellular telephone number "330-564-6316." (Ochoa Decl. Ex. C, ¶ 10.)  These messages contained the following content:

---

[9]    For all practical purposes, Click Media controlled the URL contained in the text message received by the Class members, as the link automatically redirected to Click Media's website.

[10]    Although not a lender, LeadPile also purchased 5,610 leads.  (Ochoa Decl. ¶ 7.)

Do You Need up to $5000
Today? Easy Quick and All Online
at: www.lend5k.com
24 Month Repay, All Cred. Ok
Reply STOP 2 End

(Ochoa Decl. Ex. C, ¶ 10.)  "Call detail" records for longcode "330-564-6316," obtained

from wireless carrier T-Mobile U.S.A., show all inbound and outbound text messages

transmitted to and from the longcode.  (Ochoa Decl.  ¶ 10 & Ex. I; Davis Decl. ¶ 5.)  Two

other longcodes—"209-200-0084" and "808-989-5389"—were also utilized as part of this

text message marketing scheme (Ochoa Decl. Ex. C, ¶¶ 10-11) (the call detail records for

these three longcodes are hereinafter collectively referred to as the "T-Mobile Lists").  The

T-Mobile Lists show that AC Referral used these three longcodes to transmit outbound text

messages in blasts of 3,000 to 9,000 per day for days at a time from December 5, 2011,

through January 11, 2012.

The T-Mobile Lists contain overlapping cellular telephone numbers with records

produced by Click Media showing visitors to The Smart Credit Solution website.  In all,

3,370 individuals who applied for loans through Click Media's website first received a text

message redirecting them to the Smart Credit Solution website from one of the three

longcodes.  (Davis Decl. ¶ 26.)  This confirms that AC Referral sent the 98,779 text

messages from a single device as part of the Smart Credit Solution text message campaign.

### III.    Plaintiff Kristensen's Experience

Plaintiff Kristensen is just one of the thousands of individuals who was sent a text

message promoting payday loans.  Specifically, on December 6, 2011,  Kristensen's cellular

telephone alerted him that he received a text message from telephone number "330-564-

6316." (Declaration of Flemming Kristensen ("Kristensen Decl.") ¶ 2.)  The text message

appeared as follows:



(*Id.* ¶ 2, Ex. 1.)  Mr. Kristensen never requested to receive this text message from

Defendants, nor did he consent to receive it from any person, including from Defendants.

(*Id.* ¶ 3.)  After receiving this message, Kristensen immediately replied "STOP" to stop these

messages from being sent.  (*Id.* ¶ 2, Ex. 1.)  Although prior express consent is an affirmative

defense to a TCPA claim, Defendants have produced no evidence in this case even

suggesting that Plaintiff, or any of the 98,779 other recipients of this text message spam,

provided prior express consent to receive text messages from any of the Defendants.  (Ochoa

Decl. ¶ 11.)

     As a result of Defendants' standardized violation of the TCPA, Plaintiff brought the

instant action on behalf of himself and a Class of similarly situated individuals.

**THE TCPA**

     Congress enacted the TCPA to protect consumers after finding that telemarketing

calls had become a serious problem, posing a nuisance and invading the privacy of telephone

subscribers nationwide.  *Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740, 744 (2012)

(recognizing that Congress enacted the TCPA to prevent "intrusive nuisance calls" to

consumers' telephones that it determined were "invasive of privacy");[11] *Satterfield v. Simon*

---

[11]    The Supreme Court discusses some of Congress's findings when it enacted the
TCPA, including that "unrestricted marketing can be an intrusive invasion of privacy," that
"many consumers are outraged over the proliferation of intrusive, nuisance [telemarketing]
calls to their homes" and that "automated or prerecorded telephone calls made to private
residences [] were rightly regarded by recipients as an invasion of privacy."  *Mims*, 123 S. Ct.
at 745 (internal quotations and citations omitted).

& Schuster, Inc., 569 F.3d 946, 954 (9th Cir. 2009).  To combat the growing threat to privacy caused by automated telemarketing practices, the TCPA prohibits calls[12] made with equipment termed an automatic telephone dialing system ("ATDS"), which Congress defines as "equipment which *has the capacity* (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1) (emphasis added).

The Federal Communications Commission ("FCC") has clarified that equipment that dials a list of telephone numbers is still an ATDS, because "the basic function of such dialing equipment" is the same—"the capacity to dial numbers without human intervention." *Gragg v. Orange Cab Co., Inc.*, C-12-0576, 2013 WL 1788479, at *2 (W.D. Wash. Apr. 26, 2013) (citing *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 73 Fed. Reg. 6041, 6042 (Feb. 1, 2008)).   The TCPA grants individuals a private right of action for statutory damages of $500 per call, which can be trebled if the violation is found to be willful, as well as injunctive relief.  *See* 47 U.S.C. § 227(b)(3)(A-C).

To escape such liability, a defendant may assert as an affirmative defense that individuals provided "prior express consent" to be contacted.  *Grant v. Capital Mgmt. Services, L.P.,* 449 F. App'x 598, 600, n.1 (9th Cir. 2011).  The defendant, however, bears the burden of establishing consent, *Sengenberger v. Credit Control Servs., Inc.,* No. 09-C-2796, 2010 WL 1791270, at *4 (N.D. Ill. May 5, 2010), that is "clearly and unmistakably stated." *Satterfield*, 569 F.3d at 955.

Despite Congress's measures to stop such unsolicited calls, they continue to be a problem.[13]  As part of the continuing effort to prevent the type of wide-scale TCPA

---

[12]   The term "call" applies with equal force to both voice calls and text message calls. *Satterfield*, 569 F.3d at 954; *Carlson v. Nevada Eye Care Professionals*, 13-cv-364, 2013 WL 2319143, at *3 (D. Nev. May 28, 2013).

[13]   In fact, sixty-eight percent of Americans report having received a text message spam on their cellular telephones at least once and 25% of Americans receive multiple spam text messages weekly.  *See* Joanna Brenner, Pew Internet: Mobile, Pew Internet, (Sep. 18, 2013) *available at* http://pewinternet.org/Commentary/2012/February/Pew-Internet-Mobile.aspx.

violations at issue in this case, the FCC recently ruled that companies may be held vicariously liable for calls made for their benefit. *See In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois, N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C.R. 6574, 6588 (2013) (hereinafter "*Dish Network*."). As the FCC explained:

> [T]he seller is in the best position to monitor and police TCPA compliance by third-party telemarketers. We thus agree that, consistent with the statute's consumer protection goals, potential seller liability will give the seller appropriate incentives to ensure that their telemarketers comply with our rules. By contrast, allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case.

*Id.* The courts to have considered the issue are in accord with the FCC. *See Mey v. Monitronics Int'l, Inc.*, 5:11-CV-90, 2013 WL 4105430, at *5-6 (N.D. W. Va. Aug. 14, 2013) (holding that the FCC's interpretation of the scope of liability under the TCPA to be reasonable and denying defendants' motion for summary judgment); *Savanna Grp., Inc. v. Trynex, Inc.*, 10 C 7995, 2013 WL 4734004, at *5 (N.D. Ill. Sept. 3, 2013) (finding that the FCC *Dish Network* ruling to be the controlling standard of liability under the TCPA and denying in part defendant's motion for summary judgment).

Given companies' widespread violations and the statute's limited damages, courts routinely certify class actions to remedy telemarketing campaigns that systematically violate the TCPA, like the conduct at issue here. *See, e.g., Agne v. Papa John's Int'l, Inc., et al.*, 286 F.R.D. 559, 572 (W.D. Wash. 2012) (certifying class "for resolving the claims of consumers who received text message advertisements [calls] sent by or at the instruction of the Defendants"); *Lee v. Stonebridge Life Ins. Co., et al.*, 289 F.R.D. 292, 294 (N.D. Cal. 2013) (finding that defendant could point to no "question of law or fact that is not suitable for disposition on a class-wide basis" and certifying class of consumers who received text messages sent to generate leads for defendant insurance company). For the reasons described below, the Court should do the same in this case.

**ARGUMENT**

**I.      The Standards for Class Certification Are Satisfied**

Federal Rule of Civil Procedure 23 provides that "[a] class action may be maintained if two conditions are met—the suit must satisfy the criteria set forth in subdivision (a) (*i.e.* numerosity, commonality, typicality, and adequacy of representation), and it must also fit into one of the three categories described in subdivision (b))." *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010) (quoting *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1437 (2010)).  In the instant case, Plaintiff seeks certification under Rule 23(b)(3), which requires that common questions of law or fact predominate and that maintenance of the lawsuit as a class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011).  Although in some cases the court may have to "probe behind the pleadings" to determine whether the plaintiffs have met the requirements of Rule 23, the court only considers the merits of the claims insofar as they overlap with the certification requirements.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011); *see also Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 981 (9th Cir. 2011); *United Steel, Paper & Forestry, Rubber, Mfg. Energy Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC, v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (stating that a court's class certification determination should be based on the analysis of Rule 23's criteria and not on the underlying merits of the claim).

**A.      The Proposed Class Satisfies Rule 23(a)'s Requirements**

Plaintiff Kristensen easily establishes the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a).  As an initial matter, and though not explicitly required by Rule 23, some courts have suggested that the members of the class must also be "clearly ascertainable before a class action may proceed."  *Chavez v. Blue Sky Natural Beverage Co.,* 268 F.R.D. 365, 376 (N.D. Cal. 2010) (listing cases).  This implicit requirement is satisfied as long as "members can be ascertained by reference to objective criteria," but not when "membership is contingent on the prospective member's state of mind."  *Schwartz v. Upper*

*Deck Co.*, 183 F.R.D. 672, 679-80 (S.D. Cal. 1999).  The goal of ascertainability is to ensure that class members generally "receive the best notice practicable and have an opportunity to opt out," not to determine the actual identities of individual class members.  *See* Man. for Complex Litig. (4th ed. 2004) § 21.222.  Thus, plaintiff need not identify each class member in order to establish a class's ascertainability at the certification stage.  *See Knutson v. Schwan's Home Serv., Inc.* No. 3:12-cv-0964, 2013 WL 3746118, at *5 (S.D. Cal. July 15, 2013).

Here, membership in the Class is straightforward and based on the cellular telephone numbers contained in the T-Mobile Lists.  As such, class membership is unquestionably based on objective criteria—a person is a member of the Class if he or she was sent a text message from one of the three specified longcodes.  Consequently, the Class can be readily ascertained through this evidence.  *See Knutson*, 2013 WL 3746118, at *5 (finding the proposed class ascertainable because "[w]hether a customer received an autodialed or artificial/prerecorded call may be determined objectively."); *see also G.M. Sign, Inc. v. Finish Thompson, Inc.*, No. 07-cv-5953, 2009 WL 2581324, at *4 (N.D. Ill. Aug. 20, 2009) (finding TCPA class sufficiently identifiable because "[plaintiff] may use the log and fax numbers to 'work backwards' to locate and identify the exact entities to whom the fax was sent.").

### 1.    The Numerosity Requirement Is Satisfied because the Class contains 98,779 individuals

Next, the Class easily satisfies the numerosity requirement, which requires that the "the class is so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1).  Numerosity is satisfied when the class comprises forty or more members, *Hester v. Vision Airlines, Inc.*, 2:09-cv-00117, 2009 WL 4893185, at *2-3 (D. Nev. Dec. 16, 2009), and classes that number in the thousands "clearly" satisfy the numerosity requirement. *See e.g., Heastie v. Cmty. Bank of Greater Peoria*, 125 F.R.D. 669, 674 (N.D. Ill. 1989); *Lo v. Oxnard European Motors, LLC*, No. 11-cv-1009, 2011 WL 6300050, at *2 (S.D. Cal. Dec. 15, 2011) (finding numerosity requirement satisfied in TCPA text message spam case involving 203 class members); *Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 646-47 (W.D.

Wash. 2007) (finding numerosity requirement satisfied in TCPA junk fax case involving the transmission of 3,000 unsolicited faxes).

In this case, the T-Mobile Lists establish that text messages were transmitted *en masse* to 98,779 individuals.  (Davis Decl. ¶ 25.)  Numerosity is therefore, undoubtedly satisfied.  *See* 1 Newberg on Class Actions § 3:12 (5th ed.) ("Class actions under Rule 23 have involved classes numbering in the hundreds, or thousands . . . . In such cases, the impracticability of bringing all class members before the court has been obvious, and the Rule 23(a)(1) requirement has been easily met.").

## 2.     The Commonality Requirement is Satisfied

Kristensen also satisfies the commonality prerequisite, which requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  This rule is "construed permissively," *Parra v. Bashas', Inc.*, 536 F.3d 975, 978 (9th Cir. 2008), and may be demonstrated when the claims of all class members "depend upon a common contention"—"even a single common question will do."  *Dukes*, 131 S. Ct. at 2545, 2556. The common contention must be of such a nature that it is capable of class-wide resolution, and that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id*. at 2545.  Moreover, the permissive standard of commonality provides that "[w]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists."  *Parra*, 536 F.3d at 978 ("[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.").

In this case, Kristensen has alleged one claim for Defendants' violations of the TCPA.  From this single claim rise multiple common legal and factual issues, including (i) whether the equipment used to send the text messages satisfies the statutory definition of an ATDS, (ii) whether Defendants can be held vicariously liable for the allegedly unauthorized text messages, and (iii) whether Defendants can establish the Class members provided prior express consent.  Further, should Kristensen ultimately succeed in this action, both he and the

proposed Class will be entitled to identical statutory damages.  47 U.S.C. § 227(b)(3).

Because each of these questions will provide answers common to all Class Members, the

commonality requirement is satisfied.  *See Lee*, 289 F.R.D. at 294 (finding that defendants in

a similar TCPA action contesting common questions of liability, use of an ATDS, and prior

express consent were unable to point to any "question of law or fact that [was] not suitable

for disposition on a class-wide basis.").

### i.   Whether an ATDS Was Used to Transmit the Text Messages Is a Common Question

AC Referral Systems used a single software program—Data Doctor—coupled with hardware

and T-Mobile cellular telephones to transmit the text messages.  (Ochoa Decl. Ex. C, ¶ 8.)

Because all text messages at issue were sent from a single source utilizing a single piece of

software and hardware, whether that system is an ATDS is necessarily a question that will be

resolved for all members of the Class at once.  Regardless of the ultimate answer to the

ATDS question, the Court's determination will apply to the Class as a whole.

### ii.   Whether Defendants Are Liable to the Class for Transmission of the Text Messages Is a Common Question

Another common question is whether Defendants are liable to the Class for the

transmission of the allegedly unauthorized text messages.  Because Defendants did not send

the text messages themselves, liability in this case will turn on the nature of their

relationships with each other and if they can be held vicariously liable for the text message

transmissions under federal common law agency principles.  *See Dish Network,* 28 F.C.C.

Rcd. at 6594; *Mims*, 132 S. Ct. at 743 ("Congress enacted detailed, uniform federal

substantive prescriptions and provided for a regulatory regime administered by a federal

agency."); *see also Birchmeier, et al. v. Caribbean Cruise Line, Inc.*, No. 12-cv-04069, 2012

WL 7062748, at *2 (N.D. Ill. Dec. 31, 2012) ("reject[ing] defendants' contention that

liability attaches under the TCPA only to the party that actually placed the call" as "[a]

Congressional enactment that permitted this would be absurd indeed.").

As a result, Defendants' liability, "as a legal or factual matter, does not turn on any

issues specific to individual class members . . . and . . . can be made as to the class as a

1   whole." *Lee*, 289 F.R.D. at 295 ("however strong [defendant's] arguments on the merits may

2   be for avoiding liability, there is no reason those issues cannot be properly decided on a

3   class-wide basis.").  Moreover, the issue at the class certification stage is not whether a

4   plaintiff's claim is meritorious, but rather whether the plaintiff has shown a defendant's

5   involvement in the telemarketing campaign "is a common question of liability that can be

6   resolved 'in one stroke'."  *Agne*, 286 F.R.D. at 568 (citing *Dukes*, 131 S. Ct. at 2545); *see*

7   *also Stonebridge,* 289 F.R.D. at 294-95.[14]

8         In analyzing a Defendants' vicarious liability, courts can consider a "broad range of

9   agency principles," including, but not limited to, 1) whether the Defendants had apparent

10  authority over the marketing campaign, and 2) whether the Defendants ratified the conduct.

11  *Dish Network,* 28 F.C.C. Rcd. at 6584, 6586-87; *see also Jamison v. First Cred. Servs., Inc.*,

12  290 F.R.D. 92, 100 (N.D. Ill. 2013).

13        Under the theory of apparent authority, a seller can be held liable for a sender's

14  actions if "a reasonable consumer would [] assume that the telemarketer was acting as the

15  [service provider's] authorized agent."  *See Dish Network*, 28 F.C.C. Rcd. at 6592-93; *see*

16  *also Savanna Grp., Inc.*, 2013 WL 4734004, at *6 ("apparent authority holds a principal

17  accountable for the results of third-party beliefs about authority to act as an agent when the

18  belief is reasonable and is traceable to a manifestation of the principal."); *Newman v.*

19  *Checkrite Cal., Inc.*, 912 F. Supp. 1354, 1371 (E.D. Cal. 1995); Restatement (Third) of

20  Agency § 2.03 (2006) ("Apparent authority is the power held by an agent or other actor to

21  affect a principal's legal relations with third parties when a third party reasonably believes

22  the actor has authority to act on behalf of the principal and that belief is traceable to the

23  principal's manifestations.").[15]

24  _____

     [14]      Merits-based discovery is underway in this case, but some of the Defendants have not
25  yet produced documents (or completed production) in response to Plaintiff's document
     requests.  (Ochoa Decl. ¶ 12.)
26

     [15]      To determine whether a sender acted with apparent authority, courts may consider,
27  *inter alia*, whether the seller "knew (or reasonably should have known) that the telemarketer
     was violating the TCPA on the seller's behalf and . . . failed to take effective steps within its
28

1    A defendant can also be held vicariously liable for the transmission of text messages

2    if it ratified the sender's conduct.  *Dish Network*, 28 F.C.C. Rcd. 6587.  "Ratification is the

3    affirmance of a prior act done by another, whereby the act is given effect as if done by an

4    agent acting with actual authority."  Restatement (Third) of Agency § 4.01 (2006).  This

5    affirmance results when a defendant "knowingly accepts the benefits of the transaction."  *See*

6    *Jamison*, 290 F.R.D. at 100 (citing Restatement (Third) of Agency § 4.01 at cmt. d).  In fact,

7    ratification likely results in TCPA actions when a defendant did not send the text messages

8    but did accept monetary benefits from the telemarketing campaign.  *See Jamison*, 290 F.R.D.

9    at 100 (finding a defendant unlikely to escape vicarious liability because it accepted a

10   monetary benefit from the calls placed).

11   Here, the Court need not decide now whether Defendants are vicariously liable for the

12   transmission of text messages at issue, nor does it need to focus on the individual Class

13   Member's conduct.  Rather, the Court's determination of Defendants' liability will focus

14   *solely* on the Defendants' conduct regarding the text message campaign as well as their

15   relationships with one another.  For example, under a theory of apparent authority, liability

16   will depend on whether Defendants knew, or should have known, that they were buying and

17   selling leads generated through the mass transmission of text messages and failed to do

18   anything about it.[16]  *See Dish Network*, 28 F.C.C.R. at 6592-93.  Under a ratification theory,

19   liability will depend on whether Defendants were aware that the purchased leads were

20   generated by text message marketing, whether Defendants were aware of the TCPA, and

21   whether Defendants accepted the benefits of such text message campaign.  *See Newman,*

22   *Inc.*, 912 F. Supp. at 1371-72 (denying defendant's summary judgment motion when the

23   power to force the telemarketer to cease the conduct." *In re Dish*, 28 F.C.C.R. at 6592-93;

24   *see also Savanna Grp., Inc.*, 2013 WL 4734004, at *7.

25   [16]    Another consideration is whether it was reasonable for consumers to believe that
      Defendants authorized the text message transmissions, as recipients merely clicked on a URL
26   in the text message and minutes later obtained a loan from an individual lender.

27

28

defendant was aware of the of the party's conduct, aware of the requirements of the underlying law, and accepted monetary benefits as a result of the party's conduct).

As a result, the Court's determination of each Defendant's liability will focus solely on Defendants' knowledge of the text message marketing and their relationships with one another.  This determination, therefore, will apply to all Class Members across the board.  As the Supreme Court explained in *Dukes*, "what matters to class certification . . . is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of litigation." 131 S. Ct. at 2551.  Here, the answer to the question of whether these Defendants are vicariously liable for the text message transmissions will be answered solely by examining the conduct of Defendant's themselves, and is thus "apt to drive the resolution of the case."  *Id*. at 2551.

### iii.    Whether Defendants Can Establish that Class Members Provided Prior Express Consent Is a Common Question

In addition, whether Defendants can prove Class Members provided prior express consent to receive the allegedly unauthorized text messages is a common question.  This is true for two reasons.  First, not a single Defendant has provided any evidence suggesting they obtained consent from any Class Member, even though Plaintiff has requested it through discovery. (Ochoa Decl. ¶ 11.)  As discussed above, defendants in a TCPA action may raise prior express consent as an affirmative defense, and they bear the burden of proving that such consent exists.  *See Sengenberger*, 2010 WL 1791270, at *4. The reason why Defendants have not produced any evidence is simple: They have none.

Even if Defendants were able to establish that some Class Members did provide consent (which they cannot), that evidence would not be enough.  *See Jamison*, 290 F.R.D. at 107-08.  In *Jamison v. First Cred. Servs., Inc.*, the court considered the entire body of authority examining when issues of individual consent preclude class certification in TCPA cases.  290 F.R.D. at 106-07.  The court found that in order to establish that consent is an individualized issue, the defendant must "set[] forth specific evidence showing that a significant percentage of the putative class consented to receiving calls on their cellular

phone." *Id.* If, however, "the defendants fail to set forth this specific evidence and instead only make vague assertions about consent, then individualized issues regarding consent will not predominate over common questions of law or fact so as to prevent class certification." *Id.* at 108; *see also Meyer v. Portfolio Recovery Assocs.*, 707 F.3d 1036, 1042 (9th Cir. 2012) (rejecting arguments that class members "may have" consented because the defendant could not point to a "single instance" where consent may have been obtained); *Silbaugh v. Viking Magazine Servs.,* 278 F.R.D. 389, 393 (N.D. Ohio 2012) ("having produced no evidence that any individual consented to receive text messages in response to plaintiff's presentation of [] testimony, defendant is unable to realistically argue that individual issues of consent outweigh commonality."); *Agne*, 286 F.R.D. at 567 ("Defendants' speculation that customers may have given their express consent to receive text message advertising is not sufficient to defeat class certification."). Accordingly, consent here is undoubtedly a common issue.

Second, consent in this case (if any) is possibly obtainable from one source—360 Data Management LLC—and was never verified by AC Referral Systems. (Ochoa Decl. Ex. C, ¶ 9.) When cellular phone numbers are obtained from a single source and then sent telemarketing calls as part of a standardized course of conduct, courts consistently find the commonality requirement satisfied. *See, e.g., Paldo Sign & Display Co. v. Topsail Sportswear, Inc.,* No. 08-cv-5959, 2010 WL 4931001, at *2 (N.D. Ill. Nov. 29, 2010) (finding consent to be common when the sender purchased the recipients' fax numbers from a single source and never sought to verify consent); *Agne*, 286 F.R.D. at 567 (finding that when alleged consent was obtained in a uniform way, the issue of consent is common "and the validity of one of [d]efendants' consent defenses can therefore be resolved in one stroke."); *Kavu*, 246 F.R.D. at 647 ("whether the recipient's inclusion in [a particular] database constitutes express permission to receive advertisements via facsimile is a common issue.").

That is exactly the case here. In particular, AC Referral Systems obtained all cellular phone numbers from either 360 Data Management or Identity Defender for use in the same Smart Credit Solution text-messaging scheme. (Ochoa Decl. Ex. C, ¶ 9.) Then, without ever

verifying that the Class Members had provided their consent to be called by anyone, much less Defendants, AC Referral systems transmitted, from a single program, the text messages redirecting consumers to The Smart Credit Solution website.  (Ochoa Decl. Ex. C, ¶¶ 6-11; Ex. E - Interrogatory Answer No. 6.)  Thus, the issue of consent is also common in this regard.

Accordingly, no matter how the Court decides to analyze the question, whether Class Members provided prior express consent to receive the text messages can be answered for all of the Class Members in "one stroke."  *See Dukes*, 131 S. Ct. at 2545.

### iv.   Whether the Class Members Suffered the Same Injury and Are Entitled to Damages Is a Common Question

Finally, whether Plaintiff and the Class Members all suffered the same injury entitling them to damages is another common question.  *See, e.g., Dukes,* 131 S. Ct. at 2551.  Here, Plaintiff alleges a single violation of the TCPA, which exists to redress privacy violations caused by the annoying and invasive transmission of unsolicited text messages.  *Mims*, 123 S. Ct. at 745; *see also Smith v. Microsoft Corp.*, No. 11-cv-1958, 2012 WL 2975712, at *6 (S.D. Cal. July 20, 2012) (explaining that the TCPA protects privacy rights and does not depend on economic injury).  The TCPA provides for statutory injunctive relief and monetary damages of $500 per violation, or $1,500 if the court finds a Defendant's conduct willful. 47 U.S.C. § 227(b)(3)(A-C).

Here, each and every Class Member suffered an identical invasion of privacy when they were sent the unsolicited text messages.  As a result, calculating the amount of statutory damages as well as proving whether the Defendants' conduct was willful and damages should be trebled, will be a collective task.  Because the Class Members' entitlement to such statutory relief will rise or fall when the Court analyzes the merits, it too is a common question.  *See, e.g., Targin Sign Sys., Inc. v. Preferred Chiropractic Ctr., Ltd.*, 679 F. Supp. 2d 894, 898-99 (N.D. Ill. 2010) (availability of statutory damages in a TCPA case made an individualized damages inquiry unnecessary and class certification appropriate).

1    In the end, regardless of the ultimate answer to any of these questions, each will

2    resolve all issues on a class-wide basis. To the extent that any individualized issues exist,

3    they will be merely peripheral to the dispositive issues in this case. Accordingly, the

4    commonality requirement is satisfied.

5                    **3.      The Typicality Requirement Is Satisfied**

6    Plaintiff also satisfies Rule 23(a)'s typicality prerequisite.  To satisfy this

7    requirement, the class representative's claims should be typical of those of the putative class

8    members.  Fed. R. Civ. P. 23(a)(3).  Like commonality, the typicality requirement is satisfied

9    if the plaintiff's claims arise from the same practice or course of conduct that gives rise to the

10   claims of other class members.  *Santoro v. Aragon Agency, Inc.*, 252 F.R.D. 675, 681 (D.

11   Nev. 2008).  Typicality, however, does not require that a class representative's claim be

12   identical to all class members' claims; rather it requires that they be "reasonably coextensive

13   with those of absent class members."  *Zeisel v. Diamond Foods, Inc.,* No. 10-cv-01192, 2011

14   WL 2221113, at *7 (N.D. Cal. June 7, 2011) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d

15   1011, 1020 (9th Cir. 1998)); *see also* 8 Newberg on Class Actions, § 24.25 (4d ed. 2013)

16   (typicality "does not mean that the claims of the class representative[s] must be identical or

17   substantially identical to those of the absent class members.")  Notably, "a finding of

18   commonality will ordinarily support a finding of typicality."  *Ashmus v. Calderon*, 935 F.

19   Supp. 1048 (N.D. Cal. 1996); *see General Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 157 n.13

20   (1982) (noting how the requirements of commonality and typicality "merge").

21   In the TCPA context, courts consistently find a plaintiff's claims are typical of the

22   class's when the defendant's practice of sending unsolicited advertisements results in their

23   claims being "based upon the same legal theory, *i.e.* violation of the TCPA."  *CE Design v.*

24   *Beaty Const., Inc.*, No. 07-cv-3340, 2009 WL 192481, at *5 (N.D. Ill. Jan. 26, 2009); *see*

25   *also Kavu, Inc.*, 246 F.R.D. at 648 (finding the named plaintiff's TCPA claim for receiving

26   unsolicited faxes typical of the class); *Malta v. Fed. Home Loan Mortg. Corp.*, No. 10-cv-

27   1290, 2013 WL 444619, at *2 (S.D. Cal. Feb. 5, 2013) (finding a plaintiff's claim typical of

28

the class's when it "ar[o]se from the same factual basis as that of the class: calls made . . .

using auto-dialing equipment" and utilized the same legal theory under the TCPA).

In this case, Plaintiff Kristensen's claims are undoubtedly typical of the Class's. Kristensen was sent a text message promoting "lend5k.com" from "330-564-6316," one of the three longcodes used by AC Referral Systems, along with each of the other members of the proposed Class. (Kristensen Decl. ¶ 2; Ochoa Decl. Ex. C, ¶¶ 10-11.) In particular, Plaintiff was sent a text message by AC Referral Systems that utilized the Data Doctor software. (*See id.*; Ochoa Decl. Ex. C, ¶¶ 8, 10-11.) This is precisely the same set of facts applicable to all the Class Members in this case. As a result of this standardized conduct, these spam text message calls violated the privacy rights of Kristensen and the other Class Members, providing them the same cause of action under which to bring their claims. Thus, Kristensen's claim under the TCPA arises out of the same conduct, resulted in the same injury, and is based on the same legal theory. Accordingly, the typicality requirement of Rule 23 is easily satisfied.

### 4.   The Adequacy of Representation Requirement Is Satisfied

This final Rule 23(a) prerequisite requires that the representative parties have and will continue to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This factor has two components. "First, the named representatives must appear able to prosecute the action vigorously through qualified counsel, and second, the representatives must not have antagonistic or conflicting interests with the unnamed members of the class." *Hester*, 2009 WL 4893185, at *2-3 (quoting *Dukes*, 509 F.3d at 1185.)

In this case, Plaintiff Kristensen has the same interests as the proposed Class Members—all were allegedly sent unsolicited text messages from Defendants. In addition, Plaintiff has actively participated in the litigation, having responded to multiple sets of discovery and otherwise assisted counsel in their prosecution of the case. Additionally, Plaintiff has no interests antagonistic to those of the Class. Therefore, Plaintiff has, and will continue to, adequately represent the Class.

Similarly, Plaintiff's counsel at Edelson LLC satisfy the adequacy requirement. In

particular, Plaintiff's counsel have regularly engaged in major complex litigation and have extensive experience in consumer class actions involving cellular phone technology generally, and TCPA text messaging cases in particular.  (*See* Edelson LLC Firm Resume, attached as Exhibit J to the Declaration of John Ochoa.)  In fact, Edelson has been at the forefront of litigation related to TCPA violations and has obtained several influential opinions concerning the TCPA.  (*See id.*)  For example, it was co-lead counsel in the seminal case of *Satterfield v. Simon & Schuster, Inc.*, in which the court extended the TCPA to text messaging in the Circuit.  569 F.3d at 949.  It also acted as lead counsel in *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999 (N.D. Ill. 2010), where the court upheld the constitutionality of the TCPA, and in *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010), where the court held the TCPA's "prior express consent" requirement was not unconstitutionally vague.  Furthermore, the Edelson firm has been appointed as class counsel in *Lee v. Stonebridge Life Ins. Co.*, a case in which the attorneys recently obtained class certification on nearly identical issues.  289 F.R.D. 292 (N.D. Cal. 2013).

Moreover, the firm's attorneys have been appointed class counsel in some of the largest TCPA class action cases and settlements in history.  *See, e.g., Rojas v. Career Educ. Corp.*, 10-cv-05260 (N.D. Ill. 2012) ($20 million settlement); *In re: Jiffy Lube Int'l, Inc. Text Message Spam Litig.*, 3:11-md-2261 (S.D. Cal. 2011) ($35 million settlement).  "The fact that attorneys have been found adequate in other cases is persuasive evidence that they will be adequate again." *Whitten v. ARS Nat. Servs., Inc.*, 00 C 6080, 2001 WL 1143238, at *4 (N.D. Ill. Sept. 27, 2001) (internal quotations omitted); *see, e.g., Satterfield,* No. 06-cv-2893; *Lozano,* No. 09-cv-06344; *Weinstein, et al. v. The Timberland Co.,* No. 06-cv-0454 (N.D. Ill.); *Kramer*, 10-cv-2722; *Espinal v. Burger King Corp., et al.,* No. 09-20982 (S.D. Fla.).  For all these reasons, Plaintiff's counsel have been—and will continue to be—adequate representatives of the Class.  Accordingly, the adequacy requirement is satisfied.

### B.   The Proposed Class Satisfies Rule 23(b)(3)'s Requirements

In addition to meeting the prerequisites of Rule 23(a), Plaintiff must also meet one of the three requirements of Rule 23(b) for class certification.  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).  Plaintiff seeks to certify the Class under Rule

23(b)(3), which requires that (1) the questions of law and fact common to members of the class predominate over any questions affecting only individuals, and (2) the class action mechanism is superior to the other available methods for the fair and efficient adjudication of the controversy.  Fed. R. Civ. P. 23(b)(3).  Certification under Rule 23(b)(3) is appropriate and encouraged "whenever the actual interests of the parties can be served best by settling their differences in a single action."  *In re Ferrero Litig.*, 278 F.R.D. 552, 559 (S.D. Cal. 2011) (citing *Hanlon,* 150 F.3d at 1022)).  The same is true when class members will likely choose not to pursue an action based on the small amount of redress available.  *See Chamberlan v. Ford Motor Co.*, 223 F.R.D. 524, 527 (N.D. Cal. 2004) (stating that "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.").

### 1.    Common Questions of Law and Fact Predominate

First, Plaintiff satisfies the predominance requirement, which "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010).  When common questions "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication . . . . there is clear justification for handling the dispute on a representative rather than an individual basis."  *Mazza v. Am. Honda Motor Co., Inc*., 666 F.3d 581, 589 (9th Cir. 2012).  The same is true when the plaintiff advances a generalized theory of liability in its certification motion.  *See United Steel,* 593 F.3d at 808-09 (9th Cir. 2010).

The predominance test "begins . . . with the elements of the underlying cause of action."  *Erica P. John Fund, Inc.*, 131 S. Ct. at 2184.  Pursuant to the TCPA, a plaintiff must establish that Defendants (i) "made" text message calls (ii) using an ATDS.  *See* 47 U.S.C. § 227(b)(1)(A)(iii).  Furthermore, in TCPA cases, courts regularly find that common questions of law and fact predominate when the plaintiff's claims focus on the defendant's advertising campaign.  *Kavu, Inc.*, 246 F.R.D. at 647, 650; *Paldo Sign & Display Co.*, 2010 WL

4931001, at *3; *Silbaugh*, 278 F.R.D. at 393-94.

Plaintiff presents a cognizable, unified theory of liability in this Motion: Defendants "made" all the text message calls to further their joint marketing scheme and benefitted from them.[17]   As described in Section I.A.2, *supra*, Plaintiff's and the Class's claims will rise or fall with generalized proof regarding (i) whether Defendants can be held vicariously liable for "making" the calls and (ii) whether AC Referral Systems used an ATDS.   Indeed, these questions predominate over any individualized issues, as they determine the elements of Plaintiff's claims.   The same is true for the common questions of prior express consent and damages, as they also go to the heart of Defendants' liability and the Class Members' entitlement to relief.   Of course, the Court need not rule on a blank slate as to whether these issues predominate over individualized ones, as courts throughout the country have decided similar claims.   *See Silbaugh*, 278 F.R.D. at 393-94 (finding the predominance requirement satisfied when the plaintiff alleges a generalized theory that "a single text message marketing campaign . . . was conducted in the same manner with respect to all class members."); *Malta*, 2013 WL 444619, at *4 (finding the predominance requirement satisfied when "[t]he central inquiry [was] whether Wells Fargo violated the TCPA by making calls to the class members.").

In the end, common issues predominate over individualized questions, and the predominance requirement is satisfied.

### 2.   The Class Action Mechanism Is the Superior Method for Adjudicating this Controversy

Finally, the instant class action is superior to any other method available to fairly and efficiently adjudicate the Class Members' claims.   The superiority requirement's purpose is one of judicial economy and it ensures that a class action is the "most efficient and effective

---

[17]   Indeed, Defendants' violation of the TCPA occurred when the text messages were transmitted to the Class Members. *See Stonebridge*, 289 F.R.D. at 295 ("The TCPA violations, if any, occurred when the messages were *sent*, not when class members phoned in and were pitched products or services of Stonebridge or any other Trifecta client."). Thus, whether anyone visited The Smart Credit Solution website, applied for a loan, or even received a loan from any of the Defendant Lenders is entirely irrelevant for certification.

1  means of resolving the controversy." *Wolin*, 617 F.3d at 1175.  Class certification is

2  warranted "[w]here recovery on an individual basis would be dwarfed by the cost of

3  litigating on an individual basis," *id.*, but where "injury is substantial in the aggregate."

4  *Holloway v. Full Spectrum Lending*, No. 06-cv-5975, 2007 WL 7698843, at *9 (C.D. Cal.

5  June 26, 2007) (citing *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006)).

6      Class certification is warranted in this case because Plaintiff and the proposed Class

7  Members have identical claims for Defendants' transmission of the allegedly unauthorized

8  text messages, entitling them to the same statutory relief.  *See Silbaugh,* 278 F.R.D. at 390.

9  In addition, given the limited amount of statutory damages—$500 per call, or $1,500 if

10  trebled—relative to the cost of litigating the claims, most individuals would be unable (or

11  unlikely) to bring their own lawsuits.[18]  Thus, a class action is the only way to provide all

12  Class Members redress for the invasions of privacy they suffered.

13      Furthermore, it is likely the only way to stop Defendants from continuing their

14  practice of sending unauthorized text messages, as the financial incentive to continue sending

15  text messages *en masse* is greater than their potential liability for the limited individual

16  claims that may be filed.  This is especially true in light of recent statistics concerning spam

17  text messages.  In particular, in the beginning of 2013, text messages promoting short-term,

18  payday loans received the second highest number of complaints of all text message spam.

19  *See* Cloudmark 1Q13: Global eMessaging Threat Report, January-March 2013, *available at*

20  http://www.cloudmark.com/releases/docs/threat_report/Cloudmark_eMessaging_Threat_Rep

21  ort_1Q13.pdf.  Thus, such text message spam is a recognized nuisance that has continued and

22  will continue to occur unless the judiciary intervenes on a class-wide basis.

23      Moreover, even if individual lawsuits were filed, the consequences would be entirely

24  inefficient.  Specifically, parties would have to present the same arguments and provide the

25  same evidence in each case, and courts would have to rule on the same facts and claims time

26  and again.  Class certification, on the other hand, would prevent these duplicative

---

27  [18]    For example, this case has required Plaintiff to litigate for more than a year, serve and
28  respond to several sets of discovery, and engage in discovery motion practice.

1  proceedings by resolving all the claims in one judgment.  In addition, it would save time and

2  resources for both the litigants and the courts while ensuring consistency in rulings.

3       Accordingly, a class action is the superior method for adjudicating this controversy,

4  and the Class should be certified under Rule 23(b)(3).

5  **II.    The Court Should Appoint Plaintiff's Counsel as Class Counsel**

6       When a court certifies a class under Rule 23, it must also appoint class counsel who

7  will "fairly and adequately represent the interests of the class." *See* Fed. R. Civ. P.

8  23(g)(1)(B).  Courts consider four factors in making this determination, including counsel's

9  (1) work in identifying or investigating potential claims; (2) experience in handling class

10  actions or other complex litigation and the types of claims asserted in the case; (3)

11  knowledge of the applicable law; and (4) resources committed to representing the class. Fed.

12  R. Civ. P. 23(g)(1)(A)(i-iv).

13       Plaintiff's counsel are undoubtedly qualified and should be appointed Class Counsel.

14  In particular, they have devoted substantial time, energy, and resources to investigating and

15  developing the theory of Plaintiff's claims, to obtaining discovery to better understand the

16  breadth of the Class and the companies behind the text messages, and to progressing the

17  litigation.  (Ochoa Decl. ¶ 14.)  In addition, and as described in Section I.A.4, *supra,*

18  Plaintiff's counsel also have extensive experiencing prosecuting TCPA claims and have been

19  appointed class counsel in numerous TCPA actions in state and federal courts throughout the

20  country. (*See* Firm Resume of Edelson LLC.)  Furthermore, Plaintiff's counsel have

21  committed and will continue to commit the resources necessary to adequately represent the

22  Class.  (Ochoa Decl. ¶ 15.)  As such, Plaintiff's counsel, Ryan D. Andrews, John C. Ochoa,

23  and David J. Dale of Edelson LLC, should be appointed Class Counsel pursuant to Rule

24  23(g). [19]

25

26  [19]     Upon certification of this Class, Plaintiff will present a notice plan to the Court and

27  provide an explanation about how direct notice that satisfies Due Process can be
    accomplished.

28

# CONCLUSION

For the reasons stated above, Plaintiff Flemming Kristensen respectfully requests that this Court enter an Order granting Plaintiff's Motion for Class Certification in its entirety and for such other and further relief that this Court deems reasonable and just.

Dated:  October 31, 2013

Respectfully submitted,

FLEMMING KRISTENSEN, individually and on behalf of a class of similarly situated individuals

By: /s/  John C. Ochoa
      One of Plaintiff's Attorneys

LAW OFFICES OF JOHN BENEDICT
John Benedict, Esq.
Nevada Bar No. 005581
2190 E. Pebble Road, Suite 260
Las Vegas, Nevada 89123
Telephone: (702) 333-3770
Facsimile: (702) 361-3685
john.benedict.esq@gmail.com

EDELSON LLC
Ryan D. Andrews (admitted *pro hac vice*)
randrews@edelson.com
John C. Ochoa (admitted *pro hac vice*)
jochoa@edelson.com
David D. Dale (admitted *pro hac vice*)
ddale@edelson.com
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Telephone: (312) 589-6370
Facsimile: (312) 589-6378

*Counsel for Plaintiff*
*FLEMMING KRISTENSEN*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 31, 2013, I electronically filed the foregoing *Plaintiff's Motion for Class Certification* with the Clerk of the Court using the CM/ECF system.  Notice of this filing is sent to all counsel of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


Dated:  October 31, 2013          By:     /s/  John C. Ochoa
                                          John C. Ochoa