Steven Martin Aaron, Esq. (MO Bar No. 41653)
*Admitted Pro Hac Vice*
Gregory T. Wolf, Esq. (MO Bar No. 43717)
*Admitted Pro Hac Vice*
DENTONS US LLP
4520 Main Street, 11th Floor
Kansas City, MO 64111-7700
Telephone: (816) 460-2400
Facsimile: (816) 531-7545
steven.aaron@dentons.com
gregory.wolf@dentons.com

Martin L. Welsh, Esq.
Nevada State Bar No. 8720
LAW OFFICE OF HAYES & WELSH
199 North Arroyo Grande Blvd., Suite 200
Henderson, Nevada 89074
Telephone: (702) 434-3444
Facsimile: (702) 434-3729
mwelsh@lvlaw.com

*Attorneys for Defendant*
*CREDIT PAYMENT SERVICES, INC.*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| FLEMMING KRISTENSEN, individually, and on behalf of a class of similarly situated individuals,<br><br>           Plaintiff,<br><br>   v.<br><br>CREDIT PAYMENT SERVICES, INC., a Nevada corporation, f/k/a MYCASHNOW.COM INC., ENOVA INTERNATIONAL, INC., an Illinois corporation, PIONEER FINANCIAL SERVICES, INC., a Missouri corporation, LEADPILE LLC, a Delaware limited liability company, and CLICKMEDIA, LLC d/b/a NET1PROMOTIONS LLC, a Georgia limited liability company,<br><br>           Defendants. | Case No. 2:12-CV-00528-APG (PAL)<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |

81825678\V-1

COME NOW Defendants Credit Payment Services, Inc. f/k/a MyCashNow.com, Inc. ("CPS"), Pioneer Financial Services, Inc. ("Pioneer"), LeadPile LLC ("LeadPile"), and Enova International, Inc. (Enova) (collectively, "Defendants"), by and through their respective counsel and hereby submit this Opposition to Plaintiff's Motion for Class Certification (Dkt. 113).

## I.      Introduction

The Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA") was enacted to protect against "the proliferation of intrusive, nuisance calls." *Mimms v. Arrow Fin. Servs.*, 132 S. Ct. 740, 744 (2012). But as the Wall Street Journal recently reported, "the law has found a lucrative new life as a tool for plaintiffs' attorneys." Ryan Knutson, "Curbs on Cellphone Calls Pay Off for Lawyers," Wall St. J., Nov. 17, 2013, at 1 (Exhibit 1 to the Declaration of Steven Martin Aaron (the "Aaron Decl."), attached hereto as Exhibit A[1]). Indeed, since 2011, "TCPA cases in federal court exploded to over 350." *Id.* at 2. Stated another way, "[f]our-fifths of all federal TCPA cases filed in or transferred to federal court have occurred in the past five years." *Id.* at 1. "Like many statutes . . . remedial laws can themselves be abused and perverted into money-making vehicles for individuals and lawyers. This may be one of those cases." *Saunders v. NCO Fin. Sys., Inc.*, 2012 WL 6644278, at *1 (E.D.N.Y. Dec. 19, 2012) (plaintiff's case failed under the TCPA because he gave "prior express consent" to be contacted by defendant).

Here, Plaintiff brings yet another TCPA case. But Plaintiff does not even sue the entity that sent the complained-of text message. Nor does Plaintiff sue the entity that provided his phone number to the entity that sent the text message. Instead, Plaintiff sues five entities that are one, two, and even three layers removed from the transmission of the message. In addition to being several layers removed, these entities did not control, contribute, or even know of the text message's

---

[1] Hereafter exhibit references to exhibits attached in support of this opposition brief refer to exhibits attached to the Aaron Decl., attached hereto as Exhibit A.

2

existence.  Plaintiff's only tenuous connection to Defendants is the purposefully convoluted and confused allegation that all Defendants worked with several other non-parties in a confined and seamless conspiracy.  Class action discovery, however, has debunked this myth.  What is worse, class action discovery has  also unearthed evidence that all, if not a vast majority, of the recipients of the complained-of text message first consented to receive the text – thus, as a threshold matter, there is no underlying violation of the TCPA.  Regardless, with little more than a single text message and a factually unsupported conspiracy theory, Plaintiff has filed a motion for class certification ("Motion") asking the Court to certify a class of nearly 100,000 unnamed, and likely unknowable, individuals.  Plaintiff's tenuous allegations, however, cannot withstand the rigorous class certification analysis, and his motion should be denied because he has failed to demonstrate that the putative class merits certification based on the strictures of Federal Rule of Civil Procedure 23.

## II.     Factual Background

Plaintiff alleges that non-parties AC Referral Systems LLC ("AC Referral"), Identity Defender, Inc. ("Identity Defender") and 360 Data Management, LLC ("360 Data"), caused unsolicited text messages to be delivered to Plaintiff and the putative class members.  *See* First Amended Complaint, Doc. 35, ¶ 27; Motion for Class Certification, Doc. 113, Exhibit C.  Based on receipt of these text messages, Plaintiff seeks to certify a class of "[a]ll individuals who were sent a text message from telephone numbers '330-564-6316,' 808-989-5389,' and '209-200-0084' from December 5, 2011 through January 11, 2012."  Plaintiff seeks relief on behalf of the putative class pursuant to the Telephone Consumer Protection Act, 47 U.S.C. § 227[2], *et seq.*  *See* Plaintiff's Motion for Class Certification, Doc. 113, ECF p. 4.

---

[2] In relevant part, the TCPA makes it unlawful for a person to (1) send a text, (2) without the prior express consent of the recipient, (3) using an automatic telephone dialing system; (4) to any cellular telephone device. *See* 47 U.S.C. § 227(b)(1).

Plaintiff's allegations are purposefully confusing and convoluted in order to obscure the fact that he cannot connect any of the class allegations to Defendants.  The entirety of Plaintiff's basis for certifying a class against Defendants is that lenders CPS, Pioneer and Enova allegedly each separately contracted with LeadPile to purchase leads from LeadPile's database for CPS's, Pioneer's and Enova's respective online payday loan products.[3]  *See* First Am. Comp., Doc. 35, ¶ 28.  Plaintiff admits that none of Defendants physically transmitted any text message to Plaintiff or the putative class members.  Instead, Plaintiff's entire theory of liability against Defendants is based on his conclusory allegation that Defendants' alleged agents sent unsolicited text messages to putative class members.  *See* First Am. Comp., Doc. 35, ¶ 35; Exhibit 2, Plaintiff's Responses to Defendant CPS First Set of Requests for Admission, Request for Admission 1.  Plaintiff has continued to proceed with this theory of liability even though each Defendant has denied hiring any party to transmit unsolicited text messages on its behalf.  *See* Exhibit 3, Defendant CPS' Responses to Plaintiff Flemming Kristensen's First Interrogatories, dated December 12, 2012, Interrogatory 11; CPS' Answer to First Amended Complaint, Doc. 38, ¶ 27; Pioneer's Answer to First Amended Complaint, Doc. 50, ¶ 27; Enova's Answer to First Amended Complaint, Doc. 69, ¶ 27;  and Exhibit 4, Defendant LeadPile's Objections and Answers to Plaintiff's First Interrogatories, dated August 16, 2013, Response to Interrogatory 6.  Plaintiff's Motion for Class Certification fails to provide any further connection between the alleged harms incurred by the putative class and Defendants' actions.  Instead, Plaintiff has refused to file suit against AC Referral, which sent the text messages in question, or 360 Data, the company that provided AC Referral with the list of phone numbers.

In his Motion for Class Certification, Plaintiff states that "not a single Defendant has

---

[3] As further evidence of Plaintiff's confused allegations, Pioneer does not offer payday loan products or services. Therefore, Pioneer would not engage in a conspiracy to solicit payday loan applications, as a matter of fact.

81825678\V-1

provided any evidence suggesting they obtained consent from any Class Member, even though Plaintiff has requested it through discovery."  Doc. 113, p 16.  If he wanted evidence regarding consent, Plaintiff should have sought additional discovery from the entity that sent the texts and the entity that provided the information of the individuals who received the texts.  Further, if he wanted evidence regarding consent, Plaintiff should have investigated his own online behavior, or, at the very least, preserved that information so that Defendants could investigate.  By his own admission, Plaintiff has failed to perform searches on his laptop or desktop for information regarding consent and has failed to preserve information on his laptop hard drive and in his email accounts.  *See* Deposition of Flemming Kristensen taken January 21, 2014 ("Kristensen Dep."), 83:7-15, 147:4-9, 148:11-18, 167:3-16, 148:19-22, 209:9-11 (Kristensen Dep. transcript attached as Exhibit 5). Despite his own failures, Plaintiff sued Defendants who are wholly removed from any aspect of the complained-of text message, yet is surprised to find no evidence regarding the text message.

Meanwhile, Defendants have conducted class certification discovery, seeking discovery from the entity that sent the text message and the entity that provided the list that contained Plaintiff's phone number.  While AC Referral, 360 Data, and Identity Defender are no longer actively in operation and no longer retain documents or information from the complained-of time period, both Michael Ferry as principal and corporate representative for 360 Data and Identity Defender, and James Gee as principal and corporate representative for AC Referral, testified to one single course of business – *they only sent text messages to those individuals who consented to receive text messages.*  *See* Deposition of AC Referral and James Gee taken January 23, 2014 ("Gee Dep."), 23:19-21 (Gee Dep. Transcript attached as Exhibit 6); Deposition of 360 Data, Identity Defender, and Michael Ferry taken January 10, 2014 ("Ferry Dep."), 63:9-64:20 (Ferry Dep. transcript attached as Exhibit 7).  During the time they were working together, Ferry, Gee  and their respective entities received only a handful of complaints from parties claiming to have

received "unsolicited" text messages. Gee Dep. 24:3-11, 128:11-15 (Exhibit 6); Ferry Dep. 68:10-13 (Exhibit 7). The testimony given by Gee and Ferry is especially significant given that they and their entities are the only parties involved who do not have a monetary interest in the outcome of these proceedings.  Gee and Ferry's testimony is supported by an April 2012 email exchange, which demonstrates that, while they were still in operation, AC Referral and 360 Data could supply opt-in information, including the date and website through which an individual consented to receiving the text messages, within hours of receiving an inquiry.  *See* Gee Dep. 129:15-23 (Exhibit 6), Dep. Exhibit 38, April 2, 2012 email from Dawn Landers at Click Media to Jim Gee (Exhibit 8). Therefore, while the opt-in information may not exist today, years after the fact, this email supports both Ferry and Gee's testimony that this opt-in information existed and could quickly be produced to parties who requested it in a timely manner.  *See* Gee Dep. 128:11-129-23 (Exhibit 6), Dep. Exhibit 38 (Exhibit 8).

Indeed, the only evidence that consent was not received is Plaintiff's self-serving testimony that it is his standard operating procedure to never opt-in to receiving solicitations.  Kristensen Dep. 28:2-17 (Exhibit 5).  Yet, by Plaintiff's own admission, he has received between 15 and 20 "unsolicited" text messages regarding different subject matters. Kristensen Dep. 152:13-15; 49:17-18 (Exhibit 5).  Significantly, Plaintiff testified that he has taken *no* steps to preserve any information in his five email accounts, and has taken *no* steps to preserve any information stored in his desktop computer or laptop computer hard drives and has in fact replaced his laptop hard drive and failed to disable the auto-delete function in his email accounts.  *See* Kristensen Dep. 146:11-148:3, 148:19-22, and 167:3-16 (Exhibit 5).  Indeed, the only preservation step taken was preserving the complained-of text message, along with nine other, unrelated "unsolicited" text messages.  *See* Kristensen Dep. 48:21-49:10 (Exhibit 5).

As demonstrated in the arguments that follow, Plaintiff has failed to meet his burden to certify the putative class and the testimony of Gee and Ferry further dooms Plaintiff's quest to certify the putative class.

## II.   Legal Standard

To prevail on a motion for class certification, Plaintiff must establish all requirements set forth in Federal Rule of Civil Procedure 23(a) (numerosity, commonality, typicality and adequacy).  *Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1432 (2013).  The requirements of Rule 23(a) are not judged by a pleading standard; rather, Plaintiff must *prove* his compliance with each of the specific requirements of Rule 23(a).  *Id.*  Plaintiff must also satisfy, through evidentiary proof, at least one of the provisions of Rule 23(b).  *Id.; Mazza v. Am. Honda Motor Co., Inc.,* 668 F.3d 581, 588 (9th Cir. 2012).  The burden to prove the propriety of class certification rests with Plaintiff.  *Id.* ("The party seeking class certification has the burden of affirmatively demonstrating that the class meets the requirements of Federal Rule of Civil Procedure 23.").  Certification is proper only if after "rigorous analysis," which may entail some overlap with the merits of Plaintiff's claims, the prerequisites of Rule 23 are satisfied.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

## III.   Argument and Analysis

### A.   Ascertainability

"Before a class may be certified, it is axiomatic that such a class must be ascertainable." *Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554, 557 (C.D. Cal. 2012).  A class cannot be certified if a plaintiff has not "establish[ed] an objective way to determine" who is a member of the class."  *Williams v. Oberon Media, Inc.*, 468 F. App'x 768, 770 (9th Cir. 2012) (affirming denial of class certification for lack of ascertainability); *see also Gannon v. Network Tel. Servs., Inc.*, 2013 WL 2450199, *2 (C.D. Cal. June 5, 2013) ("A class is identifiable and ascertainable if it is

7

'administratively feasible for the court to ascertain whether an individual is a member.'").  Where the determination of who is in the class would require the court to "delve into the issues of liability," the class is not ascertainable, and class certification is improper.  *Vandervort*, 287 F.R.D. at 557-58.

Here, the proposed class is not ascertainable because this Court would need to hold mini-trials to determine which individuals, if any, consented to receive the complained-of text messages.  *See, e.g., Gannon v. Network Tel. Servs., Inc.*, 2013 WL 2450199, at *2-3 (C.D. Cal. June 5, 2013) (denying class certification for lack of ascertainability where the facts of the case would require the court to hold "mini-trials" to determine who consented to receiving text messages); *Vandervort*, 287 F.R.D. at 558-59 (C.D. Cal. 2012) (class was unascertainable because the proposed class definition required determining who consented to receive advertisements).

Aside from Plaintiff's uninvestigated belief that he did not consent to receive any text message solicitation, all other evidence establishes that AC Referral only sent text messages to those who opted in.  AC Referral only sent text messages to a list of individuals provided by 360 Data.  *See* Gee Dep. 18:3-21 (Exhibit 6).  360 Data only received this information from list owners and data brokers who had detailed opt-in information including, the date of consent, the name of individual, the individual's IP address, and the website through which consent was obtained.  *See* Ferry Dep. 143:21-25, 63:9-64:20 (Exhibit 7).  Additionally, 360 Data independently checked that information against its own suppression lists (i.e. lists of individuals who opted-out of receiving messages) and any suppression lists provided by Click Media.  *See* Ferry Dep. 67:13-19, 69:13-70:2, and 118:13-23 (Exhibit 7).  And, as an added precaution, AC Referral used each list only once.  Gee Dep. 60:21-61:1, 104:23-105:6 (Exhibit 6).  Therefore, for an individual to receive a second text message, that individual would need to expressly opt-in a second time.  Finally, Plaintiff's uninvestigated claim that he never consented to receive a single solicitation is unreliable, when by his own admission, he has received between 15 and 20 "unsolicited" text messages regarding several different subject matters.

81825678\V-1

Even assuming members of the purported class had a claim under the TCPA (which Defendants maintain they do not), Plaintiff has offered no meaningful method to actually locate any class member.  Instead of providing a plan to identify the class members, Plaintiff instead invokes the general and unsatisfying assertion that the class members "can be readily ascertained." Pl. Mot. for Class Certification, Doc. 113, p. 11.  How?  Plaintiff does not say.  Therefore, not only does each class member's consent (or lack thereof) pose significant administrative hurdles for the Court, but also the class members' very identities make acertainability unfeasible.

### B.  Commonality[4]

Plaintiff wholly fails to demonstrate that there are questions of law or fact common to the class.  *See* Fed. R. Civ. P. 23(a)(2).  A common question of law "does not mean merely that [the class members] have all suffered a violation of the same provision of law." *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011).  Rather, the class claims must depend on a "common contention" that is "capable of class wide resolution - which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*  "What matters to class certification [...] is not the raising of common 'questions' - even in droves - but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (emphasis in original).

Plaintiff claims the common questions in this case are:

> (i) whether the equipment used to send the text messages satisfies the statutory definition of an ATDS; (ii) whether Defendants can be held vicariously liable for the allegedly unauthorized text messages, and (iii) whether Defendants can establish the class members provided prior express consent.

---

[4] Defendants do not challenge Plaintiff's claim that he meets the numerosity requirement.  Demonstrating numerosity alone, however, does not merit class certification.  All requirements of Rule 23(a) and at least one requirement of Rule 23(b) must be met to certify the class.  *Behrend*, 133 S. Ct. at 1432.

Pl. Mot. for Class Certification. Doc. 113,  p. 14.

Defendants dispute that Plaintiff can establish commonality for any of these questions.

> **1.    AC Referral did not use an ATDS to send the complained-of text message, and use of an ATDS alone is insufficient to establish commonality.**

First, Plaintiff's allegation that all putative class members received a text from an automatic telephone dialing system ("ATDS") utilized by AC Referral is insufficient, alone, to certify a class based on commonality.  *See Hicks v. Client Servs., Inc.*, No. 07-61822-civ, 2008 WL 5479111 (S.D. Fla. Dec. 11, 2008) (noting that Plaintiff alleged a common question that an ATDS was utilized, but nonetheless refusing to certify the class because other individual issues predominated).  Further, it does not appear AC Referral used an ATDS.  An ATDS  is a piece of equipment "which has the capacity-- (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  47 U.S.C. § 227(a)(1); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 950-51 (9th Cir. 2009).  Gee has testified that the program used by AC Referral to transmit the text messages did not have the capacity to store or produce phone numbers to be called.  Gee Dep. 130:13-131-24 (Exhibit 6).  Instead, the software required human intervention.  Gee Dep. 131:10-18.  Each time Gee wanted to send a text message he had to copy and paste lists of phone numbers into a box in the program and, after typing the message, hit send.  *See* Gee Dep. 56:9-57:14 (Exhibit 6).

> **2.    Defendants are not vicariously liable for the actions of AC Referral, and there is no commonality as to vicarious liability.**

Defendants likewise challenge Plaintiff's assertion that there are common issues regarding Defendants' vicarious liability to the putative class members for the alleged text messages.  Plaintiff claims that "the Court's determination of Defendants' liability will focus *solely* on the Defendants' conduct regarding the text message campaign […]"  *See* Pl. Mot. for Class Certification, Doc. 113,

ECF p. 17.  Plaintiff's own theories of Defendants' alleged conduct, however, contradict Plaintiff's assertion that the vicarious liability question is a question common to all Defendants.

In order to prove that Defendants are vicariously liable for the transmission of the text messages, Plaintiff would need to demonstrate that each Defendants controlled, or had the right to control, the manner and means of the text message campaign conducted by AC Referral, or alternatively that each Defendant had apparent authority.  *See Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1084-1085 (C.D. Cal. 2012) (to succeed in vicarious liability theory, plaintiff must demonstrate that defendants "controlled or had the right to control [the party who transmitted the text] and, more specifically, the manner and means of the text message campaign they conducted"); and FCC Declaratory Ruling 13-54, 28 F.C.C. Rcd. 6574, 6592 (2013) (indicating that an apparent authority may be supported by evidence that "seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control…the authority to use the seller's trade name, trademark and service mark ….that the seller approved, wrote or reviewed the outside entity's telemarketing scripts… [or that] the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.").[5]

However, according to Plaintiff's own allegations, the conduct of each Defendant varies greatly, destroying commonality as to any direct agency argument.  For example, LeadPile's *alleged* conduct of acquiring leads from consumers interested in receiving loan information varies greatly from CPS, Pioneer, and Enova's *alleged* conduct of simply receiving leads from LeadPile. *See* Pl. Mot. for Class Certification, Doc. 113, p. 4.  These Defendants' actions are also significantly different from the actions of Defendant Click Media who allegedly collected

---

[5] While not directly relevant for this brief, Defendants note that there is a dispute regarding what deference courts owe the FCC's interpretation of agency principles under federal common law, which is arguably beyond its role of simply interpreting the TCPA

11

information from putative class members in order to provide leads to LeadPile's marketplace. *See* Plaintiff's Motion for Class Certification, Doc. 113, ECF p. 4.  Because each  Defendant's conduct varies, the Court will have to conduct individualized inquiries into each Defendant's alleged conduct in order to determine whether each Defendant may be vicariously liable to each putative class member under the TCPA.  Such individual inquiry does not merit class certification.

In addition, to the extent Plaintiff relies upon apparent authority to establish vicarious liability, this analysis is heavily dependent upon the experience of each individual consumer.  For instance, Plaintiff received a text message that only identified a web address – lend5k.com.  (Dep. Ex. 18 (Exhibit 9).  The text message did not identify any Defendant.  *Id.*  Plaintiff did not follow the link for lend5k.com.  Kristensen Dep. 73:7-9 (Exhibit 5).   Plaintiff, therefore, never saw the name of any Defendant at or near the time he received the text message.  Other putative class members (how many, we do not know) followed the link for lend5k.com.  Where they were each redirected and what web site they each saw, we do not know.  *See* Gee Dep. 68:2-14, 124:5-22, 125:3-126:2, 165:14-18 (Exhibit 6).  At least 3,370 putative class members somehow made their way to a Click Media operated website after receiving the text, where they entered their personal consumer information to apply for a loan.  Dep. Ex. 26, Declaration of Shawn C. Davis in Support of Plaintiff's Motion for Class Certification dated October 31, 2013, ¶ 26 (Exhibit 10).  At least 212 members of the putative class were ultimately sent to LeadPile's marketplace where their "lead" was purchased by a lender (although not necessarily CPS, Enova or Pioneer).[6]  Dep. Ex. 27, analysis performed by Shawn Davis  (Exhibit 11).  In the end, each recipient of the complained-of text message had different interactions and saw different information after receiving the text message.  These individual experiences determine whether each member of the class can argue that

---

[6] The discrepancy between the numbers for Click Media and LeadPile also demonstrates that Click Media was not acting as an agent for LeadPile or the lender Defendants.  Rather, Click Media was selling a product—lead data—a fraction of which was bought by LeadPile.

12

one or more of the Defendants gave AC Referral apparent authority to send him or her the complained-of text message.

Further, to the extent Plaintiff could prove an agency relationship existed between AC Referral and Defendants (which Defendants maintain he cannot), to attribute liability to each Defendant, Plaintiff would need to establish that AC Referral was acting in the scope of its authority when it sent the text messages. *See Uesco Industries, Inc. v. Poolman of Wisconsin, Inc.*, 993 N.E.2d 97, 112 (Il. App. 2013) (holding a business could not be held vicariously liable for a violation of the TCPA that occurred when an advertiser exceeded the scope of its authority by sending faxes to recipients outside of the type of recipients that the business had contracted with advertiser to market its services to). However, the contracts in place between AC Referral and Click Media during the applicable time frame specifically required AC Referral to comply with all Federal, state and local regulations, including but not limited to the TCPA. *See* Dep. Exhibits 9, ¶7 (Exhibit 12), and 31, ¶3 (Exhibit 13).[7]

### 3. The putative class members' consent to receive text messages requires individualized inquiry.

Plaintiff's failure to demonstrate commonality on the question of class member's consent to receive the text messages, perhaps more so than individual questions regarding the ATDS or Defendants' liability, is the fatal flaw in Plaintiff's Motion for Class Certification. There is no

---

[7] June 28, 2011 "Smart Credit Solution" Publishing Agreement between Click Media and AC Referral (Dep. Exhibit 9) (Exhibit 12 hereto):

"7. All Affiliates and their Indirect Affiliates are responsible for complying with all federal, state, and local rules and regulations governing all of their marketing activities, including but not limited to the Telephone Consumer Protection Act ("TCPA")and Federal Communications Commission rules implementing the TCPA. Affiliate hereby understands and agrees that the TCPA makes it unlawful to use any automatic telephone dialing system to make any call or send any text message to any telephone number assigned to a cellular telephone service, unless the call is made for emergency purposes or with the prior express consent of the called party…"

December 22, 2011 "Alliance Capital" Publishing Agreement between Click Media and AC Referral (Dep. Exhibit 31) (Exhibit 13 hereto):

"3. SMS Messaging: Publisher and its Affiliates warrant that all traffic sent to Click Media's offer and all messages sent by Publisher and its affiliates, via SMS messaging, are in compliance with all Federal, State and

question that Plaintiff has wholly failed to establish that there is class commonality with regard to whether class members provided express consent to receive the text messages at issue.  Numerous courts have recognized that claims under the TCPA require individual inquiries regarding whether class members consented to the receipt of the text messages at issue.  *See, e.g., Balthazor v. Centr. Credit Servs., Inc.,* No. 10-62435, 2012 WL 6725872 (S.D. Fla. Dec. 27, 2012) (resolution of each class member's TCPA claim would necessarily involve an individual assessment of whether each plaintiff consented to receiving calls); *Hicks,* 2008 WL 5479111 (class certification is improper because "consent is an issue that would have to be determined on an individual basis at trial."); *Conrad v. Gen. Motors Acceptance Corp.,* 283 F.R.D. 326, 330 (N.D. Tex. 2012) (denying motion to certify TCPA class because "the consent issue would necessitate individual inquiries regarding each putative class member's account and the circumstances surrounding each call or contact.").

In reply to Click Media's Opposition to Class Certification, Plaintiff claims "[h]ypothetical arguments about consent are insufficient as a matter of law to defeat class certification in the Ninth Circuit."  *See* Doc. 135 at ECF p. 6 (citing *Meyer v. Portfolio Recovery Associates, LLC,* 707 F.3d 1036, 1043 (9th Cir. 2012)). Plaintiff's reliance on *Meyer* is misplaced.  In *Meyer*, the district court only granted provisional certification of the class pursuant to Rule 23(b)(2) in order to enter a preliminary injunction.  707 F.3d at 1043.  Individualized issues regarding each putative class member's consent were not at issue in *Meyer* because the court was only concerned with classwide injunctive relief - not individual monetary relief based on statutory damages.  *See id.* at 1040.

Plaintiff's putative class is more akin to the proposed class in *Balthazor*.  In that case, the court refused to certify a Rule 23(b)(3) TCPA class because resolution of each class member's TCPA claim would necessarily involve an individual assessment of whether each plaintiff consented to receiving calls.  2012 WL 6725872.  The *Balthazor* court reasoned that while the

local regulations, including but not limited to the Telephone Consumer Protection Act of l991(TCPA)…"

14

defendant ultimately will bear the burden of demonstrating consent at trial, "at the class certification stage, the burden is on the Plaintiff to establish the Rule 23 factors" including whether consent issues will defeat commonality. *Id.* at *4. The court refused to certify the class because the plaintiff could not articulate why consent would not be an individualized issue if the class proceeded to trial. *Id. See also Hicks,* 2008 WL 5479111, *8 (refusing to certify the class even though defendant did not present evidence of consent at the class certification stage because plaintiff has the burden of demonstrating Rule 23(a) standards and plaintiff could not "describe how she intends [to prove that no class members consented to receiving messages] without the trial degenerating into mini-trials on consent of every class member.").

Plaintiff's own evidence demonstrates that will be an individualized inquiry. Plaintiff claims that he never consented to receive such messages. *See* First Am. Comp., Doc. 35, ¶ 39. AC Referral and 360 Data, however, assert that all individuals to whom AC Referral sent text messages consented to receive such messages. *See* Decl. of J. Gee, Doc. 113, Exhibit C, ¶ 9; Ferry Dep. 63:9-64:20 (Exhibit 7). In fact, members of the putative class may have provided consent via hundreds of different websites. *See* Ferry Dep. 21:25 and 144:16-22. 360 Data received the lists of consumer phone numbers it provided to AC Referral from various list owners and data-brokers. *See* Ferry Dep. 65:11-18 (Exhibit 7). The list owners and data brokers in turn received their information from possibly hundreds of various websites the consumers had visited, presumably each with their own privacy policies and opt-in settings. *See* Ferry Dep. 143:21-144:24 (Exhibit 7). Courts in this circuit have held that "class certification is warranted only when the 'unique facts' of a particular case indicate that individual adjudication of the pivotal element of prior express consent is unnecessary." *Connelly v. Hilton Grand Vacations Co., LLC,* ---F.R.D.---, 2013 WL 5835414, *2 (S.D. Cal. 2013) (citing *Gene & Gene LLC v. BioPay LLC,* 541 F.3d 318, 326 (5th Cir. 2008)). In *Connelly,* the court denied class certification because the putative class members' interactions with

the defendant were "sufficiently varied to provide dissimilar opportunities for the expression of consent." *Id.* at *3. The court found that despite putative class members dealing with a common entity, the fact that the class members' cell phone numbers came from a variety of sources rather than under uniform circumstances warranted consent being evaluated on an individual basis. *Id.* at *4. The presence of potentially hundreds of different sources of consent similarly warrants an individualized inquiry in the instant case.

An individualized inquiry is also warranted by possible differences in 360 Data's processes during the relevant time period. Plaintiff seeks to certify a class of individuals who allegedly received test messages from AC Referral between December 5, 2011 and January 11, 2012. *See* Pl. Mot. for Class Certification, Doc. 113, p. 4. Ferry, the principal of 360 Data and individual who processed the information to ensure all parties had consented, suffered a series of strokes in early December 2011. Ferry Dep. 105:8-10 (Exhibit 7). After his strokes Ferry was unable to work for months. *See* Ferry Dep. 107:4-12 (Exhibit 7). AC Referral continued to send messages to lists provided by Ferry pre-stroke for a period, but post-stroke others, including a girlfriend of Ferry, began sending the lists to AC Referral. *See* Gee Dep. 81:1-13 (Exhibit 6). Neither Gee nor Ferry can be certain how those individual(s) processed the lists post-stroke. *See* Gee Dep. 83:9-16 (Exhibit 6); Ferry Dep. 148:13-23 (Exhibit 7). Plaintiff alleges he received a text message from AC Referral on December 6, 2011. Plf. Mtn. for Class Certification, Doc. 113, p. 6. Accordingly, Plaintiff's information, may have been processed for consent in a different manner than those who received text messages from AC Referral later in December 2011, after Ferry's stroke.

Plaintiff's convoluted efforts to tie an allegedly unsolicited text message to Defendants will not only be futile, but it will also involve a highly individualized inquiry. Even if the text message could be tied to any Defendant (which Defendants deny) the analysis necessary to do so would involve an individualized inquiry to determine whether each individual putative class member opted

in to receive text messages and how AC Referral and 360 Data allegedly received his or her phone number.  Plaintiff cannot establish commonality, his request to certify a class should be denied.

### C.      Typicality

To demonstrate typicality, Plaintiff must show that his claims are typical of the class.  Fed. R. Civ. P. 23(a)(3).  The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named Plaintiff and whether other class members were injured by the same course of conduct.  *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 984 (9th Cir. 2011) (internal citation omitted).  "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought."  *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992).

Plaintiff baldly states that his claims are typical of the class because he received a text message from the same phone number as some of the putative class members.  Plaintiff, however, claims that he did not consent to receive such a text message.  *See* First Am. Comp., Doc. 35, at ¶ 39.  Plaintiff's claims, therefore, are not typical of the putative class members who did consent to receive such messages.  Plaintiff's own analysis indicates that information for hundreds of those consumers who responded to the messages appeared in LeadPile's database even before the messages were sent.  *See* Deposition of Shawn Davis taken January 22, 2014 ("Davis Dep.") 56:12-21  (Davis Dep. transcript attached hereto as Exhibit 14) and Dep. Exhibit 27 (Exhibit 11).  Presumably, this information appeared in LeadPile's databases because the consumers had previously expressed interest in receiving information about pay day lending or other products.

Likewise, AC Referral has asserted that, contrary to Plaintiff, the putative class members *did* consent to receive text messages.  *See* Decl. of J. Gee, Doc. 113, Exhibit C, ¶ 9; Gee Dep. 23:19-21 (Exhibit 6).  AC Referral's assertions are supported by Ferry, the principal of 360 Data, the company from whom AC Referral received the list of consumer telephone numbers.  Ferry Dep.

63:9-64:20 (Exhibit 7). 360 Data received the lists of consumer phone numbers from various list owners or data brokers, who in turn received their information from possibly hundreds of websites that the consumers had visited. *See supra* III.B. Ferry having been a part of the industry for 10 years, worked with trusted, proven data-brokers and list managers. *See* Ferry Dep. 146:16-147:2 (Exhibit 7). 360 Data received the information within one to three days of the consumers providing consent, or in some cases even in real time. Ferry Dep. 142:17-24 and 145:19-146:8 (Exhibit 7). Ferry would then distribute the lists of consumer phone numbers to entities like AC Referral within 24 hours. Ferry Dep. 142:6-143:7 (Exhibit 7). While no longer available, Ferry maintains he only sent AC Referral phone numbers for which he had detailed consent information, including the website through which consent was obtained, the date of consent, and the name and IP address of the consenting consumer. *See* Ferry Dep. 63:9-64:20 (Exhibit 7). Before transmitting the consumer phone numbers to others, Ferry would cross check the list of numbers against his own internal suppression list, i.e. a list of individuals who have indicated they would no longer like to receive text messages. Ferry Dep. 67:13-19, 69:13-70:2, and 118:8-14 (Exhibit 7). He would then also cross check the numbers against suppression lists provided by Click Media and others entity for whom AC Referral was attempting to generate leads. *See* Ferry Dep. 67:13-19, 69:13-70:2, and 118:8-14 (Exhibit 7).

Plaintiff's claim that the text message he received violated his privacy is not typical of the claims of the putative class members who either expressly consented to receive such text messages, or did not object to receiving such messages. *See, e.g. Forman v. Data Transfer, Inc.,* 164 F.R.D. 404, 404 (E.D. Pa. 1995) (refusing class certification under the TCPA, in part, because the proposed class failed to satisfy the typicality requirements because each potential plaintiff must prove whether it consented to receive the transmission in question).

81825678\V-1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D.    Adequacy

This Court cannot certify a class action unless it is convinced "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4)[8].

Plaintiff is not an appropriate class representative because he did not pay for his own cellular telephone service.  Plaintiff's phone bill was paid by his employer, who claims it as a business expense for tax purposes.  Kristensen Dep. 42:20-43:1 (Exhibit 6).  Accordingly, his employer is the party with standing to bring the suit.

Plaintiff's approach to the discovery process also demonstrates that he is an inadequate representative of a voluminous putative class.  Defendants have sought, several times, to obtain copies of Plaintiff's December 2011 phone bill, but have been informed by Plaintiff's counsel that such bills are unavailable.[9]  However, at his deposition, Plaintiff revealed he does possess "the summaries of the phone bills" "going back to October of 2010."  Kristensen Dep. at 142:6-13 (Exhibit 6).  Upon first learning of the summary telephone bills' existence, Pioneer requested their production during the deposition.  Kristensen Dep. at 143:21-144:6 (Exhibit 6).  Plaintiff agreed to at least produce the summary telephone bill for December 2011.  Kristensen Dep. at 144:3-6 (Exhibit 6).  Ten days later (and three and one-half months after the first request), Plaintiff has produced *no* telephone bills and *no* telephone bill summaries.

---

[8] Rule 23(a)(4) applies to both the adequacy of class counsel and the adequacy of the class representative.  Defendants raise no objection to the appointment of the Edelson firm as class counsel, should the Court elect to certify the class.

[9] On October 17, 2013, Pioneer requested Plaintiff's telephone bills.  (Exhibit 15, Plaintiff Flemming Kristensen's Responses to Defendant Pioneer Services' First Set of Requests for Production, dated November 19, 2013, Request No. 12).  On November 19, 2013, Plaintiff objected because, among other reasons, "the documents sought are not within his possession," but he would "subpoena his wireless carrier."  (Exhibit 15, Response to Request No. 12).  Plaintiff's counsel then, during the course of one meet-and-confer teleconference and several exchanged letters, refused to produce more than a single month of telephone bills for only one telephone, relying solely on his unilateral claim of relevance.  Moreover, on January 15, 2014, Plaintiff's counsel blamed AT&T for the delay in producing these telephone bills stating:  "In my experience, cell phone carriers usually take several months to process subpoena requests and produce documents.  Of course, we will forward you any records as soon as we receive them."  (Exhibit 16, at 2).

Access to this information and to Plaintiff's devices is crucial to determining whether Plaintiff consented to receiving the text message.  Plaintiff estimates 30% of all goods he purchased in 2011 were purchased online.  Kristensen Dep. 27:4-9 (Exhibit 6).  In nearly every instance in which a consumer makes a purchase online, the consumer is asked whether they consent to receiving communications from the seller and/or its affiliates, and the consumer is instructed to check, or uncheck, the appropriate box according to their wishes.  Plaintiff himself acknowledges that he may have mistakenly clicked, or forgotten to unclick, a box during the checkout process and thus opted-in to receiving text messages.  *See* Kristensen Dep. 28:4-9 (Exhibit 6).  This is supported by the fact Plaintiff has received between 15 and 20 other "unsolicited" text messages that are not part of the instant suit.  *See* Kristensen Dep. 49:8-14 (Exhibit 6).

Plaintiff's counsel has a computer forensics investigator on staff who has the capability to perform forensic searches on laptop and desktop computers and determine, for example, what websites Plaintiff visited in the weeks and months before he received the text as issue.  *See* Davis Dep. 14:9 and 24:13-21 (Exhibit 14).  Despite having such a resource at their disposal, Plaintiff and his counsel have failed to perform any such searches for pertinent information on his laptop or desktop computers, or in his email accounts.  Kristensen Dep. 83:7-15 and 148:11-18 (Exhibit 6).  Instead, in responding to discovery requests served by Defendants, Plaintiff simply relied on his own belief that he had never opted-in to receiving unsolicited communications.  *See* Kristensen Dep. 83:7-15 (Exhibit 6).  As noted above, Plaintiff acknowledged that he may have not opted-out of receiving messages.  Accordingly, information on his computer regarding websites he visited in the months and weeks before receiving the message could be crucial in determining whether Plaintiff consented to receiving the text message at issue.  In addition, Pioneer has repeatedly asked Plaintiff to confirm what, if any, of Plaintiff's electronically-stored information ("ESI") was preserved, including any computers or email accounts.  In response, Plaintiff has stated that only the

iPhone that allegedly received the complained of text message was preserved.  Plaintiff suggested that no other ESI has been preserved because Plaintiff had no "reason to believe" other ESI "is potentially relevant to this lawsuit."  (December 17, 2013 letter from John C. Ochoa to James M. Humphrey, (Exhibit 17), at 3).  Plaintiff, however, must have a "reason to believe" other ESI, including Plaintiff's email accounts and computer hard drives, are "potentially relevant to this lawsuit," because Plaintiff's own document production, specifically P53 (November 10, 2012 email from Verify@DonotCall.gov to Flemming Kristensen, P53, Exhibit 18), includes a purported email exchange between Plaintiff and the National Do Not Call Registry.  Moreover, the email was printed on November 10, 2012, thus Plaintiff has known about this for at least one year.  To Defendants' knowledge, Plaintiff has still not preserved his other ESI, including email accounts and computers.  Also, to Defendants' knowledge, Plaintiff has not collected, reviewed, or processed any of his ESI – despite the fact that Pioneer has made many such requests, including proposing potential search terms over one month ago.  (December 20, 2013 letter from Robert V. Spake to John C. Ochoa (Exhibit 19).

Significantly, in addition to failing to produce such evidence  Plaintiff has further thwarted the discovery process by failing to take steps to preserve information stored on his  computer or in his email accounts.  Plaintiff  used his desktop and possibly his laptop to make personal purchases online in December 2011.  Kristensen Dep. 71:4-9 (Exhibit 6).  However, Plaintiff replaced his laptop hard drive in early 2012, perhaps after engaging Plaintiff's counsel to represent him, and discarded the old hard drive.  *See* Kristensen Dep. 167:3-16 (Exhibit 6), and the Client Retainer Agreement between Edelson McGuire, LLC and Flemming Kristensen (P51-P52) (Exhibit 20).  While he transferred most of the files to his new hard drive, Plaintiff acknowledges that he did not transfer cookies, cache files or temporary internet files over to the new hard drive.  *See* Kristensen Dep. 208:24-209:11 (Exhibit 6).  Similarly, Plaintiff has failed to disable the auto-delete function

on his email accounts or otherwise preserve information stored in the accounts. *See* Kristensen Dep. 147:4-9 and 148:19-22 (Exhibit 6). Plaintiff's failure to cooperate with the discovery process and preserve relevant evidence indicates that he is an improper class representative for the putative class. This is further demonstrated by Plaintiff's failure to include Gee, AC Referral, Ferry, Identity Defender or 360 Data as Defendants in this lawsuit.

Plaintiff's Motion for Class Certification should be denied on these bases. Furthermore, the fact that Plaintiff's allegation that he did not consent to receive any text message is vastly different from the evidence presented that putative class members did consent to receive text messages further demonstrates that Plaintiff is inadequate to represent the interests of any class that might be certified.

### D. Plaintiff fails to meet the requirements of Federal Rule of Civil Procedure 23(b).

Even if the Court were to conclude that Plaintiff has satisfied all requirements of Rule 23(a) (which is disputed), Plaintiff's Motion for Class Certification should be denied because Plaintiff cannot meet any requirement for certification under Federal Rule of Civil Procedure 23(b). Plaintiff seeks to certify his class under Rule 23(b)(3) which requires (1) that the questions of law and fact common to members of the class predominate over any questions affecting only individuals, and (2) that the class action mechanism is superior to the other available methods for the fair and efficient adjudication of the controversy. *See* Pl. Mot. for Class Certification, Doc. 113, p. 24.

Rule 23(b)(3) sets forth four factors relevant to determining superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).  Consideration of these factors must "focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis."  *Zinser v. Accurix Research Int., Inc.,* 253 F.3d 1180,1190 (9th Cir. 2001).

The analysis underlying a motion for certification under Rule 23(b)(3) is rigorous.  Courts are not to grant Rule 23(b)(3) requests for certification carte blanche, rather, Rule 23(b)(3) requires the Court to take a "close look" at whether common questions predominate over individual inquiries such that a class action should be certified.  *Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 615 (1997).

> ### 1.   Plaintiff cannot demonstrate that questions of fact or law common to class members predominate over questions affecting individual inquiries.

To demonstrate predominance, Plaintiff must show that "questions of law or fact common to the class members predominate over any question affecting only individual members."  Fed. R. Civ. P. 23(b)(3)(1).   "Although TCPA cases are not 'per se unsuitable for class resolution,' class certification is warranted only when the 'unique facts' of a particular case indicate that individual adjudication of the pivotal element of prior express consent is unnecessary."  *Connelly v. Hilton Grand Vacations Co.*, 294 F.R.D. 574, *2 (S.D. Cal. 2013) (quoting *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008)).  Thus, predominance in TCPA cases is intrinsically linked to consent issues and commonality.  The question of predominance in TCPA cases "primarily turns on whether a class-based trial on the merits could actually be administered."  *Id.*

In the class Plaintiff seeks to certify, the predominant question is that of consent, which is inherently individualized.  As demonstrated above at Section III.B., the individual issue of whether each putative class member consented to receipt of each text message will predominate over any

common issues that may exist.  Plaintiff's Motion for Class Certification should be denied on this basis.

2.     **Plaintiff cannot demonstrate that the class action mechanism is superior to other available methods for adjudicating the TCPA claims asserted by Plaintiff.**

To certify a class, this Court must be convinced that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3)(2).  Small claims court, not federal district court, is the superior method for adjudicating the TCPA claims asserted by Plaintiff.  The TCPA permits statutory damages of $500 per incident for negligent conduct and up to $1,500 per incident for willful behavior.  *See* 47 U.S.C. § 227(b)(3). This is more than sufficient incentive for TCPA plaintiffs to individually bring their suits in small claims court.  TCPA's legislative history indicates that Congress expressly intended TCPA actions to be brought in state small claims court - not in federal district courts as class actions.

> The [...] private right-of-action provision [...] will make it easier for consumers to recover damages from receiving these computerized calls. The provision would allow consumers to bring an action in State court against any entity that violates the bill [...] It is my hope that states will make it as easy as possible for consumers to bring such actions, preferably in small claims court.

137 Cong. Rec. S16205-06 (Nov. 7, 1991).  *See also Kim v. Sussman*, No.  03 CH 07663 2004 WL 3135348 (Ill. Cir. Ct. 2004) (denying class certification because "[t]o engraft on this statutory scheme the possibility of private class actions, with potential recoveries in the millions of dollars, strikes the Court as unfair given the nature of the harm Congress attempted to redress in the TCPA.").  Further, "by imposing a statutory award of $500, a sum considerably in excess of any real or sustained damages, Congress has presented an aggrieved party with an incentive to act in his or her own interest without the necessity of class action relief." *Local Baking Prods., Inc. v. Kosher Bagel Munch, Inc.*, 421 N.J. Super. 268, 23 A.3d 469, 476 (N.J. Super Ct. App. Div. 2011).  In

24

81825678\V-1

many states, consumers do not need an attorney to file a small claims complaint, such actions appear quickly before a judge, and the costs of litigation are significantly less than the potential recovery.  *See, e.g. id* at 476-77 (examining New Jersey's procedures and finding that small claims action could be brought and significantly less than $500).   This Court should deny Plaintiff's Motion for Class Certification, as a class action is not the superior method for adjudicating Plaintiff's claims.

**IV.     Conclusion**

For the foregoing reasons, Defendants respectfully request the Court deny Plaintiff's Motion for Class Certification and grant Defendants other just relief.


DATED:  January 31, 2014                          DENTONS US LLP

                                                  _____*/s/ Gregory T. Wolf*_____
                                                  Steven Aaron, Esq. (*pro hac* vice) MO Bar # 41653
                                                  Gregory T. Wolf, Esq. (*pro hac vice*) MO Bar #43717
                                                  4520 Main Street, 11th Floor
                                                  Kansas City, MO 64111-7100

                                                  LAW OFFICE OF HAYES & WELSH

                                                  _____*/s/ Martin L. Welsh*_____
                                                  Martin L. Welsh, Esq.
                                                  Nevada State Bar No. 8720
                                                  199 North Arroyo Grande Blvd., Suite 200
                                                  Henderson, Nevada 89074
                                                  ***Attorneys for Defendant***
                                                  ***Credit Payment Services, Inc.***

                                                  POLSINELLI PC

                                                  _____*/s/ Russell S. Jones, Jr.*_____
                                                  Russell S. Jones, Jr. (*Pro hac vice*)
                                                  James M. Humphrey, IV (*Pro hac vice*)
                                                  900 W. 48th Place, Suite 900
                                                  Kansas City, MO 64112

1

SNELL & WILMER, L.L.P.

2

_____/s/ Chad R. Fears_____
Chad R. Fears, Esq., Nevada Bar No. 6970
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
**Attorneys for Defendant Pioneer Services**

3

4

5

HUSCH BLACKWELL LLP

6

_____/s/ Ryan W. Mitchem_____
Ryan W. Mitchem, TN #022196
Michael K. Alston, TN #013697
736 Georgia Avenue, Suite 300
Chattanooga, Tennessee 37402

7

8

9

HUTCHISON & STEFFEN
Patricia Lee, Nevada Bar No. 8287
Joseph R. Ganley, Nevada Bar No. 5643
Telia U. Williams, Nevada Bar No. 9359
Peccole Professional Park
10080 West Alta Drive, Suite 200
Las Vegas, Nevada 89145

10

11

12

13

14

**Attorneys for Defendant LeadPile LLC**

15

MCGUIRE WOODS LLP

16

By: _/s/ Brian O'Meara_____
    Brian O'Meara, IL #6275625
    77 West Wacker Drive, Suite 4100
    Chicago, IL 60601-1818
    Telephone:  312-849-8100
    Facsimile:  312-920-6132
    bomeara@mcguirewoods.com

17

18

19

20

21

LEWIS ROCA ROTHGERBER LLP

22

By: _/s/ Dan R. Waite_____
    Dan R. Waite, NV #4078
    3993 Howard Hughes Parkway, Ste. 600
    Las Vegas, NV 89169
    Telephone:  702-949-8200
    Facsimile:   702-949-8398
    dwaite@lrlaw.com

23

24

25

26

**Attorneys for Defendant Enova International, Inc.**

27

28

81825678\V-1

1

2

**CERTIFICATE OF SERVICE**

3        Pursuant to FRCP 5(b), I certify that on January 31, 2014, I caused the above and

4    foregoing document entitled DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR

5    CLASS CERTIFICATION to be served on all counsel of record through the Court's CM/ECF

6    system.

7

8

9

_/s/ Steven Martin Aaron_____

An attorney for Credit Payment Services, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28