John Benedict, Esq. (Nevada Bar No. 005581)
john.benedict.esq@gmail.com
LAW OFFICES OF JOHN BENEDICT
2190 E. Pebble Road, Suite 260
Las Vegas, Nevada 89123
Tel: 702.333.3770
Fax: 702.361.3685

Ryan D. Andrews (Admitted *pro hac vice*)
randrews@edelson.com
John C. Ochoa (Admitted *pro hac vice*)
jochoa@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiff Flemming Kristensen*

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| FLEMMING KRISTENSEN, individually and on behalf of a class of similarly situated individuals, | Case No. 2:12-CV-00528-APG-PAL |
| | CLASS ACTION |
| Plaintiff, | **PLAINTIFF'S REPLY TO DEFENDANT'S COMBINED OPPOSITION TO CLASS CERTIFICATION** |
| v. | |
| | |
| CREDIT PAYMENT SERVICES INC., a Nevada corporation, f/k/a MYCASHNOW.COM INC., ENOVA INTERNATIONAL, INC., an Illinois corporation, PIONEER FINANCIAL SERVICES, INC., a Missouri corporation, LEADPILE LLC, a Delaware limited liability company, and CLICKMEDIA LLC d/b/a NET1PROMOTIONS LLC, a Georgia limited liability company, | Hon. Andrew P. Gordon |
| | Magistrate: Hon. Peggy A. Leen |
| Defendants. | |

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................2

I.     Defendants' Liability Will Be Determined on Common Proof..............................2

        A.     Defendants Fail to Challenge Plaintiff's Unified Theory of this Case .............3

        B.     Defendants' Merits Arguments Do Not Affect Class Certification
               Issues because the Issue of Their Vicarious Liability Is Susceptible
               to Common Proof .....................................................................................4

        C.     Defendants Concede that the Text Messages were Transmitted
               Using a Single Piece of Hardware and Software, Making the Issue
               of Whether this Equipment Constitutes an ATDS Susceptible to
               Common Proof .........................................................................................6

II.    Defendants Present no Evidence that any Class Member provided Prior
     Express Consent to any Defendant, and Plaintiff Presents Common
     Contentions Well-Suited for Class-Wide Resolution .........................................7

        A.     Defendants Fail to Show that there Are any Individual Issues About
               Consent that Affect the Class......................................................................7

        B.     Plaintiff Presents a Common Theory of Consent that Predominates ............11

III.   Plaintiff Kristensen Is an Ideal Class Representative .......................................13

        A.     Kristensen Has Standing to Bring this Lawsuit.........................................13

        B.     Defendants' Imagined Discovery Disputes Are without Merit, and
               Provide no Grounds to Find Plaintiff an Inadequate Representative
               of the Class.............................................................................................14

IV.   Plaintiff's Claims Are Typical of the Class's................................................17

V.    This Class Action Is Superior to 98,799 Individual Suits for $500.................18

VI.   The Class Is Ascertainable because it Can Be Determined by Objective
     Criteria..........................................................................................................19

CONCLUSION ...................................................................................................................20

**INTRODUCTION**

Defendants' Opposition does not challenge the major premises of Plaintiff's Motion, and their failure to do so confirms that class certification is warranted.  Defendants do not challenge that:

- A single piece of hardware and software transmitted the nearly 100,000 text messages to Plaintiff and all of the Class Members;

- All of these text messages were sent to Plaintiff and the Class Members as part of the "Smart Credit Solution" payday loan scheme to generate borrowers, or "leads," for the Lender Defendants; and

- Clicking on the "lend5k.com" hyperlink contained in the text messages would lead consumers "up the chain" from Defendant Click Media, to LeadPile, and ultimately to the Lender Defendants, who contracted for and purchased thousands of such "leads."

Instead challenging these facts, Defendants distort the testimony they obtained through their minimal discovery efforts in order to raise a jumbled litany of summary judgment arguments, inchoate discovery squabbles, and attacks on the plaintiffs' bar generally.  Defendants argue, *inter alia*, that they can't be liable under the TCPA, that Plaintiff's case is a "conspiracy theory," that they will prevail on their "consent" affirmative defense, and that the equipment used to transmit the nearly 100,000 messages was not an automatic telephone dialing system.

All of these arguments are not only incorrect, but also irrelevant to Plaintiff's class certification motion.  The evidence adduced shows that this case is exceptionally suited for class-wide resolution.  All of the text messages were sent to Plaintiff and the Class from a single piece of equipment for a single payday loan scheme.  Defendants' liability for this text message scheme does not depend on the conduct of any Class Member, but rather will all be based on Defendants' own actions, Defendants' own knowledge of text message marketing, and Defendants' purchase of the leads generated through the Smart Credit Solution scheme—which will be illuminated through merits discovery, which just recently began.

Finally, no Defendant has come forth with specific evidence that any Class Member provided prior express consent, and instead argues that the Class "may have" "possibly" consented to receiving these messages.  (Defendants' Opposition to Class Certification ("Defs.' Opp."), dkt. 148, at 15.)  Such speculation is insufficient as a matter of law in the Ninth Circuit to defeat class certification based on an affirmative defense of consent.  Regardless, the limited evidence

Defendants do have shows that consumer phone numbers originated from a single source and were collected in a uniform way.  This Court should certify the Class so that their claims can be resolved on the merits.

<strong>ARGUMENT</strong>

**I.     Defendants' Liability Will Be Determined on Common Proof.**

Defendants' Opposition fails to address any issues bearing on class certification and demonstrates a complete misunderstanding of the requirements of Federal Rule of Civil Procedure 23.  Instead of inquiring as to whether Plaintiff's TCPA claim can be resolved on a class-wide basis, Defendants present a smattering of ultimate merits-based arguments consisting of the following; "Plaintiff does not connect Defendants to the alleged conduct" (Defs.' Opp. at 4); "Plaintiff sued the wrong parties" (*id.*); "an automatic telephone dialing system ('ATDS') was not used in this case" (*id.* at 10); and "Defendants cannot be liable in this case" (*id.* at 10-11).  These arguments are irrelevant to the issue of class certification.

At the class certification stage, Plaintiff only needs to present evidence that common questions exist and that they can be answered for the Class as a whole.  Commonality may be demonstrated when the claims of all Class Members "depend upon a common contention" and "even a single common question will do."  *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2556 (2011); *see also Parra v. Bashas', Inc.*, 536 F.3d 975, 978 (9th Cir. 2008) ("[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class").  The common contention must be of such a nature that it is capable of class-wide resolution, and that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 131 S. Ct. at 2545.

Violations of the TCPA consists of the 'use of an automatic telephone dialing system . . . to call any . . . cellular telephone[.]"  *Mims v. Arrow Financial Services, Inc.*, 132 S. Ct. 740, 745 (2012).  A violation of the TCPA is complete upon the transmission of the offending text messages.  *Lee v. Stonebridge Life Ins. Co.*, 289 F.R.D. 292, 295 (N.D. Cal. 2013).  Therefore, Defendants' liability will be established if they (1) made a call (or can be held vicariously liable for making a

call) (2) using an ATDS.  Because there is no factual variation among Defendants' actions towards

any Class Member, Defendants' liability can, and should, be determined on a class-wide basis.

### A.    Defendants Fail to Challenge Plaintiff's Unified Theory of this Case.

Plaintiff's theory of this case is straightforward—that the Lender Defendants (CPS, Pioneer,

and Enova) all purchased "dirty" leads from Defendant LeadPile that were generated through illegal

text message marketing.  Pursuant to rulemaking of the Federal Communications Commission

("FCC"), persons and entities can be held liable under the TCPA using "a broad range of agency

principles."  *In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of*

*Am., & the States of California, Illinois, N. Carolina, & Ohio for Declaratory Ruling Concerning the*

*Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C.R. 6574, 6584 (2013).  These principles are not

limited to "classical agency," but include the full range federal common law of agency principles,

which consist of, *inter alia*, apparent authority and ratification.  *Savanna Grp., Inc. v. Trynex, Inc.*,

No. 10-cv-7995, 2013 WL 4734004, at *5 (N.D. Ill. Sept. 3, 2013).

Defendants do not challenge the substantial evidence Plaintiff presented in his Class

Certification Motion.  Specifically, Plaintiff presented evidence showing how:

- All of the text messages transmitted to the Class were sent using a single piece of hardware and software (dkt. 133-1, Ex. C, ¶¶ 3-4);

- All of the text messages contained the "lend5k.com" URL, and redirected to the "Smart Credit Solution" website, hosted by Defendant Click Media (dkt. 133-1, Ex. C, ¶¶ 10-11; Ex. E at 11-12);[1]

- Defendant LeadPile purchased thousands of leads from Click Media via the "Smart Credit Solution" website (dkt. 113-1 ¶ 7);

- LeadPile sold thousands of leads generated from the "Smart Credit Solution" website to the Lender Defendants (dkt. 113-1 ¶ 7); and

- LeadPile touted the use of text message marketing on its online blog as an effective way to generate leads (dkt. 113-1 ¶ 2, Ex. A.)

---

[1]    Additional testimony from James Gee confirms this.  Gee Testified that the Click Media payday loan offer (which he referred to by the "Alpine Select" sponsorship discussed in Plaintiff's Opening Brief at dkt. 113, pg. 3) was the only Click Media offer that he generated leads for. (Deposition testimony of James Gee ("Gee Dep."), attached to the Declaration of John C. Ochoa ("Ochoa Decl.") as Exhibit A, at 170:4-17.)  He also testified that generating these payday loan leads was the "majority" of what he was doing starting in 2010, and continuing into the class period.  (Gee Dep. 45:14 – 46:12.)

1    Instead of trying to rebut the evidence, Defendants pretend that it doesn't exist, citing only to the

2    pleadings when discussing the facts of this case and stating that Plaintiff's allegations are

3    "purposefully confusing and convoluted." (Defs. Opp. at 4.)  The reason Defendants cannot

4    challenge the evidence directly is simple—it's all true.  The Lender Defendants tacitly admit that

5    they all bought thousands of "dirty" leads generated through the "Smart Credit Solution" payday

6    loan scheme.  They also tacitly admit that all of the text messages sent to the Class Members were

7    transmitted using a single piece of hardware and software in furtherance of this singular scheme.

8
       **B.    Defendants' Merits Arguments Do Not Affect Class Certification Issues because**
9           **the Issue of Their Vicarious Liability Is Susceptible to Common Proof.**

10   The fundamental problem with Defendants' arguments is that they are based on an incorrect

11   legal position.  At this stage, Plaintiff only needs to present evidence that a common question exists

12   that can be answered for the Class as a whole.  *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957

13   (9th Cir. 2013); *see also Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting

14   *Dukes*, 131 S. Ct. at 2551) (holding that "commonality requires that the class members' claims

15   'depend upon a common contention' such that 'determination of its truth or falsity will resolve an

16   issue that is central to the validity of each claim in one stroke.'").  Defendants, however, believe that

17   inquiry into each Defendants' liability destroys commonality because each Defendant's role in the

18   text messaging scheme was different.  (Defs. Opp. at 11-12.)  As the Court in *Dukes* made clear,

19   what matters at the class certification stage is that theories of liability are presented that can be

20   resolved in "one stroke" as to the Class.  *Dukes*, 131 S. Ct. at 2551.  This can be done here, as

21   inquiry into individual Class Members' experiences is not necessary to determine Defendants'

22   liability.

23   Vicarious liability under the TCPA will be determined by examining (1) the nature of

24   Defendants' relationships with each other; (2) their knowledge of the text message transmissions to

25   generate leads; and (3) their acceptance of the benefits flowing from those transmissions.  (*See* Pl's

26   Mot. for Class Cert., dkt. 113, at 13-16.)  Defendants' interactions with individual Class Members do

27   not factor into this analysis, and, as such, each Defendants' liability is a question capable of class-

28   wide resolution.  Other Courts examining TCPA claims are in accord.  *See Agne v. Papa John's*

*Intern., Inc.*, 286 F.R.D. 559, 568 (W.D. Wash. 2012) (finding that defendant's vicarious liability under the TCPA is a merits question to be resolved later, and that it can be determined based on common proof); *Lee*, 289 F.R.D. at 294 (holding that "the availability of [vicarious liability as] a defense, as a legal or factual matter, does not turn on any issues specific to individual class members," and "to the extent the facts and the law might not support imposing liability for the conduct of [defendants], that determination can be made as to the class as a whole.").

For example, to determine whether Defendants can be vicariously liable under a theory of apparent authority, the court examines "third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal." *Savanna*, 2013 WL 4734004 at *6. Here, each of the Class Members' beliefs spring from the identical text message each one of the received promoting payday loans and encouraging them to visit the same website—"lend5k.com."[2] Because these facts are common to all Class Members, no individual inquiry is necessary. *See, e.g., Guardian Angel Credit Union v. Metbank*, No. 08-cv-261, 2010 WL 1794713, at *10 (D.N.H. May 5, 2010) (finding defendants' vicarious liability under an apparent authority theory a common question because the court had "no reason to question [plaintiff's] assertion that [defendants] acted in substantially similar ways with respect to each class member.").

Defendants' argument that the determination of whether apparent authority exists is an individualized inquiry because some Class Members may or may not have "followed the link for lend5k.com" misses the point—the TCPA violation was complete upon transmission of the text message, and whether Class Members actually clicked on the link is irrelevant to the TCPA claim. *See Lee*, 289 F.R.D. at 295 ("The TCPA violations, if any, occurred when the messages were *sent*, not when class members phoned in and were pitched products or services of [defendant] . . ."). And under a theory of apparent authority, the primary inquiry is into the manifestations of the principle (or lack thereof).[3]  *See* Restatement (Third) of Agency § 3.03 (2006) ("Apparent authority, as

---

[2]     And as Gee testified, this link led to the same "Alpine Select" payday loan website. (Gee Dep. 170:4-17; *see also* dkt. 113-1, Ex. D – showing a copy of the "Alpine Select" website at www.thesmartcreditsolution/securelinkcorp.com.)

[3]     For instance, apparent authority can attach by "permit[ting] an agent to acquire a reputation of authority . . . by acquiescing in conduct by the agent under circumstances likely to lead to a

defined in § 2.03, is created by a person's manifestation that another has authority to act . . .").

Similarly, vicarious liability under a ratification theory occurs when a defendant "knowingly accepts

the benefits from the transaction." *See Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 100 (N.D.

Ill. 2013) (citing Restatement (Third) of Agency § 4.01 at cmt. d).  None of these determinations are

dependent on individual Class Member's experiences, and thus present common questions.[4]

### C.   Defendants Concede that the Text Messages were Transmitted Using a Single Piece of Hardware and Software, Making the Issue of Whether this Equipment Constitutes an ATDS Susceptible to Common Proof.

Defendants do not challenge that the question of whether the text messages here were sent by

equipment that qualifies as an ATDS is a common one, since all of the text messages were sent using

the same hardware and software.  (*See* dkt. 113-1 Ex. C, ¶ 8.)  Instead, Defendants make a merits

argument that the equipment does not qualify as an ATDS.  (Defs. Opp. at 10.)  This merits

argument is irrelevant to the class certification question.

 Furthermore, their merits argument is wrong on the facts and the law, as AC Referral's

president James Gee testified that the equipment dialed lists of phone numbers without human

intervention, which falls squarely into the definition of an ATDS as defined by the FCC.  (Gee Dep.

149:20 – 150:8; 151:18 – 152:1);[5] *see Fields v. Mobile Messengers Am., Inc.*, No. 12-cv-05160,

2013 WL 6774076, at *3 (N.D. Cal. Dec. 23, 2013).  What's more, Gee also testified that the

hardware used to transmit the text messages contained Microsoft Excel software, which has the

capacity to randomly and sequentially generate telephone numbers and store those numbers.  (Gee

Dep. 144:13 – 145:13; Ochoa Decl. ¶¶ 3-4.)  Microsoft Excel was on the same computer as "Data

Doctor"—the software used to transmit these text messages—which did so at the pace of 3,000 to

9,000 per day, all without human intervention.  (Dkt. 113-3 ¶ 25; dkt. 135-1 Ex. 1; Gee Dep. 144:13

reputation."  Restatement (Third) of Agency, § 2.03 cmt. c (2006)).

[4]  Even if the Court finds that one theory of liability is not susceptible to common proof, Plaintiff only needs to present <u>one</u> common theory to satisfy the commonality requirement.  *Dukes*, 131 S. Ct. at 2556; *Thomasson v. GC Servs. Ltd. P'ship*, 539 F. App'x 809, 810 (9th Cir. 2013).

[5]  The Hobbs Act makes the FCC's Order binding on district Courts.  *See, e.g.*, *Pac. Bell v. Pac W. Telecomm, Inc.*, 325 F.3d 1114, 1125 (9th Cir. 2003) ("The Hobbs Act gives the courts of appeals exclusive jurisdiction to determine the validity of all FCC final orders. . . .  The district court must dismiss a complaint if it directly attacks an FCC order or if it raises only issues that were conclusively decided by the FCC order.") (internal quotations and citations omitted).

– 145:13.)  There is little question that this equipment constitutes an ATDS, and Plaintiff believes the issue will be resolved in his favor at the summary judgment stage.

## II.   Defendants Present no Evidence that any Class Member Provided Prior Express Consent to any Defendant, and Plaintiff Presents Common Contentions Well-Suited for Class-Wide Resolution.

Defendants argue that issues of consent require individualized inquiries that defeat class certification.  These arguments fall flat in light of Defendants' burden of proof regarding consent at the class certification stage and the evidence (or lack thereof) elicited in class discovery.  Defendants suggest repeatedly that Plaintiff and the Class Members "may have" "possibly" "opted-in" to receive these text messages at various websites, but present <u>zero</u> <u>evidence</u> that any of the 98,779 Class Members on the T-Mobile Lists consented, where or when they gave their consent, or, critically, that individual issues of proof exist amongst the Class Members.  Defendants make this suggestion simply by cobbling together and then mischaracterizing the testimony of Michael Ferry, a person who stated unequivocally that he had no personal knowledge or proof that any Class Member consented.

Plaintiff, on the other hand, has presented a cohesive theory of commonality and predominance with regards to consent that has been accepted by numerous Courts—namely that when phone numbers are obtained in a common way (in this case, acquired lists of numbers using a common method), consent is a common question.  Defendants have presented nothing to counter this evidence, and in fact, confirm that consent can be determined, either affirmatively or negatively, on the same common proof.

### A.   Defendants Fail to Show that there Are any Individual Issues About Consent that Affect the Class.

"Express consent" is not an element of a plaintiff's *prima facie* TCPA case, but rather is an affirmative defense for which the defendant bears the burden of proof.  *Grant v. Capital Mgmt. Servs., L.P.*, 449 F. App'x 598, 600 n.1 (9th Cir. 2011); *Connelly v. Hilton Grand Vacations Co., LLC*, No. 12-cv-599, 2012 WL 2129364, at *3 (S.D. Cal. June 11, 2012) (collecting authorities).  To defeat a TCPA class certification motion based on individual issues of consent, a defendant must "set forth *specific evidence* showing that a significant percentage of the putative class consented to

receiving calls on their cellular phone"—and more to the point—that there is no way to apply "generalized proof" to prove consent.  *Jamison*, 290 F.R.D. at 107-08 (emphasis added).  If a defendant cannot set forth such specific evidence, individual issues of consent cannot predominate. *Meyer v. Portfolio Recovery Assocs.*, 707 F.3d 1036, 1042 (9th Cir. 2012) (rejecting arguments that class members "may have" consented because the defendant could not point to a "single instance" where consent may have been obtained); *Silbaugh v. Viking Magazine Servs.,* 278 F.R.D. 389, 393 (N.D. Ohio 2012); *Agne*, 286 F.R.D. at 567.

Defendants repeat *ad nauseum* that Michael Ferry testified that cell phone numbers he obtained and passed on to be sent text messages belonged to individuals who had "opted-in" to receive those messages at websites.[6]  The conclusion that the Class Members all consented to receive the text messages at issue in this case is in no way supported by Ferry's testimony.  Ferry was only a "list broker"—he did not collect consumer's cell phone numbers directly, but instead received lists of phone numbers from a data management company called AbsoluteROI.  (Ferry Dep. 115:7-21.) Ferry lacked any personal knowledge about whether or not individuals actually opted-in to receive text messages, and testified that he had no "protocols or compliance programs in place to ensure that [he], in fact, made sure that the numbers [he] sent on [were] proper numbers."[7]  (*See* Ferry Dep.

---

[6]      Defendants cite to an email produced by Click Media in their Opposition purportedly showing one such website where individuals "opted-in" to receive text messages.  (Defs. Opp. at 6.)  Reliance on this website (www.bestdigitalrewards.com), is troubling for several reasons— most of all that the Federal Trade Commission sought a temporary restraining order shutting this and other websites down for violations of 15 U.S.C. § 45(a), which prohibits "unfair or deceptive acts or practices in or affecting commerce."  The FTC argued that such websites were "false, misleading and deceptive."  *See FTC v. SubscriberBASE Holdings, Inc., et al.*, No. 13-cv-01527 (N.D. Ill.).  The "bestdigitalrewards" website was shut down pursuant to a preliminary injunction, and the website contained a notice that it was shut down by the FTC.  (Ochoa Decl. ¶ 5.)  Ferry also testified that the purported "consent" language was buried in privacy policies that nobody reads, and that "99 percent" of the people "really don't understand [] anyhow."  (Deposition testimony of Michael Ferry ("Ferry Dep."), attached to the Ochoa Decl. as Exhibit E, at 127:15-128:5.)

[7]      In blindly relying on Ferry's speculation about consumers' consent to receive the text messages he was involved in sending for Defendants, the opposition claims that the opt-in information for the Class is no longer available.  (Defs. Opp. at 5-6.)  Defendants have no idea whether this is true given that their belated class certification discovery didn't even bother asking the company that apparently harvested the cell phone numbers for Ferry, AbsoluteROI, whether such information exists.

---

1  87:12-17.)  When pressed, Ferry could not name a single website where phone numbers were

2  collected.  (Ferry Dep. 121:8-17.)  The same is true of James Gee—the person who actually

3  transmitted these text messages—who had no personal knowledge about consent, other than

4  "trusting" Mike Ferry.  (Gee Dep. 24:3-11.)  As such, Defendants have presented *zero* actual

5  evidence that anyone consented to receive the text messages at issue here, and more importantly, that

6  individual issues exist precluding certification.[8]

7        The Ninth Circuit has already rejected Defendants' speculative arguments that class

8  certification is unwarranted because a class member "may have" "possibly" opted-in to receive the

9  message.  (*See* Defs. Opp. at 15.)  In *Meyer v. Portfolio Recovery Associates*, the defendant

10  presented hypothetical arguments about consent in the context of class certification in a TCPA case

11  in the same way Defendants do here.  In *Meyer*, the defendant argued that prior express consent was

12  an individualized issue because class members "might have agreed to be contacted at any telephone

13  number" or class members' phone numbers may have been obtained "via skip-tracing," thus creating

14  individualized issues.  *Id.* at 1042.  The Court rejected these arguments, and upheld class

15  certification, stating that the defendant could not point to a "single instance" where this may have

16  occurred.  *Id.*

17        It is the same here—Defendants' theories about "multiple websites" creating individual

18  issues, and all Class Members "opting in" are speculative, and do not preclude class certification.

19  Both of the witnesses Defendants rely on, James Gee and Mike Ferry, lack personal knowledge

20  about whether consent was actually obtained—they simply received lists of cell phone numbers from

21  AbsoluteROI.  (*See* Ochoa Decl. ¶¶ 7-8;[9] Ferry Dep. 65:19 – 66:18; Ferry Dep. 87:12-17; Gee Dep.

[8]  Defendants' suggestion that the issue of consent is further complicated by the fact that Ferry suffered a series of strokes around the time they sent the text message to Plaintiff and that Ferry's girlfriend passed on the cell phone numbers for a brief period of time is of no moment—nothing changes the fact none of these individuals had actual knowledge of how or where AbsoluteROI was gathering the cell phone numbers from.  As such, the lack of consent here remains demonstrable through common proof.

[9]  This is the only list broker identified by name by Mr. Ferry and the only contract produced by Ferry, which shows that AbsoluteROI provided data to James Gee for text message campaigns.  (Ochoa Decl. Ex. G at pg. 11.)

24:3-11.)[10]  In situations like this, individual issues of consent do not defeat commonality.  *See*
*Silbaugh,* 278 F.R.D. at 393 ("[H]aving produced no evidence that any individual consented to
receive text messages in response to plaintiff's presentation of [] testimony, defendant is unable to
realistically argue that individual issues of consent outweigh commonality."); *Agne*, 286 F.R.D. at
567 ("Defendants' speculation that customers may have given their express consent to receive text
message advertising is not sufficient to defeat class certification."); *G.M. Sign, Inc. v. Finish
Thompson, Inc.*, No. 07-cv-5953, 2009 WL 2581324, at *5 (N.D. Ill. Aug. 20, 2009) ("[defendant]
cannot defeat class certification by asserting the vague possibility that some of the individuals on the
anonymous lists may have perchance consented to receiving the fax.").

Defendants attempt to distinguish *Meyer* by arguing that it was certified as a (b)(2), and not
(b)(3) class (implying that this is somehow less rigorous), and because the certification was only
"provisional."  Neither of these arguments diminishes its applicability here.

First, Defendants argue that *Meyer* is inapplicable because it was certified as a (b)(2), and not
a (b)(3) class.  Aside from the fact that both (b)(2) and (b)(3) classes contain the same numerosity,
typicality, commonality, and adequacy requirements, courts have noted that the requirements of
certifying a (b)(2) class are actually <u>more</u> rigorous than a (b)(3) class, as class members do not have
to receive notice, nor do they have the opportunity to opt-out.  *Newberg on Class Actions* § 4:34 (5th
ed.); *see also Gates v. Rohm and Haas Co.*, 655 F.3d 255, 263 (3d Cir. 2011) ("Indeed, a (b)(2) class
may require more cohesiveness than a (b)(3) class.") (internal quotations and citations omitted).  In
fact, "[s]ince the common-question and superiority standards of Rule 23(b)(3) are in some ways

[10]  Gee testified as follows:

Q: And how do you know the people on the lists that Mr. Ferry provided to you were
people who had opted in?
A: I have a very trusting relationship with Mike [Ferry], and I know that was the case, and
we never really had complaints about it, so I assume, of course – he said these people opted
in, and I said, okay, they opted in, and so I took his word for it."  (Gee Dep. 24:3-11).

Compare this testimony with the witness in *Silbaugh*, who was told that a third party text spammer
"had obtained consents to text the people," and where the witness did not take any steps to confirm
this "other than trusting the guy."  *Silbaugh*, 278 F.R.D. at 391.

1   much less demanding than that of either Rule 23(b)(1) or Rule 23(b)(2), actions that are maintainable

2   under either of the latter provisions also generally satisfy the subdivision (b)(3) requirements."   7AA

3   Wright, Miller & Kane, Federal Practice & Procedure, Civ. § 1784.1 (3d ed.).

4          Second, Defendants cite to no cases suggesting that provisional class certification is any

5   different than certification in any other context.  Indeed, it is well established that class certification

6   for *any* purpose must meet the requirements of Federal Rule of Civil Procedure 23.  *See Sobel v.*

7   *Hertz Corp.*, 291 F.R.D. 525, 531 n.5 (D. Nev. 2013) ("[T]he standard for certification is the same

8   for settlement classes as for conventional classes.") (citing *In re GMC Pick–Up Truck Fuel Tank*

9   *Products Liability Litig.,* 55 F.3d 768, 818 (3d Cir. 1995)).  In any event, Fed. R. Civ. P. 23(c)(1)(C)

10  provides that a court may alter or amend any certification order before final judgment.

11          **B.      Plaintiff Presents a Common Theory of Consent that Predominates.**

12          To show that "common questions" predominate regarding consent, a plaintiff[] must advance

13  a viable theory employing generalized proof to establish liability with respect to the class involved."

14  *Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318, 328 (5th Cir. 2008).  Plaintiff has done so here

15  by presenting evidence that the transmitter of the text messages, AC Referral Systems (aka James

16  Gee), sent text messages to phone numbers that originated from lists obtained in a uniform way—in

17  this case, from 360 Data Management, who in turn obtained them from data broker AbsoluteROI—

18  and that neither Mike Ferry at 360 Data Management, nor James Gee at AC Referral Systems

19  independently verified that consent was provided by consumers to receive texts. (*See* Ochoa Decl.

20  Ex. G; Ferry Dep. 65:19 – 66:18; 87:12-17; Gee Dep. 24:3-11.) Plaintiff contends this common

21  evidence will show Defendants did not have the requisite consent for their affirmative defense as to

22  the Class as a whole.

23          In rebuttal, Defendants argue that the testimony from Ferry and Gee shows that everyone in

24  the class consented, and therefore the consent issue fails to satisfy commonality and predominance.

25  This exact argument was recently considered, and rejected, by Judge Guilford in the Central District

26  of California.  *Stern v. DoCircle, Inc.*, No. 12-cv-2005, 2014 WL 486262, at *1 (C.D. Cal. Jan. 29,

27  2014).  There, the court certified a TCPA class over defendant's objection that a third-party who

28  collected phone numbers had a policy to only contact "consumers who consented to receive text

1   messages." *Id*.  The court determined that testimony presented saying that consent was purportedly

2   collected at "eighty-five websites" was irrelevant (because there was no  individualized evidence of

3   consent), and instead focused on the process and manner in which the telephone numbers were

4   collected, which were uniform. *Id.* at *3.  ("Defendant's primary evidence is a declaration [] stating

5   that BTS has policy of obtaining consent and that BTS followed that policy.  But this evidence

6   doesn't differ between putative class members, and the Court's evaluation of it will apply to all class

7   members equally.")  The same situation exists in this case.  Defendants here simply cite to the

8   testimony of Michael Ferry, who said that he had a "policy" of texting phone numbers of individuals

9   who "opted-in" generally, but, as explained above, neither he nor Mr. Gee did anything to actually

10   confirm this consent.  (Defs. Opp. at 6.)  Similar to the court's holding in *Stern*, the issue of whether

11   this testimony is enough to satisfy Defendants' affirmative defense of consent can easily be applied

12   to the Class as a whole.  As the court in *Stern* noted, "[b]ased on the facts before it now, it does not

13   appear that the Court will have to make individualized determinations of consent.  While such

14   determinations would be necessary if the parties presented individualized evidence of consent, they

15   haven't done so."  2014 WL 486262, at *3.  Fatal to Defendants' argument here is that they have not

16   presented actual evidence that the phone numbers of the proposed Class Members were collected in

17   different ways such that it creates individualized issues.

18           Other Courts are in accord, and have held that the use of "dialing lists" for the promotion and

19   marketing of a single program through the same dialing system presents common questions capable

20   of class-wide resolution.  *See Silbaugh*, 278 F.R.D. at 391 (certifying class after testimony that

21   defendant was told that [list brokers] obtained consent, but defendant did not independently verify

22   such consent); *Kavu v. Omnipak Corp.*, 246 F.R.D. 642, 647 (W.D. Wash. 2007) (finding defendant

23   engaged in a "common course of conduct" by obtaining facsimile numbers "in the same way and

24   sending the same broadcast facsimile to all recipients within a short period of time as part of the

25   same effort to generate new business."); *G.M. Sign*, 2009 WL 2581324 at *4-5 (finding commonality

26   and predominance satisfied when the offending fax was sent to "anonymous third party fax lists . . .

27   which [defendant] did not review.").

28

1    At this point, the Court need not decide whether the evidence presented by Plaintiff or

2  Defendant establishes or defeats the affirmative defense of consent because it is sufficient that the

3  same evidence will be used to make that determination.  The evidence presented by Defendant does

4  not prove that individual issues regarding the collection of telephone numbers predominates—rather,

5  Defendants admit that the procurement of these "dialing lists" was "one single course of business."

6  (Defs. Opp. at 5.) The "single course of business" employed by the text spammers can be applied to

7  the class as a whole to determine whether Defendants' evidence meets the standard of "consent that

8  is clearly and unmistakably stated," as required by the TCPA.  *Satterfield v. Simon & Schuster, Inc.*,

9  569 F.3d 946, 955 (9th Cir. 2009) (internal quotations, citation, and alteration omitted).

10  **III.    Plaintiff Kristensen Is an Ideal Class Representative**

11    Defendants next take aim at Mr. Kristensen himself arguing that he is an inadequate

12  representative of the Class.  Courts in this Circuit look to two criteria for determining adequacy: (1)

13  "the proposed representative Plaintiffs do not have conflicts of interest with the proposed class," and

14  (2) "Plaintiffs are represented by qualified and competent counsel."  *Hester v. Vision Airlines, Inc.*,

15  No. 09-cv-00117, 2009 WL 4893185, at *5 (D. Nev. Dec. 16, 2009) *aff'd*, 687 F.3d 1162 (9th Cir.

16  2012) (internal quotations and citations omitted).  Defendants do not contest the latter requirement

17  and have not identified any conflicts Mr. Kristensen has with the Class he proposes to represent, but

18  instead make arguments (unsupported by any case law) that Plaintiff lacks standing and that

19  imagined discovery issues somehow render Plaintiff inadequate.  The facts and the law, however,

20  easily dismiss these specious arguments.

21    **A.    Kristensen Has Standing to Bring this Lawsuit.**

22    Defendants claim that Kristensen's phone bill "was paid by his employer," then claim (albeit

23  without authority) that his employer therefore possesses the TCPA claim here.  This argument

24  misconstrues the record and ignores cases directly on point.

25    To start, Defendants' presentation of this testimony is misleading.  Plaintiff's employer is

26  Krifcon, Inc. a consulting company of which Plaintiff is (and has always been) the sole employee.

27  (Deposition testimony of Flemming Kristensen ("Kristensen Dep."), attached to the Ochoa Decl. as

28  Exhibit H, at 18:2 – 19:5.)  Plaintiff testified that he personally purchased the iPhone that received

the text message.  (Kristensen Dep. 141:11-15.)  He did <u>not</u> testify that his cell phone bill "was paid by his employer" (as Defendants claim), but rather that "[Krifcon] is a personally-owned company, so in effect, I'm paying for it."  (Kristensen Dep. 42:16-22.)  He also testified that he uses the "917" phone number (which is his only cell phone, and the one that received the text message at issue) for personal matters. (Kristensen Dep. 32:19 – 33:5 [purchases]; 40:11-21 [personal texts].)  Indeed, Kristensen's name, and not Krifcon's, appears on the cellular telephone bill, as he is the subscriber. (Ochoa Decl. Ex. I.)

It is undisputed that Plaintiff received the text message on the "917" phone number, which he has owned since 2008.  (Kristensen Dep. 34:24 – 35:1.)  In this Circuit (and across the country), the person who received the text message (*i.e.* the "called party") has standing to bring suit.  *Olney v. Progressive Cas. Ins. Co.*, --- F. Supp. 2d ---, 2014 WL 294498, at *5 (S.D. Cal. Jan. 24, 2014) (finding that "the regular user of a cellular telephone has standing to bring a claim under the TCPA, regardless of whether he is responsible for paying the bill.").  In this case, the person who received this text message is the Plaintiff—whether he was acting in his personal or professional capacity is of no moment, as Mr. Kristensen was at all times the user and subscriber of the "917" phone number.

### B.    Defendants' Imagined Discovery Disputes Are without Merit, and Provide no Grounds to Find Plaintiff an Inadequate Representative of the Class.

Defendants' second purported "adequacy" argument claims that a series of manufactured and unripe discovery disputes are grounds to find Mr. Kristensen an inadequate representative of the Class.[11]  Contrary to Defendants' contentions, Plaintiff Kristensen's actions in this case demonstrate that he has vigorously pursued this case on behalf of the Class he seeks to represent, and is a more

---

[11]    If Defendants truly believed there were actual issues with Plaintiff's discovery, the proper place to raise them is before the Magistrate Judge, so that they can be resolved after a full review of the record.  *See Koss v. Wackenhut Corp.*, No. 03-cv-7679, 2009 WL 928087, at *8 (S.D.N.Y. Mar. 30, 2009) ("Should either party encounter additional difficulties in obtaining discovery, the Federal Rules of Civil Procedure provide the authority whereby Plaintiffs or Defendants may obtain discovery, as well as the means to compel such production if a certain party is not forthcoming.").  Arguing discovery disputes superficially, and without a full record, in a dispositive motion is not the proper time or place.  *See Ferrone v. Onorato*, No. 05-cv-303, 2007 WL 2973684, at *10-11 (W.D. Pa. Oct. 9, 2007) *aff'd*, 298 F. App'x 190 (3d Cir. 2008) ("[E]ven assuming plaintiff had evidence of alleged spoliation, it was incumbent on him to seek redress through an appropriate discovery motion.").

than adequate class representative. "For a plaintiff who wishes to be a class representative, general knowledge of the case and a participation in discovery are enough." *In re Northrop Grumman Corp. ERISA Litig.*, No. 06-cv-06213, 2011 WL 3505264, at *14 (C.D. Cal. Mar. 29, 2011). For example, reviewing the complaint, sitting for a deposition, and responding to discovery "comports with what courts expect of class representatives." *Id.* In fact, "[c]ourts that have denied class certification based on the inadequate qualifications of plaintiffs have done so only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." *In re Frontier Ins. Grp., Inc. Sec. Litig.,* 172 F.R.D. 31, 47 (E.D.N.Y.1997) (internal quotation marks and citations omitted).

Plaintiff has taken this lawsuit and his discovery obligations seriously. Plaintiff reviewed the complaint and amended complaint, and had comments to both, before they were filed. (Kristensen Dep. 55:9-16; 78:7-12). He has reviewed and responded to ten separate sets of discovery requests, preserved and produced electronically stored information, offered his cellular telephone up for inspection, and sat for an approximately five-hour deposition.[12] He has agreed to produce his phone bills for the month in question, including the "call detail" portion showing all outgoing and inbound telephone calls and text messages) once his wireless carrier produces them.[13] These are the actions of a conscientious, competent representative of the class. *Compare Koss*, 2009 WL 928087 at *8 (finding proposed class representatives inadequate when they repeatedly failed to appear at deposition or respond to discovery requests.)

Because Defendants do not have a basis to find Plaintiff inadequate under Rule 23, they instead turn to half-baked discovery disputes that have not even become ripe, much less raised before the Court. Still, Defendants' discovery arguments lack merit. First, Defendants vociferously

---

[12]    *See* Ochoa Decl. ¶ 11.

[13]    Defendants, on the other hand, have until quite recently shown a complete disinterest in participating in the discovery process at all. (*See, e.g.,* Plaintiff's Opposition to Defendant's Motion to Extend Time, dkt. 125.) It was only on the eve of Plaintiff's deadline to move for class certification that Defendants began scrambling to take discovery. As they have done so, Plaintiff has responded, without an extension, to almost all of Defendants' discovery requests.

complain that Plaintiff has not produced his telephone bills—but Defendant Pioneer only first requested the bills in October, after which time Plaintiff requested the full telephone bills, including the "call detail" portion of the bill, from AT&T Mobility LLC, as these records were not in his possession  (Ochoa Decl. 12.)[14]  Plaintiff has agreed to produce such bills as soon as AT&T produces them.  (Ochoa Decl. 12.)

Next, Defendants argue that Plaintiff's telephone bills are "crucial to determining whether Plaintiff consented to receiving the text message." (Defs. Opp. at 20.)  But how so?  Defendants cannot say.  In fact, Defendants argue in their brief that alleged "consent" was collected at websites, making their argument for producing the phone bills nonsensical.  Furthermore, Plaintiff preserved the cellular telephone that received the text message at issue, and produced it to Defense counsel for inspection at his deposition, thus making the need for the phone records moot.  (Ochoa Decl. ¶ 10.)  Plaintiff further testified that he searched for evidence of consent on his cell phone, and found none. (Kristensen Dep. 151:6-17.)

Finally, Defendants make a convoluted argument that Plaintiff has "failed to preserve" information on his computer.  But Defendants cannot even articulate what they are looking for, other than to say "relevant evidence."  Before a party can even make a colorable claim of spoliation, they must first establish that relevant evidence does in fact exist.  *Patton*, No. 12-cv-02142, 2013 WL 6158467, at *4 (D. Nev. Nov. 20, 2013).  Plaintiff testified adamantly that he never consented to receive this spam text message—and Defendants have no evidence to the contrary.  (Dkt. 113-2 ¶ 3; Kristensen Dep. 27:22 – 28:3; 44:4-7.)  Instead, to prove their theory that Plaintiff failed to preserve "relevant evidence," they explain that Plaintiff did in fact preserve and produce relevant electronically stored information—an email showing his registration on the National Do-Not-Call Registry.  (Defs. Opp. at 21.)  This evidence only further corroborates his testimony that he never consented to receiving the text message at issue, and confirms that he did preserve evidence relevant to this lawsuit.

---

[14]    The "summary" bill that Plaintiff has produced to Defendants simply shows the charge for the month in question, along with Mr. Kristensen's name, address, and account number.  (Ochoa Decl. Ex. I.)

1   Plaintiff further testified that, other than spam emails that automatically delete, he has not

2   deleted any other emails, nor has he taken any "extraordinary steps" with his email accounts.[15]

3   (Kristensen Dep. 147:1-9; 147:16 – 148:3.)  Similarly, he still possesses the two computers he owned

4   in 2011, and the one time he replaced the hard drive on his laptop he copied the files from his old

5   hard drive to his new one.  (Kristensen Dep. 66:9-20; 204:24 – 205:4.)  He never testified that he

6   actively deleted anything.  Rather, he testified that he hasn't deleted anything in his internet browser

7   histories.  (Kristensen Dep. 179:6 – 180:17.)  Further, Plaintiff has agreed to use search terms

8   provided by Pioneer to search for ESI.  (See Dkt. 148-1, Ex. 19, at pg. 4.)

9   Defendants' complaints about discovery are without basis, and in any event have no bearing

10  on Plaintiff's adequacy, which has been more than demonstrated by his actions in this case.

11  **IV.    Plaintiff's Claims Are Typical of the Class's.**

12  Defendants next confusingly argue that Plaintiff's experiences are not typical of the Class's,

13  because Plaintiff didn't consent to receive the text message, but the other Class Members did.  (Defs.

14  Opp. at 17-18; 22.)  Putting aside the fact that Defendants have not yet presented any evidence than

15  any Class Member consented to receive these text messages, this argument again ignores the relevant

16  inquiry. The typicality requirement is satisfied if the plaintiff's claims arise from the same practice or

17  course of conduct that gives rise to the claims of other class members.  *Santoro v. Aragon Agency,*

18  *Inc.*, 252 F.R.D. 675, 681 (D. Nev. 2008).  Importantly for purposes of this argument, "a finding of

19  commonality will ordinarily support a finding of typicality." *Ashmus v. Calderon*, 935 F. Supp. 1048

20  (N.D. Cal. 1996); *see also General Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 157 n.13 (1982) (noting

21  how the requirements of commonality and typicality "merge").

22  As discussed above, consent is a merits issue for which Defendants bear the burden of proof.

23  Plaintiff has already presented a theory showing how the issue of consent (or lack thereof) is

24  susceptible to common proof, and it is Plaintiff's position that neither he nor the Class Members

25  provided prior express consent to Defendants to receive these spam text messages.  As it stands,

26  [15]    And this is only relevant to the extent that Defendants have any reason to believe that there
27  would be any relevant evidence in his email accounts—the testimony adduced provided no reason
    to believe this is so.

28

Plaintiff's experience was identical to the other Class Members—he received a payday loan text message sent from the same equipment for the same payday loan scheme and suffered identical statutory damages as a result.  As such, Typicality is satisfied.

**V.      This Class Action Is Superior to 98,779 Individual Suits for $500.**

Defendants claim (as Click Media did in its opposition brief, *see* dkt. 129 at pp. 10-12) that this Court should follow two state court cases[16] that concluded a class action was not superior to scores of consumers bringing individual TCPA suits, worth at most $500-$1500. (Defs. Opp. at 24.) Referencing these two cases, Defendants claim that Congress did not intend TCPA suits to be brought as class actions because the available statutory damages provide adequate incentive for individual suits.  This argument has zero merit.

This same superiority argument has been expressly rejected by the Ninth Circuit in review of class certification decision under the Fair and Accurate Credit Transactions Act, 15 U.S.C § 1681, *et seq*. ("FACTA"):

> Congress expressly created a statutory damages scheme that intended to compensate individuals for actual or potential damages resulting from FACTA violations, without requiring individuals to prove actual harm. . . .  But the plain text of the statute makes absolutely clear that, in Congress' judgment, the $100 to $1000 range *is* proportionate and appropriately compensates the consumer.  That proportionality does not change as more plaintiffs seek relief; indeed, the size of [the defendant's] potential liability expands at exactly the same rate as the class size.

*Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 719 (9th Cir. 2010).  This reasoning easily transfers to TCPA class actions.[17]

Defendants' lack-of-superiority argument has been rejected in the context of a TCPA class action by nearly every federal and state court to consider the issue as well.  The court in *Kavu v. Omnipak Corp.* rejected a challenge to superiority in a TCPA case finding that

> [d]efendant's argument, however, is actually a challenge to the statutory amount of damages, set by Congress, rather than to the best method of adjudicating this case. If

---

[16]      The Illinois circuit court case, *Kim v. Sussman*, is not binding here, nor is it even precedent in Illinois.  *Delgado v. Bd. of Election Comm'rs of City of Chicago*, 224 Ill. 2d 481, 488 (2007) ("Under Illinois law, the decisions of circuit courts have no precedential value.").

[17]      As the Supreme Court recently noted, the vast majority of TCPA suits brought in federal courts are class actions. *See Mims*, 132 S. Ct. at 753.

the claims were adjudicated individually, defendant would owe the same amount of damages. Rather, it is hoping that if no class is certified, it will avoid damages for the vast majority of its violations. The Court will not decline to certify a class on that basis. Furthermore, the class size is a direct result of defendant's large number of violations, for which it should not be rewarded.

246 F.R.D. at 650; *Critchfield Physical Therapy v. Taranto Grp., Inc.,* 263 P.3d 767, 780 (Kan. 2011) (rejecting the argument in a TCPA case "that over 100,000 individual small claims actions would be superior to a single class action."); *Sparkle Hill, Inc. v. Interstate Mat Corp.*, No. 11-cv-10271, 2012 WL 6589258, at *4 (D. Mass. Dec. 18, 2012) (same).

Defendants place primary reliance on a state court case out of New Jersey Superior Court that, in analyzing a TCPA claim under New Jersey's state statute addressing class actions, determined that certifying a TCPA class in New Jersey would not be superior to thousands of individual lawsuits. *Local Baking Prods., Inc. v. Kosher Bagel Munch, Inc.*, 23 A.3d 469, 476 (N.J. Super. Ct. App. Div. 2011). A federal district court in New Jersey criticized this case for being wrongly decided, and every federal court to address the *Local Baking Products* decision has rejected its reasoning. *A & L Indus., Inc. v. P. Cipollini, Inc.,* No. 12-cv-07598, 2013 WL 5503303, at *4-5 (D. N.J. Oct. 2, 2013) (collecting authorities). This Court should decline Defendants' invitation to adopt the flawed reasoning of the *Local Baking Products* decision here.

Because of the limited amount of statutory damages relative to the cost of litigating the claims here, most individuals would be unable (or unlikely) to bring their own lawsuits, and a class action is the superior method for adjudicating this controversy.

**VI.    The Class Is Ascertainable because it Can Be Determined by Objective Criteria.**

Although Defendants do not challenge numerosity, they do argue that Plaintiff's class is not ascertainable, because, as the authority they cite states, "a class cannot be certified if a plaintiff has not established an objective way to determine who is a member of the class." (Defs. Opp. at 7) (citing *Williams v. Oberon Media, Inc.*, 468 F. App'x 768, 770 (9th Cir. 2012)). Defendants claim that this standard would require the Court to "hold mini-trials to determine which individuals, if any, consented to receive the complained-of text messages." (Defs. Opp. at 7.) These arguments studiously ignore that Plaintiff's proposed class definition, which does not present the same issues considered in Defendants' claimed authority. In both *Gannon v. Network Tel. Servs., Inc.*, No. 12-

cv-9777, 2013 WL 2450199 (C.D. Cal. June 5, 2013) and *Vandervort v. Balboa Capital Corp.*, 287

F.R.D. 554 (C.D. Cal. 2012) the proposed class included those who "received one or more

*unauthorized* text messages." *Gannon*, 2013 WL 2450199, at *2 (emphasis in original). As such,

those Courts found that to determine whether a text message was "unauthorized" would require

consideration of consent. Plaintiff's class definition does not suffer the same infirmary, as he asks

the Court certify a class of:

> All individuals who were sent a text message from telephone numbers "330-564-6316," "808-989-5389," and "209-200-0084" from December 5, 2011 through January 11, 2012.

Plaintiff's class definition is a neutral one that does not require the Court to delve into the merits of

the case. Instead, class membership can be defined by "objective criteria"—namely, whether or not

an individual's cell phone number appears on one of the call detail records from the three longcodes

used by AC Referral during the specified time periods. Not only would a Class Member be able to

objectively determine if he or she was a member of the class, but the T-Mobile Lists themselves

allow for the identification of the Class Members. *See G.M. Sign*, 2009 WL 2581324 at *4 (finding

TCPA class sufficiently identifiable because "[plaintiff] may use the log and fax numbers to 'work

backwards' to locate and identify the exact entities to whom the fax was sent."); *CE Design Ltd. v.

Cy's Crabhouse N., Inc.*, 259 F.R.D. 135, 141 (N.D. Ill. 2009) (finding class sufficiently identifiable

in a TCPA fax case through reference to fax numbers on transmission logs).

## CONCLUSION

For the reasons stated above, Plaintiff Flemming Kristensen respectfully requests that this

Court enter an Order granting Plaintiff's Motion for Class Certification in its entirety and for such

other and further relief that this Court deems reasonable and just.

Dated: February 24, 2014                     Respectfully submitted,

                                             FLEMMING KRISTENSEN, individually and on
                                             behalf of a class of similarly situated individuals

                                             By: /s/  John C. Ochoa
                                                 One of Plaintiff's Attorneys

                                             John Benedict, Esq. (Nevada Bar No. 005581)
                                             john.benedict.esq@gmail.com

LAW OFFICES OF JOHN BENEDICT
2190 E. Pebble Road, Suite 260
Las Vegas, Nevada 89123
Tel: 702.333.3770
Fax: 702.361.3685

Ryan D. Andrews (Admitted *pro hac vice*)
randrews@edelson.com
John C. Ochoa (Admitted *pro hac vice*)
jochoa@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiff and the putative Class*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 24, 2014, I electronically filed the foregoing *Plaintiff's Reply to Defendants' Combined Opposition to Class Certification* with the Clerk of the Court using the CM/ECF system.  Notice of this filing is sent to all counsel of record by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


Dated: February 24, 2014          By:     /s/  John C. Ochoa
                                          John C. Ochoa