# EXHIBIT 2

John Benedict, Esq.
LAW OFFICES OF JOHN BENEDICT
Nevada Bar No. 005581
2190 E. Pebble Road, Suite 260
Las Vegas, Nevada 89123
Telephone: (702) 333-3770
Facsimile: (702) 361-3685

Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Ryan D. Andrews (Admitted *Pro Hac Vice*)
randrews@edelson.com
John C. Ochoa (Admitted *Pro Hac Vice*)
jochoa@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiff Flemming Kristensen*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| FLEMMING KRISTENSEN, individually and on behalf of a class of similarly situated individuals, | Case No. 2:12-CV-00528-APG-(PAL) |
| | CLASS ACTION |
| Plaintiff, | Judge: Hon. Andrew P. Gordon |
| v. | Magistrate: Hon. Peggy Leen |
| CREDIT PAYMENT SERVIECS INC., a Nevada corporation, f/k/a MY CASHNOW.COM INC., ENOVA INTERNATIONAL, INC., an Illinois corporation, PIONEER FINANCIAL SERVICES, INC., a Missouri corporation, LEADPILE LLC, a Delaware limited liability company, and CLICKMEDIA LLC d/b/a NET1PROMOTIONS LLC, a Georgia limited liability company, | **DECLARATION OF JOHN C. OCHOA IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL DEFENDANT CREDIT PAYMENT SERVICES INC. TO PRODUCE DOCUMENTS AND AMENDED ANSWERS TO REQUESTS TO ADMIT AND INTERROGATORIES** |
| Defendants. | |

I, John C. Ochoa, hereby aver, pursuant to 28 U.S.C. § 1746, that I have personal knowledge of all matters set forth herein unless otherwise indicated, and would testify thereto if called as a witness in this matter.

1.     I am an adult over the age of 18 and a resident of the State of Illinois. I am an attorney representing Plaintiff Flemming Kristensen in this matter and am admitted *Pro Hac Vice* before this Court. I am fully competent to make this Declaration, and make such Declaration in support of Plaintiff's Motion to Compel Defendant Credit Payment Services, Inc. to Produce Documents and Amended AnswerS to Requests to Admit and Interrogatories.

2.     Pursuant to Local Rule 26-7, I certify that Parties have made a sincere effort to meet and confer over the matters addressed in Plaintiff's Motion but have been unable to resolve the matter on their own. The Parties' efforts are detailed in the exhibits that follow, as well as in the Background Section of Plaintiff's Motion to Compel.

3.     A true and accurate copy of Plaintiff's Second Set of Document Requests to Credit Payment Services Inc. ("CPS") is attached hereto as Exhibit A.

4.     A true and accurate copy of Plaintiff's First Set of Requests to Admit to CPS is attached hereto as Exhibit B.

5.     A true and accurate copy of Plaintiff's Second Set of Interrogatories to CPS is attached hereto as Exhibit C.

6.     A true and accurate copy of CPS's Responses to Plaintiff's Second Set of Document Requests is attached hereto as Exhibit D.

7.     A true and accurate copy of CPS's Responses to Plaintiff's First Set of Requests to Admit is attached hereto as Exhibit E.

8.     A true and accurate copy of CPS's Responses to Plaintiff's Second Set of Interrogatories is attached hereto as Exhibit F.

9.     On May 27, 2014, I sent a letter to counsel for CPS.  A true and accurate copy of Plaintiff's discovery letter is attached hereto as Exhibit G.

**Declaration of John C. Ochoa**                                    **No. 2:12-cv-00528-APG-(PAL)**

10.     On May 27, 2014, Plaintiff and CPS engaged in a telephonic meet and confer to discuss CPS's discovery responses.  On June 3, 2014, I sent an email to counsel for CPS.  A true and accurate copy of Plaintiff's discovery email is attached hereto as Exhibit H.

11.     On June 6, 2014, CPS responded to Plaintiff's June 3, 2014 email.  A true and accurate copy of CPS's June 6th email is attached hereto as Exhibit I.

12.     A true and accurate copy of the December 18, 2011 Chattanooga Times Free Press Article entitled Local companies tied to offshore payday lenders by Ellis Smith is attached hereto as Exhibit J.

13.     A true and accurate copy of the January 3, 2013 Chattanooga Times Free Press Article entitled Brown disputes claims against his businesses is attached hereto as Exhibit K.

14.     A true and accurate copy of the statement by Aaron Shelley, which appeared in the article entitled Brown disputes claims against his businesses, is attached hereto as Exhibit L.

15.     A true and accurate copy of the statement by Byron DeLoach, which appeared in the article entitled Brown disputes claims against his businesses, is attached hereto as Exhibit M.

16.     A true and accurate copy of the statement by Chris Christiansen, which appeared in the article entitled Brown disputes claims against his businesses, is attached hereto as Exhibit N.

I declare under penalty of perjury that the above and foregoing is true and accurate. Executed on this 19th day of June 2014 at Chicago, Illinois.

_/s/  John C. Ochoa_
John C. Ochoa

John Benedict, Esq.
LAW OFFICES OF JOHN BENEDICT
Nevada Bar No. 005581
2190 E. Pebble Road, Suite 260
Las Vegas, Nevada 89123
Telephone: (702) 333-3770
Facsimile: (702) 361-3685
john.benedict.esq@gmail.com

Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com

-3-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ryan D. Andrews (Admitted *Pro Hac Vice*)
randrews@edelson.com
John C. Ochoa (Admitted *Pro Hac Vice*)
jochoa@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiff Flemming Kristensen*

-4-

# EXHIBIT A

John Benedict, Esq.
john.benedict.esq@gmail.com
Nevada Bar No. 005581
LAW OFFICES OF JOHN BENEDICT
2190 E. Pebble Road, Suite 260
Las Vegas, Nevada 89123
Tel: 702.333.3770
Fax: 702.361.3685

Ryan D. Andrews (Admitted *Pro Hac Vice*)
randrews@edelson.com
Rafey Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
John C. Ochoa (Admitted *Pro Hac Vice*)
jochoa@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Attorneys for Plaintiff Flemming Kristensen

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| FLEMMING KRISTENSEN, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>CREDIT PAYMENT SERVICES INC., a Nevada corporation, f/k/a MYCASHNOW.COM INC., ENOVA INTERNATIONAL, INC., an Illinois corporation, PIONEER FINANCIAL SERVICES, INC., a Missouri corporation, LEADPILE LLC, a Delaware limited liability company, and CLICKMEDIA LLC d/b/a NETIPROMOTIONS LLC, a Georgia limited liability company,<br><br>Defendants. | Case No. 2:12-CV-00528-APG(PAL)<br><br>CLASS ACTION<br><br>**PLAINTIFF'S SECOND SET OF DOCUMENT REQUESTS TO DEFENDANT CREDIT PAYMENT SERVICES INC.**<br><br>Judge: Hon. Andrew P. Gordon<br><br>Magistrate: Hon. Peggy A. Leen |

Plaintiff FLEMMING KRISTENSEN, pursuant to Rule 34 of the Federal Rules of Civil Procedure, requests that Defendant CREDIT PAYMENT SERVICES, INC. produce the following documents at the office of Edelson PC, 350 North LaSalle Street, Suite 1300, Chicago, Illinois 60654, within thirty (30) days of service of this request.

### I. Definitions

1.      "ANSWER" means Your Answer to Plaintiff's First Amended Class Action Complaint that You filed on March 28, 2013. (Dkt. 38.)

2.      "ATTACHMENTS" means files or data that are physically or logically associated with or embedded into email, and should be identified by mapping to their parent by the Document or Production number. If attachments and embedded files are combined with their parent documents, then "BeginAttach" and "EndAttach" fields listing the unique beginning and end number for each attachment or embedded document must be included.

3.      "BATES NUMBERING" means that each page of a produced document, or media upon which ESI in native format is produced, shall have a legible, unique page identifier "Bates Number" electronically "burned" onto or associated with the media, or image in such a manner that information from the source document is not obliterated, concealed, or interfered with. There shall be no other legend or stamp placed on the document image unless a document qualifies for confidential treatment pursuant to the terms of a Protective Order in this litigation, or has been redacted in accordance with applicable law or Court order. In the case of confidential materials as defined in the Protective Order, a designation may be "burned" onto or otherwise associated with the document's image at a location that does not obliterate or obscure any information from the source document. For redacted material, the word "Redacted" will be burned onto the document image over the protected information. To the extent native files are produced, the producing party will name the native file with the Bates number.

4.      "CLASS" or "CLASS MEMBERS" means all individuals who were sent a text message from telephone numbers "330-564-6316," "808-989-5389," and "209-200-0084" from December 5, 2011 through January 11, 2012."

-2-

5.       "COLOR" means that if an original document contains color, the producing party may produce black and white image(s) for each such document. The parties agree that color copies of documents will be produced on an as-needed basis when specified by a party, upon a showing of good cause, and only when the color original is readily accessible. The requesting party will provide a specific Bates range for documents it wishes to be produced in color.

6.       "COMMUNICATION" means or refers to the transmittal of information, facts or ideas including, but not limited to, communications in the form of any discussion, conversation, inquiry, negotiation, agreement, understanding, meeting telephone conversation, letter, correspondence, note, memorandum, e-mail message, telegram, advertisement or other form of exchange of words, whether oral or written.

7.       "COMPLAINT" means Plaintiff's First Amended Class Action Complaint filed in the United States District Court for the District of Nevada on March 8, 2013. (Dkt. 35.)

8.       "COMPUTER" and "COMPUTER EQUIPMENT" means all data processing equipment, including but not limited to, central processing units (CPUs), whether contained in a server or free standing computer or laptop or PDA or similar device that may contain data storage capabilities, irrespective of whether such computing platform, infrastructure or storage is virtualized, whether that data be structured or unstructured, and also including any equipment where computer files (including without limitation, records, documents, logs, and any other contiguous of non-contiguous bit strings), hidden system files or metadata presently reside such as hard disk drives, optical disk drives, removable media, such as floppy disk drives, CD-ROM and DVD drives, Zip drives, Jaz drives, Maxtor drives or snap drives, data processing cards, computer magnetic tapes, backup tapes, drum and disk storage devices or any other similar electronic storage media or system of whatever name or description. "Computer or computer equipment" also means all digital image evidence that may be stored on any type of hardware used to store or manipulate electronic images, including but not limited to microfilm, microfiche and their repositories and readers, or design or engineering computer systems and regardless of any digital image's format, including .jpg, .bmp, or some other advanced or proprietary form of digital image format, such as CAD layered

-3-

1  drawings. "Computer or computer equipment" also refers to sources of digital evidence that may
2  not presently be in use by your company or may have been deleted from your active systems,
3  whether the source is a backup tape or disk, some other data retention system or some form of
4  disaster recovery system. "Computer or computer equipment" also refers to places where digital
5  evidence may reside that may have been deleted from your active files and which may not be
6  readily recoverable from a backup medium, such as metadata.

7        9.     "COMPUTER SYSTEM" refers to free standing servers, computers, and laptops,
8  and also refers to the network infrastructure and computer support systems of the Defendant or
9  subject to the Defendant's possession, custody or control, such as its subsidiaries, predecessors,
10  successors, assigns, joint ventures, partners, parents, agents, or affiliates (in this country or
11  throughout the world), including but not limited to the following:

12           a.     Defendant's LAN, WAN, or other network systems, regardless of methods of
13                connectivity (e.g., by T1, T3, or optical lines), domains, including PDCs, network
14                OS (such as Novell, Microsoft, UNIX, Citrix or some other similar type) or
15                protocols, backup and disaster recovery hardware and media, regardless of the
16                physical location of those electronic storage systems.

17           b.     Defendant's email servers and any repository of email (including within the
18                inbox, sent box, deleted box, or some similar file of the computers of employees or
19                management), or in any backup form whatsoever, regardless of whether you use
20                Microsoft Exchange, Outlook, Outlook Express, Lotus Notes, or some combination
21                of email management software or some alternative commercial or proprietary email
22                management software.

23           c.     Defendant's IS administrative offices, including backup and disaster recovery
24                restoration plans and repositories, data retention plans and repositories, purge plans
25                and repositories, training plans and repositories, and libraries of hardcopy materials
26                of any description (regardless of where located), and online training and operation
27                manuals that have been scanned to disk.

28

-4-

d.      All offsite technology and service bureau support and provisioning systems, including but not limited to cloud or virtualized application, platform, infrastructure or storage schema, and including without limitation any support, scanning, or data conversion support, offsite data storage or archive support schema in connection therewith.

e.      Web hosting and administration services, including intranet and extranet sites, regardless of whether they are now publicly posted or exist in English, or some other language.

10.      "CORRESPONDENCE" means or refers to all written and unwritten but recorded communications, including non-duplicate drafts, versions not sent, and copies that differ only in margin notes or annotations, including memos, letters analog or digital recordings, voicemail, email, computer files, computer disks, or other correspondence or things sent or received by you to or from any entity, including correspondence or files maintained or exchanged internally within your business or with your employees.

11.      "DATE" means the exact year, month and date, if known, or, if not known, your best approximation thereof.

12.      "DESCRIBE" when used in relation to any process, policy, act, or event means explain the process, policy, act, or event in complete and reasonable detail, stating the time, date, and location, identifying all persons participating or present, and identifying all documents relating thereto.

13.      "DOCUMENT" or "DOCUMENTS" shall mean any writings, letters, telegrams, memoranda, Correspondence, email messages, memoranda or notes of conferences or telephone conversations, reports, studies, lists, compilations of data, papers, books, records, contracts, deeds, leases, agreements, pictures, photographs, transcripts, tapes, microfilm, computer data files, printouts, accounting statements, mechanical and electrical recordings, checks, pleadings, and other tangible things upon which any handwriting, typing, printing, drawing, representation, photostatic, or other magnetic or electrical impulses or other form of communication is recorded, stored or

1  produced, including audio and video recordings and electronically-stored information (including but
2  not limited to e-mails, web pages, Websites, computer discs, computer programs and computer
3  files, including, where applicable, compiled and uncompiled source code), whether or not in
4  printout form. These terms shall also mean copies of Documents even though the originals are not
5  in your possession, custody or control; every copy of a Document which contains handwritten or
6  other notations or which otherwise does not duplicate the original of any other copy; all attachments
7  to any Document; and any other Document, item and/or information discoverable under federal law
8  and procedure, including, without limitation, the items referenced in Federal Rule of Civil
9  Procedure 34(a)(1).

10      14.    "DUPLICATES" means exact duplicate ESI documents (based on MD5 or SHA-1
11  hash values) resident within a party's data set. Only documents where the main document and the
12  attachments are exactly the same will be considered exact duplicates. ESI with differing file names
13  but identical hash values shall not be considered duplicates. Exact duplicate shall mean bit-for-bit
14  identicality with both document content and any associated metadata. Where any such documents
15  have attachments, hash values must be identical for both the document-plus-attachment (including
16  associated metadata) as well as for any attachment (including associated metadata) standing alone.

17      15.    "ELECTRONICALLY STORED INFORMATION" or "ESI" as used herein, means
18  and refers to computer generated information or data, of any kind, stored on computers, file servers,
19  disks, tape or other devices or media, or otherwise evidenced by recording on some storage media,
20  whether real virtual, or cloud based.

21      16.    "FILE NAMING CONVENTIONS" means that where production of .tiff images
22  rather than native format ESI is requested or agreed to, each document image file produced shall be
23  named with the unique Bates Number of the first page of the document, followed by the extension
24  ".tif" or ".tiff." To the extent separate text files are provided, text files should be named the same as
25  the first .tiff image of the document.

26      17.    "HER" or "HIS" means both "his" and "her" and is not limited to the masculine or
27  feminine, but includes both.

28

-6-

18.     "IDENTIFY," when used with respect to a natural person, means to state the person's full name, present or last known business affiliation and position, past and present home address and past position and business affiliation, if any, with any of the parties herein.

19.     "IDENTIFY," when used with respect to a company or other business entity, means to state the company's legal name, the names under which it does business, its form (e.g., partnership, corporation, etc.), the address of its principal place of business, and to identify its principal proprietors, officers or directors.

20.     "IDENTIFY," when used with respect to a document, means to state the date(s) prepared, drafted or generated, the author(s), intended and actual recipient(s), type of document (e.g., "letter," "Terms of Service" or "email"), and to identify its last known custodian or location.

21.     "IDENTIFY," when used in reference to an event, transaction, or occurrence, means to describe the act in complete and reasonable detail; state the time, date, location; identify all persons participating or present; and identify all documents relating thereto.

22.     "IDENTIFY," when used with respect to a communication, means to state the type of communication (i.e., telephone discussion, email, face-to-face, etc.), the name and present address of each person present during the communication, or who otherwise observed or heard the communication, and to state the subject matter of the communication and the date upon which it occurred.  If the communication was in writing, identify all documents that relate or are related to the communication in the manner provided above.

23.     "INCLUDING" means "including, but not limited to;" "includes" means "includes, but not limited to."

24.     "LEAD" means a request made by a potential consumer who has indicated an interest in a particular type of goods or service.

25.     "MEDIA" means an object or device, real or virtual, including but not limited to a disc, tape, computer, or other device, on which data is or was stored.

26.     "METADATA" means and refers to data about data, including without limitation, information embedded in a native file or other data that is not ordinarily viewable or printable from

-7-

1  the application that generated, edited, or modified such native file which describes the

2  characteristics, origins, usage, and validity of the electronic file as well as information generated

3  automatically by the operation of a computer or other information technology system when a native

4  file is created, modified, transmitted, deleted or otherwise manipulated by a user of such system.

5      27.      METADATA means, in connection with ESI requested, and includes without

6  limitation, file, application and system metadata. The following list identifies the Metadata fields

7  that referred to (to the extent available):

8      • Document number or Production number (including the document start and

9         document end numbers). This should use the standard Bates number in accordance

10        with those used in previous productions.

11     • BeginAttach

12     • EndAttach

13     • Title/Subject

14     • Sent/Date and Time (for emails only)

15     • Last Modified Date and Time Created Date and Time (for E-docs)

16     • Received Date and Time (for emails only)

17     • Author

18     • Recipients

19     • cc:

20     • bcc:

21     • Source (custodian)

22     • Hash Value

23     • File Path

24     • Media (type of media that the document was stored on when it was collected)

25     • Page Count

26     • Original File Name

27     • Doc extension

28

-8-

- Full Text
- Accessed Date & Time
- Last Print Date

28.    "NATIVE DATA FORMAT" means and refers to the format of ESI, whether structured or unstructured, in which it was generated and as used by the producing party in the usual course of its business and in its regularly conducted activities.

29.    "PERSON" means or refers to any natural person, corporation, partnership, association, organization, joint ventures, or other entity of any type or nature.

30.    "PLAINTIFF," "PLAINTIFF KRISTENSEN," or "KRISTENSEN" means or refers to the Plaintiff FLEMMING KRISTENSEN.

31.    "PRODUCTION OF PAPER DOCUMENTS" means production of paper-based original documents (i.e., documents which were not first generated by a computer, such as hand written memoranda) shall be produced in hard copy manner.

32.    "RELATING TO," including its various forms such as "relates to" or "relating to" means to consist of, concern, discuss, mention, regard, refer to, reflect or be in any way logically, factually or legally connected, directly or indirectly, with the matter described.

33.    "RELEVANT TIME PERIOD," means the four (4) years prior to the date the Complaint was filed in the District of Nevada until the present. Unless otherwise indicated, all DOCUMENT and ESI production requests shall mean for the RELEVANT TIME PERIOD.

34.    "SMS" means short message service.

35.    "SMS Message" shall mean a text message, text message call, text call, text message advertisement, SMS message, Short Message Service, SMS message call, SMS communication, SMS spam, spam text message, commercial text call and/or wireless spam.

36.    "STATIC IMAGE" means or refers to a representation of ESI produced by converting a native file into a standard image format capable of being viewed and printed on standard computer systems.

37.    "STRUCTURED DATA" Structured data such as relevant database information will

-9-

1 | be produced in Native Data Format data, together with any associated database schema necessary to
2 | render such data reasonably usable using commonly and currently available tools.

3 | 38.   "TCPA" means and refers both individually and collectively to the Telephone
4 | Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. §227, and any amendments thereto, 47
5 | C.F.R. §64.1200, Report and Order ("R&O") adopted by the Federal Communication Commission
6 | ("FCC") on September 17, 1992, and Memorandum Opinion and Order ("MO&O") adopted by the
7 | FCC on July 26, 1995, and Rules and Regulations Implementing the TCPA, Report and Order, 18
8 | FCC Rcd. 14014, 14115, ¶ 165, 2003 WL 21517853 (2003) ("2003 TCPA Order"), and the
9 | Regulatory Ruling adopted by the FCC on December 28, 2007, CG Docket No. 02-278, and other
10 | such promulgations of the FCC addressing interpretation and implementation of same.

11 | 39.   "TEXT MESSAGE" or "TEXT MESSAGE CALL" shall mean a text message, text
12 | message call, text call, text message advertisement, SMS message, Short Message Service, SMS
13 | message call, SMS communication, SMS spam, spam text message, commercial text call and/or
14 | wireless spam sent to any member of the Class as defined in ¶ 40 of the Complaint.

15 | 40.   "YOU," "YOUR," "DEFENDANT," or "CPS" means or refers to Defendant
16 | CREDIT PAYMENT SERVICES, INC., MYCASHNOW.COM, INC., AREA203 DIGITAL, and
17 | their divisions, subsidiaries, related companies, predecessors, and successors, all present and former
18 | officers, directors, agents, attorneys, employees, and all persons acting or purporting to act on
19 | behalf of any of them.

20 |

### II. Instructions

21 | 1.   If, in responding to these requests, You encounter any ambiguity in construing either
22 | the request or any instruction relevant to the request, You should nonetheless respond to the request,
23 | set forth the matter deemed ambiguous, and shall set forth the construction used in responding to the
24 | request.

25 | 2.   These are intended as continuing requests having within them a duty to timely
26 | supplement the responses until and during the course of trial. Information sought by these requests
27 | that You obtain after You serve Your responses must be disclosed to the Plaintiff by supplementary

28 |

-10-

1 | responses.

2 | 3. If You object to answering all or any part of any request on the grounds of privilege

3 | or work product, You are required to identify the privileged Document(s) or Communication(s), and

4 | with respect to each such privileged responsive Document or Communication identify:

5 | (a) the date appearing on such document, or if no date appears, the date on which

6 | such Document or ESI was prepared;

7 | (b) ESI metadata creation, revision, transmission, receipt, and last access dates;

8 | (c) the name of each person to whom such Document or ESI was addressed;

9 | (d) the name of each person, other than the addressee(s) identified in

10 | subparagraph (b) above, to whom such Document or ESI, or copy thereof

11 | was sent, or with whom such document was discussed;

12 | (e) the name of each person who signed such Document or ESI, if not signed, the

13 | name of each person who prepared it;

14 | (f) the name of each person making any contribution to the authorship of such

15 | Document or ESI;

16 | (g) the job title or position of each person identified in subparagraph (b), (c), (d),

17 | and (e) above;

18 | (h) the date such Document or ESI was received or discussed by each Person

19 | identified in subparagraphs (b) or (c) above;

20 | (i) the general nature or description of such Document or ESI, and, where

21 | applicable, its number of pages;

22 | (j) the name of each person who currently has custody of such Document or ESI;

23 | and

24 | (k) the specific ground(s) upon which the privilege or work product rests.

25 | Each demand herein shall be construed independently and shall not be limited by reference

26 | to any other demand.

27 | 4. When producing the requested Documents, You are to designate for which specific

28 |

-11-

1   request or requests the Document is responsive or produce the Documents as they are kept in the
2   ordinary course of business. All Documents are to be produced in the form, order, and manner in
3   which they are generated and maintained by You in the usual course of Your everyday routine
4   business activities. Where structured data (e.g., data from a database) is requested, appropriate
5   queries will be used to extract relevant data from any such database, which data shall match
6   specified criteria, and returning specified fields, in a form and format that is verifiably responsive
7   and readable by the use of commonly and currently available tools. Documents are to be produced
8   in folders, cartons, or containers in which they have been maintained, stored, clipped, stapled, or
9   otherwise arranged in the same form and manner in which they were found and in such manner that
10  the office and location from which they were produced is readily identifiable. Whenever a
11  Document (as defined) or a group of Documents is taken out of a file folder, file drawer, file box, or
12  notebook, before the same is produced, attach thereto a copy of the label on the file folder, file box,
13  or notebook from which the Document or group of Documents was removed. All ESI should be
14  produced in native format, reasonably usable, and verifiably responsive to the pertinent request(s)
15  and processable using readily available tools.

16      5.      If any Document requested has been lost or destroyed since its creation, Identify the
17  nature of the Document (e.g., letter, email, etc.), the date of the Document, the persons who sent and
18  received the original and copies of the Document, a summary of the content of the Document and
19  describe when, where, how, and by whom said Document was lost or destroyed, and state the name
20  of the person(s) who last had custody thereof.

21      6.      "And" as well as "or" shall be construed either disjunctively or conjunctively as
22  necessary to bring within the scope of this request any information which might otherwise be
23  construed to be outside of the scope. Singular and plural words should be read so as to bring within
24  the scope of these requests any information that might otherwise be construed to be outside their
25  scope.

26      7.      "Each" shall be construed to include and encompass "all."

27      8.      For any term used herein, which is not otherwise specifically defined, the common

28

-12-

1   and usual meaning of such term is intended.  Any ambiguity in these requests shall be resolved so as
2   to construe these requests as broadly as possible.

3       9.       Unless otherwise specified, the time period in these requests is the Relevant Time
4   Period, as that term is defined herein.

5       10.      Defined terms need not be capitalized to retain their meaning.

6                           ***III.  Documents Requested***

7   **DOCUMENT REQUEST NO. 61**

8       All Communications Related To the creation, negotiation, and execution of the Agency of
9   Record Agreement between Credit Payment Services, Inc. and Area203 dated December 16, 2011.

10  **DOCUMENT REQUEST NO. 62**

11      All Documents Identifying Your ownership interests in LeadPile LLC between January 1,
12  2011 and April 1, 2012.

13  **DOCUMENT REQUEST NO. 63**

14      All Documents Identifying Your payment of monetary compensation to LeadPile LLC
15  employees between January 1, 2011 and April 1, 2012.

16  **DOCUMENT REQUEST NO. 64**

17      All Communications to or from Carey V. Brown containing the phrase "LeadPile."

18  **DOCUMENT REQUEST NO. 65**

19      All Communications to or from any employee of Credit Payment Services, Inc. discussing,
20  mentioning, or Related To the December 18, 2011 Times Free Press Article entitled "Local
21  companies tied to offshore payday lenders" by Ellis Smith.

22  **DOCUMENT REQUEST NO. 66**

23      All Communications to or from Carey V. Brown discussing, mentioning, or Related To the
24  December 18, 2011 Times Free Press Article entitled "Local companies tied to offshore payday
25  lenders" by Ellis Smith.

26

27

28

                                    -13-

1  **DOCUMENT REQUEST NO. 67**

2       All Communications to or from Ron Beaver discussing, mentioning, or Related To the

3  December 18, 2011 Times Free Press Article entitled "Local companies tied to offshore payday

4  lenders" by Ellis Smith.

5  **DOCUMENT REQUEST NO. 68**

6       All Documents Identifying all persons who received a Form W-2 Wage and Tax Statement

7  from Credit Payment Services, Inc. between January 1, 2011 and May 1, 2012.

8  **DOCUMENT REQUEST NO. 69**

9       All Documents Identifying all persons who received a Form 1099-MISC from Credit

10  Payment Services, Inc. between January 1, 2011 and May 1, 2012.

11  **DOCUMENT REQUEST NO. 70**

12       All Documents Identifying any invoices provided to LeadPile LLC from You between

13  January 1, 2011 and April 1, 2012.

14  **DOCUMENT REQUEST NO. 71**

15       All Documents Identifying any invoices provided to You from LeadPile between January 1,

16  2011 and April 1, 2012.

17  **DOCUMENT REQUEST NO. 72**

18       All Documents Identifying any and all bank accounts jointly held by You and LeadPile

19  between January 1, 2011 and April 1, 2012.

20  **DOCUMENT REQUEST NO. 73**

21       All Documents Identifying the number of potential borrowers provided to You and/or

22  MyCashNow.com, Inc. for the purpose of providing short-term loans from LeadPile LLC between

23  January 1, 2011 and April 1, 2012.

24  **DOCUMENT REQUEST NO. 74**

25       All Documents concerning steps You took to ensure that the entities You identified in Your

26  Answer to Plaintiff's Interrogatory No.12 complied with the TCPA.

27

28

-14-

1

**DOCUMENT REQUEST NO. 75**

2        All Documents Identifying policies, procedures, and protocols You had in place to ensure

3   that the Leads You purchased from LeadPile were not generated in violation of the TCPA.

4   **DOCUMENT REQUEST NO. 76**

5        All Documents Identifying and/or Related to the "producer ID 1284047772106"

6   **DOCUMENT REQUEST NO. 77**

7        All Documents Identifying and/or Related to the producer ID associated with

8   Net1Promotions LLC d/b/a Click Media.

9   **DOCUMENT REQUEST NO. 78**

10        All Communications between You and LeadPile LLC.

11   **DOCUMENT REQUEST NO. 79**

12        All Documents and ESI Identifying or Relating To Your account settings with LeadPile

13   LLC.  Documents and ESI produced in response to this Request should include:

14        (a) communications between CPS employees Related To Your account settings with

15   LeadPile LLC; and

16        (b) website screenshots of the LeadPile web portal showing Your account settings with

17   LeadPile.

18   **DOCUMENT REQUEST NO. 80**

19        Produce all documents concerning your knowledge of the use of SMS Marketing by entities

20   or individuals You purchased Leads from.

21   **DOCUMENT REQUEST NO. 81**

22        All Documents and ESI Identified referenced, or relied upon in providing Your Answers to

23   Plaintiff's Second Set of Interrogatories on You.

24   **DOCUMENT REQUEST NO. 82**

25        All Communications Related To the creation, negotiation, and execution of the LeadPile

26   Lead Buyer Agreement between You and LeadPile LLC dated August 8, 2009.

27

28

-15-

**DOCUMENT REQUEST NO. 83**

All Documents and ESI You have produced to a state or federal government agency Related To Your corporate structure.

**DOCUMENT REQUEST NO. 84**

All Documents and ESI Identifying Your ownership Interests in LeadPile LLC as of December 1, 2011.

**DOCUMENT REQUEST NO. 85**

All Documents and ESI Describing why LeadPile LLC refers to CPS as a "sister company."

**DOCUMENT REQUEST NO. 86**

All Documents and ESI supporting or refuting the factual allegations made in the December 18, 2011 Times Free Press Article entitled "Local companies tied to offshore payday lenders" by Ellis Smith.

**DOCUMENT REQUEST NO. 87**

All Documents, ESI, and Communications Related To Christopher Christiansen's involvement in the December 18, 2011 Times Free Press Article entitled "Local companies tied to offshore payday lenders" by Ellis Smith.

**DOCUMENT REQUEST NO. 88**

All Documents, ESI, and Communications Related To Aaron Shelley's involvement in the December 18, 2011 Times Free Press Article entitled "Local companies tied to offshore payday lenders" by Ellis Smith.

**DOCUMENT REQUEST NO. 89**

All Documents, ESI, and Communications Related To Byron DeLoach's involvement in the December 18, 2011 Times Free Press Article entitled "Local companies tied to offshore payday lenders" by Ellis Smith.

**DOCUMENT REQUEST NO. 90**

All Documents and ESI Related To Your lawsuits against Byron DeLoach, Aaron Shelley, and Christopher Christiansen.

-16-

**DOCUMENT REQUEST NO. 91**

All Documents Related To the deposition testimony of Carey V. Brown provided on February 15, 2005, supporting the testimony that MyCashNow.com, Inc. is "basically just a shell corporation."

**DOCUMENT REQUEST NO. 92**

All Documents Related To Scott Wilson's involvement in and creation of the corporate structure of the following companies listed below. This request includes all Communications between any of Your current or former employees and Scott Wilson.

- Area 203 (formerly known as Logic Marketing)
- DiscountAdvances.com
- MyCashNow.com
- PayDayMax.com
- Scenic City Legal Group
- Terenine (formerly known as Basenine)
- Woody Holdings
- LeadPile LLC
- Credit Payment Services, Inc.
- Support Seven
- Credit Protection Depot

**DOCUMENT REQUEST NO. 93**

All Documents Identifying Carey V. Brown's ownership interests in the following companies from January 1, 2009 to December 21, 2012:

- Area 203 (formerly known as Logic Marketing)
- DiscountAdvances.com
- MyCashNow.com
- PayDayMax.com
- Scenic City Legal Group

-17-

1
- Terenine (formerly known as Basenine)

2
- Woody Holdings

3
- LeadPile LLC

4
- Credit Payment Services, Inc.

5
- Support Seven

6
- Credit Protection Depot

7 **DOCUMENT REQUEST NO. 94**

8
All Documents Related To Any changes in the corporate structure of the following

9 companies from January 1, 2009 to December 21, 2012:

10
- Area 203 (formerly known as Logic Marketing)

11
- DiscountAdvances.com

12
- MyCashNow.com

13
- PayDayMax.com

14
- Scenic City Legal Group

15
- Terenine (formerly known as Basenine)

16
- Woody Holdings

17
- LeadPile LLC

18
- Credit Payment Services, Inc.

19
- Support Seven

20
- Credit Protection Depot

21 **DOCUMENT REQUEST NO. 95**

22
All Contracts entered into among and between any of the following companies:

23
- Area 203 (formerly known as Logic Marketing)

24
- DiscountAdvances.com

25
- MyCashNow.com

26
- PayDayMax.com

27
- Terenine (formerly known as Basenine)

28

-18-

1      •   Woody Holdings

2      •   LeadPile LLC

3      •   Credit Payment Services, Inc.

4      •   Support Seven

5      •   Credit Protection Depot

6  **DOCUMENT REQUEST NO. 96**

7  Notices of meetings and the minutes of all CPS shareholder meetings between January 1,

8  2008 to the April 1, 2012.

9  **DOCUMENT REQUEST NO. 97**

10  Minutes of all meetings and resolutions of Your Board of Directors between January 1, 2008

11  to the April 1, 2012.

12  **DOCUMENT REQUEST NO. 98**

13  Documents on which You will rely to show that You observed corporate formalities and

14  were adequately capitalized between January 1, 2008 to the April 1, 2012.

15  **DOCUMENT REQUEST NO. 99**

16  Copies of Your Articles of Incorporation and By-Laws between January 1, 2008 and April

17  1, 2012.

18  **DOCUMENT REQUEST NO. 100**

19  Documents and ESI Identifying transfers of funds between CPS and LeadPile LLC between

20  January 1, 2008 and April 1, 2012.

21  **DOCUMENT REQUEST NO. 101**

22  Documents and ESI Identifying expenses/liabilities of LeadPile paid by CPS between

23  January 1, 2008 and April 1, 2012.

24  **DOCUMENT REQUEST NO. 102**

25  Documentation of transfers of assets between LeadPile LLC and CPS between January 1,

26  2008 and April 1, 2012.

27

28

1  **DOCUMENT REQUEST NO. 103**

2      General ledgers or balance sheets of CPS between January 1, 2008 and April 1, 2012.

3

4

5  Dated: March 31, 2014

6                                                              Respectfully submitted,

7                                                              FLEMMING KRISTENSEN, individually and on
                                                              behalf of a class of similarly situated individuals
8
                                                              By: _____
9
                                                                      One of his attorneys

10
   John Benedict, Esq.
11 john.benedict.esq@gmail.com
   Nevada Bar No. 005581
12 LAW OFFICES OF JOHN BENEDICT
   2190 E. Pebble Road, Suite 260
13 Las Vegas, Nevada 89123
   Tel: 702.333.3770
14 Fax: 702.361.3685

15 Ryan D. Andrews (Admitted *pro hac vice*)
   randrews@edelson.com
16 Rafey Balabanian (Admitted *pro hac vice*)
   rbalabanian@edelson.com
17 John C. Ochoa (Admitted *pro hac vice*)
   jochoa@edelson.com
18 EDELSON PC
   350 North LaSalle Street, Suite 1300
19 Chicago, Illinois 60654
   Tel: 312.589.6370
20 Fax: 312.589.6378

21 Attorneys for Plaintiff Flemming Kristensen

22

23

24

25

26

27

28
                                              -20-

## CERTIFICATE OF SERVICE

I, John C. Ochoa, an attorney, certify that on March 31, 2014, I caused to be served the above and foregoing *Plaintiff's Second Set of Document Requests to Defendant Credit Payment Services, Inc.* by causing true and accurate copies of such paper to be hand delivered to the following:

**Steven Aaron**
**Gregory Wolf**
Dentons US LLP
4520 Main Street, Ste. 1100
Kansas City, MO 64111
Steven.aaron@dentons.com
Gregory.wolf@dentons.com

*Attorneys for Defendant Credit Payment Services, Inc.*

Plaintiff's Second Set of Document Requests                    Case No. 2:12-CV-00528-APG(PAL)

# EXHIBIT B

John Benedict, Esq.
john.benedict.esq@gmail.com
Nevada Bar No. 005581
LAW OFFICES OF JOHN BENEDICT
2190 E. Pebble Road, Suite 260
Las Vegas, Nevada 89123
Tel: 702.333.3770
Fax: 702.361.3685

Ryan D. Andrews (Admitted *Pro Hac Vice*)
randrews@edelson.com
Rafey Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
John C. Ochoa (Admitted *Pro Hac Vice*)
jochoa@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Attorneys for Plaintiff Flemming Kristensen

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| FLEMMING KRISTENSEN, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>CREDIT PAYMENT SERVICES INC., a Nevada corporation, f/k/a MYCASHNOW.COM INC., ENOVA INTERNATIONAL, INC., an Illinois corporation, PIONEER FINANCIAL SERVICES, INC., a Missouri corporation, LEADPILE LLC, a Delaware limited liability company, and CLICKMEDIA LLC d/b/a NET1PROMOTIONS LLC, a Georgia limited liability company,<br><br>Defendants. | Case No. 2:12-CV-00528-APG(PAL)<br><br>CLASS ACTION<br><br>**PLAINTIFF'S FIRST SET OF REQUESTS TO ADMIT TO DEFENDANT CREDIT PAYMENT SERVICES, INC.**<br><br>Judge: Hon. Andrew P. Gordon<br><br>Magistrate: Hon. Peggy A. Leen |

1    Plaintiff FLEMMING KRISTENSEN, pursuant to Rule 36 of the Federal Rules of

2  Civil Procedure requests that Defendant CREDIT PAYMENT SERVICES, INC. admit or

3  deny the following under oath, within thirty (30) days of service of these requests.

4    *I. Definitions*

5    1.    "Class Members" means all individuals who were sent a text message from

6  telephone numbers "330-564-6316," "808-989-5389," and "209-200-0084" from December

7  5, 2011 through January 11, 2012" as certified by the Court. (Dkt. 164.)

8    2.    "Complaint" shall mean Plaintiff's Amended Class Action Complaint filed in

9  the United States District Court for the District of Nevada on March 8, 2013.

10    3.    "Lead" means a request made by a potential consumer who has indicated an

11  interest in a particular type of goods or service.

12    4.    "Lender Defendants" means Defendant Credit Payment Services, Inc. f/k/a

13  MyCashNow.com, Inc., Area203 Digital, Inc., Pioneer Financial Services, Inc., MidCountry

14  Bank, Enova International, Inc., CNU Online Holdings LLC, and their divisions,

15  subsidiaries, related companies, predecessors, and successors, all present and former officers,

16  directors, agents, attorneys, employees, and all persons acting or purporting to act on behalf

17  of any of them.

18    5.    "Person" means or refers to any natural person, corporation, partnership,

19  association, organization, joint ventures, or other entity of any type or nature.

20    6.    "Plaintiff," "Plaintiff Kristensen," or "Kristensen" means or refers to the

21  Plaintiff Flemming Kristensen.

22    7.    "Relating To," including its various forms such as "relates to," means to

23  consist of, concern, discuss, mention, regard, refer to, reflect or be in any way logically,

24  factually or legally connected, directly or indirectly, with the matter described.

25    8.    "SMS" means short message service.

26    9.    "SMS Message" shall mean a text message, text message call, text call, text

27  message advertisement, SMS message, Short Message Service, SMS message call, SMS

28  communication, SMS spam, spam text message, commercial text call and/or wireless spam.

1    10.    "TCPA" means the Telephone Consumer Protection Act (47 U.S.C. § 227, *et*
2  *seq.*).

3    11.    "Text Message" shall mean the text message, text message call, text call, text
4  message advertisement, SMS message, Short Message Service, SMS message call, SMS
5  communication, SMS spam, spam text message, commercial text call and/or wireless spam
6  defined in Plaintiff's Complaint at ¶ 35.

7    12.    "You," "Your," "Defendant," or "CPS" means or refers to Defendant Credit
8  Payment Services, Inc., MyCashNow.com, Inc., Area203 Digital, and their divisions,
9  subsidiaries, related companies, predecessors, and successors, all present and former officers,
10  directors, agents, attorneys, employees, and all persons acting or purporting to act on behalf
11  of any of them.

12    13.    Where a request addresses acts or omissions of any entity, it shall be
13  construed and interpreted to apply to the acts or omissions of that entity and the acts or
14  omissions of that entity's employees, assigns, contractors, and any other agent of that entity.

15    14.    All other terms shall be construed as necessary to bring within the scope of
16  these requests any information that might otherwise be construed to be outside its scope.

17                                    ***II. Instructions***

18    1.    A matter is admitted unless, within 30 days after being served, You serve on
19  the requesting party, through his counsel, a written answer or objection addressed to the
20  matter and signed by You or Your attorney.

21    2.    If a matter is not admitted, Your answer must specifically deny it or state in
22  detail why You cannot truthfully admit or deny it. A denial must fairly respond to the
23  substance of the matter; and when good faith requires that You qualify an answer or deny
24  only a part of a matter, Your answer must specify the part admitted and qualify or deny the
25  rest. You may assert lack of knowledge or information as a reason for failing to admit or
26  deny only if You state that You have made reasonable inquiry and that the information You
27  know or can readily obtain is insufficient to enable You to admit or deny the matter.

28    3.    The grounds for objecting to a request must be stated. You may not object

1   solely on the ground that the request presents a genuine issue for trial.

2   ### III.  Requests to Admit

3   1.      Admit that at least one current or former CPS employee was aware at some
4   point between January 1, 2008 and March 31, 2012 that LeadPile bought leads from Click
5   Media that were generated, in part, from the use of SMS Messaging.

6   **RESPONSE:**

7

8   2.      Admit that at least one current or former CPS employee was aware at some
9   point between January 1, 2008 and March 31, 2012 that LeadPile bought leads from
10  publishers that were generated, in part, from the use of SMS Messaging.

11  **RESPONSE:**

12

13  3.      Admit that at least one current or former CPS employee was aware at some
14  point between January 1, 2008 and March 31, 2012 that SMS Messaging was one method
15  that Leads were generated in the online, payday lending industry.

16  **RESPONSE:**

17

18  4.      Admit that at no time between January 1, 2010 and March 31, 2012 did any
19  current or former CPS employee instruct any LeadPile employee that CPS would not buy
20  Leads generated through SMS Messaging.

21  **RESPONSE:**

22

23  5.      Admit that You never rejected a Lead You purchased from LeadPile because
24  the Lead was generated using SMS Messaging.

25  **RESPONSE:**

26

27

28

1      6.     Admit that at least one of Your employees was aware at some point between

2 January 1, 2008 and March 31, 2012 that SMS Messaging was one method used by at least

3 one of the entities identified in Your Response to Interrogatory No. 12 to generate Leads.

4      **RESPONSE:**

5

6      7.     Admit that at least one CPS employee viewed the blog post authored by

7 former LeadPile employee Eugen Ilie entitled "SMS and Lead Gen in a Lead Exchange at

8 some point before March 31, 2012.

9      **RESPONSE:**

10

11      8.     Admit that prior to December 1, 2011, You had knowledge that sending SMS

12 Messages to Persons without prior express consent using an automatic telephone dialing

13 system violated the TCPA.

14      **RESPONSE:**

15

16      9.     Admit that prior to entering into the LeadPile Lead Buyer Agreement with

17 LeadPile that You had knowledge that sending SMS Messages to persons without prior

18 express consent using an automatic telephone dialing system violated the TCPA.

19      **RESPONSE:**

20

21      10.     Admit that prior to entering into the LeadPile Lead Buyer Agreement with

22 LeadPile that You had knowledge that LeadPile delegated the generation of leads to other

23 entities.

24      **RESPONSE:**

25

26      11.     Admit that LeadPile forwarded the information collected at the website

27 "https://thesmartcreditsolution.securelinkcorp.com" to You if You purchased the Lead.

28      **RESPONSE:**

12.     Admit that the LeadPile Lead Buyer Agreement You entered into with LeadPile LLC placed no restrictions on the use of SMS Messaging to generate Leads.

**RESPONSE:**

13.     Admit that LeadPile would not have provided You Leads generated through SMS Messaging if you instructed them you would not accept such Leads.

**RESPONSE:**

14.     Admit that LeadPile would not have provided You Leads generated through SMS Messaging if you including a provision in the LeadPile Lead Buyer Agreement that you would not accept such Leads.

**RESPONSE:**

15.     Admit that You provided loans to Leads purchased from LeadPile LLC.

**RESPONSE:**

16.     Admit that You underwrote loans purchased from LeadPile LLC.

**RESPONSE:**

17.     Admit that you provided loans to Leads originating at the website https://thesmartcreditsolution.securelinkcorp.com."

**RESPONSE:**

18.     Admit that you underwrote loans provided to Leads originating at the website https://thesmartcreditsolution.securelinkcorp.com."

**RESPONSE:**

1       19.    Admit that You earned money on the loans You provided to Leads purchased

2   from LeadPile LLC.

3       **RESPONSE:**

4

5       20.    Admit that You earned money on the loans You provided to Leads You

6   purchased from LeadPile that originated at the website

7   https://thesmartcreditsolution.securelinkcorp.com."

8       **RESPONSE:**

9

10      21.    Admit that You were aware that the website

11  https://thesmartcreditsolution.securelinkcorp.com" was used at some point between January

12  1, 2010 and March 31, 2012 to generate Leads for online, payday lenders.

13      **RESPONSE:**

14

15      22.    Admit that You were aware that the website

16  https://thesmartcreditsolution.securelinkcorp.com" was used at some point between January

17  1, 2010 and March 31, 2012 to generate Leads for the Lender Defendants.

18      **RESPONSE:**

19

20      23.    Admit that the Text Message identified in paragraph 35 of Plaintiff's

21  Complaint promoted loans available online.

22      **RESPONSE:**

23

24      24.    Admit that the Text Message identified in paragraph 35 of Plaintiff's

25  Complaint advertised loans available online.

26      **RESPONSE:**

27

28

1      25.    Admit that the Text Message identified in paragraph 35 of Plaintiff's

2  Complaint appeared to advertise loans available online.

3      **RESPONSE:**

4

5      26.    Admit that the Text Message identified in paragraph 35 of Plaintiff's

6  Complaint appeared to promote loans available online.

7      **RESPONSE:**

8

9      27.    Admit that from January 1, 2010 through March 31, 2012, You provided loan

10  products and services available online.

11      **RESPONSE:**

12

13      28.    Admit that from January 1, 2010 through March 31, 2012, MyCashNow.com,

14  Inc. provided loan products and services available online.

15      **RESPONSE:**

16

17      29.    Admit that from January 1, 2010 through March 31, 2012, You underwrote

18  loan products and services available online.

19      **RESPONSE:**

20

21      30.    Admit that Carey V. Brown testified truthfully at his February 15, 2005

22  deposition when he was asked "What did My Cash now do in connection with Credit

23  Payment Services?" and Mr. Brown answered "It's just a shell corporation."

24      **RESPONSE:**

25

26      31.    Admit that Carey V. Brown provided truthful deposition testimony on

27  February 15, 2005 in the case *Electroweb Media, inc. v. MyCashNow.com, Inc., et al.*, No.

28  1:02-cv-133 (E.D. Ten.).

1      **RESPONSE:**

2

3          32.     Admit that Area203 purchased Leads from LeadPile LLC on Your behalf.

4          **RESPONSE:**

5

6          33.     Admit that Carey V. Brown is Your sole owner.

7          **RESPONSE:**

8

9          34.     Admit that Carey V. Brown is the sole owner of LeadPile LLC.

10         **RESPONSE:**

11

12         35.     Admit that Carey V. Brown is the sole owner of Area203.

13         **RESPONSE:**

14

15         36.     Admit that Carey V. Brown shares assets between You and LeadPile.

16         **RESPONSE:**

17

18         37.     Admit that Carey V. Brown shares assets between You and Area203.

19         **RESPONSE:**

20

21     Dated: March 31, 2014

22
                                         FLEMMING KRISTENSEN, individually and
23                                       on behalf of a class of similarly situated
                                         individuals
24
                                         BY: _____
25                                       One of his attorneys

26

27     John Benedict, Esq.
       john.benedict.esq@gmail.com
28     Nevada Bar No. 005581

LAW OFFICES OF JOHN BENEDICT
2190 E. Pebble Road, Suite 260
Las Vegas, Nevada 89123
Tel: 702.333.3770
Fax: 702.361.3685

Ryan D. Andrews (Admitted *pro hac vice*)
randrews@edelson.com
Rafey Balabanian (Admitted *pro hac vice*)
rbalabanian@edelson.com
John C. Ochoa (Admitted *pro hac vice*)
jochoa@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Attorneys for Plaintiff Flemming Kristensen

## CERTIFICATE OF SERVICE

I, John C. Ochoa, an attorney, certify that on March 31, 2014, I caused to be served the above and foregoing *Plaintiff's Requests to Admit Facts to Defendant Credit Payment Services, Inc.* by causing true and accurate copies of such paper to be hand delivered to the following:

**Steven Aaron**
**Gregory Wolf**
Dentons US LLP
4520 Main Street, Ste. 1100
Kansas City, MO 64111
Steven.aaron@dentons.com
Gregory.wolf@dentons.com

*Attorneys for Defendant Credit Payment Services, Inc.*



# EXHIBIT C

1

2  John Benedict, Esq.
   john.benedict.esq@gmail.com
3  Nevada Bar No. 005581
   LAW OFFICES OF JOHN BENEDICT
4  2190 E. Pebble Road, Suite 260
   Las Vegas, Nevada 89123
5  Tel: 702.333.3770
   Fax: 702.361.3685

6  Ryan D. Andrews (Admitted *Pro Hac Vice*)
   randrews@edelson.com
7  Rafey Balabanian (Admitted *Pro Hac Vice*)
   rbalabanian@edelson.com
8  John C. Ochoa (Admitted *Pro Hac Vice*)
   jochoa@edelson.com
9  EDELSON PC
   350 North LaSalle Street, Suite 1300
10 Chicago, Illinois 60654
   Tel: 312.589.6370
11 Fax: 312.589.6378

12 Attorneys for Plaintiff Flemming Kristensen

13            IN THE UNITED STATES DISTRICT COURT
                     DISTRICT OF NEVADA
14

15 | FLEMMING KRISTENSEN, individually and on behalf of a class of similarly situated individuals, | Case No. 2:12-CV-00528-APG(PAL) |

16 |  | CLASS ACTION |

17 |            Plaintiff, | **PLAINTIFF'S SECOND SET OF INTERROGATORIES TO DEFENDANT CREDIT PAYMENT SERVICES, INC.** |

18 | v. |  |

19 | CREDIT PAYMENT SERVICES INC., a Nevada corporation, f/k/a | Judge: Hon. Andrew P. Gordon |

20 | MYCASHNOW.COM INC., ENOVA INTERNATIONAL, INC., an Illinois | Magistrate: Hon. Peggy A. Leen |

21 | corporation, PIONEER FINANCIAL SERVICES, INC., a Missouri corporation, |  |

22 | LEADPILE LLC, a Delaware limited liability company, and CLICKMEDIA LLC d/b/a |  |

23 | NET1PROMOTIONS LLC, a Georgia limited liability company, |  |

24 |            Defendants. |  |

25

26

27

28 Plaintiff's Second Set of Interrogatories to CPS                Case No. 2:12-cv-00528 APG (PAL)

1  Plaintiff FLEMMING KRISTENSEN, pursuant to Rule 33 of the Federal Rules of Civil
2  Procedure, requests that Defendant CREDIT PAYMENT SERVICES, INC. answer the following
3  Interrogatories, in writing and under oath, in accordance with the definitions and instructions set
4  forth herein, within thirty (30) days of service, and to make service of said answers upon Plaintiff's
5  counsel.

6  ## I. Definitions

7  1.  "CLASS" or "CLASS MEMBERS" means all individuals who were sent a text
8  message from telephone numbers "330-564-6316," "808-989-5389," and "209-200-0084" from
9  December 5, 2011 through January 11, 2012."

10  2.  "COMMUNICATION" means or refers to the transmittal of information, facts or
11  ideas including, but not limited to, communications in the form of any discussion, conversation,
12  inquiry, negotiation, agreement, understanding, meeting telephone conversation, letter,
13  correspondence, note, memorandum, e-mail message, telegram, advertisement or other form of
14  exchange of words, whether oral or written.

15  3.  "DATE" means the exact year, month and date, if known, or, if not known, your best
16  approximation thereof.

17  4.  "DESCRIBE" when used in relation to any process, policy, act, or event means
18  explain the process, policy, act, or event in complete and reasonable detail, stating the time, date,
19  and location, identifying all persons participating or present, and identifying all documents relating
20  thereto.

21  5.  "DOCUMENT" or "DOCUMENTS" shall mean any writings, letters, telegrams,
22  memoranda, Correspondence, email messages, memoranda or notes of conferences or telephone
23  conversations, reports, studies, lists, compilations of data, papers, books, records, contracts, deeds,
24  leases, agreements, pictures, photographs, transcripts, tapes, microfilm, computer data files,
25  printouts, accounting statements, mechanical and electrical recordings, checks, pleadings, and other
26  tangible things upon which any handwriting, typing, printing, drawing, representation, photostatic,
27  or other magnetic or electrical impulses or other form of communication is recorded, stored or
28  produced, including audio and video recordings and electronically-stored information (including but

-2-

1  not limited to e-mails, web pages, Websites, computer discs, computer programs and computer
2  files, including, where applicable, compiled and uncompiled source code), whether or not in
3  printout form. These terms shall also mean copies of Documents even though the originals are not
4  in your possession, custody or control; every copy of a Document which contains handwritten or
5  other notations or which otherwise does not duplicate the original of any other copy; all attachments
6  to any Document; and any other Document, item and/or information discoverable under federal law
7  and procedure, including, without limitation, the items referenced in Federal Rule of Civil
8  Procedure 34(a)(1).

9        6.     "ELECTRONICALLY STORED INFORMATION" or "ESI" as used herein, means
10  and refers to computer generated information or data, of any kind, stored on computers, file servers,
11  disks, tape or other devices or media, or otherwise evidenced by recording on some storage media,
12  whether real virtual, or cloud based.

13        7.     "INCLUDING" means "including, but not limited to;" "includes" means "includes,
14  but not limited to."

15        8.     "LEAD" means a request made by a potential consumer who has indicated an
16  interest in a particular type of goods or service.

17        9.     "PERSON" means or refers to any natural person, corporation, partnership,
18  association, organization, joint ventures, or other entity of any type or nature.

19       10.     "PLAINTIFF," "PLAINTIFF KRISTENSEN," or "KRISTENSEN" means or refers
20  to the Plaintiff FLEMMING KRISTENSEN.

21       11.     "YOU," "YOUR," "DEFENDANT," or "CPS" means or refers to Defendant
22  CREDIT PAYMENT SERVICES, INC., MYCASHNOW.COM, INC., AREA203 DIGITAL, and
23  their divisions, subsidiaries, related companies, predecessors, and successors, all present and former
24  officers, directors, agents, attorneys, employees, and all persons acting or purporting to act on
25  behalf of any of them.

26                                           ***II. Instructions***

27        1.     The person responding to a request should have knowledge to answer said questions.
28  If another person has superior knowledge on certain questions, that other person should respond to

1   that request and be so designated. If such person is unavailable, that person should be fully

2   identified and the nature and scope of their knowledge and the reasons that such person's knowledge

3   is or is believed to be superior, explained fully.

4       2.      In responding to these requests, furnish all information, however obtained, including

5   hearsay that is available to You and any information known by You, in Your possession, or

6   appearing in Your records.

7       3.      These are intended as continuing requests having within them a duty to timely

8   supplement the responses until and during the course of trial. Information sought by these requests

9   that You obtain after You serve Your responses must be disclosed to the Plaintiff by supplementary

10  responses.

11      4.      It is intended by this set of requests to elicit information not merely within Your

12  knowledge, but obtainable by You or on Your behalf.

13      5.      You may not claim lack of information or knowledge as grounds for failing to

14  respond to any Interrogatory or as grounds for giving an incomplete or partial response to any

15  Interrogatory without exercising due diligence to secure the full information needed to do so.

16  Where You rely or respond based on information provided to You by any other person, fully

17  identify that person and how You obtained the information from them. Where You rely on

18  information in any document, specifically identify the document and identify the person who has

19  custody of that document.

20      6.      If You cannot respond to a Interrogatory in full after exercising due diligence to

21  secure the full information needed to do so, so state and respond to the extent possible, specifying

22  Your inability to respond to the remainder, stating whatever information or knowledge You have

23  concerning the unresponded to portion and detailing what You did in attempting to secure the

24  unknown information.

25      7.      If any Interrogatory is objected to on the basis that the time period covered by the

26  request is irrelevant, burdensome, or otherwise inappropriate, state what time period You consider

27  proper for that request and answer the request for that time period, preserving Your objection to the

28  remainder of the time period.

-4-

8.      If You object or otherwise refuse to respond to any portion of any Interrogatory, You shall: (1) state the nature and basis of the objection or reason for such refusal in sufficient fashion to permit the Court to rule on the validity of the objection; and (2) answer all portions of such Interrogatory that are not claimed to be objectionable.

9.      If You object to answering all or any part of any Interrogatory on the grounds of privilege or work product, You are required to identify the privileged document(s) or communication(s), and with respect to each such privileged responsive document or communication identify:

(a)     the date appearing on such document, or if no date appears, the date on which such document or ESI was prepared;

(b)     ESI metadata creation, revision, transmission, receipt, and last access dates;

(c)     the name of each person to whom such document or ESI was addressed;

(d)     the name of each person, other than the addressee(s) identified in subparagraph (b) above, to whom such document or ESI, or copy thereof was sent, or with whom such document was discussed;

(e)     the name of each person who signed such document or ESI or, if not signed, the name of each person who prepared it;

(f)     the name of each person making any contribution to the authorship of such document or ESI;

(g)     the job title or position of each person identified in subparagraphs (b), (c), (d), and (e) above;

(h)     the date such document or ESI was received or discussed by each person identified in subparagraphs (b) or (c) above;

(i)     the general nature or description of such document or ESI, and, where applicable, its number of pages;

(j)     the name of each person who currently has custody of such document or ESI; and

(k)     the specific ground(s) upon which the privilege or work product rests.

-5-

1          Each demand herein shall be construed independently and shall not be

2          limited by reference to any other demand.

3         10.    The singular form of a word shall be interpreted as plural, and the plural form of a

4     word shall be interpreted as singular, whichever makes the Interrogatory most broad.

5         11.    As used herein, the present tense shall also include the past tense.

6         12.    For any term used herein, which is not otherwise specifically defined, the common

7     and usual meaning of such term is intended.  Any ambiguity in an Interrogatory shall be resolved so

8     as to construe the Interrogatory as broadly as possible.

9         13.    When these Interrogatories refer to a "specific location," they contemplate a level of

10    detail that would allow counsel to independently locate an item without significant assistance.

11    Thus, when these Interrogatories request the specific location of digital media, an acceptable answer

12    might be, "in Bill Johnson's office, at 123 Main Street, Suite 100, New York, NY 10000."

13        14.    If You are producing any document in lieu of answering any of the Interrogatories

14    stated herein, all documents are to be produced in the form, order, and manner in which they are

15    maintained in Your files.  Documents are to be produced in the folders, cartons, or containers in

16    which they have been maintained, stored, clipped, stapled, or otherwise arranged in the same form

17    and manner in which they were found and in such a manner that the office and location from which

18    they were produced is readily identifiable.  Whenever a document (as defined) or group of

19    documents is taken out of a file folder, file drawer, file box, or notebook, before the same is

20    produced, attach thereto a copy of the label on the file folder, file box, or notebook from which the

21    document or group of documents was removed.  All ESI should be produced in native format,

22    reasonably usable, and verifiably responsive to the pertinent request(s) and processable using

23    readily available tools.

24                 ***III. Interrogatories***

25    **INTERROGATORY NO. 16**

26        Describe any policies and/or procedures You had in place between January 1, 2011 and

27    February 1, 2012 to ensure that the entities You identified in Your Answer to Plaintiff's

28    Interrogatory No. 12 complied with the Telephone Consumer Protection Act, 47 U.S.C. § 227. *et*

-6-

1    *seq.*

2       **ANSWER:**

3

4    **INTERROGATORY NO. 17**

5       Identify all current or former employees or agents of CPS who were aware that any of the

6    entities You identified in Your Answer to Plaintiff's Interrogatory No.12 obtained, bought and/or

7    sold leads generated through the use of SMS Messaging during the Relevant Time Period.

8       **ANSWER:**

9

10    **INTERROGATORY NO. 18**

11       Describe all actions You have taken to ensure that LeadPile LLC bought and sold leads that

12    were generated in compliance with the TCPA.

13       **ANSWER:**

14

15    **INTERROGATORY NO. 19**

16       Identify all current or former CPS employees who, between January 1, 2008 and March 31,

17    2012, were aware that LeadPile LLC bought and sold Leads that were generated through SMS

18    Marketing.

19       **ANSWER:**

20

21    **INTERROGATORY NO. 20**

22       Identify, based on a comparison of customer phone numbers in Your possession, the phone

23    numbers of the Class Members who You provided a loan to.

24       **ANSWER:**

25

26    **INTERROGATORY NO. 21**

27       Identify each and every fact or document supporting any denials You made to Plaintiff's

28    First Set of Requests for Admission to Defendant Credit Payment Services, Inc.

1    **ANSWER:**

2

3    **INTERROGATORY NO. 22**

4         Identify, based on a comparison of phone numbers of Your customers in Your possession,

5    the phone numbers of leads generated from the website "http://thesmartcreditsolution

6    .securelinkcorp.com" that You provided a loan to.

7         **ANSWER:**

8

9    **INTERROGATORY NO. 23**

10        Identify All CPS employees whose computers and files You searched for documents

11   relevant to this case.

12        **ANSWER:**

13

14   **INTERROGATORY NO. 24**

15        Describe in detail all actions taken to investigate or review the business operated by

16   LeadPile LLC before, during, and after CPS entered into the contract between LeadPile LLC and

17   CPS (identified in the documents produced by LeadPile LLC in this litigation bates labeled

18   LEAD000001-LEAD0000004) and Identify the Person(s) responsible for such investigation(s) or

19   review.

20        **ANSWER:**

21

22   **INTERROGATORY NO. 25**

23        Identify each and every fact or document supporting any denials You made to Plaintiff's

24   First Set of Requests for Admission to Defendant Credit Payment Services, Inc.

25        **ANSWER:**

26

27

28

-8-

1

2     Dated: March 31, 2014

3                                    Respectfully submitted,

4

5                                    FLEMMING KRISTENSEN, individually and on
                                     behalf of a class of similarly situated individuals

6
                                     By: _____
7                                         One of his attorneys

8     John Benedict, Esq.
      john.benedict.esq@gmail.com
9     Nevada Bar No. 005581
      LAW OFFICES OF JOHN BENEDICT
10    2190 E. Pebble Road, Suite 260
      Las Vegas, Nevada 89123
11    Tel: 702.333.3770
      Fax: 702.361.3685
12
      Ryan D. Andrews (Admitted *pro hac vice*)
13    randrews@edelson.com
      Rafey Balabanian (Admitted *pro hac vice*)
14    rbalabanian@edelson.com
      John C. Ochoa (Admitted *pro hac vice*)
15    jochoa@edelson.com
      EDELSON PC
16    350 North LaSalle Street, Suite 1300
      Chicago, Illinois 60654
17    Tel: 312.589.6370
      Fax: 312.589.6378
18
      Attorneys for Plaintiff Flemming Kristensen
19

20

21

22

23

24

25

26

27

28

                                            -9-

## CERTIFICATE OF SERVICE

I, John C. Ochoa, an attorney, certify that on March 31, 2014, I caused to be served the above and foregoing *Plaintiff's Second Set of Interrogatories to Defendant Credit Payment Services, Inc.* by causing true and accurate copies of such paper to be hand delivered to the following:

**Steven Aaron**
**Gregory Wolf**
Dentons US LLP
4520 Main Street, Ste. 1100
Kansas City, MO 64111
Steven.aaron@dentons.com
Gregory.wolf@dentons.com

*Attorneys for Defendant Credit Payment Services, Inc.*

-10-

# EXHIBIT D

1   Steven Martin Aaron, Esq. (MO Bar No. 41653)
    *Admitted Pro Hac Vice*
2   Gregory T. Wolf, Esq. (MO Bar No. 43717)
    *Admitted Pro Hac Vice*
3   DENTONS US LLP
4   4520 Main Street, 11th Floor
    Kansas City, MO 64111-7700
5   Telephone: (816) 460-2400
    Facsimile:  (816) 531-7545
6   steven.aaron@dentons.com
    gregory.wolf@dentons.com
7
8   Martin L. Welsh, Esq.
    Nevada State Bar No. 8720
9   LAW OFFICE OF HAYES & WELSH
    199 North Arroyo Grande Blvd., Suite 200
10  Henderson, Nevada 89074
    Telephone: (702) 434-3444
11  Facsimile:  (702) 434-3729
    mwelsh@lvlaw.com
12
13  *Attorneys for Defendant*
    *CREDIT PAYMENT SERVICES, INC.*
14

15              **IN THE UNITED STATES DISTRICT COURT**
                      **DISTRICT OF NEVADA**
16

| | | |
|---|---|---|
| 17 | FLEMMING KRISTENSEN, individually, and on behalf of a class of similarly situated individuals, | ) ) ) | Case No. 2:12-CV-00528-APG (PAL) |
| 18 | | ) ) | CREDIT PAYMENT SERVICES, INC.'S ANSWERS TO SECOND REQUESTS |
| 19 | Plaintiff, | ) ) | FOR PRODUCTION FROM PLAINTIFF |
| 20 | v. | ) ) | |
| 21 | CREDIT PAYMENT SERVICES, INC., a Nevada corporation, | ) ) | |
| 22 | f/k/a MYCASHNOW.COM INC., ENOVA INTERNATIONAL, INC., | ) ) | |
| 23 | an Illinois corporation, PIONEER FINANCIAL SERVICES, INC., | ) ) | |
| 24 | a Missouri corporation, LEADPILE LLC, | ) ) | |
| 25 | a Delaware limited liability company, and CLICKMEDIA, LLC d/b/a | ) ) | |
| 26 | NET1PROMOTIONS LLC, a Georgia limited | ) ) | |
| 27 | liability company, Defendants. | ) ) | |
| 28 | | | |

Defendant Credit Payment Services, Inc. ("CPS"), pursuant to Federal Rule of Civil Procedure 34, hereby submits its Responses to the Second Request for Production of Documents from Plaintiff (the "Requests"), as follows:

## PRELIMINARY STATEMENT

1.      These objections and responses are made solely for the purpose of this action. Each response, if any, is subject to all objections as to competence, relevance, materiality, propriety, admissibility and all other objections and grounds that would require the exclusion of any document.  All such objections and grounds, therefore, are reserved and may be interposed at any time during this litigation including at the time of trial.

2.      Defendant objects to the Requests to the extent they purport to impose obligations on Defendant not required by Federal Rule of Civil Procedure 34.

3.      While these objections and responses are based upon diligent exploration and investigation by Defendant and its counsel, all objections and responses must be construed as given on the basis of presently known information.  Defendant has not yet completed its investigation of facts or documents relating to this case and has not completed preparation for trial in this matter.  Consequently, the following responses are given without prejudice to Defendant's right to produce at any time during this litigation, including at the time of trial, subsequently discovered evidence, and Defendant reserves the right to amend, supplement, delete from, alter, modify or otherwise change them as may be appropriate when Defendant has ascertained all relevant facts.

4.      The fact that Defendant responds to any Request should not be taken as an admission that Defendant accepts or admit the existence of any facts set forth or assumed by such Request, or that the response constitutes admissible evidence.  The fact that Defendant answers

part or all of any Request is not intended and shall not be construed to be a waiver by Defendant of all or any part of any objection to any Request made by Defendant.

5.      Because some of these responses may have been ascertained by Defendant's attorneys and investigators, Defendant may not have personal knowledge of the information from which such responses were derived.

6.      The inadvertent production of a privileged or confidential document shall not be deemed or construed as a waiver of any privilege or right of Defendant.

7.      Defendant reserves the right to supplement its responses if necessary or appropriate at any time.  However, Defendant does not assume a continued responsibility to update its responses to these Requests, and hereby specifically objects to each Request to the extent that it may seek to impose any continuing obligation on it.

## **GENERAL OBJECTIONS**

Defendant makes the following general objections to the Requests and incorporates them into each response below as if set forth in full:

1.      Defendant objects to the Requests' instructions and definitions to the extent they are vague, ambiguous, overbroad, overly burdensome, do not describe the information sought with requisite particularity, and/or require compliance and responses beyond the requirements of, and/or at variance with the Federal Rules of Civil Procedure and the Local Rules of the District of Nevada.  In addition, the definitions attempt to identify information from entities not named in the suit and not subject to these requests.  By responding to the Requests, Defendant does not adopt any definition or characterization of any term defined in the Requests.

2.      Defendant objects to the Requests to the extent that they seek information protected from disclosure by any privilege or doctrine, including, without limitation, the attorney-client privilege and/or the work product doctrine.  No privileged material will be intentionally produced.

Any response by Defendant to the Requests is made without a waiver of and with the preservation of the attorney-client privilege, the work product doctrine, and all other applicable privileges. These Responses are made without waiver of, and with preservation of, the right to withhold any document or information subject to any such privilege and/or any document or information discovered to be privileged during the course of discovery.  The inadvertent production of any document that is privileged shall not be deemed or construed to constitute a waiver of any privilege or any other ground for objecting to discovery with respect to (1) such document or information, (2) any other document or information, or (3) the subject matter of any inadvertently produced document or information.

3.     Defendant objects to each Request to the extent that it seeks confidential information, trade secret, proprietary, financial or commercially sensitive information, the disclosure of which could result in substantial competitive injury to Defendant.  Defendant's response, and/or any such documents are subject to the terms and conditions of the Protective Order agreed and entered into between the parties.

4.     Defendant objects to each Request to the extent that it seeks confidential information, trade secret, proprietary, financial or commercially sensitive information of non-parties that Defendant is under an obligation to maintain in confidence.

5.     Defendant objects to the Requests to the extent that they seek information that is outside of Defendant's possession, custody, or control or are matters of public record or are equally available to Plaintiff.  Defendant's responses indicating that it will produce any responsive, non-privileged documents in its possession, custody and control are subject to the existence and location of said responsive documents.

6.     Defendant objects to the Requests to the extent that they are overbroad and unreasonable as to time and subject matter, unduly burdensome, unreasonably comprehensive or

duplicative, unlimited in time or scope, oppressive and harassing and seek information that is neither relevant to the subject matter of the action nor reasonably calculated to lead to the discovery of admissible evidence, and consequently are burdensome, oppressive and harassing.

7.      Defendant objects to each and every Request seeking "all" information as overly broad and unduly burdensome. Defendant will respond to such requests by providing the information sufficient to respond to the request that is located after a diligent investigation.

8.      Defendant objects to the phrase "identify all documents" as overly broad, unduly burdensome and harassing. To the extent Defendant relies on Fed. R. Civ. P. 33(d) to respond to a Request, Defendant will identify those documents. Otherwise, Defendant will identify and provide documents pursuant to non-objectionable Requests for Production.

9.      Defendant objects to each Request that separately seeks substantive information, a separate identification of witnesses, and a separate identification of documents as such Requests are compound and constitute multiple discrete subparts. Plaintiff's Requests, because of multiple subparts, exceed the limits of the Federal Rules of Civil Procedure.

10.      Defendant objects to identifying any privileged documents that were written or prepared on or after March 29, 2012, the date this action was initiated by Plaintiff. Defendant will withhold all privileged documents created or prepared by any of its employees, attorneys, agents, or representatives on or after March 29, 2012. The categorical identification of these documents is considered sufficient to satisfy any identification requirements necessary to properly assert privilege or immunity for those documents.

11.      In addition to the foregoing General Objections, Defendant hereby incorporates by reference its General Objections listed in Defendant's Responses to Plaintiff's Second Interrogatories, and Responses to First Request for Admissions, and may also state specific objections to the Request where appropriate, including objections that are not generally applicable

1  to each specific Request.  By setting forth such specific objections, Defendant does not intend to

2  limit or restrict the General Objections set forth above.

3      12.    Each and every one of these objections is incorporated by reference in the

4  following responses.  Restatement of any of the above objections in the responses to the Requests

5  serves to emphasize said objection and/or add details to said objection.

6      Subject to and without waiving these or any other objections or claims to privileges,

7  Defendant responds as follows:

8                              **DOCUMENTS REQUESTED**

9  **DOCUMENT REQUEST NO. 61.** All Communications Related To the creation,

10 negotiation, and execution of the Agency of Record Agreement between Credit Payment Services,

11 Inc. and Area203 dated December 16, 2011.

12

13     **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in
          scope, unduly burdensome, oppressive, harassing, and seeks
          information and documents that are irrelevant and not reasonably
          calculated to lead to the discovery of admissible evidence.**

14

15

16 **DOCUMENT REQUEST NO. 62.**  All Documents Identifying Your ownership interests

17 in LeadPile LLC between January 1, 2011 and April 1, 2012.

18

19     **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope,
          unduly burdensome, oppressive, harassing, and seeks information and
          documents that are irrelevant and not reasonably calculated to lead to
          the discovery of admissible evidence.  CPS further objects to this
          Request on the grounds that is misleading as it assumes facts not in
          evidence.**

20

21

22 **DOCUMENT REQUEST NO. 63.** All  Documents  Identifying  Your  payment  of

23 monetary compensation to LeadPile LLC employees between January 1, 2011 and April 1, 2012.

24

25     **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope,
          unduly burdensome, oppressive, harassing, and seeks information and
          documents that are irrelevant and not reasonably calculated to lead to
          the discovery of admissible evidence.  CPS further objects to this
          Request on the grounds that it is vague and ambiguous when the**

26

27

28

phrase "monetary compensation" is used in this context, which causes CPS to speculate in order to respond

**DOCUMENT REQUEST NO. 64.** All Communications to or from Carey V. Brown containing the phrase "LeadPile."

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 65.** All Communications to or from any employee of Credit Payment Services, Inc. discussing, mentioning, or Related To the December 18, 2011 Times Free Press Article entitled "Local companies tied to offshore payday lenders" by Ellis Smith.

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 66.** All Communications to or from Carey V. Brown discussing, mentioning, or Related To the December 18, 2011 Times Free Press Article entitled "Local companies tied to offshore payday lenders" by Ellis Smith.

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 67.** All Communications to or from Ron Beaver discussing, mentioning, or Related To the December 18, 2011 Times Free Press Article entitled "Local companies tied to offshore payday lenders" by Ellis Smith.

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 68.** All Documents Identifying all persons who received a Form W-2 Wage and Tax Statement from Credit Payment Services, Inc. between January 1, 2011 and May 1, 2012.

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 69.** All Documents Identifying all persons who received a Form 1099-MISC from Credit Payment Services, Inc. between January 1, 2011 and May 1, 2012.

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 70.** All Documents Identifying any invoices provided to LeadPile LLC from You between January 1, 2011 and April 1, 2012.

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 71.** All Documents Identifying any invoices provided to You from LeadPile between January 1, 2011 and April 1, 2012.

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.** Without waving said objection, see documents previously produced.

**DOCUMENT REQUEST NO. 72.** All Documents Identifying any and all bank accounts jointly held by You and LeadPile between January 1, 2011 and April 1, 2012.

**RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waving its objections, CPS states no such documents exist.**

**DOCUMENT REQUEST NO. 73.** All Documents Identifying the number of potential borrowers provided to You and/or MyCashNow.com, Inc. for the purpose of providing short-term loans from LeadPile LLC between January 1, 2011 and April 1, 2012.

**RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. CPS also objects to this Request on the grounds that it seeks confidential, proprietary, and commercially sensitive information of non-parties that CPS is required to maintain in confidence.**

**DOCUMENT REQUEST NO. 74.** All Documents concerning steps You took to ensure that the entities You identified in Your Answer to Plaintiff's Request No.12 complied with the TCPA.

**RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  Without waving said objections, see documents previously produced.**

**DOCUMENT REQUEST NO. 75.** All Documents Identifying policies, procedures, and protocols You had in place to ensure that the Leads You purchased from LeadPile were not generated in violation of the TCPA.

**RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  Without waving said objection, see documents previously produced.**

**DOCUMENT REQUEST NO. 76.** All Documents Identifying and/or Related to the "producer ID 1284047772106".

**RESPONSE:** CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Without waving said objection, see documents previously produced.

**DOCUMENT REQUEST NO. 77.** All Documents Identifying and/or Related to the producer ID associated with Net1Promotions LLC d/b/a Click Media.

**RESPONSE:** CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Without waving said objection, see documents previously produced.

**DOCUMENT REQUEST NO. 78.** All Communications between You and LeadPile LLC.

**RESPONSE:** CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

**DOCUMENT REQUEST NO. 79.** All Documents and ESI Identifying or Relating To Your account settings with LeadPile LLC. Documents and ESI produced in response to this Request should include:

(a)     communications between CPS employees Related To Your account settings with LeadPile LLC; and

(b)     website screenshots of the LeadPile web portal showing Your account settings with LeadPile.

**RESPONSE:** CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

**DOCUMENT REQUEST NO. 80.** Produce all documents concerning your knowledge of the use of SMS Marketing by entities or individuals You purchased Leads from.

**RESPONSE: : CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 81.** All Documents and ESI Identified referenced, or relied upon in providing Your Answers to Plaintiff's Second Set of Requests on You.

**RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 82.** All Communications Related To the creation, negotiation, and execution of the LeadPile Lead Buyer Agreement between You and LeadPile LLC dated August 8, 2009.

**RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 83.** All Documents and ESI You have produced to a state or federal government agency Related To Your corporate structure.

**RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 84.** All Documents and ESI Identifying Your ownership Interests in LeadPile LLC as of December 1, 2011.

**RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. CPS further objects to this Request on the grounds that is misleading as it assumes facts not in evidence.**

**DOCUMENT REQUEST NO. 85.** All Documents and ESI Describing why LeadPile LLC refers to CPS as a "sister company."

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 86.** All Documents and ESI supporting or refuting the factual allegations made in the December 18, 2011 Times Free Press Article entitled "Local companies tied to offshore payday lenders" by Ellis Smith.

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 87.** All Documents, ESI, and Communications Related To Christopher Christiansen's involvement in the December 18, 2011 Times Free Press Article entitled "Local companies tied to offshore payday lenders" by Ellis Smith.

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 88.** All Documents, ESI, and Communications Related To Aaron Shelley's involvement in the December 18, 2011 Times Free Press Article entitled "Local companies tied to offshore payday lenders" by Ellis Smith.

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 89.** All Documents, ESI, and Communications Related To Byron DeLoach's involvement in the December 18, 2011 Times Free Press Article entitled "Local companies tied to offshore payday lenders" by Ellis Smith.

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 90.** All Documents and ESI Related To Your lawsuits against Byron DeLoach, Aaron Shelley, and Christopher Christiansen.

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 91.** All Documents Related To the deposition testimony of Carey V. Brown provided on February 15, 2005, supporting the testimony that MyCashNow.com, Inc. is "basically just a shell corporation."

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. CPS also objects to the Request on the grounds that it seeks documents protected by the attorney-client privilege and/or work product doctrine.**

**DOCUMENT REQUEST NO. 92.** All Documents Related To Scott Wilson's involvement in and creation of the corporate structure of the following companies listed below. This request includes all Communications between any of Your current or former employees and Scott Wilson.

- Area 203 (formerly known as Logic Marketing)

- DiscountAdvances.com

- MyCashNow.com

- PayDayMax.com

- Scenic City Legal Group

- Terenine (formerly known as Basenine)

- Woody Holdings

- LeadPile LLC

- Credit Payment Services, Inc.

- Support Seven

- Credit Protection Depot

**RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.   CPS also objects to the Request on the grounds that it seeks documents outside the control of CPS.**

**DOCUMENT REQUEST NO. 93.** All   Documents   Identifying   Carey   V.   Brown's ownership interests in the following companies from January 1, 2009 to December 21, 2012:

- Area 203 (formerly known as Logic Marketing)

- DiscountAdvances.com

- MyCashNow.com

- PayDayMax.com

- Scenic City Legal Group

- Terenine (formerly known as Basenine)

- Woody Holdings

- LeadPile LLC

- Credit Payment Services, Inc.

- Support Seven

- Credit Protection Depot

**RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  CPS also objects to the Request on the grounds that it seeks information that is outside of CPS's possession, custody, and control.**

**DOCUMENT REQUEST NO. 94.**  All Documents Related To Any changes in the corporate structure of the following companies from January 1, 2009 to December 21, 2012:

- Area 203 (formerly known as Logic Marketing)
- DiscountAdvances.com
- MyCashNow.com
- PayDayMax.com
- Scenic City Legal Group
- Terenine (formerly known as Basenine)
- Woody Holdings
- LeadPile LLC
- Credit Payment Services, Inc.
- Support Seven
- Credit Protection Depot

**RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  CPS also objects to the Request on the grounds that it, in part, seeks information that is outside of CPS's possession, custody, and control.**

**DOCUMENT REQUEST NO. 95.**  All Contracts entered into among and between any of the following companies:

- Area 203 (formerly known as Logic Marketing)
- DiscountAdvances.com

- MyCashNow.com

- PayDayMax.com

- Terenine (formerly known as Basenine)

- Woody Holdings

- LeadPile LLC

- Credit Payment Services, Inc.

- Support Seven

- Credit Protection Depot

**RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. CPS also objects to the Request on the grounds that it, in part, seeks information that is outside of CPS's possession, custody, and control.**

**DOCUMENT REQUEST NO. 96.** Notices of meetings and the minutes of all CPS shareholder meetings between January 1, 2008 to the April 1, 2012.

**DOCUMENT REQUEST NO. 97.** RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. CPS also objects to this Request on the grounds that it seeks confidential, proprietary, and commercially sensitive information. Minutes of all meetings and resolutions of Your Board of Directors between January 1, 2008 to the April 1, 2012.

**RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. CPS also objects to this Request on the grounds that it seeks confidential, proprietary, and commercially sensitive information.**

**DOCUMENT REQUEST NO. 98.** Documents on which You will rely to show that You observed corporate formalities and were adequately capitalized between January 1, 2008 to the April 1, 2012.

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 99.** Copies of Your Articles of Incorporation and By-Laws between January 1, 2008 and April 1, 2012.

**DOCUMENT REQUEST NO. 100.** RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.   Documents and ESI Identifying transfers of funds between CPS and LeadPile LLC between January 1, 2008 and April 1, 2012.

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 101.** Documents and ESI Identifying expenses/liabilities of LeadPile paid by CPS between January 1, 2008 and April 1, 2012.

> **RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 102.** Documentation of transfers of assets between LeadPile LLC and CPS between January 1, 2008 and April 1, 2012.

**RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**DOCUMENT REQUEST NO. 103.** General ledgers or balance sheets of CPS between January 1, 2008 and April 1, 2012.

**RESPONSE: CPS objects to this Request on the grounds that it is overbroad in scope, unduly burdensome, oppressive, harassing, and seeks information and documents that are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  CPS also objects to this Request on the grounds that it seeks confidential, proprietary, and commercially sensitive information.**

DATED:  April 30, 2014                    DENTONS US LLP

                                          _____/s/ Steven Martin Aaron_____
                                          Steven Martin Aaron, Esq.
                                          (*pro hac* vice) MO Bar # 41653
                                          Gregory T. Wolf, Esq.
                                          (*pro hac vice*) MO Bar #43717
                                          4520 Main Street, 11th Floor
                                          Kansas City, MO 64111-7100

                                          LAW OFFICE OF HAYES & WELSH

                                          _____/s/ Martin L. Welsh_____
                                          Martin L. Welsh, Esq.
                                          Nevada State Bar No. 8720
                                          199 North Arroyo Grande Blvd., Suite 200
                                          Henderson, Nevada 89074
                                          *Attorneys for Defendant*
                                          *Credit Payment Services, Inc.*

## CERTIFICATE OF SERVICE

Pursuant to FRCP 5(b), I certify that on April 30, 2014, I caused the above and foregoing document entitled CREDIT PAYMENT SERVICES, INC.'S ANSWERS TO SECOND INTERROGATORIES was served on all counsel of record by email transmission and by United States first class mail, postage prepaid.


_/s/ Steven Martin Aaron_
An Attorney for Defendants

# EXHIBIT E

Steven Martin Aaron, Esq. (MO Bar No. 41653)
*Admitted Pro Hac Vice*
Gregory T. Wolf, Esq. (MO Bar No. 43717)
*Admitted Pro Hac Vice*
DENTONS US LLP
4520 Main Street, 11th Floor
Kansas City, MO 64111-7700
Telephone:  (816) 460-2400
Facsimile:   (816) 531-7545
steven.aaron@dentons.com
gregory.wolf@dentons.com

Martin L. Welsh, Esq.
Nevada State Bar No. 8720
LAW OFFICE OF HAYES & WELSH
199 North Arroyo Grande Blvd., Suite 200
Henderson, Nevada 89074
Telephone:  (702) 434-3444
Facsimile:   (702) 434-3729
mwelsh@lvlaw.com

*Attorneys for Defendant*
*CREDIT PAYMENT SERVICES, INC.*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| FLEMMING KRISTENSEN, individually, and on behalf of a class of similarly situated individuals, | ) Case No. 2:12-CV-00528-APG (PAL) |
| | ) |
| | ) |
| | ) CREDIT PAYMENT SERVICES, INC.'S |
| | ) RESPONSES TO FIRST REQUESTS |
| Plaintiff, | ) FOR ADMISSION FROM PLAINTIFF |
| v. | ) |
| | ) |
| CREDIT PAYMENT SERVICES, INC., | ) |
| a Nevada corporation, | ) |
| f/k/a MYCASHNOW.COM INC., | ) |
| ENOVA INTERNATIONAL, INC., | ) |
| an Illinois corporation, | ) |
| PIONEER FINANCIAL SERVICES, INC., | ) |
| a Missouri corporation, | ) |
| LEADPILE LLC, | ) |
| a Delaware limited liability company, and | ) |
| CLICKMEDIA, LLC d/b/a | ) |
| NET1PROMOTIONS LLC, a Georgia limited | ) |
| liability company, | ) |
| Defendants. | ) |

COME NOW Defendants Credit Payment Services, Inc. ("CPS"), pursuant to Federal Rule of Civil Procedure 36, hereby submits its Responses to Plaintiff's First Set of Requests to Admit (the "Requests"), as follows:

## PRELIMINARY STATEMENT

1.      These objections and responses are made solely for the purpose of this action. Each response, if any, is subject to all objections as to competence, relevance, materiality, propriety, admissibility and all other objections and grounds that would require the exclusion of any document.  All such objections and grounds, therefore, are reserved and may be interposed at any time during this litigation including at the time of trial.

2.      Defendant objects to the Requests to the extent they purport to impose obligations on Defendant not required by Federal Rule of Civil Procedure 36.

3.      While these objections and responses are based upon diligent exploration and investigation by Defendant and its counsel, all objections and responses must be construed as given on the basis of presently known information.  Defendant has not yet completed its investigation of facts or documents relating to this case and has not completed preparation for trial in this matter.  Consequently, the following responses are given without prejudice to Defendant's right to produce at any time during this litigation, including at the time of trial, subsequently discovered evidence, and Defendant reserves the right to amend, supplement, delete from, alter, modify or otherwise change them as may be appropriate when Defendant has ascertained all relevant facts.

4.      The fact that Defendant responds to any Request should not be taken as an admission that Defendant accepts or admit the existence of any facts set forth or assumed by such Request, or that the response constitutes admissible evidence.  The fact that Defendant answers

part or all of any Request is not intended and shall not be construed to be a waiver by Defendant of all or any part of any objection to any Request made by Plaintiff.

5. Because some of these responses may have been ascertained by Defendant's attorneys and investigators, Defendant may not have personal knowledge of the information from which such responses were derived.

6. The inadvertent production of a privileged or confidential document shall not be deemed or construed as a waiver of any privilege or right of Defendant.

7. Defendant reserves the right to supplement its responses if necessary or appropriate at any time. However, Defendant does not assume a continued responsibility to update its responses to these Requests, and hereby specifically objects to each Request to the extent that it may seek to impose any continuing obligation on it.

## GENERAL OBJECTIONS

Defendant makes the following general objections to the Requests and incorporates them into each response below as if set forth in full:

1. Defendant objects to the Requests' instructions and definitions to the extent they are vague, ambiguous, overbroad, overly burdensome, do not describe the information sought with requisite particularity, and/or require compliance and responses beyond the requirements of, and/or at variance with the Federal Rules of Civil Procedure and the Local Rules of the District of Nevada. In addition the definitions attempt to identify information from entities not named in the suit and not subject to these Requests. By responding to the Requests, Defendant does not adopt any definition or characterization of any term defined in the Requests.

2. Defendant objects to the Requests to the extent that they seek information protected from disclosure by any privilege or doctrine, including, without limitation, the attorney-client privilege and/or the work product doctrine. No privileged material will be intentionally produced.

Any response by Defendant to the Requests is made without a waiver of and with the preservation of the attorney-client privilege, the work product doctrine, and all other applicable privileges. These Responses are made without waiver of, and with preservation of, the right to withhold any document or information subject to any such privilege and/or any document or information discovered to be privileged during the course of discovery. The inadvertent production of any document that is privileged shall not be deemed or construed to constitute a waiver of any privilege or any other ground for objecting to discovery with respect to (1) such document or information, (2) any other document or information, or (3) the subject matter of any inadvertently produced document or information.

3.    Defendant objects to each Request to the extent that it seeks confidential information, trade secret, proprietary, financial or commercially sensitive information, the disclosure of which could result in substantial competitive injury to Defendant. Defendant's response, and/or any such documents are subject to the terms and conditions of the Amended Protective Order agreed and entered into between the parties.

4.    Defendant objects to each Request to the extent that it seeks confidential information, trade secret, proprietary, financial or commercially sensitive information of non-parties that Defendant is under an obligation to maintain in confidence.

5.    Defendant objects to the Requests to the extent that they are overbroad and unreasonable as to time and subject matter, unduly burdensome, unreasonably comprehensive or duplicative, unlimited in time or scope, oppressive and harassing and seek information that is neither relevant to the subject matter of the action nor reasonably calculated to lead to the discovery of admissible evidence, and consequently are burdensome, oppressive and harassing.

6.    In addition to the foregoing General Objections, Defendant hereby incorporates by reference its General Objections listed in Defendant's Responses to Plaintiff's Second

Interrogatories, and Responses to Plaintiff's Second Set of Document Requests, and may also state specific objections to the Request where appropriate, including objections that are not generally applicable to each specific Request.  By setting forth such specific objections, Defendant does not intend to limit or restrict the General Objections set forth above.

7.     Each and every one of these objections is incorporated by reference in the following responses.  Restatement of any of the above objections in the responses to the Requests serves to emphasize said objection and/or add details to said objection.

Subject to and without waiving these or any other objections or claims to privileges, Defendant responds as follows:**REQUESTS TO ADMIT**

**REQUEST 1.**          Admit that at least one current or former CPS employee was aware at some point between January 1, 2008 and March 31, 2012 that LeadPile bought leads from Click Media that were generated, in part, from the use of SMS Messaging.

**RESPONSE:**  CPS objects to Request for Admission number 1 on the grounds that it is not properly limited in time and it is vague and ambiguous when the phrase "at some point between" is used in this context, which causes CPS to speculate in order to properly respond. Furthermore, request number 1 is not limited in scope as it seeks a response to a question that fails to define the context in which LeadPile bought leads, which makes request number 1 overly broad and unduly burdensome.  Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.   Furthermore, CPS admits that it did not control; did not contract with; and had no knowledge of the entity that sent the text message described in the instant matter; and that CPS did not request that any such text be sent on its behalf.

**REQUEST 2.**          Admit that at least one current or former CPS employee was aware at some point between January 1, 2008 and March 31, 2012 that LeadPile bought leads from publishers that were generated, in part, from the use of SMS Messaging.

**RESPONSE:**          CPS objects to Request for Admission number 2 on the grounds that it is not properly limited in time and it is vague and ambiguous when the phrase "at some point between" is used in this context, which causes CPS to speculate in order to properly respond. Furthermore, request number 2 is not limited in scope as it seeks a response to a question that fails to define the context in which LeadPile bought leads, which makes request number 2 overly broad and unduly burdensome.  Without waiving said objection, CPS states that it has made reasonable

inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.   Furthermore, CPS admits that it did not control; did not contract with; and had no knowledge of the entity that sent the text message described in the instant matter; and that CPS did not request that any such text be sent on its behalf.

**REQUEST 3.**          Admit that at least one current or former CPS employee was aware at some point between January 1, 2008 and March 31, 2012 that SMS Messaging was one method that Leads were generated in the online, payday lending industry.

**RESPONSE:**          CPS objects to Request for Admission number 3 on the grounds that it is not properly limited in time and it is vague and ambiguous when the phrase "at some point between" is used in this context, which causes CPS to speculate in order to properly respond. Furthermore, request number 3 neither relevant nor reasonably calculated to lead the discovery of admissible evidence as an answer does not prove or disprove any allegation in the instant matter. Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny. Furthermore, CPS admits that it did not control; did not contract with; and had no knowledge of the entity that sent the text message described in the instant matter; and that CPS did not request that any such text be sent on its behalf.

**REQUEST 4.**          Admit that at no time between January 1, 2010 and March 31, 2012 did any current or former CPS employee instruct any LeadPile employee that CPS would not buy Leads generated through SMS Messaging.

**RESPONSE:**          CPS objects to Request for Admission number 4 on the grounds that it is vague and ambiguous when the phrases "at not time", "did any", and "would not" are used in this context, and in combination with each other, which causes CPS to speculate in order to properly respond.  Furthermore, request number 4 neither relevant nor reasonably calculated to lead the discovery of admissible evidence as an answer does not prove or disprove any allegation in the instant matter.   Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.   Furthermore, CPS admits that it always instructed that all acquisitions, be it leads or otherwise, to be in full compliance with the law, including the TCPA.

**REQUEST 5.**          Admit that You never rejected a Lead You purchased from LeadPile because the Lead was generated using SMS Messaging.

**RESPONSE:**          CPS objects to Request for Admission number 5 on the grounds that it is vague and ambiguous when the term "rejected" is used in this context, as it appears inconsistent to reject something at the same time as not rejecting something by way of purchase,

which causes CPS to speculate in order to properly respond.  Furthermore, request number 5 neither relevant nor reasonably calculated to lead the discovery of admissible evidence as an answer does not prove or disprove any allegation in the instant matter.   Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.   Furthermore, CPS admits that it always instructed that all acquisitions, be it leads or otherwise, to be in full compliance with the law, including the TCPA.

**REQUEST 6.**          Admit that at least one of Your employees was aware at some point between January 1, 2008 and March 31, 2012 that SMS Messaging was one method used by at least one of the entities identified in Your Response to Interrogatory No. 12 to generate Leads.

**RESPONSE:**          CPS objects to Request for Admission number 6 on the grounds that it is not properly limited in time and it is vague and ambiguous when the phrase "at some point between" is used in this context, which causes CPS to speculate in order to properly respond. Furthermore, request number 6 neither relevant nor reasonably calculated to lead the discovery of admissible evidence as an answer does not prove or disprove any allegation in the instant matter. Furthermore, request number 6 is misleading as it assumes an answer not made in interrogatory No. 12, as it relates to CPS.  Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.   Furthermore, CPS admits that it did not control; did not contract with; and had no knowledge of the entity that sent the text message described in the instant matter; and that CPS did not request that any such text be sent on its behalf.

**REQUEST 7.**          Admit that at least one CPS employee viewed the blog post authored by former LeadPile employee Eugen Ilie entitled "SMS and Lead Gen in a Lead Exchange" at some point before March 31, 2012.

**RESPONSE:**          CPS objects to Request for Admission number 7 on the grounds that it is vague and ambiguous when the phrase "at some point before" is used in this context, which causes CPS to speculate in order to properly respond.  Furthermore, request number 7 neither relevant nor reasonably calculated to lead the discovery of admissible evidence as an answer does not prove or disprove any allegation in the instant matter. Request number 7 also causes CPS to speculate on the authenticity of a matter, without providing or setting a foundation for blog cited. Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.

**REQUEST 8.**         Admit that prior to December 1, 2011, You had knowledge that sending SMS Messages to Persons without prior express consent using an automatic telephone dialing system violated the TCPA.

**RESPONSE:**         CPS objects to Request for Admission number 8 on the grounds that it seeks a response calling for a legal conclusion, and thus, it lacks foundation.  Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.   Furthermore, CPS admits that it always instructed that all acquisitions, be it leads or otherwise, to be in full compliance with the law, including the TCPA.

**REQUEST 9.**         Admit that prior to entering into the LeadPile Lead Buyer Agreement with LeadPile that You had knowledge that sending SMS Messages to persons without prior express consent using an automatic telephone dialing system violated the TCPA.

**RESPONSE:**         CPS objects to Request for Admission number 9 on the grounds that it seeks a response calling for a legal conclusion, and thus, it lacks foundation.  CPS further objects to request number 9 on the grounds that it is not limited in time.  Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.   Furthermore, CPS admits that it always instructed that all acquisitions, be it leads or otherwise, to be in full compliance with the law, including the TCPA.

**REQUEST 10.**         Admit that prior to entering into the LeadPile Lead Buyer Agreement with LeadPile that You had knowledge that LeadPile delegated the generation of leads to other entities.

**RESPONSE:**         CPS objects to Request for Admission number 10 on the grounds that it is not properly limited in time and it is vague and ambiguous when the term "delegated" is used in this context, which causes CPS to speculate in order to properly respond.  Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.   Furthermore, CPS admits that it always instructed that all acquisitions, be it leads or otherwise, to be in full compliance with the law, including the TCPA.

**REQUEST 11.**         Admit that LeadPile forwarded the information collected at the website "https://thesmartcreditsolution.securelinkcorp.com" to You if You purchased the Lead.

**RESPONSE:**         CPS objects to Request for Admission number 11 on the grounds that it is vague and ambiguous when the phrase "if you purchased the lead" is used in this context,

which causes CPS to speculate in order to properly respond.  Furthermore, request number 11 is misleading as it assumes CPS was aware of the referenced website and assumes that CPS obtained leads for this campaign only at anytime it may have obtained leads.  Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.   Furthermore, CPS admits that it always instructed that all acquisitions, be it leads or otherwise, to be in full compliance with the law, including the TCPA.

**REQUEST 12.**        Admit that the LeadPile Lead Buyer Agreement You entered into with LeadPile LLC placed no restrictions on the use of SMS Messaging to generate Leads.

**RESPONSE:**        CPS objects to Request for Admission number 12 on the grounds that it is vague and ambiguous when the phrase "placed no restrictions" is used in this context, which causes CPS to speculate in order to properly respond.  Furthermore, request number 12 fails to comply with Federal Rule of Civil Procedure 36(a)(2) and that the document speaks for itself.  Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.  Furthermore, CPS admits that it always instructed that all acquisitions, be it leads or otherwise, to be in full compliance with the law, including the TCPA.

**REQUEST 13.**        Admit that LeadPile would not have provided You Leads generated through SMS Messaging if you instructed them you would not accept such Leads.

**RESPONSE:**        CPS objects to Request for Admission number 13 on the grounds that it causes CPS to speculate in order to properly respond as it seeks a response based on what another entity, not CPS,  would or would not do.  Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.   Furthermore, CPS admits that it always instructed that all acquisitions, be it leads or otherwise, to be in full compliance with the law, including the TCPA.

**REQUEST 14.**        Admit that LeadPile would not have provided You Leads generated through SMS Messaging if you including a provision in the LeadPile Lead Buyer Agreement that you would not accept such Leads.

**RESPONSE:**        CPS objects to Request for Admission number 14 on the grounds that it causes CPS to speculate in order to properly respond as it seeks a response based on what another entity, not CPS,  would or would not do.  Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.   Furthermore, CPS admits that it always instructed that all acquisitions, be it leads or otherwise, to be in full compliance with the law, including the TCPA.

**REQUEST 15.**     Admit that You provided loans to Leads purchased from LeadPile LLC.

**RESPONSE:**     CPS objects to Request for Admission number 15 on the grounds that it is vague and ambiguous when the phrase "provided loans" is used in this context, which causes CPS to speculate in order to respond. Furthermore, request number 15 is not limited in time or scope.  Without waiving said objection, CPS denies request for admission number 15.

**REQUEST 16.**     Admit that You underwrote loans purchased from LeadPile LLC.

**RESPONSE:**     CPS objects to Request for Admission number 16 on the grounds that it is vague and ambiguous when the phrase "underwrote loans purchased" is used in this context, which causes CPS to speculate in order to respond. Furthermore, request number 16 is not limited in time or scope.  Without waiving said objection, CPS denies it purchased loans from LeadPile LLC.

**REQUEST 17.**     Admit that you provided loans to Leads originating at the website 'https://thesmartcreditsolution.securelinkcorp.com."

**RESPONSE:**     CPS objects to Request for Admission number 17 on the grounds that it is vague and ambiguous when the phrase "provided loans" and the term "originating" are used in this context, which causes CPS to speculate in order to properly respond.  Furthermore, request number 17 is misleading as it seems to suggest that the referenced website originated loans, which makes the request confusing and vague.  Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.  Furthermore, CPS admits that it did not control; did not contract with; and had no knowledge of the entity that sent the text message described in the instant matter; and that CPS did not request that any such text be sent on its behalf.

**REQUEST 18.**     Admit that you underwrote loans provided to Leads originating at the website https://thesmartcreditsolution.securelinkcorp.com."

**RESPONSE:**     CPS objects to Request for Admission number 18 on the grounds that it is vague and ambiguous when the phrase "underwrote loans" and the term "originating" are used in this context, which causes CPS to speculate in order to properly respond.  Furthermore, request number 18 is misleading as it seems to suggest that the referenced website originated loans, which makes the request confusing and vague.  Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.  Furthermore, CPS admits that it did not control; did not contract with; and had no knowledge of the entity that sent the text message described in the instant matter; and that CPS did not request that any such text be sent on its behalf.

**REQUEST 19.**        Admit that You earned money on the loans You provided to Leads purchased from LeadPile LLC.

**RESPONSE:**        CPS objects to Request for Admission number 19 on the grounds that it is vague and ambiguous when the phrase "earned money" is used in this context, which causes CPS to speculate in order to respond.  Furthermore, request number 19 is not limited in time or scope.  Without waiving said objection, CPS denies request for admission number 19.

**REQUEST 20.**        Admit that You earned money on the loans You provided to Leads You purchased from LeadPile that originated at the website https://thesmartcreditsolution.securelinkcorp.com."

**RESPONSE:**        CPS objects to Request for Admission number 20 on the grounds that it is vague and ambiguous when the phrase "earned money" is used in this context, which causes CPS to speculate in order to respond.  Furthermore, request number 20 is not limited in time or scope.  Without waiving said objection, CPS denies request for admission number 20.

**REQUEST 21.**        Admit that You were aware that the website https://thesmartcreditsolution.securelinkcorp.com" was used at some point between January 1, 2010 and March 31, 2012 to generate Leads for online, payday lenders.

**RESPONSE:**        CPS denies Request for Admission Number 21.

**REQUEST 22.**        Admit that You were aware that the website https://thesmartcreditsolution.securelinkcorp.com" was used at some point between January 1, 2010 and March 31, 2012 to generate Leads for the Lender Defendants.

**RESPONSE:**        CPS denies Request for Admission Number 22.

**REQUEST 23.**        Admit that the Text Message identified in paragraph 35 of Plaintiff's Complaint promoted loans available online.

**RESPONSE:**        CPS objects to Request for Admission number 23 on the grounds that it is vague and ambiguous when the phrase "promoted loans" is used in this context, which causes CPS to speculate in order to respond.  Without waiving said objection, CPS denies Request for Admission Number 23.

**REQUEST 24.**          Admit that the Text Message identified in paragraph 35 of Plaintiff's Complaint advertised loans available online.

**RESPONSE:**          CPS objects to Request for Admission number 24 on the grounds that it is vague and ambiguous when the phrase "advertised loans" is used in this context, which causes CPS to speculate in order to respond.  Without waiving said objection, CPS denies Request for Admission Number 24.

**REQUEST 25.**          Admit that the Text Message identified in paragraph 35 of Plaintiff's Complaint appeared to advertise loans available online.

**RESPONSE:**          CPS objects to Request for Admission number 25 on the grounds that it is vague and ambiguous when the phrase "appeared to advertise loans" is used in this context, which causes CPS to speculate in order to respond.  Without waiving said objection, CPS denies Request for Admission Number 25.

**REQUEST 26.**          Admit that the Text Message identified in paragraph 35 of Plaintiff's Complaint appeared to promote loans available online.

**RESPONSE:**          CPS objects to Request for Admission number 26 on the grounds that it is vague and ambiguous when the phrase "appeared to promoted loans" is used in this context, which causes CPS to speculate in order to respond.  Without waiving said objection, CPS denies Request for Admission Number 26.

**REQUEST 27.**          Admit that from January 1, 2010 through March 31, 2012, You provided loan products and services available online.

**RESPONSE:**          CPS objects to Request for Admission number 27 on the grounds that it is vague and ambiguous when the phrase "loan products and services" is used in this context, which causes CPS to speculate in order to respond.  Without waiving said objection, CPS admits that it underwrote and serviced loans.  CPS denies each and every allegation not expressly admitted herein.

**REQUEST 28.**          Admit that from January 1, 2010 through March 31, 2012, MyCashNow.com, Inc. provided loan products and services available online.

**RESPONSE:**          CPS objects to Request for Admission number 28 on the grounds that it is vague and ambiguous when the phrase "loan products and services" is used in this context, which causes CPS to speculate in order to respond.  Without waiving said objection, CPS admits that it underwrote and serviced loans.  CPS denies each and every allegation not expressly admitted herein.

**REQUEST 29.**　　　Admit that from January 1, 2010 through March 31, 2012, You underwrote loan products and services available online.

**RESPONSE:**　　　CPS objects to Request for Admission number 28 on the grounds that it is vague and ambiguous when the phrase "loan products and services" is used in this context, which causes CPS to speculate in order to respond.  Without waiving said objection, CPS admits that underwrote and serviced loans.  CPS denies each and every allegation not expressly admitted herein.

**REQUEST 30.**　　　Admit that Carey V. Brown testified truthfully at his February 15, 2005 deposition when he was asked "What did My Cash now do in connection with Credit Payment Services?" and Mr. Brown answered "It's just a shell corporation."

**RESPONSE:**　　　CPS objects to Request for Admission number 30 on the grounds that it is causes CPS to speculate in order to properly respond as it seeks a response from a third party, and not CPS.  Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.

**REQUEST 31.**　　　Admit that Carey V. Brown provided truthful deposition testimony on February 15, 2005 in the case *Electroweb Media, inc. v. MyCashNow.com, Inc., et al.*, No. l:02-cv-133 (E.D. Ten.).

**RESPONSE:**　　　CPS objects to Request for Admission number 31 on the grounds that it is causes CPS to speculate in order to properly respond as it seeks a response from a third party, and not CPS.  Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.

**REQUEST 32.**　　　Admit that Area203 purchased Leads from LeadPile LLC on Your behalf.

**RESPONSE:**　　　CPS objects to Request for Admission number 32 on the grounds that it is vague and ambiguous as it seeks a response from third parties, and not CPS.  Furthermore, request number 32 misleading as it assumes facts not in evidence as it relates to the purchasing of leads.  Without waiving said objections, CPS denies request for admission number 32.

**REQUEST 33.**        Admit that Carey V. Brown is Your sole owner.

**RESPONSE:**        CPS objects to Request for Admission number 33 on the grounds that it is vague and ambiguous when the phrase "sole owner" is used in this context, which causes CPS to speculate in order to properly respond.  Furthermore, request number 33 seeks a legal conclusion, and thus, request number 33 lacks foundation.  Request number 33 is also neither relevant nor reasonably calculated to lead the discovery of admissible evidence as an answer does not prove or disprove any allegation in the instant matter.  Finally, request for admission number 33 is not limited in time or scope.  Without waiving said objection, CPS admits that Carey V. Brown is the sole Shareholder of CPS.  CPS denies each and every allegation not expressly admitted herein.

**REQUEST 34.**        Admit that Carey V. Brown is the sole owner of LeadPile LLC.

**RESPONSE:**        CPS objects to Request for Admission number 34 on the grounds that it is vague and ambiguous as it seeks a response from third parties, and not CPS.  CPS further objects to Request for Admission number 34 on the grounds that it is vague and ambiguous when the phrase "sole owner" is used in this context, which causes CPS to speculate in order to properly respond.  Furthermore, request number 34 seeks a legal conclusion, and thus, request number 33 lacks foundation.  Request number 34 is also neither relevant nor reasonably calculated to lead the discovery of admissible evidence as an answer does not prove or disprove any allegation in the instant matter.  Finally, request for admission number 34 is not limited in time or scope.  Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.

**REQUEST 35.**        Admit that Carey V. Brown is the sole owner of Area203.

**RESPONSE:**        CPS objects to Request for Admission number 35 on the grounds that it is vague and ambiguous as it seeks a response from third parties, and not CPS.  CPS further objects to Request for Admission number 35 on the grounds that it is vague and ambiguous when the phrase "sole owner" is used in this context, which causes CPS to speculate in order to properly respond.  Furthermore, request number 35 seeks a legal conclusion, and thus, request number 35 lacks foundation.  Request number 35 is also neither relevant nor reasonably calculated to lead the discovery of admissible evidence as an answer does not prove or disprove any allegation in the instant matter.  Finally, request for admission number 35 is not limited in time or scope.  Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.

**REQUEST 36.**        Admit that Carey V. Brown shares assets between You and LeadPile.

**RESPONSE:**        CPS objects to Request for Admission number 36 on the grounds that it is vague and ambiguous as it seeks a response from third parties, and not CPS.  CPS further objects to Request for Admission number 36 on the grounds that it is vague and ambiguous when the phrase "shares assets" is used in this context, which causes CPS to speculate in order to properly respond, and it is misleading.  Furthermore, request number 36 seeks a legal conclusion, and thus, request number 35 lacks foundation.  Request number 36 is also neither relevant nor reasonably calculated to lead the discovery of admissible evidence as an answer does not prove or

disprove any allegation in the instant matter.   Finally, request for admission number 36 is not limited in time or scope.  Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.

**REQUEST 37.**        Admit that Carey V. Brown shares assets between You and Area203.

**RESPONSE:**        CPS objects to Request for Admission number 37 on the grounds that it is vague and ambiguous as it seeks a response from third parties, and not CPS.  CPS further objects to Request for Admission number 37 on the grounds that it is vague and ambiguous when the phrase "shares assets" is used in this context, which causes CPS to speculate in order to properly respond, and it is misleading.  Furthermore, request number 37 seeks a legal conclusion, and thus, request number 35 lacks foundation.  Request number 37 is also neither relevant nor reasonably calculated to lead the discovery of admissible evidence as an answer does not prove or disprove any allegation in the instant matter.   Finally, request for admission number 37 is not limited in time or scope.  Without waiving said objection, CPS states that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny.

DATED:  April 30, 2014                DENTONS US LLP

                                        _____/s/ Steven Martin Aaron_____
                                        Steven Martin Aaron, Esq.
                                        (*pro hac* vice) MO Bar # 41653
                                        Gregory T. Wolf, Esq.
                                        (*pro hac vice*) MO Bar #43717
                                        4520 Main Street, 11th Floor
                                        Kansas City, MO 64111-7100

                                        LAW OFFICE OF HAYES & WELSH

                                        _____/s/ Martin L. Welsh_____
                                        Martin L. Welsh, Esq.
                                        Nevada State Bar No. 8720
                                        199 North Arroyo Grande Blvd., Suite 200
                                        Henderson, Nevada 89074
                                        ***Attorneys for Defendant***
                                        ***Credit Payment Services, Inc.***

## **CERTIFICATE OF SERVICE**

Pursuant to FRCP 5(b), I certify that on April 30, 2014, I caused the above and foregoing document entitled CREDIT PAYMENT SERVICES, INC.'S RESPONSES TO FIRST REQUEST FOR ADMISSION FROM PLAINTIFF to be served on all counsel of record by email transmission and by United States first class mail, postage prepaid.


_____/s/ Steven Martin Aaron_____
An Attorney for Defendants

# EXHIBIT F

1  Steven Martin Aaron, Esq. (MO Bar No. 41653)
   *Admitted Pro Hac Vice*
2  Gregory T. Wolf, Esq. (MO Bar No. 43717)
   *Admitted Pro Hac Vice*
3  DENTONS US LLP
4  4520 Main Street, 11th Floor
   Kansas City, MO 64111-7700
5  Telephone:  (816) 460-2400
   Facsimile:   (816) 531-7545
6  steven.aaron@dentons.com
   gregory.wolf@dentons.com
7
8  Martin L. Welsh, Esq.
   Nevada State Bar No. 8720
9  LAW OFFICE OF HAYES & WELSH
   199 North Arroyo Grande Blvd., Suite 200
10 Henderson, Nevada 89074
   Telephone:  (702) 434-3444
11 Facsimile:   (702) 434-3729
   mwelsh@lvlaw.com
12
13 *Attorneys for Defendant*
   *CREDIT PAYMENT SERVICES, INC.*
14

15            **IN THE UNITED STATES DISTRICT COURT**
                    **DISTRICT OF NEVADA**
16

17 FLEMMING KRISTENSEN, individually,      )  Case No. 2:12-CV-00528-APG (PAL)
   and on behalf of a class of similarly situated  )
   individuals,                                )
18                                              )  CREDIT PAYMENT SERVICES, INC.'S
                                               )  ANSWERS TO SECOND
19                          Plaintiff,          )  INTERROGATORIES FROM
   v.                                          )  PLAINTIFF
20                                              )
   CREDIT PAYMENT SERVICES, INC.,             )
21 a Nevada corporation,                       )
   f/k/a MYCASHNOW.COM INC.,                  )
22 ENOVA INTERNATIONAL, INC.,                 )
   an Illinois corporation,                    )
23 PIONEER FINANCIAL SERVICES, INC.,          )
   a Missouri corporation,                     )
24 LEADPILE LLC,                               )
   a Delaware limited liability company, and   )
25 CLICKMEDIA, LLC d/b/a                       )
   NET1PROMOTIONS LLC, a Georgia limited       )
26                                              )
   liability company,                          )
27                                              )
                          Defendants.
28
   82120264\V-1

COME NOW Defendants Credit Payment Services, Inc. ("CPS"), pursuant to Federal Rule of Civil Procedure 33, hereby submits its Responses to the Second Interrogatories from Plaintiff (the "Interrogatories"), as follows:

## PRELIMINARY STATEMENT

1.      These objections and responses are made solely for the purpose of this action. Each response, if any, is subject to all objections as to competence, relevance, materiality, propriety, admissibility and all other objections and grounds that would require the exclusion of any document.  All such objections and grounds, therefore, are reserved and may be interposed at any time during this litigation including at the time of trial.

2.      Defendant objects to the Interrogatories to the extent they purport to impose obligations on Defendant not required by Federal Rule of Civil Procedure 33.

3.      While these objections and responses are based upon diligent exploration and investigation by Defendant and its counsel, all objections and responses must be construed as given on the basis of presently known information.  Defendant has not yet completed its investigation of facts or documents relating to this case and has not completed preparation for trial in this matter.  Consequently, the following responses are given without prejudice to Defendant's right to produce at any time during this litigation, including at the time of trial, subsequently discovered evidence, and Defendant reserves the right to amend, supplement, delete from, alter, modify or otherwise change them as may be appropriate when Defendant has ascertained all relevant facts.

4.      The fact that Defendant responds to any Interrogatory should not be taken as an admission that Defendant accepts or admit the existence of any facts set forth or assumed by such Interrogatory, or that the response constitutes admissible evidence.  The fact that Defendant

answers part or all of any Interrogatory is not intended and shall not be construed to be a waiver by Defendant of all or any part of any objection to any Interrogatory made by Defendant.

5.     Because some of these responses may have been ascertained by Defendant's attorneys and investigators, Defendant may not have personal knowledge of the information from which such responses were derived.

6.     The inadvertent production of a privileged or confidential document shall not be deemed or construed as a waiver of any privilege or right of Defendant.

7.     Defendant reserves the right to supplement its responses if necessary or appropriate at any time.   However, Defendant does not assume a continued responsibility to update its responses to these Interrogatories, and hereby specifically objects to each Interrogatory to the extent that it may seek to impose any continuing obligation on it.

## GENERAL OBJECTIONS

Defendant makes the following general objections to the Interrogatories and incorporates them into each response below as if set forth in full:

1.     Defendant objects to the Interrogatories' instructions and definitions to the extent they are vague, ambiguous, overbroad, overly burdensome, do not describe the information sought with requisite particularity, and/or require compliance and responses beyond the requirements of, and/or at variance with the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Nevada.   In addition the definitions attempt to identify information from entities not named in the suit and not subject to these Requests. By responding to the Interrogatories, Defendant does not adopt any definition or characterization of any term defined in the Interrogatories.

2.     Defendant objects to the Interrogatories to the extent that they seek information protected from disclosure by any privilege or doctrine, including, without limitation, the attorney-

client privilege and/or the work product doctrine.  No privileged material will be intentionally produced.  Any response by Defendant to the Interrogatories is made without a waiver of and with the preservation of the attorney-client privilege, the work product doctrine, and all other applicable privileges.  These Responses are made without waiver of, and with preservation of, the right to withhold any document or information subject to any such privilege and/or any document or information discovered to be privileged during the course of discovery.  The inadvertent production of any document that is privileged shall not be deemed or construed to constitute a waiver of any privilege or any other ground for objecting to discovery with respect to (1) such document or information, (2) any other document or information, or (3) the subject matter of any inadvertently produced document or information.

3.     Defendant objects to each Interrogatory to the extent that it seeks confidential information, trade secret, proprietary, financial or commercially sensitive information, the disclosure of which could result in substantial competitive injury to Defendant.  Defendant's response, and/or any such documents are subject to the terms and conditions of the Protective Order agreed and entered into between the parties.

4.     Defendant objects to each Interrogatory to the extent that it seeks confidential information, trade secret, proprietary, financial or commercially sensitive information of non-parties that Defendant is under an obligation to maintain in confidence.

5.     Defendant objects to the Interrogatories to the extent that they seek information that is outside of Defendant's possession, custody, or control or are matters of public record or are equally available to Plaintiff.  Defendant's responses indicating that it will produce any responsive, non-privileged documents in its possession, custody and control are subject to the existence and location of said responsive documents.

6.     Defendant objects to the Interrogatories to the extent that they are overbroad and unreasonable as to time and subject matter, unduly burdensome, unreasonably comprehensive or duplicative, unlimited in time or scope, oppressive and harassing and seek information that is neither relevant to the subject matter of the action nor reasonably calculated to lead to the discovery of admissible evidence, and consequently are burdensome, oppressive and harassing.

7.     Defendant objects to each and every Interrogatory seeking "all" information  as overly broad and unduly burdensome.  Defendant will respond to such requests by providing the information sufficient to respond to the request that is located after a diligent investigation.

8.     Defendant objects to the phrase "identify all documents" as overly broad, unduly burdensome and harassing.  To the extent Defendant relies on Fed. R. Civ. P. 33(d) to respond to an interrogatory, Defendant will identify those documents.  Otherwise, Defendant will identify and provide documents pursuant to non-objectionable Requests for Production.

9.     Defendant objects to each interrogatory that separately seeks substantive information, a separate identification of witnesses, and a separate identification of documents as such interrogatories are compound and constitute multiple discrete subparts.   Plaintiff's Interrogatories, because of multiple subparts, exceed the limits of the Federal Rules of Civil Procedure.

10.     Defendant objects to identifying any privileged documents that were written or prepared on or after March 29, 2012, the date this action was initiated by Plaintiff.  Defendant will withhold all privileged documents created or prepared by any of its employees, attorneys, agents, or representatives on or after March 29, 2012. The categorical identification of these documents is considered sufficient to satisfy any identification requirements necessary to properly assert privilege or immunity for those documents.

11.    In addition to the foregoing General Objections, Defendant hereby incorporates by reference its General Objections listed in Defendant's Responses to Plaintiff's Second Request for Production of Documents, and Responses to First Request for Admissions, and may also state specific objections to the Interrogatory where appropriate, including objections that are not generally applicable to each specific interrogatory.  By setting forth such specific objections, Defendant does not intend to limit or restrict the General Objections set forth above.

12.    Each and every one of these objections is incorporated by reference in the following responses.  Restatement of any of the above objections in the responses to the Interrogatories serves to emphasize said objection and/or add details to said objection.

Subject to and without waiving these or any other objections or claims to privileges, Defendant responds as follows:

## INTERROGATORIES

**INTERROGATORY NO. 16.**    Describe any policies and/or procedures You had in place between January 1, 2011 and February 1, 2012 to ensure that the entities You identified in Your Answer to Plaintiff's Interrogatory No. 12 complied with the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*.

**ANSWER:**    CPS objects to interrogatory number 16 on the grounds that it seeks information regarding a third party, and not CPS. Accordingly, no response is required.  Without waiving said objection, CPS states that it has already produced document describing certain policies and/or procedures requested in interrogatory number 16.  Further, CPS always instructed that all vendors be in full compliance with the law, including the TCPA.

**INTERROGATORY NO. 17.**    Identify all current or former employees or agents of CPS who were aware that any of the entities You identified in Your Answer to Plaintiff's Interrogatory No.12 obtained, bought and/or sold leads generated through the use of SMS Messaging during the Relevant Time Period.

**ANSWER:**    CPS objects to interrogatory number 17 on the grounds that it overly broad and unduly burdensome and it is not limited in time or scope.   CPS further objects as the information sought is neither relevant nor reasonable calculated to lead to the discovery admissible evidence as an answer does not prove or disprove any allegation in the instant matter.   Without waiving said objection, CPS states none to the best of its knowledge and belief.

**INTERROGATORY NO. 18.**    Describe all actions You have taken to ensure that LeadPile LLC bought and sold leads that were generated in compliance with the TCPA.

**ANSWER:**    CPS objects to interrogatory number 18 on the grounds that it overly broad and unduly burdensome and it is not limited in time or scope.   CPS further objects as the information sought is neither relevant nor reasonable calculated to lead to the discovery admissible evidence as an answer does not prove or disprove any allegation in the instant matter.   Without waiving said objection, CPS states that it has already produced document describing certain policies and/or procedures describing actions taken by CPS.    Further, CPS always instructed that all vendors be in full compliance with the law, including the TCPA.

**INTERROGATORY NO. 19.**    Identify all current or former CPS employees who, between January 1, 2008 and March 31, 2012, were aware that LeadPile LLC bought and sold Leads that were generated through SMS Marketing.

**ANSWER:**    CPS objects to interrogatory number 19 on the grounds that it overly broad and unduly burdensome and it is not limited in scope.   CPS further objects as the information sought is neither relevant nor reasonable calculated to lead to the discovery admissible evidence as an answer does not prove or disprove any allegation in the instant matter.   Without waiving said objection, CPS states none to the best of its knowledge and belief.

**INTERROGATORY NO. 20.**    Identify, based on a comparison of customer phone numbers in Your possession, the phone numbers of the Class Members who You provided a loan to.

**ANSWER:**    CPS objects to interrogatory number 20 on the grounds that it seeks information in violation of the Federal Rules of Civil Procedure, including Rules, 26 and 33, as it requests CPS to take an affirmative act in order to respond.   Interrogatory 20 is misleading as it assumes facts not in evidence, and in particular, that such a comparison was completed or was required.   Furthermore, interrogatory number 20 arguably seeks information protected by the attorney client privilege and work product doctrine.

**INTERROGATORY NO. 21.**      Identify each and every fact or document supporting any denials You made to Plaintiff's First Set of Requests for Admission to Defendant Credit Payment Services, Inc.

**ANSWER:**   CPS objects to interrogatory number 20 on the grounds that its  references to "each and every" is overly broad and unduly burdensome, and in essence, a request for all relevant information and documents that fails to designate with any reasonably particularity the documents or information requested. Without waiving said objection, see documents previously produced.

**INTERROGATORY NO. 22.**      Identify, based on a comparison of phone numbers of Your customers in Your possession, the phone numbers of leads generated from the website "http://thesmartcreditsolution.securelinkcorp.com" that You provided a loan to.

**ANSWER:**   CPS objects to interrogatory number 22 on the grounds that it seeks information in violation of the Federal Rules of Civil Procedure, including Rules 26 and 33, as it requests CPS to take an affirmative act in order to respond.  Interrogatory 22 is misleading as it assumes facts not in evidence, and in particular, that such a comparison was completed or was required.  Furthermore, interrogatory number 22 arguably seeks information protected by the attorney client privilege and work product doctrine.

**INTERROGATORY NO. 23.**      Identify all CPS employees whose computers and files You searched for documents relevant to this case.

**ANSWER:**   CPS objects to interrogatory number 23 on the grounds that it is argumentative and seeks information is neither relevant nor reasonable calculated to lead to the discovery admissible evidence as an answer does not prove or disprove any allegation in the instant matter. Furthermore, interrogatory number 23 arguably seeks information in violation of the Federal Rules of Civil Procedure, including Rules 26 and 33.

**INTERROGATORY NO. 24.**      Describe in detail all actions taken to investigate or review the business operated by LeadPile LLC before, during, and after CPS entered into the contract between LeadPile LLC and CPS (identified in the documents produced by LeadPile LLC in this litigation bates labeled LEAD000001-LEAD0000004) and Identify the Person(s) responsible for such investigation(s) or review.

**ANSWER:**   CPS objects to interrogatory number 24 on the grounds that it is vague and ambiguous when the phrase "all actions" is used in this context, which causes CPS to speculate in order to answer.  Furthermore, it is misleading as it suggests that certain actions were required and it seeks information is neither relevant nor reasonable calculated to lead to the discovery admissible evidence as an answer does not prove or disprove any allegation in the instant matter.  Furthermore, interrogatory number 23 arguably seeks information protected by the attorney client privilege and work product doctrine.  Without waiving said objection, CPS states see documents previously produced and that an in person risk assessment was conducted by CPS at Leadpile for consumer related issues.

**INTERROGATORY NO. 25.**     Identify each and every fact or document supporting any denials You made to Plaintiff's First Set of Requests for Admission to Defendant Credit Payment Services, Inc.

**ANSWER:**    See CPS's response to interrogatory number 21.

DATED:  April 30, 2014                DENTONS US LLP

                            _____*/s/ Steven Martin Aaron*_____
                            Steven Martin Aaron, Esq.
                            (*pro hac* vice) MO Bar # 41653
                            Gregory T. Wolf, Esq.
                            (*pro hac vice*) MO Bar #43717
                            4520 Main Street, 11th Floor
                            Kansas City, MO 64111-7100

                            LAW OFFICE OF HAYES & WELSH

                            _____*/s/ Martin L. Welsh*_____
                            Martin L. Welsh, Esq.
                            Nevada State Bar No. 8720
                            199 North Arroyo Grande Blvd., Suite 200
                            Henderson, Nevada 89074
                            ***Attorneys for Defendant***
                            ***Credit Payment Services, Inc.***

# **CERTIFICATE OF SERVICE**

Pursuant to FRCP 5(b), I certify that on April 30, 2014, I caused the above and foregoing document entitled CREDIT PAYMENT SERVICES, INC.'S ANSWERS TO SECOND INTERROGATORIES FROM PLAINTIFF was served on all counsel of record by email transmission and by United States first class mail, postage prepaid.

<div align="right">

*/s/ Steven Martin Aaron*

</div>

An Attorney for Defendants

# EXHIBIT G

**Edelson PC**

350 North LaSalle, Suite 1300, Chicago, IL 60654
t 312.589.6370  f 312.589.6378

www.edelson.com

May 27, 2014

<span style="text-decoration: underline;">Via Electronic Mail</span>

Steve Martin Aaron
Gregory T. Wolf
DENTONS US LLP
4520 Main Street, 11th Floor
Kansas City, MO 64111
steven.aaron@dentons.com
gregory.wolf@dentons.com

Re:     ***Kristensen v. Credit Payment Services, Inc., et al.*, No. 2:12-cv-00528 (D. Nev.)**

Dear Steve and Greg,

I write to address several deficiencies in Credit Payment Services' ("CPS") responses to Plaintiff's First Set of Requests to Admit and Second Sets of Interrogatories and Requests to Produce.  Plaintiff asks that CPS supplement its discovery responses no later than June 3, 2014.

**Plaintiff's First Set of Requests to Admit**

In response to 22 out of 37 Requests to Admit, CPS stated "that it has made reasonable inquiry and the information known or readily obtainable by CPS is insufficient to enable CPS to admit or deny."  (*See* Requests to Admit 1-14, 17-18, 30-31, 34-37.)  At no point, however, does CPS describe or indicate the extent of its "reasonable inquiry." The Ninth Circuit is clear on this issue: "a litigant's obligation to make 'reasonable inquiry'" is not "a mere semantic exercise." *Asea, Inc. v. S. Pac. Transp. Co.*, 669 F.2d 1242, 1247 (9th Cir. 1981).  A response to a Request to Admit that "fails to admit or deny a proper request for admission does not comply with the requirements of Rule 36(a) if the answering party has not, in fact, made 'reasonable inquiry.'" *Id.*; *see also F.D.I.C. v. Halpern*, 271 F.R.D. 191, 194 (D. Nev. 2010) ("Rule 36 requires the responding party to make a reasonable inquiry, a reasonable effort, to secure information that is readily obtainable from persons and documents within the responding party's relative control and to state fully those efforts.").

Moreover, CPS's inability to admit or deny is belied by the fact that the information Plaintiff seeks appears to be readily obtainable by CPS would enable it to admit or deny numerous of Plaintiff's Requests.  For example, Request 12 asks CPS to admit the details *of its own* Lead Buyer Agreement.  Additionally, Requests 30-31 and 34-37 all ask CPS to admit facts within the knowledge *of its own* owner, Carey V. Brown.  Each of these Requests—i.e., "admit that Carey V. Brown is the sole owner of LeadPile, LLC" (Request No. 34)—could be answered by simply asking Mr. Brown.

To the extent CPS responded to Plaintiff's Requests, it chose to "admit" or "deny" facts that were not part of Plaintiff's Requests to Admit.  For example, in response to Requests 1-6, 8-14, 17-18, CPS asserted that it lacked information sufficient to enable it to admit or deny, and then proceeded to "admit" to statements that were not part of Plaintiff's Requests to Admit.  Additionally, in response to Request 16, which asked to "Admit that [CPS] underwrote loans purchased from LeadPile LLC," CPS "denied it purchased loans from LeadPile LLC."  Plainly, this "denial" does not address the Request made.

Accordingly, Plaintiff requests that CPS supplement its responses by no later than June 3, 2014 by (1) setting forth with specificity the "reasonable inquiry," that it conducted, and (2) properly responding to Plaintiff's actual requests.

## **Plaintiff's Second Set of Interrogatories**

Rather than respond to Plaintiff's Interrogatories, CPS hid behind references to "already produced documents," lodged improper objections, and claimed to lack knowledge about the information requested.  As detailed below, CPS's responses must be supplemented.

### a.    *"Already Produced Documents"*

In response to Interrogatories Nos. 16, 18, 21, and 24,[1] CPS states that it has "already produced documents" or directs Plaintiff to "see documents previously produced."  Plaintiff will presume that this is CPS's effort at responding pursuant to Rule 33(d).  However, without identifying the documents CPS is referencing, CPS is violating Rule 33(d) and its responses are tantamount to no response at all.  *See Chudacoff v. Univ. Med. Ctr.*, 2013 WL 1737201, at *2 (D. Nev. Apr. 22, 2013) ("A party that attempts to rely upon Rule 33(d) with a mere general reference to a mass of documents or records has not adequately responded.").  CPS has produced thousands of documents in this action, and if it is going to rely on Rule 33(d) now, it must be more specific.

### b.    *Nonresponsive Answers*

Through Interrogatory Nos. 20 and 22, Plaintiff sought to determine the phone numbers of the Class Members CPS provided a loan to and which of those leads were generated from the Smart Credit Solution website.  In response, CPS responded in an identical boilerplate manner:

CPS objects to interrogatory number [20 and 22] on the grounds that it seeks information in violation of the Federal Rules of Civil Procedures, including Rules 26 and 33, as it requests CPS to take an affirmative act in order to respond. Interrogatory [20 and 22] is misleading as it assumes facts not in evidence, and in particular, that such a comparison was completed or required.  Furthermore, interrogatory number [20 and 22] arguably seeks information protected by the attorney client privilege and work product doctrine.

CPS provides no case law for the proposition that "taking an affirmative act" is somehow

---

[1]    CPS made the same improper assertions in response to Document Request Nos. 71 and 74-77.

prohibited by Rules 26 and 33—indeed, responding to any discovery request would take an affirmative act. It is expected that a party may have to examine its records to respond to an interrogatory. *Whittington v. City of Cuero, Texas*, CIV A V-06-0011, 2007 WL 737484 (S.D. Tex. Mar. 5, 2007) ([I]t is entirely appropriate to derive information for interrogatory responses from diligent examinations of records.)

Additionally, in response to Interrogatory No. 23, which sought to "Identify all CPS employees whose computers and files [CPS] searched for documents relevant to this case," CPS stated:

> CPS objects to interrogatory number 23 on the grounds that it is argumentative and seeks information [sic] is neither relevant nor reasonable [sic] calculated to lead to the discovery [sic] admissible evidence as an answer does not prove or disprove any allegation in the instant matter. Furthermore, interrogatory number 23 arguably seeks information in violation of the Federal Rules of Civil Procedure, including Rules 26 and 33.

These objections are incorrect. The relevance of an interrogatory does not depend upon whether the answer would, in and of itself, prove or disprove any allegations. *See Kalinauskas v. Wong*, 151 F.R.D. 363, 365 (D. Nev. 1993) ("In general, the scope of discovery is very broad.") Additionally, CPS provides no citation or explanation for its assertion that the Interrogatory "arguably seeks" information in violation of the Federal Rules of Civil Procedure—in fact, document custodians are normally identified in the discovery process. *See, e.g., In re SunPower Securities Litig.*, 2012 WL 4343245 (N.D. Cal. Sept. 20, 2012).

### c.    Lack of Knowledge

In response to Interrogatory Nos. 17 and 19, CPS states that "to the best of its knowledge and belief," it is unaware of any responsive information. The standard in responding to interrogatories, however, is not "awareness," it is a "reasonable inquiry." *F.T.C. v. Johnson*, 2013 WL 5408272, at *5 (D. Nev. Sept. 25, 2013). CPS must indicate the extent of its inquiry to discover responsive information.

Accordingly, Plaintiff asks that CPS withdraw its objections and supplement its responses by no later than June 3, 2014.

### Plaintiff's Second Set of Requests to Produce

CPS failed to identify a single responsive document in response to 43 Document Requests. Rather than respond, CPS lodged nearly identical boilerplate objections. Plaintiff delineates its Document Requests into the categories set forth below and addresses CPS's objections in turn:

### a.    Requests Relating to CPS's Relationship with LeadPile & Area203

Through Document Request Nos. 61-64, 70-73, 75, 78-79, and 82, Plaintiff seeks to establish the nature and extent of CPS's relationship with LeadPile and Area203. As has been plain throughout this litigation, CPS's relationship with LeadPile and Area203 will be crucial to

the question of CPS's vicarious liability.

CPS asserts a number of baseless objections to these Requests, including overbreadth, undue burden, harassment, relevance, and vague and ambiguous.  These "boilerplate, generalized objections are inadequate and tantamount to not making any objection at all."  *Walker v. Lakewood Condo. Owners Ass'n*, 186 F.R.D. 584, 587 (C.D. Cal. 1999); *see also Queensridge Towers, LLC v. Allianz Global Risks US Ins. Co.*, 2014 WL 496952, at *5-6 (D. Nev. Feb. 4, 2014) ("The general objections, reservations, and boilerplate objections look like a form provided to the firm's most junior attorney thirty years ago to teach new lawyers how to obstruct discovery.").

Contrary to CPS's boilerplate objections, these requests are not overbroad, unduly burdensome, harassing, or irrelevant.  CPS's relationships with its "lead generators" is directly at issue in this case, and other Courts have found in TCPA litigation that a seller's relationship with third parties that generate customers for the seller are relevant to the vicarious liability inquiry— even if those third-parties are not directly at issue in the case.  *See In re Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, 2014 WL 316476, at *7 (N.D.W. Va. Jan. 28, 2014).

### b.    *Requests Relating to CPS's Knowledge of the Use of SMS Marketing*

Through Document Request No. 80, Plaintiff seeks "documents concerning [CPS's] knowledge of the use of SMS Marketing by entities or individuals [CPS] purchased Leads from." CPS responds that this Request with boilerplate objections including overbreadth, undue burden, harassment, and relevance.  These boilerplate objections are improper.  *See Walker v. Lakewood Condo. Owners Ass'n*, 186 F.R.D. at 587; *Queensridge Towers, LLC*, 2014 WL 496952, at *5-6.

This Request is not overbroad, unduly burdensome, harassing, or irrelevant.  CPS's knowledge of LeadPile's (and its other lead generators) use of SMS Marketing is directly relevant to the vicarious liability analysis in this case.  *See In re Monitronics Int'l, Inc.,* 2014 WL 316476, at *7; *see also* this Court's March 26, 2014 Order, dkt. 164, at pg. 8 ("[A] seller may be liable for the acts of another under traditional agency principles if it ratifies those acts by knowingly accepting their benefits"). CPS must withdraw its objections and respond meaningfully to the document request by conducting a reasonable inquiry for relevant documents.

### c.    *Requests Relating to CPS's Relationship with its Sister Companies*

Through Document Request Nos. 65-67, 86-90, 92-95 and 100-102, Plaintiff seeks documents concerning the relationship between and among CPS and its numerous sister companies.  In response to each of these Requests, CPS asserts nearly identical boilerplate and generalized objections, including overbreadth, undue burden, harassment, relevance, and privilege.  CPS further objects on the basis that the Requests seek documents outside of CPS's control.  These boilerplate objections are improper.  *See Walker v. Lakewood Condo. Owners Ass'n*, 186 F.R.D. at 587; *Queensridge Towers, LLC*, 2014 WL 496952, at *5-6.

Contrary to CPS's objections, the nature of the relationship between CPS and its sister companies is highly relevant to theories that can support liability under the TCPA, including agency and alter-ego. *See M/V Am. Queen v. San Diego Marine Const. Corp.*, 708 F.2d 1483, 1490

(9th Cir. 1983) ("Where the alter ego doctrine applies, therefore, the two corporations are treated as one for purposes of determining liability"). As Judge Gordon recognized during oral argument on March 19, a company may be liable under the TCPA if it acts through one or more "shell companies." Plaintiff's investigation of this case has revealed strong evidence that CPS conducted its marketing and payday lending activities through the use of multiple "shell" companies that were all controlled by Carey V. Brown, and which all basically functioned for one purpose—to enable CPS and its related entities to maximize profits from its online, payday lending operations.

###### d.    *Requests Relating to Corporate Formalities Observed by CPS*

Through Document Request Nos. 91, 96-99 and 103, Plaintiff seeks documents concerning whether CPS observed corporate formalities. In response to each of these Requests, CPS asserts identical boilerplate and generalized objections, including overbreadth, undue burden, harassment, and relevance. CPS further objects on the basis that the Requests seek confidential or otherwise proprietary information. These boilerplate objections are improper and incorrect. *See Walker v. Lakewood Condo. Owners Ass'n*, 186 F.R.D. at 587. Furthermore, regarding the potential production of documents containing confidential or otherwise proprietary information, where, as here, there is a protective order in place, "objection[s] to producing documents based on the proprietary or confidential nature of the requested information" are not well taken. *Koninklijke Philips Electronics N.V. v. KXD Tech., Inc.*, 2007 WL 778153, at *4 (D. Nev. Mar. 12, 2007).

Plaintiff's document requests seek relevant information. The level of corporate formalities observed by CPS is directly relevant to Plaintiff's alter ego theory. *See Interactive Fitness, Inc. v. Basu*, 2011 WL 1870597, at *4 (D. Nev. May 13, 2011) ("Numerous 'critical facts' must be present to establish alter ego liability. Among these critical facts, are inadequate capitalization, commingling of assets, and the disregard of corporate formalities.") As discussed above, this discovery is relevant to determining to what extent CPS conducted its operations through the use of shell companies, and, relatedly, how many of these companies can be considered "sub-agents" of CPS.

Finally, due to formatting issues, CPS's responses to Document Requests Nos. 95-103 are unintelligible. Plaintiff asks that CPS please correct its responses so Plaintiff can fairly evaluate them.

Plaintiff asks that CPS withdraw its objections and supplement its responses to Plaintiff's Second Set of Document Requests by no later than June 3, 2014. We look forward to discussing these issues further with you.

Sincerely,

EDELSON PC

/s/  John C. Ochoa
John C. Ochoa

# EXHIBIT H



John Ochoa <jochoa@edelson.com>

---

# Kristensen v. Credit Payment Services, Inc., et al., No. 12-cv-0528 (D. Nev.)

**John Ochoa** <jochoa@edelson.com>                                        Tue, Jun 3, 2014 at 5:33 PM
To: "Wolf, Gregory T." <gregory.wolf@dentons.com>
Cc: "Aaron, Steven M." <steven.aaron@dentons.com>, Ari Scharg <ascharg@edelson.com>, Rafey Balabanian
<rbalabanian@edelson.com>, Ryan Andrews <randrews@edelson.com>

Steve and Greg,

Thank you for the meet-and-confer telephone call last week. Although I understood CPS's position to be that it believed Plaintiff's discovery was "harassing," a waste of time, and irrelevant to the vicarious liability issues in this case, you agreed to consider some of the issues Plaintiff raised in his May 27 letter and get back to us. I write to obtain CPS's final position on these issues. Below is a summary of some of the issues we discussed on the call:

Plaintiff's First Set of Requests to Admit

Per Plaintiff's letter to CPS, CPS responded to numerous Requests to Admit that it lacked information sufficient to admit or deny. On our call, I asked what inquiry CPS conducted before it interposed its responses, and it is your position that Plaintiff is not entitled to know what "reasonable inquiry" CPS undertook.

With regards to a "reasonable inquiry," I pointed out that, for example, in response to Request Nos. 17 & 18, Plaintiff asked that CPS admit that it either "provided" or "underwrote" loans originating at The Smart Credit Solution website, CPS stated that the information known to it is insufficient to enable CPS to admit or deny, but CPS's own expert confirmed that CPS did in fact provide loans originating from The Smart Credit Solution website. You stated that CPS did a less extensive investigation than that which its expert performed.

Please let us know if CPS is willing to describe the "reasonable inquiry" that it conducted in responding to Plaintiff's Requests to Admit.

We also discussed how many of CPS's responses to Plaintiff's Requests to Admit (and some Interrogatories) were not responsive to the question posed. Please let us know if CPS will amend its responses to these requests to respond to the question actually posed, or if CPS intends to stand on its current responses.

CPS's References to "Already Produced" Documents

In response to numerous Interrogatories (as well as several document requests), CPS simply referred Plaintiff to documents previously produced by CPS, without identifying the specific bates ranges that were responsive to the Interrogatory. I explained that CPS has an obligation to identify the specific documents being referenced, and that CPS's responses were inappropriate since CPS produced thousands of documents. You stated that you would "look into" this issue and get back to us. Please let us know if you will amend your responses.

Plaintiff's Interrogatories

In response to Interrogatory No. 23, you stated you would consider our request that CPS name the custodians whose files it searched for responsive information. In addition to this, please let us know if CPS intends on amending its Interrogatory responses to address the issues raised in Plaintiff's May 27 letter.

Plaintiff's Document Requests

Finally, we discussed CPS's responses to Plaintiff's document requests. As we discussed, Plaintiff's document requests sought documents related to the nature of CPS's relationships with LeadPile, Area203, and MyCashNow.com, Inc., as these companies were directly involved in the lead generation activities at issue in Plaintiff's Complaint. Specifically, Plaintiff already has evidence that suggests CPS is an alter-ego of LeadPile,

Area203, and MyCashNow.com, Inc., or that CPS controls or has the right to control their activities.  As you know from the Court's Order certifying a class, as well as Judge Gordon's comments at the hearing on class certification, agency liability, alter-ego liability, and sub-agent liability are three ways Plaintiff can prove CPS's vicarious liability under the TCPA.  You took the position that the only agency relationships that matter in this case are between CPS and either Michael Ferry and James Gee.

Although your position at the outset of our call was the CPS did not intend on to produce any documents in response to Plaintiff's requests, and that CPS intended to stand on its objections, you agreed to consider producing documents responsive to Plaintiff's requests.  Please let us know your final position on Plaintiff's document requests.

                              *     *     *

Let me know if you would like to discuss any of these issues further - I will be in the office for the rest of the week.  Otherwise, please let me know CPS's final position on these issues by this Friday, June 6.  Thank you.

Sincerely,

John


John Ochoa | Edelson PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
312.572.7209 (direct) | 312.589.6370 (firm) | 312.589.6378 (fax)
jochoa@edelson.com | www.edelson.com

þ Please consider the environment before printing this e-mail

CONFIDENTIALITY AND LIABILITY FOR MISUSE.
The information contained in this communication is the property of Edelson PC.  It is confidential, may be attorney work product, attorney-client privileged or otherwise exempt from disclosure under applicable law, and is intended only for the use of the addressee(s).  Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited.  If you have received this communication in error, please notify Edelson PC immediately by return e-mail and destroy this communication and all copies thereof, including all attachments.
Pursuant to requirements related to practice before the U.S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

[Quoted text hidden]

# EXHIBIT I

6/18/2014                                            5208cba556fdf7a0 Kristensen v. Credit Payment Services, Inc., et al., No. 12-cv-0528 (D. Nev.)

Case 2:12-cv-00528-APG-PAL   Document 199-2   Filed 06/19/14   Page 109 of 141



John Ochoa <jochoa@edelson.com>

## Kristensen v. Credit Payment Services, Inc., et al., No. 12-cv-0528 (D. Nev.)

**Aaron, Steven M.** <steven.aaron@dentons.com>                    Fri, Jun 6, 2014 at 11:13 AM
To: John Ochoa <jochoa@edelson.com>, "Wolf, Gregory T." <gregory.wolf@dentons.com>
Cc: Ari Scharg <ascharg@edelson.com>, Rafey Balabanian <rbalabanian@edelson.com>, Ryan Andrews
<randrews@edelson.com>

John-

Thank you for the follow up email. We don't agree with your recollection of the events described below. We believe our
responses and objections are proper and will stand on them as is.

Let me know if you would like to discuss any of these issues further.

Thank you

Steve



**Steven M. Aaron, Esq.**
Partner

D +1 816 460 2476   |   M +1 913 481 1155   |   US Internal 22476
steven.aaron@dentons.com
Bio   |   Website

Dentons US LLP
4520 Main Street, Suite 1100, Kansas City, MO 64111-7700

SNR Denton is proud to join Salans and FMC as a founding member of Dentons.

Dentons is an international legal practice providing client services worldwide through its member firms
and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended
recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and
delete this copy from your system. Please see dentons.com for Legal Notices, including IRS Circular 230.

**From:** John Ochoa [mailto:jochoa@edelson.com]
**Sent:** Tuesday, June 03, 2014 5:34 PM
**To:** Wolf, Gregory T.
**Cc:** Aaron, Steven M.; Ari Scharg; Rafey Balabanian; Ryan Andrews

[Quoted text hidden]

[Quoted text hidden]

# EXHIBIT J

Local companies tied to offshore payday lenders - Times Free Press... http://timesfreepress.com/news/2011/dec/18/local-companies-ti...



48°

search

| latest | local | business | sports | life | opinion | politics | | jobs | homes | cars | shop | classifieds |

sites: get out   right2know   chatter   current   community   north georgia   pix   news revolution   chattadealz   mobile

**Breaking News** | James Benson may face death penalty in Hutcheson hospital shootings - Feb. 9th, 2012 | share |          3 of 5

home » business » tn valley » local companies tied to ...

published Sunday, December 18th, 2011

## Local companies tied to offshore payday lenders

by Ellis Smith
view bio »

font size    print    email    share    comment

From the outside, the shared headquarters of Terenine, Area 203 and ACH Federal looks like a typical Chattanooga office building.

But those businesses are actually a front for an unlicensed Internet payday loan empire that consumer advocates say may not comply with a newly passed Tennessee law.

The Chattanooga entrepreneur who controls the businesses, Carey V. Brown, calls his payday business a "shell corporation" set up overseas for "lawsuit protection and tax reduction."

Tennessee regulators say that the payday entities operated out of Chattanooga — PayDayMax.com, MyCashNow.com and DiscountAdvances.com — are not licensed to do business in the state, though a new Tennessee law says payday lenders aren't supposed to operate in the state without a license.

The unlicensed payday companies claim on their websites to charge fees of $18.62 for a $100, two-week loan, though the state only allows lenders to charge a maximum of $15 on a $100 loan, according to the Tennessee Department of Financial Institutions.

Former employees say the payday loans are made through an entity called Credit Payment Services, which operates as the mothership for more than 20 companies. Each company bills the others as customers for services that typically would be conducted in-house, former employees said.

"The only way we can look at that is to say they're operating illegally if they don't have their licensing and accreditation, and within time, somebody's gonna knock on their door and shut the place down," said Jim Winsett, president of the Chattanooga Better Business Bureau.

Regulators already are knocking.

The Federal Trade Commission this year launched an investigation into the group of companies to determine if there has been a violation of the Fair Debt Collection

**Brown Order Document**



view full details    download pdf

**California Cease Document**



view full details    download pdf

**FTC Response Document**



| videos » | photos » | e-edition » |



advertisement

**other tn valley news »**

**Chattanooga shopping center developer CBL's profits up for year**
Feb. 9th, 2012 | share

**Alstom here for long term, local CEO Lawrence Quinn says**
Feb. 9th, 2012 | share

**U.S. Small Business Administration pushes loan deal**
Feb. 9th, 2012 | share

**Chattanooga among best real estate places**
Feb. 9th, 2012 | share

**New $300 million Wacker investment will boost production**
Feb. 8th, 2012 | share

**top headlines »**

**top commented stories »**

**top emailed »**

**Find us on Facebook**

Chattanooga Times Free Press

Like

24,059 people like **Chattanooga Times Free Press.**



Greg      Christopher   LeVon   Matthew   Cornell

Facebook social plugin

Case 2:12-cv-00528-APG-PAL Document 199-2 Filed 06/19/14 Page 113 of 141

Practices Act and the Federal Trade Commission Act. California, Oregon and New Hampshire issued cease-and-desist orders to the Internet companies during the year to stop what they say were illegal loans made in their states. The privately held payday lenders don't reveal financial figures, but ex-employees say they generate hundreds of millions of dollars of loans per year.

The payday conglomerate essentially operates as one company, employing as many as 400 local employees and generating between $1 million and $2 million in daily loan revenue from payday loans, former employees say.

"Five hundred million dollars a year is probably a conservative estimate," said Chris Christiansen, former director of infrastructure architecture and design for Terenine. "They're hitting that easy, especially around this time of year."

**SHELL COMPANIES**

Terenine, Area 203 and ACH Federal publicly do business as server hosters, online marketers and direct-deposit processors, with a client list that includes the Chattanooga Area Chamber of Commerce, Precept Ministries and others.

Their ads use words like "virtualization" and "cloud computing," and the companies sponsor technology-focused events and organizations.

But much of the work they do in Chattanooga supports payday lending.

From 2008 through 2010, the businesses made nearly 1.5 million loans to approximately 1.1 million unique clients, according to former operations manager Casey Lomber's written testimony to the FTC.

The number of "general notes" was 6.6 million, Lomber said, and ACH Federal told the newspaper in 2010 that it processed 300,000 transactions per month, with plans to expand to over a million by 2011.

Brown, the man behind the payday lenders and related businesses, is a former Rossville used-car dealer who began making online payday loans in 2001 through MyCashNow and Credit Payment Services.

Brown declined repeated requests for an interview with the Chattanooga Times Free Press.

But he did testify about his companies in a 2005 civil deposition, and the Times Free Press interviewed more than a dozen associates and former and current employees to corroborate his account.

Brown said in the deposition that his PayDayMax.com, MyCashNow.com and DiscountAdvances.com were set up in Canada and Grenada to avoid lawsuits and pay less in taxes.

"I think it's basically just a shell corporation," Brown said in the deposition about MyCashNow.com. "It had a legal office there in Grenada."

PayDayMax.com is based in "some other offshore tax-free country," and Discount Advances.com is "another shell corporation," Brown said in response to questions in the deposition.



view full details    download pdf

**MyCashNow Deposition Document**



view full details    download pdf

**New Hampshire Document**



view full details    download pdf

**New Hampshire Cease Document**



advertisement



MEDICAL RECORDS CLE
CHATTANOOGA, TN SOUTHEAST EYE SPECIALISTS

S STOWERS MA
CHATTANOOGA, TN STOWERS MACHINERY CORP



$34,785
2010 Ford F-150
Larry Hill Ford
View All Featured



$249,000
Re/Max Renaissance Realtors
More Details...

**Find a Business**

Search: [                    ]  [Search]

Popular Searches
Apartments in Chattanooga
Attorneys in Chattanooga
Auto Dealers in Chattanooga
Auto Parts in Chattanooga
Auto Repair in Chattanooga
Beauty Salons in Chattanooga
Car Rental in Chattanooga
Dentists in Chattanooga
Doctors in Chattanooga
Flowers in Chattanooga



Case 2:12-cv-00528-APG-PAL   Document 199-2   Filed 06/19/14   Page 114 of 141

The company behind the offshore shell companies is Credit Payment Services, which Brown controls through a series of contracts set up a decade ago, he said.

Though it seems complicated, it's not unusual for companies to go offshore to avoid regulations, said Allan Jones, owner of one of the nation's biggest payday lenders, Cleveland, Tenn.-based Check Into Cash.

"If an online operator is unlicensed, then he or she may not be following applicable regulatory laws," explained Jones, whose company is licensed to operate both Internet and retail store locations making payday loans. "Those who operate offshore are able to avoid regulations."

**'AFFILIATE COMPANIES'**

Though MyCashNow.com and related companies owned by Brown appear to be based offshore, Chattanooga is the actual physical location that houses most of the payday businesses' workers, split among two buildings on Amnicola Highway and one on Brainerd Road, former employees said.

"We did a lot of stuff with payday loans," said former Area 203 intern Brittany Jackson. "That's the main thing I worked with, and the largest business unit while I was there."

Aaron Shelley, former director of engagement services for Terenine, said employees were encouraged to use the term "affiliate companies" to describe the various entities owned or controlled by Brown.

The businesses invoice each other for services, just like any company does with its customers, even though they're owned or controlled by the same man, Shelley said.

"All of the customers were referred to as affiliate companies because it was common ownership," Shelley said.

Brown said in his 2005 deposition that he owned more than 20 such businesses, which he personally operates through contracts rather than a traditional ownership structure.

For instance, DiscountAdvances.com owns "absolutely nothing," Brown said, nor is it really owned by anyone.

"It's a shell," Brown said in the deposition. "They're in some third-world tax-free country, I don't know which one."

In fact, the site itself says it's located in Canada, though its only physical presence in Canada is a drawer filled with legal documents, according to Brown's deposition.

Even the payday mothership, Credit Payment Services, is yet another "shell" corporation based in Nevada, created in 2001 along with MyCashNow.com, Brown said.

Most of the work happens inside Brown's buildings on Amnicola Highway and Brainerd Road, where employees ostensibly hired to do marketing, Web hosting and advertising for Area 203, Terenine and ACH Federal find themselves working for Brown's CPS, former employees said.

**CHARITABLE CAUSES**

The strategy is a means to an end: Payday revenues are used to support missionaries in their efforts to "save souls" overseas, said Christiansen, the former Terenine engineer who helped set up many of



view full details    download pdf

**Oregon Case Document**



view full details    download pdf

**Petition to Quash Document**



view full details    download pdf

Case 2:12-cv-00528-APG-RAL Document 199-2 Filed 06/19/14 Page 115 of 141

the company's operations.

Christiansen was lured to Terenine from a medical career at CeloNova Biosciences in 2008, at a time when he found himself wondering whether it was better to "save lives or save souls," he said.

"[Brown] personally has debated the pros and cons of what he does, versus of what he's able to do with the money," Christiansen said.

Bulletin boards at the Amnicola Highway building that houses Terenine, ACH Federal and Area 203 are covered with pictures of smiling children whom Brown has helped, and overflowing with postcards from overseas missionaries whom he supports with revenues from his payday sites, former employees said.

In fact, the overall company's mission statement is "to maximize the growth of the Kingdom by helping the least of these, through strategic giving from profitable business," according to an email received from Brown during a prior investigation.

The goal is a reference to strengthening the biblical kingdom of God, said Terenine chief technology officer David Glenn in a mid-2011 interview.

At that time, the company counted Focus on the Family, Precept Ministries and the Dawson McAllister Association among its clients, a gold-plated evangelical client list that Glenn said helped attract like-minded employees to the company.

"We do give a good percentage of revenues from the company to charity," Glenn said.

**OVERSEAS MISSIONS**

Brown's overseas efforts aren't limited to supporting missionaries, however.

Engineers route the majority of his payday loan Web traffic through a company in Bermuda called Woody Holdings, masking the location of the payday operations on Amnicola Highway in Chattanooga, said Byron DeLoach, former director of engineering at Terenine.

"They do go through Bermuda, but the servers are physically located in Chattanooga," DeLoach said.

Sometimes, however, the company simply cuts out the middleman, Christiansen said.

"Whenever a big storm came through Bermuda, they'd show the weather map to the lawyers, and they'd give the OK to route the traffic directly to Chattanooga," Christiansen said. "When you're pushing $2 million a day, it's really just about not interrupting the volume."

Former employees say Brown creates individual companies where a typical business would simply employ a human resources or accounting department, for example.

According to the former employees:

- Terenine has a state-of-the-art data center on Riverside Drive that exists to keep the money flowing.

- Area 203 specializes in lead generation, search engine optimization and analytics for the payday sites.

- ACH Federal, which is located in the same building as Area 203 and Terenine, handles the debit transactions that both deposit and withdraw cash directly from consumers' bank accounts.

- Scenic City Legal, three miles away on Amnicola Highway, handles the company's legal work, including the lawsuits from governments and dissatisfied consumers.

- API Recruiting and Account Pros handle human resources and accounting tasks, respectively.

- Support Seven, located on Brainerd Road with another office in Costa Rica, is a call center for loan seekers as well as loan collection.

The arrangement arose in 2008 and 2009 when lawyers created Terenine, ACH Federal, Area 203 and the others from existing departments at CPS, creating "affiliate companies," Terenine President David Carney said in a 2011 interview with the Times Free Press.

"We really started as a department within a family of businesses a couple of years ago," Carney said. "Prior to 2010, [Terenine] was more of an IT department that was focused on providing services to affiliated businesses."

**BEYOND PAYDAY LENDING**

The push for business beyond Brown's Internet payday loans hasn't fared well, according to

Case 2:12-cv-00528-APG-PAL Document 199-2 Filed 06/19/14 Page 116 of 141

employees who quit or were fired.

His companies started quickly out of the gate in 2010 with a marketing and PR blitz, even allowing photographers into the server room.

The two most visible of Brown's companies, Terenine and Area 203, joined local business groups such as the Chattanooga Technology Council and participated in events like the Devlink technology conference. Area 203 sponsored the 48-hour launch, an event to spur startup businesses in Chattanooga, and did marketing work for clients like the Crash Pad, the Chattanooga Area Chamber of Commerce and LifeKraze.

But even with the Chamber and other clients, Brown's companies weren't pulling in enough outside business. Area 203 made up the difference on its online client list by posting the names of other Brown affiliate companies such as Terenine, ACH Federal and API Recruiting.

API Recruiting, in turn, lists ACH Federal, Area 203, Firma 8, Kingdom Site, Support Seven and Terenine as its clients.

Though Brown spent millions of dollars and hired hundreds of workers, former employees say that about 90 percent of his revenue still comes from payday loans, and that a high rate of turnover has led to a loss of clients.

"They only had two or three outside clients when I left," said Christiansen, who resigned from Terenine in May.

DeLoach said that during his tenure, the company tried to "do the payday stuff and they were doing external clients as well," but Brown was dropping nonpayday clients "pretty fast."

"I think they had one when I left," said DeLoach, who left in September.

The problem was that feeding the beast — the payday loan business — remained the active priority, even trumping outside clients, they said.

"The original goal wasn't to sell to external companies, it was to work for CPS — even though nobody wanted to talk about what that was," said Shelley, the former director of engagement services for Terenine.

Despite the limited number of nonpayday clients that Brown's companies service, a few of his businesses are ringing up staggering revenue growth.

Area 203 had sales of "nearly $46 million in 2010," the company reported in a news release issued in January, after it ran a social media campaign to encourage tourism in Guatemala and opened a since-closed office there.

J.Ed. Marston, director of marketing and communications for the Chattanooga Area Chamber of Commerce, said at the time the Chamber hired Area 203 he had no indication that a payday business was behind the marketing group.

"I don't have any direct knowledge of any of those things," he said.

**BROWN'S SIDE**

During the 2005 civil suit, Brown argued that by installing a computer overseas, he wasn't technically operating in the United States and subject to lending rules, since the payday lending decisions were being made by a computer on a Caribbean island tax haven instead of by a human being.

"And frankly, the servers make a lot of the decisions," he said.

Brown said because the company wasn't seeking out customers, but instead allowing customers to come to his payday websites, he is further insulated from the legal hurdles that licensed operators like Check Into Cash face.

"If the customers are seeking us out trying to do business with us, that's our right," Brown said. "But if we're — we can't specifically target a specific state that has lower allowable fees than what we charge."

Some of his websites claim not to lend to consumers in Tennessee, Georgia and a handful of other states, though customer complaints received by the Tennessee Division of Consumer Affairs show that some of Brown's loans still get through.

Tennessee state Rep. Charles Sargent, R-Franklin, who is chairman of the House Finance, Ways and Means Committee and sponsored a law in 2011 to tighten rules on payday lenders, said that Brown's methods could be illegal.

Case 3:12-cv-00528-ARC-RAL  Document 199-2  Filed 06/19/14  Page 117 of 141

"If they're not registered, it would be illegal, so you could shut them down," Sargent said. "They'd be doing it illegally."

He acknowledged that setting up shell companies overseas can make investigations more difficult, even if the companies are physically located in the state.

"The problem with a company that looks like it's overseas is we would have to have some way of tracking them down so we can tell who's good and who's bad," Sargent said.

**DATA TRAILS**

Though Brown's payday sites are legally located in foreign countries, not much happens overseas, he said in his 2005 deposition.

"Literally all that happens in Bermuda is that data is transferred through IP traffic," said Shelley. "There must be a lot of companies that do it, because there is nothing else attractive about Bermuda to make it a data center. It's an island that gets destroyed by storms over and over again."

The overseas entities, insofar as they exist, are contractually run through CPS, which handles tasks that include "marketing, handling phone calls, taking applications, approving and denying loans, fraud verification, accounts receivable," Brown said in 2005.

CPS is registered in Nevada, according to the Nevada secretary of state.

Brown incorporated CPS through a company called Silver Shield Services, which claims on its website to offer "protection from lawsuits, government creditors and state taxes through Nevada's incorporation-friendly laws."

Also registered through Silver Shield are: Area 203, Credit Protection Depot, ACH Federal, Collateralized Investment Services Limited Partnership, 3806 Amnicola LLC, Terenine and Support Seven.

For $600, Silver Shield Services sets up "everything that you need to prove that you are in fact operating in the state of Nevada," according to its website.

Former federal prosecutor Gary Humble said that "there are unresolved questions" about why a company would go through the effort to set up such an elaborate series of international entities.

"If I were doing the investigation, I'd want to know why, what legitimate reasons are there for conducting those transactions overseas," said Humble, who was not speaking specifically about Brown's companies.

However, stashing a router on an island doesn't necessarily get around U.S. laws, according to Uriah King, vice president of state policy for the Center for Responsible Lending, a consumer advocacy group.

"Many lenders argue that because it's over the Internet, the law doesn't apply, but the Internet doesn't bequeath magical status on the loan," King said.

Ira Rheingold, executive director for the National Association of Consumer Advocates, said most Bermuda Internet businesses are set up to dodge taxes or U.S. laws.

"It's all about avoiding liability and avoiding U.S. law or state law, as the case may be," Rheingold said.

And Brown is "very good at finding tax holes," Shelley said.

**THE LAW**

The Federal Trade Commission this year initiated an investigation into Brown's companies "to determine whether certain unnamed creditors may be engaged in violation of the Truth in Lending Act ... and whether they may be engaged in unfair or deceptive acts and practices."

But an FTC spokesman said no public charges have been filed against Brown or any of his companies, and regulators wouldn't comment on the status of any investigation.

The state of Tennessee won't say whether it is investigating Brown.

"At this time, we can say that we are investigating some possible unlicensed activity in this state," said Neil MacDonald, spokesman for the Tennessee Department of Financial Institutions.

That department regulates 10,262 financial entities. Only in May was the agency handed the responsibility of regulating and licensing Internet payday lenders, MacDonald said.

Case 2:12-cv-00528-ARC-PAL   Document 199-2   Filed 06/19/14   Page 118 of 141

"Since that time, we have started a process of determining what entities might be engaging in Internet payday lending without being licensed," he said. "We cannot comment on specific investigations."

**WHO IS CAREY BROWN?**

Brown is no stranger to investigations.

His move to portray his business as an overseas interest was itself a response to an ongoing class-action lawsuit against five cash advance stores that he owned in 2001, he said in the deposition.

"I already have a class-action suit going against my brick-and-mortar stores," Brown said at the time. "It was just a matter of time before they come after the Internet business, too."

Former employees describe Brown, who shuns publicity, as a kindhearted and generous man, who was a leading citizen in Rossville.

There he ran Happy Motors, a buy-here, pay-here dealership famous for a 15-foot-high, bright yellow chicken that he then called "the second most famous chicken in Georgia" after the Big Chicken in Marietta, Ga.

As a sign of his status in the community, he was selected for a development study in 2005 to revitalize the downtown area, including the old Peerless Woolen Mill.

Brown's chicken was used for directions to get people around Rossville, he said, "and it took 20 people to get it on top of the building and get it in place."

Though that was years ago, his employees still call his payday business "the chicken" in honor of the long-gone mascot, Shelley said, if only because they don't know what else to call CPS.

Brown's goal, however, isn't earthly riches and glory.

"He'd walk away from the business tomorrow if he could find a better way of saving souls," Christiansen said.

The hardship of running such a complicated business and the expense of dodging regulators is worth it if it supports Brown's work building the kingdom, Christiansen said.

"What's a soul worth?" Christiansen asked. "Do the ends justify the means?"





Tweet 76 Like

**about Ellis Smith...**

Ellis Smith joined the Chattanooga Times Free Press in January 2010 as a business reporter. His beat includes the flooring industry, Chattem, Unum, Krystal, the automobile market, real estate and technology. Ellis is from Marietta, Ga., and has a bachelor's degree in mass communication at the University of West Georgia. He previously worked at UTV-13 News, Carrollton, Ga., as a producer; at the The West Georgian, Carrollton, Ga., as editor; and at the Times-Georgian, Carrollton, ...

view bio
view articles
fav staff
rss feed

## 30 comments

Comments do not represent the opinions of the Chattanooga Times Free Press, nor does it review every comment. Profanities, slurs and libelous remarks are prohibited. For more information you can view our Terms & Conditions and/or Ethics policy.

**Astropig** said...

This is what passes for "capitalism" circa 2011. Instead of making something of value and selling it to people that want to buy it,our economy is reduced to loan sharking, "virtual" companies and "entrepreneurs" like this guy.No wonder we're broke several times over.

December 18, 2011 at 8:11 a.m.                                    permalink   suggest removal



**Techie1721** said...

Great article! One of the best pieces of investigative journalism I've seen from the TFP for a while. Those of us in the Chattanooga technology industry have been wondering when the truth would come out. It sad that the Chattanoga Chamber did business with these folks, and it must be embarrassing for Kay Arthur and the folks at precept. I don't see how Mr. Brown can justify loansharking the less fortunate in the US to give their money to the less fortunate around the world in the name of Christianity? I'm interested to read the deposition from the May 2011 appearance I front of the FTC. Is this available for public viewing?

December 18, 2011 at 3:15 p.m.                                   permalink   suggest removal



**ellissmith** said...

The FTC deposition is not available on our website. We do have the 2005 MyCashNow deposition available, however: http://timesfreepress.com/news/2011/d...

Send any tips to the author of this story, Ellis Smith, at esmith@timesfreepress.com

December 18, 2011 at 5:36 p.m.                                   permalink   suggest removal



**chatboy1000** said...

It sounds like these businesses are set up in a way that is confusing and perhaps not completely transparent, but I don't understand why it's such a big deal. Almost every business of any meaningful size will choose the best state to operate out of even if the owners/execs don't live in that state. So a man lives in one country and operates some businesses out of other countries. Sounds common enough - what's so "illegal" about it?

December 18, 2011 at 8:13 p.m.                                   permalink   suggest removal



**formertnine** said...

Accurate. Should add fourseasonscash.com to the list, though it is setup differently to operate in states the others cannot.

December 18, 2011 at 9:24 p.m.                                   permalink   suggest removal



**328Kwebsite** said...

Excellent work on this story.

December 18, 2011 at 10:02 p.m.                                  permalink   suggest removal



**adk21** said...

Icoffey1, I'll let the folks from Rossville respond to your ridiculous comment about them. In reference to your comment regarding this businessman using "religion" as a way of deceiving people, you couldn't be further from the truth. This man has used the profits from his business to build and support orphanages around the world, feed and clothe thousands of starving children, sponsor several organizations, including one which reaches out to people in various crises such as abuse and suicide, just to name a few. I would venture out to say that this man gives more money away than he keeps. His charitable giving has nothing to do with "religion" nor is his business about deceiving people, it's about spreading the love of Jesus Christ. Unlike most businesses and businessmen you read about in the headlines, this man walks the walk. His reward is in heaven and in nothing here below. May God bless and continue to use Him despite these false allegations.

December 18, 2011 at 10:26 p.m.                                 permalink   suggest removal



**IAMTHE99** said...

The reason middle class Americans are being methodicly exterminated and driven into poverty is the monetary policies of the Federal Reserve. Since 1971, when Nixon extinguished the last vestiges of the gold standard and unleashed politicians to spend borrowed money without immediate consequence, the U.S. dollar has lost 82% of its purchasing power using the government manipulated CPI. In reality, it has lost over 90% of its purchasing power. The average American, after decades of being dumbed down by government sanctioned education,

is incapable of understanding the impact of inflation on their lives. As their wages rise 2% to 3% per year and inflation rises 5% to 10% per year, they get poorer day by day. The Wall Street banks, who own the Federal Reserve, step in and convince the average American to substitute debt for real wealth in order to keep living the modern techno-lifestyle sold to them by mainstream corporate media. WHO IS THE REAL ENEMY???



December 18, 2011 at 11:07 p.m.                    permalink    suggest removal

**please login to post a**

### IAMTHE99 said...



The oligarchy of moneyed interests have done a spectacular job convincing the working middle class they should be angry at the "predatory" lenders, illegal immigrants and the inner city welfare class, rather than the real culprits – the Federal Reserve, Wall Street banks and mega-corporations. This is a testament to the power of propaganda and the intellectual slothfulness of the average American. U.S. based mega-corporations fired 864,000 higher wage American workers between 2000 and 2010, while hiring almost 3 million workers in low wage foreign countries, using their stocks in cash to buy back their own stocks, and paying corporate executives shamefully excessive compensation. The corporate mainstream media treats corporate CEO's like rock stars as if they deserve to be compensated at a level 185 times the average worker. The S&P 500 consists of the 500 biggest companies in America and while the executives of these companies have reaped millions in compensation, the stock index for these companies is at the exact level it was on July 9, 1998. Over the last thirteen years workers were fired by the thousands, shareholders earned 0% (negative 39% on an inflation adjusted basis), and executives got fabulously rich. WHO IS THE REAL ENEMY???

December 18, 2011 at 11:11 p.m.                    permalink    suggest removal

### IAMTHE99 said...



In this incestuous culture, "news" is defined chiefly as the actions and statements of people in power. Reporters, dependent on "access" and leaks provided by official sources, are too often unwilling to risk alienating these sources with truly critical coverage. Nor are corporate media outlets interested in angering the elected and bureaucratic officials who have the power to regulate their businesses. DON'T BE FOOLED...

December 18, 2011 at 11:26 p.m.                    permalink    suggest removal

### useyourbrain said...



Hmm. Disgruntled much? The article says "employing as many as 400 local employees". Not bad for the local Chattanooga economy eh? That could be a lot of people out of work who can't support local businesses through spending and patronage. I bet those employees are honest and hard working people... people who might just be your neighbor. This sounds like the result of pissed off former employees, and a paper eager for dramatic headlines, trying to make the unemployment line a bit longer. Shame.

December 18, 2011 at 11:40 p.m.                    permalink    suggest removal

### tlove said...



useyourbrain so you are a fellow C. Brown employee. Those sound like the exact words that I heard from Carey and Ron Beaver in their office, when we were told to put pressure on senator Corker, by telling him that the Dodd bill would result in 300 unemployed. I am embarrassed to say that we and all the affiliate companies lobbied our representatives through contributions and fear of firing at the time 300 employees. Truth is we have fired over 75 percent of our employees over the last year. I am done with lying. I am embarassed.

December 19, 2011 at 12:27 a.m.                    permalink    suggest removal

### benkiafisa said...



This is a superb piece of investigative journalism - one of the best I've seen in the Times Free Press. "Nothing is covered up that will not be revealed, or hidden that will not be known. Therefore whatever you have said in the dark shall be heard in the light, and what you have whispered in private rooms shall be proclaimed on the housetops." With solid reporting like this, these words prove true.

December 19, 2011 at 7:02 a.m.                    permalink    suggest removal

### HomCareRN said...



Mr. Ellis Smith, when did the words "can" and "could" mean that things "are"? Appears you are raising an alarm without really knowing the facts, only speculation. You remind me of a new nurse who calls a Code Blue on their cardiac patient who is sitting up, eating his/her lunch.

December 19, 2011 at 8:22 a.m.                                              permalink    suggest removal

**adk21** said...



nowfedup, aka Mr. higher education than the rest of us, have you taken into consideration the part of this article which says, "Brown said because the company wasn't seeking out customers, but instead allowing customers to come to his payday websites." No one is going out seeking out the "least fortunate" in America and making them apply for such loans. These "least fortunate" seek THEM out to receive loans. I think big boys and girls are able to make an informed decision as to who they want to receive a loan from, wouldn't you agree? Thus, willing individuals who choose to take out these loans will pay interest back to a company with the freedom to spend its profits as it so chooses- aka- to save lives both in this country and several others. Stole from Peter to give to Paul? I think not! Perhaps you are the one who ought to be seeking out higher education.

December 19, 2011 at 11:49 a.m.                                            permalink    suggest removal

**nowfedup** said...

ad Even the most functionally illiterate KNOW the "Pay day Loan" racket would be illegal if any of us charged such rates, it rivals the mob style lending and goes after those who can least afford such thing. That is a given and has been proven time after time. They exist as did mob loan sharks via legislators they own, giving millions to elected as well as the "souls they save" who probably get less. Either you are shill for company or industry or your "they have choice" reeks of paid ad. Sorry but yes, most of USA does NOT have the education to actually do computation of compound interest that builds up via these crooks and their nasty little fees. "those willing" are simply lower end that is targeted for rip offs and have about zero protection as cannot afford to bribe elected. Same for the "legal tax dodge" by this bunch and "shell companies", as tax payers must make up for what this "wonderful christian" run company, as said, a very warm spot reserved for such folks by the big guy whose work they supposedly are doing. Amusing spin on your part, but facts show otherwise. Must worry these crooks and their elected that a TN paper now actually taking on such low life, for a change. Great story

December 19, 2011 at 1:50 p.m.                                             permalink    suggest removal

**Chowder** said...

So, Mr. Brown wants to say it's OK to commit fraud, break laws, and screw people who are already having financial difficulties? OK because it's in an effort to further Gods Kingdom? 'Jesus entered the temple area and drove out all who were buying and selling there. He overturned the tables of the money changers and the benches of those selling doves.' As for the statements that "he gives away more money than he keeps" I don't know who gets it but it certainly isn't his employee's - ask them about their Health insurance - better yet, take a ride to the Amnicola building - there's an amazing collection of vintage cars in the warehouse - but, hey, they're probably for the orphans too. What Mr. brown is doing is playing God - deciding who to punish (the borrowers) and who to reward (missions in other countries)

December 19, 2011 at 2:27 p.m.                                             permalink    suggest removal

**Work2Live** said...

I had family who worked for Mr. Brown and that family member was fired for no real reason other than being paid a resonable salary. There were excuses made but no reason was given on the termination slip. It was simply a housecleaning for no reason at all. The man who did the firing said he was "just following orders". We have all heard that line of defense before. His employees are told they do not get overtime, that the insurance is the "best" that they can afford to provide yet Mr. Brown buys expensive and one of a kind collector cars for his enjoyment and pays crap money and fires workers at the drop of a hat. It has long been known in the local technology world that working for any branch of this scam is being a party to using the poor. Ron Beaver reminded me of a car salesman who talked his way into a management role. He was like "Slick Sam" in a nice suit. His style is to fire workers and ask questions later. The revolving door of employees in the various companies, the unusual number of company name changes, the way that the real reason for all the companies existstence is not spoken about openly or simply called, "Feeding the Chicken" should be examined and investigated to the fullest extent. Its a pay day loan scam and Mr. Brown is ripping off the poor. He may get into heaven but you can bet he will have some serious explaining to God about how he used the treasures he was given. I am sure we will see several of the executives doing the walk of shame out to the police car very soon. I feel sorry for the many men and women took jobs with one of these companies and were dismissed after a few months and left holding the bag. Mr Brown and his executives ruined many lives but I guess its fine since he says he saving souls. Former



employees moved across the country only to be fired after just a month or two. They have fired some great talent with great pedigrees and backgrounds. I suppose it is all justified since he is in the soul saving business. Mr Brown and Mr Beaver please be sure to have a light jacket and a towel to lay over the handcuffs and to cover your head when you walk out to the police car. We wouldn't want you to be embarrassed by being seen being arrested. For those of you who have tried to justify it by saying the poor seek them out makes it somehow ok, why dont you open a meth lab or sell bootleg liquor and see how fast you go to jail.

December 19, 2011 at 4:09 p.m.          permalink    suggest removal

**tlove** said...

Don't worry about the cars, he donated them to kingdom site.

December 19, 2011 at 4:54 p.m.          permalink    suggest removal

**brokeT** said...

Kingdom Site, which Brown also owns. Nice.

December 19, 2011 at 5:43 p.m.          permalink    suggest removal

**redaer** said...

Regarding the statement: "Brown said because the company wasn't seeking out customers, but instead allowing customers to come to his payday websites, he is further insulated from the legal hurdles that licensed operators like Check Into Cash face.If the customers are seeking us out trying to do business with us, that's our right," Brown said. Let's not forget that part of the setup is a digital/social media marketing company whose sole purpose is to drive people to the payday loan websites. According to the story, Area 203 had sales of "nearly $46 million in 2010," the company reported in a news release issued in January" but only does business with the family of businesses. That's a lot of internet advertising, email spamming and social media for someone who isn't seeking out customers.

December 19, 2011 at 6:33 p.m.          permalink    suggest removal

**brokeT** said...

Funny you should mention not seeking out the customers. The shell company mentioned in the article "Woodies Holdings" is actually a lead generating / qualifying company. Brown's companies generate leads based on loan applications. If the customer is found to be an unacceptable risk by one of Brown's payday lending or "Micro-lending" companies as they like to say while talking to potential outside companies, Woodies Holdings or more recently Lead Pile (Phoenix AZ) a company Brown purchased in 2010, sells off the lead to the highest bidder. Brown's companies also use outside companies to purchase leads as well. Rest assured, once a lead is purchased one of Brown's companies follows up on it. Indeed they do seek the customer.

December 19, 2011 at 7:54 p.m.          permalink    suggest removal

**nashir** said...

Nice information sharing in this post. Costa rica abogados.

December 20, 2011 at 3:25 a.m.          permalink    suggest removal

**frmrt9** said...

More insight into the history and constant turmoil at Terenine

http://www.glassdoor.com/Reviews/Terenine-Reviews-E331902.htm

December 20, 2011 at 11:34 a.m.          permalink    suggest removal

**calamus77** said... 

I am an ex-employee.

**COMPANY MANAGEMENT** It is true that there was too much manager turn-over, which left things feeling unstable. However, the managers I knew (VP of T9, etc.), were good managers from what I could tell.

**EMPLOYEE COMPENSATION** My salary was a bit higher than other companies pay in Chatt. Like any business, you are going to get paid your replacement value. If you cost $50k and it costs $40k to replace you, then you need to bump up your skill. If you're getting paid $40k and you're worth $50k, the company will probably lose you. **This is economics 101**.




**HEALTH INSURANCE COMMENTERS** Health insurance is what should be expected for the pool size of the company. It's not big enough for $10 copay and $250 deductibles.

**IS IT ETHICAL?** If you are about to have a bank overdraft the following day, and you need a quick loan, a Payday loan will save you money over bank overdraft fees. Speaking of which, I find payday loans more ethical than a bank's overdraft fees. A bank charges $35 for their overdraft "loan" and if you have two $0.05 loans, you get charged $70...and you get charged more each day you have a negative balance. **In 2008, banks made 24 BILLION in overdraft fees**. Around 2003, I had 6 "overdraft fees" for what accumulated to a $3.23 overdraft because of the way they calculated most-expensive to least expensive items and put fees for both actual and 'available' balance. That's the biggest scam I've ever seen, and it was perfectly legal. His company charging $18 vs. the allowed $15 in TN is hardly usury considering we're talking about an international business not a strictly TN business.

I know for a fact that Area 203 Lead follow-up DID TAKE MEASURES to avoid giving loans to anyone who listed an address in a state where the given company was not allowed to operate.

**SHELL COMPANIES** As to shell companies. It seems devious to the "average working American," but when you start paying MILLIONS of dollars to the US government so they can go put people on welfare and run their beaurocracy POORLY...or you can determine which charities use that money better...you might make the same decision, so you can't really judge until you're there. All money passed into the US for salaries, US expenses, etc., is still taxed by US law...shell's don't get around that.

**A HYPOCRITE?** Saying he's a hypocrite for having nice cars??? When you go to mycashnow.com it doesn't say, "get a loan with us and you'll be saving orphans," he's not using charity for publicity. I can't say that the man is genuine because I don't know him...but if he wants to give 1 billion to charity and also wants to spend $200k on a nice car, I don't see that as hypocritical. He's not a catholic priest who took a vow of poverty, he's a business owner who wants to do some good in the world.

Somebody is going to give payday loans because there is a market for it...might as well be CB.

December 22, 2011 at 12:11 a.m.                                        permalink    suggest removal

**formerterenine** said...

Mr Smith, you maybe should have vetted your sources more closely. I believe Chris Christiansen was fired from Terenine as was Mr. Shelley's brother, who was a VP at Terenine. Perhaps there is some axe grinding going on.

January 9, 2012 at 5:32 p.m.                                          permalink    suggest removal

comment

**Username**

Or login with:

New Account

**Password**

Facebook

Twitter

Google

Sign In

**related articles »**

**Payday lender embroiled in lawsuits**
Feb. 5th, 2012

A company involved in an unlicensed payday lending operation recently lost an early legal bid to silence some of its ...

**New U.S. agency may reshape payday loan landscape**
Jan. 7th, 2012

Payday lenders are finding themselves in the Obama administration's crosshairs as the president's new financial regulator begins to flex its ...

**Check Into Cash promotes 2**
Sept. 11th, 2011

Check Into Cash, a Cleveland, Tenn.-based payday lender and specialty consumer financial services company, recently promoted Tim McMahan to vice ...

**Storm spurs data storage**
June 30th, 2011

It's easy to send shivers down the spine of an IT director. Just mention the name Lulz Security, the international ...

submit events          archives         site map
feedback              contact us        mobile

400 East 11th St., Chattanooga, TN 37403
General Information (423) 756-6900

place an ad
rss feeds

advertise
promotions

email updates
subscribe

Copyright, permissions and privacy policy, Ethics policy - **Copyright ©2012, Chattanooga Publishing Company, Inc. All rights reserved.**
This document may not be reprinted without the express written permission of Chattanooga Publishing Company, Inc.

2/9/12 3:02 PM

# EXHIBIT K

Chattanooga, TN
86°
View Live Radar
Weather Sponsored By:

# timesfreepress.com

**sites:** right2know | mobile | community | obits | biz experts | edge | chattanooganow | get out | chatter | ideal health | dining out | chattagov | noticias libres

home » local/regional » brown disputes claims against ...

published Thursday, January 3rd, 2013

## Brown disputes claims against his businesses

by Staff Report

view bio »

font size | print | email | share

Since the publication of this story, Carey Brown and his representatives have disputed the claim that the businesses cited in this article share common ownership and that they are not properly licensed to do business in Tennessee.

Additionally, three former employees of one of Brown's companies, Terenine, were sued for violating non-disclosure provision of their employee contracts by talking to the Times Free Press. The three now dispute some of the quotes attributed to each of them.

Though Brown and his representatives declined repeated requests for interviews prior to the initial publication, a spokesman for Brown now claims the story paints an inaccurate picture of his businesses.

"Each of the businesses mentioned in the article are distinct entities and possess all applicable licenses required by the legal authorities that govern them," Ron Beaver, chief operating officer for Terenine, said in a letter to the Times Free Press.

Beaver said Credit Payment Services is a service provided to payday lenders and does not make loans directly to consumers and therefore does not have to be licensed as a payday lender.

"Like many businesses, Credit Payment Services has several vendor relationships and does not control any of the companies referenced in the article," he said.

Beaver said the companies that service the payday lenders referenced in the article also have a consumer complaint rate well below the industry average.

Following this story's publication, attorneys for payday entrepreneur Carey Brown sued three former employees for allegedly breaching an agreement not to discuss Brown's business operations.

Over the next eight months, each of three sources signed affidavits variously claiming that they were misquoted, misrepresented or that they could not remember sharing certain details with Times Free Press reporter Ellis Smith.

The lawsuits were settled after the sources provided the affidavits to Brown's attorneys at Scenic City Legal Group.

Aaron Shelley, Byron DeLoach and Chris Christiansen said in affidavits gathered by Brown's attorneys that they either don't recall or didn't say some of quotes attributed to them in this story which may have disclosed company secrets.

**Aaron Shelley statement**



view full details | download pdf

**Byron DeLoach statement**



view full details | download pdf

**Chris Christiansen statement**

videos »    photos »    e-edition »



**other local-region news »**

Man police say shot and killed his girlfriend gives three versions of her death
June 18th, 2014 | share |

City of Chattanooga says huge mural of flying doughnuts is illegal
June 18th, 2014 | share |

Huntland TN installs tornado siren, repairs another
June 18th, 2014 | share |

Owners eye 30th anniversary with historic Falls Mill
June 18th, 2014 | share |

Bradley County cuts health department funds
June 18th, 2014 | share |

**top headlines »**

**top commented stories »**

**top emailed »**

Find us on Facebook

Chattanooga Times Free Press

Like

82,352 people like Chattanooga Times Free Press.

Facebook social plugin

Shelley, a former Terenine employee cited in the article, said he "misunderstood the nature of the article being compiled" and he said he saw "no evidence of any illegal activities."

DeLoach, one of the former employees of Brown's Basenine Inc., denied several quotes attributed to him.

Chris Christiansen also denied making some of the quotes attributed to him in the story.

Alison Gerber, managing editor for the Chattanooga Times Free Press, said the newspaper stands by the story. The newspaper's notes and recorded interviews back up the reporting, she said.

In addition to the three sources sued by Brown, The Times Free Press has interviewed more than a dozen former employees and executives about Brown's payday businesses, and has reviewed more than 1,000 pages of legal filings, Internet records and other evidence that supports the record.



view full details    download pdf

**about** Staff Report...
Get breaking news from the Times Free Press on Twitter at www.twitter.com/timesfreepress or by visiting us on Facebook or Twitter at the right:

- view bio
- view articles
- fav staff
- rss feed
- twitter
- facebook

advertisement

MILLENNIUM TAXI DRI
CHATTANOOGA, TN MILLENNIUM TAXI

OTR & Local Drivers
Chattanooga, TN Confidential

More jobs

$9,995
2009 Chevrolet Aveo5 LT
Marshal Mize Ford

View All Featured Vehicles

$315,000

Ooltewah, TN
BELL DEVELOPMENT COMPANY, INC.

More Details...

**timesfreepress.com**
Chattanooga Times Free Press
400 East 11th St., Chattanooga, TN 37403
General Information (423) 756-6900

submit events
feedback
place an ad
rss feeds

archives
contact us
advertise
promotions

site map
mobile
email updates
subscribe

Copyright, Permissions, Terms & Conditions, Privacy Policy, Ethics policy - Copyright ©2014, Chattanooga Publishing Company, Inc. All rights reserved.
This document may not be reprinted without the express written permission of Chattanooga Publishing Company, Inc.

EXHIBIT L

March 26, 2012

To Whom It May Concern:

On December 18, 2011, the Chattanooga Times Free Press published an article titled "Unlicensed Payday Lending Empire" in which I was quoted. I regret my cooperation with this story and any tarnishing of the reputation of Carey V. Brown and the companies in which he has an interest.

During my employment with Terenine, I saw no evidence of any illegal activities. Any implications to the contrary of the Chattanooga Times Free Press and Ellis Smith are, in my opinion, unfounded based on the information to which I was exposed while employed at Terenine.

It was not my intent to harm the reputations of Mr. Brown or his companies. I misunderstood the nature of the article being compiled and several of my statements were used in a manner other than the spirit in which they were given. I regret any misrepresentations or distortion of facts that my speaking with Mr. Smith may have led to.

Divulging company proprietary information is a serious matter and I understand the need for companies to keep some information private. I am committed to honoring my confidentiality agreements with Terenine.

I apologize to Mr. Brown and his employees for any actions on my part.

Sincerely,

*Aaron Shelley*

Aaron Shelley

EXHIBIT D

# EXHIBIT M

## AFFIDAVIT OF BYRON DELOACH

Comes now Byron DeLoach who, first being duly sworn, states upon his oath as follows:

1.    My name is Byron DeLoach. I am over the age of 21 years and I am competent to testify. I have personal knowledge of all matters set forth herein. This Affidavit is given for use in connection with this proceeding and all other lawful uses.

2.    I left my employment with Basenine, Inc. voluntarily, for reasons of my own, and accepted what I considered a better position with an entity in a different industry. I have no intent to engage in a campaign designed to harm Basenine, Inc. or to benefit myself at the expense of Basenine, Inc.

3.    I do not deny receiving a telephone call from Ellis Smith of the Chattanooga Times Free Press and being apprised of the fact that Mr. Smith was writing an article "about a local business man," Cary V. Brown. There was nothing in Mr. Smith's introduction that suggested to me that the article would purport to be an exposé of any kind; in fact, I assumed that the article was intended to focus on Mr. Brown's laudable activities. It was in that spirit that I spoke to Mr. Smith.

4.    I am firmly of the conviction that I disclosed nothing to Ellis Smith that constitutes a trade secret, proprietary information, or confidential information concerning Basenine, Inc. Everything that I discussed with Mr. Smith was either publicly known or information that I have seen and heard disseminated to non-confidential sources by high-ranking officials of Basenine, Inc.

5.    In addition, some of the information attributed to me in the ensuing article

(the "TFP Article") was, in fact, not shared by me in my conversation with Ellis Smith.

6.    The statements attributed to me in the TFP Article are as follows:

> Engineers route the majority of his payday loan Web traffic
> through a company in Bermuda called Woody Holdings,
> masking the location of the payday operations on Amnicola
> Highway in Chattanooga, said Byron DeLoach, former
> director of engineering at Terenine.
>
> "They do go through Bermuda, but the servers are
> physically located in Chattanooga," DeLoach said.

I was specifically asked about the Bermuda web traffic. I acknowledged that web

traffic was occasionally routed through Bermuda. Routing through optional pathways is

a common practice in the managed services provider industry. This was never considered

proprietary or confidential information at Terenine.

I deny any mention of Woody Holdings. I had very little contact with the

operations in Bermuda. This name was not known to me until I read the TFP Article.

> DeLoach said that during his tenure, the Company tried to "do the
> payday stuff and they were doing external clients as well," but
> Brown was dropping nonpayday clients "pretty fast."

I was specifically asked about the lending practice. I acknowledged that Cary

Brown's companies engage in lending but that they have external clients as well,

meaning only that they are a managed services provider and not just lenders. It was

never considered proprietary or confidential that the companies were involved in

payday/micro lending.

I deny making any mention of Cary Brown "dropping nonpayday clients pretty

fast."

2

> "I think they had one when I left," said DeLoach, who left
> in September.

I deny making this statement in reference to clients/customers. I was asked early

in the conversation the reason I had resigned my employment. My answer was that many

of the people that had built the infrastructure and with whom I had worked had left and

that I was simply ready to move on. My statement was more along the lines of this: "of

the original engineers I think they had one when I left."

> The problem was that feeding the beast – the payday loan
> business – remained the active priority, even trumping
> outside clients, they said.

Though not specifically attributed to me, the proximity of this statement to

statements that were attributed to me implies that I made this statement as well. I deny

having made this statement.

7.　　The article also includes a number of statements attributed to "former

employees" or "ex-employees" without naming any names. These statements are as

follows:

> Former employees say the payday loans are made through
> an entity called Credit Payment Services, which operates as
> the mothership for more than 20 companies.　Each
> company bills the others as customers for services that
> typically would be conducted in-house, former employees
> said.

I deny having made this statement.

> The privately held payday lenders don't reveal financial
> figures, but ex-employees say they generate hundreds of
> millions of dollars of loans per year.

I deny having made this statement.

3

> The payday conglomerate essentially operates as one company, employing as many as 400 local employees and generating between $1 million and $2 million in daily loan revenue from payday loans, former employees say.

I deny having made this statement.

> Though MyCashNow.com and related companies owned by Brown appear to be based offshore, Chattanooga is the actual physical location that houses most of the payday businesses' workers, split among two buildings on Amnicola Highway and one on Brainerd Road, former employees said.

I deny having made this statement.

> Most of the work happens inside Brown's buildings on Amnicola Highway and Brainerd Road, where employees ostensibly hired to do marketing, Web hosting and advertising for Area 203, Terenine and ACH Federal find themselves working for Brown's CPS, former employees said.

I deny having made this statement.

> Bulletin boards at the Amnicola Highway building that houses Terenine, ACH Federal and Area 203 are covered with pictures of smiling children whom Brown has helped, and overflowing with postcards from overseas missionaries whom he supports with revenues from his payday sites, former employees said.

I deny having made this statement.

> Former employees say Brown creates individual companies where a typical business would simply employ a human resources or accounting department, for example.
>
> According to the former employees:
> - Terenine has a state-of-the-art data center on Riverside Drive that exists to keep the money flowing.
> - Area 203 specializes in lead generation, search engine optimization and analytics for the payday sites.
> - ACH Federal, which is located in the same building as Area 203 and Terenine, handles the debit transactions that

both deposit and withdraw cash directly from consumers' bank accounts.

- Scenic City Legal, three miles away on Amnicola Highway, handles the company's legal work, including the lawsuits from governments and dissatisfied consumers.
- API Recruiting and Account Pros handle human resources and accounting tasks, respectively.
- Support Seven, located on Brainerd Road with another office in Costa Rica, is a call center for loan seekers as well as loan collection.

I deny having made any of these statements.

> The push for business beyond Brown's Internet payday loans hasn't fared well, according to employees who quit or were fired.

I deny having made this statement.

> Though Brown spent millions of dollars and hired hundreds of workers, former employees say that about 90 percent of his revenue still comes from payday loans, and that a high rate of turnover has led to a loss of clients.

I deny having made this statement.

> Former employees describe Brown, who shuns publicity, as a kindhearted and generous man, who was a leading citizen in Rossville.

I deny having made this statement.

FURTHER THE AFFIANT SAYETH NOT.

Byron DeLoach

STATE OF TENNESSEE:

COUNTY OF HAMILTON:

Personally appeared before me, _Byron DeLoach_, a Notary Public in and for said State and County aforesaid, duly commissioned and qualified, **BYRON DELOACH**, with whom I am personally acquainted (or duly proved to me to be such person), and who, first being duly sworn, acknowledged that he executed the within instrument for the purposes therein contained, and the facts set forth therein are true and correct to the best of his information, knowledge and belief.

WITNESS my hand, at office, this _21_ day of _May_, 2012.

Notary Public
My Commission Expires: _11/10/12_

# EXHIBIT N

## AFFIDAVIT OF CHRISTOPHER CHRISTIANSEN

Comes now, Christopher Christiansen, first being duly sworn, who states upon his oath as follows:

1.     I am over the age of 21 years and I am competent to testify. I have personal knowledge of all matters set before herein.

2.     Prior to publication of the December 18, 2011 Times Free Press article entitled "Local companies tied to offshore payday lenders," I received a call from Ellis Smith of the Times Free Press. Mr. Smith explained he was writing an article about Carey Brown. I agreed to meet with Mr. Smith.

3.     I advised Mr. Smith that I was subject to a Non-Disclosure Agreement.

4.     I did not tell Mr. Smith, or anyone else at the Times Free Press, that "[f]ive hundred million dollars a year is probably a conservative estimate" of the payday business's earnings. It is possible Mr. Smith quoted that figure to me and I responded with my belief about the accuracy of the quoted figure.

5.     Beyond possibly responding as to my belief about the accuracy of a quoted figure of annual earnings as discussed in the foregoing paragraph (which I may or may not have done), I did not tell Mr. Smith or anyone else at the Times Free Press anything about the revenue generated by the payday businesses referenced in the December 18, 2011 article. I did not provide any information about a daily loan revenue amount.

6.     I did not tell Mr. Smith, or anyone else at the Times Free Press that, "[w]henever a big storm came through Bermuda, they'd show the weather map to the lawyers, and they'd give

the OK to route the traffic directly to Chattanooga." Mr. Smith was incorrect when he attributed the foregoing quote to me in the December 18, 2011 Times Free Press article.

7.     I did not tell anyone that a weather map was shown to lawyers, nor do I have any knowledge of what the lawyers communicated.

8.     Although it is attributed to me in the December 18, 2011 Times Free Press article, I do not believe I made a statement that the hardship of running such a complicated business and the expense of dodging regulators is worth it if it supports his efforts to build the kingdom of God.

9.     I did not tell Mr. Smith, or anyone else at the Times Free Press, that payday loans are made through an entity called Credit Payment Services.

10.     I did not tell Mr. Smith, or anyone else at the Times Free Press, that there are affiliated business that bill each other as customers for services that typically would be conducted in-house.

11.     I did not discuss with Mr. Smith, or anyone else at the Times Free Press, the relationship between Terenine and any business(es) I believe(d) to be affiliated with Terenine.

12.     I did not tell Mr. Smith, or anyone else at the Times Free Press, that there is a payday conglomerate that essentially operates as one company.

13.     I did not tell Mr. Smith, or anyone else at the Times Free Press, that about 90 percent of Carey Brown's revenues come from payday loans.

14.     I do not believe I told Mr. Smith or anyone else at the Times Free Press that the push for business beyond payday loan clients has not fared well.

15.     I did not tell Mr. Smith, or anyone else at the Times Free Press, that a high rate of turnover has led to a loss of clients.

16.    I did not discuss with Mr. Smith, or anyone else at the Times Free Press, the ownership of Terenine and/or any business(es) I believe(d) to be affiliated with Terenine.

FURTHER, THIS AFFIANT SAYETH NOT.

_____

Christopher Christiansen

STATE OF TENNESSEE      :
COUNTY OF HAMILTON      :

Personally appeared before me, Krista Guinn                , a Notary Public in and for said State and County aforesaid, duly commissioned and qualified, **CHRISTOPHER CHRISTIANSEN**, with whom I am personally acquainted (or duly proved to me to be such person), and who, first being duly sworn, acknowledged that he executed the within instrument for the purposes therein contained, and the facts set forth therein are true and correct to the best of his information, knowledge and belief.

WITNESS my hand, at office, this 13th day of September, 2012.

Krista D. Guinn

Notary Public
My commission expires: 9/22/2013