DAN R. WAITE
Nevada Bar No. 4078
LEWIS ROCA ROTHGERBER, LLP
3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169
Telephone: (702) 949-8200
Facsimile: (702) 949-8398
Email: dwaite@lrrlaw.com

BRIAN P. O'MEARA
*Pro Hac Vice* IL Bar No. 6275624
FORDE LAW OFFICES LLP
111 West Washington, Suite 1100
Chicago, Illinois 60602
Telephone:  (312) 641-1441
Facsimile:  (312) 641-1288
Email: bomeara@fordellp.com

*Attorneys for Defendant CNU Online Holdings, LLC, incorrectly sued as Enova International, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| FLEMMING KRISTENSEN, individually and on behalf of a class of similarly situated individuals,<br><br>    Plaintiff,<br><br>v.<br><br>CREDIT PAYMENT SERVICES INC., a Nevada corporation, f/k/a MYCASHNOW.COM INC., ENOVA INTERNATIONAL, INC., an Illinois corporation, PIONEER FINANCIAL SERVICES, INC., a Missouri corporation, LEADPILE LLC, a Delaware limited liability company, and CLICKMEDIA LLC d/b/a NET1PROMOTIONS LLC, a Georgia limited liability company,<br><br>    Defendants. | Case No. 2:12-CV-00528-APF-PAL<br><br>**CNU ONLINE HOLDINGS, LLC'S, INCORRECTLY SUED AS ENOVA INTERNATIONAL, INC., MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:  Hon. Andrew P. Gordon<br><br>Magistrate Judge:  Hon. Peggy A. Leen |

201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595

LEWIS ROCA
ROTHGERBER

1   Defendant CNU Online Holdings, LLC, incorrectly sued as Enova International, Inc.

2   ("Enova"), by and through its attorneys, pursuant to Fed. R. Civ. P. 56(a), hereby requests

3   summary judgment in favor of Enova and against Plaintiff Flemming Kristensen ("Plaintiff").[1]

4   After Plaintiff served multiple rounds of written discovery, sent countless Rule 37 letters,

5   took several depositions, and filed various discovery motions, Plaintiff has no admissible

6   evidence to support his claim against Enova.  This case has been pending for over two and a half

7   years, discovery is closed, and Plaintiff has nothing to show for it.  The undisputed material facts

8   demonstrate that Enova did not send the text message at issue and did not direct, control or

9   authorize any individual or entity to send the text message on Enova's behalf.  Plaintiff's failure

10  to establish that Enova is either directly or vicariously liable under the Telephone Consumer

11  Protection Act is fatal to Plaintiff's claim.  Accordingly, Enova is entitled to judgment as a

12  matter of law.

13  This motion is supported by the following Memorandum of Points and Authorities, any

14  exhibits cited herein, the pleadings and papers filed in this action, and any oral argument that the

15  Court may entertain at the hearing of this motion.[2]

16  Dated: October 24, 2014

17          By:/s/ Brian P. O'Meara
18          DAN R. WAITE
            Nevada Bar No. 4078
19          LEWIS ROCA ROTHGERBER, LLP
            3993 Howard Hughes Parkway, Suite 600
20          Las Vegas, NV 89169

21          BRIAN P. O'MEARA
22          Pro Hac Vice IL Bar No. 6275624
            FORDE LAW OFFICES LLP
23          111 West Washington, Suite 1100
            Chicago, Illinois 60602
24          Attorneys for Defendant CNU Online Holdings,
            LLC, incorrectly sued as Enova International, Inc.
25

26  [1] For ease of reference, this motion and supporting memorandum will refer to the defendant as "Enova."

27  [2] Enova also adopts the motions for summary judgment and supporting documents filed by codefendants.

28

201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595

LEWIS ROCA
ROTHGERBER

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595

LEWIS ROCA
ROTHGERBER

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Plaintiff claims that he received an unauthorized text message on December 6, 2011 (the "Text Message").  (Dkt.  No. 35, Amended Complaint, ¶ 34).   The Text Message purportedly offered the following:

> Do You Need up to $5000
> Today?  Easy Quick and All
> Online at:
> www.lend5k.com 24
> Month Repay, All Cred. Ok
> Reply STOP 2 End

(Dkt.  No. 35, Amended Complaint, ¶ 35).

A few months after receiving the Text Message, Plaintiff filed this lawsuit against a single defendant alleging violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA").  Notably, Enova was not named as a defendant in the original complaint.  (Dkt. No. 1, Original Complaint).  Instead, Plaintiff brought Enova into this case almost a year later.  (Dkt. No. 35, Amended Complaint).  In doing so, Plaintiff, and the class since certified, seek to hold Enova liable for almost $150 million in statutory damages.[3]  Plaintiff and the class doggedly maintain this position even though the uncontested facts demonstrate that:

- Enova did not send the Text Message;

- Enova did not direct, control or authorize any individual or entity to send the Text Message;

- Enova did not know that the Text Message existed until Plaintiff sued Enova;

- The sender of the Text Message never heard of Enova;

- The Text Message does not identify Enova;

- The Text Message offers loan terms that are vastly different from Enova's typical loan terms;

---

[3] Plaintiff claims that the class contains 98,779 individuals.  (Dkt. No. 113, Plaintiff's Motion for Class Certification, p. 11).  And Plaintiff requests that this Court treble the amount of statutory damages so that each class member would receive $1,500, which totals $148,168,500 in claimed statutory damages.  (Dkt. No. 35, Amended Complaint, ¶ 51).

3

- Enova has no connection to the website link contained in the Text Message; and

- Enova did not receive any leads or benefit as a result of the Text Message.

Simply put, there is no evidence that Enova had anything to do with the Text Message, either directly or indirectly.  In addition, Plaintiff cannot show that the Text Message was sent using an automatic telephone dialing system, a key requirement for a TCPA claim.  Therefore, Enova did not violate the TCPA and entry of summary judgment in favor of Enova is appropriate.

## II.    STATEMENT OF UNDISPUTED FACTS

### A.  Enova's Business And Relationships With Lead Generators.

Enova is a technology company that provides short-term lending to consumers and offers various types of loan products.  (Exhibit A hereto, Deposition of Enova's 30(b)(6) witness Megan Staton, Enova's Marketing Manager, ("Staton Dep."), pp. 6-7).[4]  Over the years, Enova has contracted with several separate, unrelated companies to generate leads for Enova.  (Ex. A, Staton Dep., pp. 11, 15, 41).  In fact, over the past five years, Enova worked with maybe up to 16 to 20 lead generators at one time.  (*Id.*, p. 42).  Two of these lead generators, LeadPile and ClickMedia, have also been named as defendants in this lawsuit.  (*Id.*, pp. 11, 15).  Enova worked with LeadPile from 2004 to 2014.  (*Id.*, pp. 11, 14).  Enova worked with ClickMedia from 2011 to 2012.  (*Id.*, pp. 15, 53, 176).

Enova's contracts with LeadPile and ClickMedia included language that LeadPile and ClickMedia would comply with all applicable laws, rules, and regulations.  The Marketing Agreement between Enova and ClickMedia expressly provides:

> **Compliance with Law.**  Both parties represent and warrant that . . . they will perform all of their services and obligations hereunder, in compliance with all applicable federal, state, and local laws, statutes, rule regulations and ordinances, including without limitation all Federal Trade Commission regulations and opinions, and all applicable privacy and data protection laws, rules and regulations.

---

[4] References to exhibits that are attached hereto will be identified hereinafter with "Ex. ____".  Further, Enova is attaching only the pages of deposition transcripts that are referenced herein, but Enova will provide the Court with a complete copy of any deposition transcript upon the Court's request.

LEWIS ROCA
ROTHGERBER

201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595

(Ex. H, Marketing Agreement, ¶ 11) (bold in original).[5]  Enova expected LeadPile and ClickMedia to fulfill this contractual obligation and abide by the law.  (Ex. A, Staton Dep., p. 178).

Ms. Staton, who has worked at Enova since 2007, unequivocally testified that Enova does not know how LeadPile or ClickMedia generated, advertised for or drove leads.  (Ex. A, Staton Dep., pp. 12-13, 15).  When Enova tried to make inquiries to LeadPile and ClickMedia about how leads were generated, neither LeadPile nor ClickMedia provided that information because it is proprietary and their "bread and butter."  (*Id.*, pp. 16-17).  Ms. Staton repeatedly confirmed this point to plaintiff's counsel at her deposition.  (*Id.*, pp. 12-13, 15-17, 44-47, 85-87, 99-101, 105-109, 114-116, 125, 137, 162-163).

**B.  The Plaintiff And His Claim.**

Plaintiff claims that he received the Text Message on December 6, 2011 on his cellular telephone.  (Dkt. No. 35, Amended Complaint, ¶¶ 34-35; Ex. B, Plaintiff Flemming Kristensen's Deposition ("Plaintiff's Dep."), p. 89).  Plaintiff, however, did not click on the offer contained in the Text Message and never visited www.lend5k.com, which is the website link contained in the Text Message.  (Ex. B, Plaintiff's Dep., pp. 73, 101-102, 126-127).  Further, prior to filing the lawsuit, Plaintiff never heard of Enova.  (*Id.*, pp. 20-21, 183).  In fact, Plaintiff admitted at his deposition that he has no independent knowledge or understanding as to why he amended his complaint, which named Enova as a defendant for the first time.  (*Id.*, pp. 77-78).

**C.  The Sender Of The Text Message, AC Referral System, LLC, And Its Information Provider, 360 Data Management.**

It is uncontested that the Text Message was sent by an individual named James Gee through his company, AC Referral System, LLC ("AC Referral").  (Ex. C, Deposition of James

---

[5] Enova has been unable to locate the contract with LeadPile due to the time that has passed since the relationship began in 2004.  (Ex. A, Staton Dep., pp. 72-73).  However, Ms. Staton testified that she would expect there to be a full written agreement with LeadPile similar to the agreement with ClickMedia.  (*Id.*).  Further, Ms. Staton testified that Enova has the same compliance language found in the ClickMedia contract in its contracts with other lead generators, such as LeadPile.  (*Id.*, pp. 167-168, 178).

LEWIS ROCA
ROTHGERBER

201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595

Gee ("Gee Dep."), p. 102).   Mr. Gee is the only person who has worked on behalf of AC Referral.  (*Id.*, pp. 11-12).  AC Referral conducted various campaigns for several companies in an attempt to generate leads for loans and educational classes.  (*Id.*, pp. 16-17, 27-28).   Mr. Gee would obtain a list of phone numbers through another company, 360 Data Management ("360 Data"), operated by Michael Ferry.  (*Id.*, pp. 22-23, 116-117; Ex. D, Deposition of Michael Ferry ("Ferry Dep."), pp. 61-62, 85).  Mr. Gee assumed that the consumers associated with the phone numbers received from 360 Data had opted-in to receive text messages and that the phone numbers had been compared against "Do Not Call" and suppression lists.  (Ex. C, Gee Dep., pp. 23-24, 83, 89).  For its part, 360 Data made sure that every record had opt-out and opt-in information.  (Ex. D, Ferry Dep., pp. 63-64, 77-78, 89, 118-119).  360 Data was aware of the TCPA and always endeavored to comply with the TCPA.  (*Id.*, pp. 79-80, 141).

In generating leads, AC Referral used software called Data Doctor.  (Ex. C, Gee Dep., pp. 54-55).  Mr. Gee would input the phone numbers received from 360 Data into Data Doctor so that a text message could be sent to those phone numbers.  (*Id.*, pp. 141-142).   Mr. Gee would then type a message and hit send.  (*Id.*, p. 149).  Once AC Referral completed a text message campaign, AC Referral would usually delete the list of numbers and not keep any records of the campaign.  (*Id.*, pp. 56-57 and 61).

### D.  Enova Did Not Direct, Control Or Authorize AC Referral Or 360 Data

Enova was not involved in any part of the process used for the sending of the Text Message at issue and never directed, controlled or authorized any individual or entity to send the Text Message.  (Ex. E hereto, Enova's Answers to Plaintiff's First Set of Interrogatories, Nos. 5, 6; Ex. F, Enova's Answers to Plaintiff's Second Set of Interrogatories, No. 23).  Enova did not even know that the Text Message existed until Plaintiff sued Enova.  (Ex. E, Enova's Answers to Plaintiff's First Set of Interrogatories, No. 5).  Mr. Gee confirmed that neither he nor AC Referral had any kind of relationship, contractual or otherwise, with Enova.  (Ex. C, Gee Dep., pp, 134-138).  Similarly, Mr. Ferry confirmed that neither he nor 360 Data had any kind of relationship, contractual or otherwise, with Enova.  (Ex. D, Ferry Dep., pp. 96-100).  Both Mr.

Gee and Mr. Ferry testified that Enova never exercised any control over AC Referral or 360 Data.  (Ex. C, Gee Dep., pp. 134-138; Ex. D, Ferry Dep., pp. 96-100).  In fact, prior to his deposition, Mr. Ferry had never even heard of Enova.  (Ex. D, Ferry Dep., p. 100).  Mr. Gee also had never heard of Enova prior to his deposition other than perhaps reading a name on the "law paperwork."  (Ex. C, Gee Dep., p. 138).  Further, Plaintiff admitted at his deposition that he does not know whether Enova ever had a business relationship with AC Referral, 360 Data, James Gee or Michael Ferry.  (Ex. B, Plaintiff's Dep., pp. 105-107).

With regard to LeadPile, Mr. Ferry testified that LeadPile never instructed 360 Data how 360 Data should do its work.  (Ex. D, Ferry Dep., p. 76).  Mr. Ferry also confirmed that he never configured a website to redirect traffic to a LeadPile website of any kind.  (*Id.*, p. 76).  Further, Mr. Gee testified that neither he nor AC Referral had any type of agreement with LeadPile and never performed any services of any kind for LeadPile.  (Ex. C, Gee Dep. pp. 122-124).  And LeadPile's representative testified that LeadPile never used text message marketing itself to generate leads.  (Ex. G, Ilie Dep., pp. 41-42).

With regard to ClickMedia, while AC Referral has done business with ClickMedia, it did not dictate or control how AC Referral should generate leads.  (Ex. C, Gee Dep., pp. 46, 48).  Specifically, Mr. Gee testified that ClickMedia did not control the content of the message or how the message was sent.  (*Id.*, pp. 188-189).  In fact, it was AC Referral's choice to determine how leads should be generated and Mr. Gee would pick the content of a text message.  (*Id.*, pp. 48, 157-158).  When AC Referral drafted and sent text messages, no other entity had the ability to review and approve them.  (*Id.*, p. 69).  Mr. Ferry confirmed that when offers were run for ClickMedia, ClickMedia did not dictate what had to be included in the offer.  (Ex. D, Ferry Dep., p. 73).  Moreover, there was no discussion between 360 Data and ClickMedia regarding samples or "creative" in the context of text messages.  (*Id.*, p. 135).  Mr. Ferry testified that it was ultimately his and Mr. Gee's choice to run an offer or a campaign and they could "pick and choose whichever [offers or campaigns they] want to run."  (*Id.*, pp. 47-48).

7

1    Further, there is no evidence that Enova knew about any relationship between

2 ClickMedia and AC Referral or 360 Data.  In fact, the Marketing Agreement between

3 ClickMedia and Enova contains no provision authorizing ClickMedia to contract with, control,

4 or authorize another entity to generate leads for Enova.  (Ex. H, Marketing Agreement).

5    **III.    LEGAL STANDARD**

6    Summary judgment may be granted if the pleadings, depositions, affidavits, and other

7 materials in the record show that there is no genuine issue of material fact and that the moving

8 party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *see also Celotex Corp.*

9 *v. Catrett,* 477 U.S. 317, 322 (1986).  A fact is material if it might affect the outcome of the suit

10 under the governing law.  *Anderson v. Liberty Lobby, Inc.,* 477 U .S. 242, 248 (1986).  A dispute

11 as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a

12 verdict for the nonmoving party.  *See id.*

13    The court need only resolve factual issues of controversy in favor of the non-moving

14 party where the facts specifically averred by that party contradict facts specifically averred by the

15 movant.  *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990); *see also Anheuser–Busch,*

16 *Inc. v. Natural Beverage Distribs.,* 69 F.3d 337, 345 (9th Cir. 1995) (stating that conclusory or

17 speculative testimony is insufficient to raise a genuine issue of fact to defeat summary

18 judgment). "[U]ncorroborated and self-serving testimony," without more, will not create a

19 "genuine issue" of material fact precluding summary judgment.  *Villiarimo v. Aloha Island Air,*

20 *Inc.,* 281 F.3d 1054, 1061 (9th Cir. 2002).  Conclusory or speculative testimony is also

21 insufficient to raise a genuine issue of fact.  *Anheuser Busch, Inc. v. Natural Beverage Distribs.,*

22 69 F.3d 337, 345 (9th Cir. 1995).

23    In other words, the nonmoving party cannot avoid summary judgment by relying solely

24 on conclusory allegations unsupported by facts.  *See Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.

25 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings

26 and set forth specific facts by producing competent evidence that shows a genuine issue for trial.

27 *See* Fed.R.Civ.P. 56(e); *Celotex Corp.,* 477 U.S. at 324.  If the nonmoving party fails to make a

28

201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595

LEWIS ROCA
ROTHGERBER

1   sufficient showing of an essential element for which it bears the burden of proof, the moving

2   party is entitled to summary judgment.  *See Celotex Corp.,* 477 U.S. at 322–23.  "If the evidence

3   is merely colorable, or is not significantly probative, summary judgment may be granted." *See*

4   *Anderson,* 477 U.S. at 248.  (internal citations omitted).

5   **IV.   ARGUMENT**

6         **A.  <u>The Telephone Consumer Protection Act.</u>**

7         There are three elements to a claim under the Telephone Consumer Protection Act of

8   1991 ("TCPA"):  (a) the defendant called a cellular telephone number; (b) using an automatic

9   telephone dialing system; and (c) without the recipient's prior express consent.  *Meyer v.*

10  *Portfolio Recovery Assocs., LLC,* 707 F.3d 1036, 1043 (9th Cir. 2012).

11        Specifically, the TCPA provides:

12              It shall be unlawful for any person within the United States, or any
               person outside the United States if the recipient is within the
13             United States—

14                   (A)    to make any call (other than a call made for
               emergency purposes or made with the prior express consent of the
15             called party) using any automatic telephone dialing system or an
               artificial or prerecorded voice—
16             .

17                          (iii)    to any telephone number assigned to a
               paging service, cellular telephone service, specialized mobile radio
               service, or other radio common carrier service, or any service for
18             which the called party is charged for the call;

19  47 U.S.C. § 227(b)(1)(A)(iii).

20        Under the TCPA, the term "automatic telephone dialing system" ("ATDS") has a specific

21  meaning.  It refers to equipment that has the capacity to store or produce telephone numbers to

22  be called, using a random or sequential number generator, and which has the capacity to dial

23  such numbers.  47 U.S.C. § 227(a)(1).  A text message to a cell phone is considered a "call" for

24  purposes of the TCPA.  *Kristensen v. Credit Payment Services*, 2:12-CV-00528-APG, 2014 WL

25  1256035, at *3 (D. Nev. Mar. 26, 2014), citing *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d

26  946, 953 (9th Cir. 2009).

27

28

201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595

LEWIS ROCA
ROTHGERBER

**B.  Enova Is Neither Directly Nor Vicariously Liable Under The TCPA.**

Plaintiff alleges that Enova "directed the mass transmission of wireless spam to the cell phones of consumers" through a "dedicated telephone number by [Enova's] agents."  (Dkt. No. 35, Amended Complaint, ¶ 33 and ¶ 38).  The evidence, however, refutes these allegations. Specifically, the undisputed facts demonstrate that: (1) Enova did not send the Text Message; and (2) Enova did not direct, control or authorize any individual or entity to send the Text Message.

*(1) Enova Cannot Be Held Directly Liable Under The TCPA Because Enova Did Not Send The Text Message.*

Direct liability under the TCPA applies only to entities that "initiate" a call.  *Smith v. State Farm Mut. Auto. Ins. Co.,* No. 13-cv-2018, 2014 WL 3906923, at *3 (N.D. Ill. Aug. 11, 2014), citing *In re Joint Petition filed by Dish Network, LLC,* 28 F.C.C.R. 6574, 6582 (2013).  A person or entity "initiates" a call "when it takes steps necessary to physically place a telephone call."  *Dish Network, LLC*, 28 F.C.C.R. at 6583.

Enova believes that Plaintiff is not advancing a theory of direct liability against Enova, and rightfully so.  Plaintiff admits that he cannot identify any text message that he received from Enova.  (Ex. B, Plaintiff's Dep., pp. 108-109).  Plaintiff claims that the Text Message was sent from number 330-564-6316.  (Dkt. No. 35, Amended Complaint, ¶ 35; Ex. B, Plaintiff's Dep., pp. 124, 140-141).  There is no evidence that this number has ever been associated with Enova. To the contrary, it is undisputed that AC Referral was the sender of the Text Message. (Ex. B, Plaintiff's Dep., pp. 157-158, Ex. C, Gee Dep., p. 102).  Accordingly, any claim of direct liability against Enova can be disposed of summarily – Enova did not "initiate" the Text Message and, therefore, Enova cannot be held directly liable under the TCPA.

*(2) Enova Cannot Be Held Vicariously Liable Because Enova Did Not Direct, Control Or Authorize Any Individual Or Entity To Send The Text Message.*

Without any direct liability, Plaintiff's entire case rests on a theory of vicarious liability. While the TCPA is silent as to vicarious liability, the Ninth Circuit has recently endorsed the

10

view that the TCPA imposes vicarious liability where an agency relationship, as defined by federal common law, is established between a defendant and a third-party caller.  *See Gomez v. Campbell-Ewald Co.*, No. 13-55486, 2014 WL 4654478, at **4-5 (9th Cir. Sept. 19, 2014) (citations omitted).  In doing so, the Ninth Circuit pointed to a 2013 FCC Order, which stated that a third-party may be liable under the TCPA for acts of another under agency principles, *i.e.* formal agency, apparent authority, and ratification.  *Id.*, at *4; *Dish Network, LLC*, 28 F.C.C.R. at 6584.[6]

In evaluating whether a defendant can be vicariously liable under the federal common law of agency, courts look to the Restatement of Agency.  *See Doe I v. Unocal Corp.*, 395 F.3d 932, 972 (9th Cir. 2002) ("The general principles of the federal common law of agency have been formulated largely based on the Restatement of Agency."); *see also Kristensen*, 2014 WL 1256035, at *4, citing Restatement (Third) of Agency regarding vicarious liability under the TCPA.

As demonstrated below, Enova is not vicariously liable for any violation of the TCPA by any other entity under any theory of formal agency, apparent authority or ratification.

> a.  There Is No Formal Agency Relationship Between Enova and AC Referral or 360 Data.

Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act. Restatement (Third) Of Agency § 1.01 (2006).  An agent is one who "act[s] on the principal's behalf and subject to the principal's control." *United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010), citing Restatement (Third) Of Agency § 1.01.

---

[6] Enova is aware that, as this Court has stated, "[w]hether an agency relationship exists is ordinarily a question of fact." *Kristensen*, 2014 WL 1256035, at *5.  Yet, when (as here) no genuine issues of material fact exist as to agency, courts will grant summary judgment in favor of a defendant on a TCPA claim.  *See* discussion *infra*, pp. 12-14.

201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595

LEWIS ROCA
ROTHGERBER

201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595

LEWIS ROCA
ROTHGERBER

1    In *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079 (C.D. Cal. 2012) ("*Taco Bell I*"),

2  *aff'd*, No. 12-56458, 2014 WL 2959160 (9th Cir. July 2, 2014), the district court found that for a

3  plaintiff to succeed on a vicarious liability theory in a TCPA action, he or she must demonstrate

4  that the entities directly involved in sending the text message acted as an agent of the defendant,

5  *i.e.*, that the defendant "controlled or had the right to control them and, more specifically, the

6  manner and means of the text message campaign they conducted." *Taco Bell I*, 879 F. Supp. 2d

7  at 1084-85, citing *Bonds,* 608 F.3d at 506; *Klee v. United States,* 53 F.2d 58, 61 (9th Cir. 1931)

8  ("Agency means more than mere passive permission; it involves request, instruction, or

9  command.").  In *Taco Bell I*, the district court found that the plaintiff did not present any

10  evidence that Taco Bell "directed or supervised the manner and means of the text message

11  campaign" conducted by others; "created or developed the text message," or "played any role in

12  the decision to distribute the message by way of a blast text." *Taco Bell I*, 879 F. Supp. 2d at

13  1085.  Based on these findings, the district court entered judgment in favor of Taco Bell.  *Id.* at

14  1085-86.

15    Here, like in *Taco Bell I*, Plaintiff cannot present any evidence that Enova "directed or

16  supervised the manner and means of the text message campaign" conducted by AC Referral and

17  360 Data.  There is no evidence that Enova "created or developed" the Text Message, or that it

18  "played any role in the decision to distribute the [Text Message] by way of a blast text."

19    Courts in other districts are in accord.  For example, in *Keating v. Peterson's Nelnet,*

20  *LLC*, No. 1:11 CV 1775, 2014 WL 1891369 (N.D. Ohio May 12, 2014), the plaintiff sought to

21  hold certain defendants (CUnet and Corner Blue) vicariously liable under the TCPA for sending

22  unsolicited text messages.  *Id.* at *4.  There, a third-party marketer (River City) actually sent the

23  text message.  *Id.* at *1.  CUnet contracted with CornerBlue to provide mobile media marketing

24  services for a campaign known as "CollegeQuest."  *Id.*  CornerBlue contracted with another

25  entity, AKMG, to find available third-party affiliate marketers for the CollegeQuest campaign.

26  *Id.*  AKMG, in turn, contracted with River City to provide mobile media marketing for the

27  CollegeQuest campaign.  *Id.*

28

CUnet and CornerBlue moved for summary judgment.  In granting their motion, the district court first stated a proposition that is applicable here: "in order to establish vicarious liability under the TCPA, following the federal common law principles, a plaintiff must show that the actual caller…acted as an agent of the defendant and that the defendant controlled or had the right to control them and the manner and means of the text messaging campaign they conducted."  *Keating*, 2014 WL 1891369, at *5, citing *Taco Bell I*, 879 F. Supp. 2d at 1084; *Mey v. Pinnacle Security, LLC,* No. No. 5:11 CV 47, 2012 WL 4009718, at *5 (N.D. W. Va. Sept. 12, 2012).  In finding no genuine issue of fact as to whether River City was acting as an agent of CUnet or CornerBlue when it sent the text message promoting the CollegeQuest campaign, the court stated:

> The evidence is undisputed that River City never received any authorization, guidance, or other directive from CUnet or CornerBlue.  In fact, River City did not know the marketing was being performed on behalf of CUnet or as a subcontractor for CornerBlue.  Further, CUnet was unaware of River City's involvement, and had no idea the company even existed when the texts were sent.
>
> In short, Plaintiff has failed to provide any evidence that could support a finding that any Defendant in this case ever authorized River City to send the text messages at issue.  Further there is no evidence that River City was an agent of CUnet, or an agent of CornerBlue, the only entity authorized by CUnet to engage in mobile media marketing on its behalf.  Absent evidence that could establish such a relationship, Plaintiff cannot establish that the Defendants are vicariously liable under the TCPA for the text messages sent by River City.

*Keating*, 2014 WL 1891369, at **5-6.

In *Mey v. Pinnacle Sec., LLC*, the court found that the plaintiff failed to create an issue of material fact with regard to defendant Pinnacle's ability to control the manner and means of the calls made on its behalf.  2012 WL 4009718, at *5.  There, Pinnacle utilized four "outside companies" to provide sales leads, including the entity believed to have placed the call at issue. *Id*.  In moving for summary judgment, Pinnacle provided evidence that it had little to no control over the means or manner by which these companies generated sales leads.  *Id*.  In particular, an affidavit by Pinnacle's manager of lead generation asserted that he was "informed" that these

13

lead generators utilize prerecorded calls and that the lead generators "warrant to Pinnacle that they are fully compliant with all state and federal laws." *Id.*  The court also noted evidence that (a) "Pinnacle does not even have access to the records and/or the calls made by its lead generators, let alone control over the same" and (b) the "lead generators used directly by Pinnacle also outsource lead generation for Pinnacle to third parties with which Pinnacle has no relationship." *Id.*  Thus, the court concluded that the evidence "strongly indicate[s] that Pinnacle plays a passive role in its interaction with lead generators." *Id.*  Because the plaintiff "presented no evidence to suggest that Pinnacle has control over the means and manner by which its lead generators place calls on its behalf," (*id.*) summary judgment was entered against the plaintiff.

Similar to *Keating* and *Mey*, the undisputed facts here show that Enova had no control whatsoever over AC Referral, the entity that sent the Text Message, or 360 Data.  Accordingly, the undisputed facts demonstrate that no formal agency exists between Enova and AC Referral or 360 Data.

### b.   Absent An Agency Relationship, There Is No Actual Authority.

"Actual authority consists of powers which a principal directly confers upon an agent, as well as those the principal causes or permits the agent to believe he or she possess . . . . " *In re Fresh & Process Potatoes Antitrust Litig.,* 834 F. Supp. 2d 1141, 1167–68 (D. Idaho 2011), citing 2A C.J.S. *Agency* § 133; Restatement (Third) of Agency § 2.01 (2006).  *See also Keating*, 2014 WL 1891369, at *5 ("A principal may be vicariously liable for an agent's tortious conduct if the agent had actual authority from the principal for the conduct"), citing *Jones v. Federated Fin. Reserve Corp.,* 144 F.3d 961, 965 (6th Cir. 1998).  Obviously, where the undisputed facts demonstrate that there is no formal agency relationship, there can be no actual authority conferred by the principal.

### c.   There Is No Apparent Authority.

Apparent authority focuses on third parties.  It arises when a third party reasonably believes that the putative agent had authority to act on behalf of the principal and that belief can be traced to the principal's own manifestations.  *In re Fresh & Process Potatoes Antitrust Litig.,*

201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595

LEWIS ROCA
ROTHGERBER

14

834 F. Supp. 2d at 1167–68 (citations omitted); *see also Palm Beach Golf Ctr.–Boca, Inc. v. Sarris*, No. 12-80178, 2013 WL 5972173, at *10 (S.D. Fla. 2013) ("The Restatement forthrightly provides that '[a]pparent authority is not present when a third party [Plaintiff] believes that an interaction is with an actor who is a principal.'") (quoting Restatement (Third) of Agency § 2.03(f)) (alteration in original).  Apparent authority can only "be established by proof of something said or done by the [alleged principal], on which [the plaintiff] reasonably relied." *NLRB v. Dist. Council of Iron Workers of Cal. & Vicinity,* 124 F.3d 1094, 1099 (9th Cir. 1997).

Here, there is no evidence that Enova said or did anything on which Plaintiff could have reasonably relied.  And there are no facts that could lead a reasonable juror to find that Plaintiff believed any entity was acting on Enova's behalf.  *See Avio, Inc. v. Alfoccino, Inc.*, No. 2:10-cv-10221, 2014 WL 1870108, at **12-13 (E.D. Mich. May 9, 2014) (rejecting plaintiff's argument regarding apparent agency because there were no facts establishing that the plaintiff believed that the entity that actually sent the faxes "was acting on" the defendants' behalf).  The Text Message does not identify Enova and Plaintiff did not click on the website identified in the Text Message.  (Dkt.  No. 35, Amended Complaint, ¶ 35; Ex. B, Plaintiff's Dep., p. 73).  In fact, Plaintiff admits that he has no independent knowledge or understanding as to why he amended his complaint, which included Enova as a defendant for the first time.  (Ex. B, Plaintiff's Dep., pp. 77-78).  This concession is fatal to Plaintiff's claim against Enova.

In addition, the content of the Text Message itself demonstrates that Plaintiff had no reasonable basis to believe that the Text Message was sent on Enova's behalf.  First, the Text Message, which AC Referral drafted and sent, contained a link to www.Lend5k.com.  (Ex. C, Gee Dep., pp. 67-68, 102; Ex. D, Ferry Dep., p. 53).  The purpose of www.Lend5k.com was to be a forwarding domain that could be attached to any offer.  (Ex. D, Ferry Dep., p. 52).  It is undisputed that AC Referral purchased, used and controlled www.Lend5k.com.  (Ex. C, Gee Dep., pp. 102-103, 124, 164-165; Ex. D, Ferry Dep. p. 53).  Mr. Gee never gave anyone else permission to use www.Lend5k.com.  (Ex. C, Gee Dep., p. 165).

201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595

LEWIS ROCA
ROTHGERBER

Second, the loan terms offered in the Text Message are vastly different from Enova's typical loan terms.  For a new customer, the typical maximum loan amount offered by Enova is $450, which is significantly lower that than the "up to $5000" offered in the Text Message.  (Ex. A, Staton Dep., pp. 7, 28).  Also, while the repayment periods for Enova's loans vary depending on the product, the longer repayment periods are usually only 3 to 6 months (*Id.*, p. 27).  This three to six month repayment period is significantly shorter than the "24 Month Repay" period offered in the Text Message.  Thus, the amount offered in the Text Message is more than ten times the amount typically offered by Enova and the repayment period offered in the Text Message is four times longer than the longest repayment period typically offered by Enova. This, coupled with the fact that Enova has no connection to the website link contained in the Text Message, clearly establishes that Enova had nothing to do with the Text Message and did not say or do anything such that Plaintiff could have reasonably believed that someone was acting on Enova's behalf.  Thus, Plaintiff's theory of vicarious liability by virtue of apparent authority also fails.[7]

> d.   There Is No Ratification.

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority."  Restatement (Third) of Agency § 4.01(1) (2006).  "A person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents."  *Id.* at § 4.01(2).  Neither requirement is met here.

As an initial matter, there can be no ratification here because, as shown above, there is no principal-agent relationship between Enova and AC Referral.  "Although a principal is liable when it ratifies an originally unauthorized tort, the principal-agent relationship is still a requisite, and ratification can have no meaning without it."  *Batzel v. Smith,* 333 F.3d 1018, 1036 (9th Cir. 2003) (footnote omitted).

---

[7] Of course, these facts further support the argument that no agency relationship of any sort connects Enova to the Text Message.

1   Moreover, there simply is no evidence that Enova ratified AC Referral's conduct by

2   showing assent or consent, such as by knowingly accepting the benefits of any unauthorized text

3   message.  *See* Restatement (Third) of Agency § 4.01 cmt. d ("knowing acceptance of the benefit

4   of a transaction ratifies the act of entering into the transaction").  In fact, the evidence

5   affirmatively demonstrates that Enova did not receive any benefit or leads as a result of the Text

6   Message.  Lisa Snow, who has worked on and served as an expert on matters in the

7   telecommunications industry throughout her 18+ year career, performed an analysis to determine

8   the number of leads that were sent to lenders, including the defendants.  Based on her analysis,

9   Ms. Snow concluded that Enova received ***no leads***.  (Ex. I, Declaration of Lisa Snow, ¶ 23; Ex.

10  J, Deposition of Lisa Snow, p. 37).

11  Accordingly, Enova cannot be vicariously liable under a ratification theory.

12  **C.   There Is No Evidence That The Text Message Was Sent Using An ATDS.**

13  Lastly, Plaintiff cannot show the most fundamental element required for a TCPA claim,

14  *i.e.* that the Text Message was sent using an ATDS.  *See Meyer*, 707 F.3d at 1043 (use of an

15  ATDS is an element to a TCPA claim).  "Equipment is an ATDS if it either has 'the capacity to

16  store or produce telephone numbers to be called, using a random or sequential number generator;

17  and to dial such numbers,' 47 U.S.C. § 227(a)(1), or is a predictive dialer with the capacity to

18  dial telephone numbers from a list without human intervention."  *Gragg v. Orange Cab Co.*, 995

19  F. Supp. 2d 1189, 1192 (W.D. Wash. 2014), quoting *In the Matter of Rules & Regulations*

20  *Implementing the TCPA of 1991*, 23 F.C.C.R. 559, 566 (2008).  The Ninth Circuit has stated that,

21  "[w]hen evaluating the issue of whether equipment is an ATDS, the statute's clear language

22  mandates that the focus must be on whether the equipment has the *capacity* 'to store or produce

23  telephone numbers to be called, using a random or sequential number generator.'"  *Satterfield v.*

24  *Simon & Schuster, Inc.,* 569 F.3d 946, 951 (9th Cir. 2009) (emphasis in original).

25  Here, there is no evidence that AC Referral used an ATDS to send the Text Message.  In

26  fact, the evidence affirmatively demonstrates that AC Referral did ***not*** use an ATDS.  Mr. Gee,

27

28

201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595

LEWIS ROCA
ROTHGERBER

17

who had sole control over the software and hardware used to transmit the Text Message, testified as follows:

Q.  Next I would like to ask you about the transmission of text messages, specifically the software and hardware that you would work with to transmit the text messages.

Did the hardware and software produce phone numbers randomly?

A.  No.

Q.  Did it have the capacity to produce phone numbers randomly?

A.  No.

Q.  Did the hardware and software produce numbers sequentially?

A.  No.

Q.  Did it have the capacity to produce phone numbers sequentially?

A.  No.

Q.  Did the software and hardware store or produce phone numbers?

A.  No.

Q.  Did it have the capacity to store or produce phone numbers?

A.  No.

Q.  What level of human intervention was involved with the software and hardware?

A.  No number could be entered through the software unless it was human intervention and a human added the file, the numbers, into the software.

Q.  So a human had to go in --

A.  A human had to add the information in.

Q.  Was predictive dialing used?

A.  I don't know what that is.

Q.  Any sort of algorithms used?

A.  No.

Q.  Was the internet used?

A.  No.

1   (Ex. C, Gee Dep., pp. 130-31).

2          This testimony demonstrates that Plaintiff cannot show that the Text Message was sent

3   by equipment that had "the capacity to store or produce telephone numbers to be called, using a

4   random or sequential number generator."  Nor can Plaintiff show that a "predictive dialer" was

5   used -- as Mr. Gee testified, human intervention was required here.  Accordingly, Enova is

6   entitled to summary judgment.  *See Gragg*, 995 F. Supp. 2d at 1194 (granting defendant

7   summary judgment where plaintiff failed to raise a genuine issue of material fact that ATDS was

8   used); *Dominguez v. Yahoo!, Inc.*, No. 13-1887, 2014 WL 1096051, at *6 (E.D. Pa. Mar. 20,

9   2014) (same).

10                              **CONCLUSION**

11          For the foregoing reasons, Enova respectfully requests that this Court grant summary

12   judgment in favor of Enova and against Plaintiff and enter whatever further relief this Court

13   deems just and appropriate.

14

15          Dated: October 24, 2014

16                                      By: */s/ Brian P. O'Meara*
                                        DAN R. WAITE
17                                      Nevada Bar No. 4078
                                        LEWIS ROCA ROTHGERBER, LLP
18                                      3993 Howard Hughes Parkway, Suite 600
                                        Las Vegas, NV 89169
19
20                                      BRIAN P. O'MEARA
                                        *Pro Hac Vice* IL Bar No. 6275624
21                                      FORDE LAW OFFICES LLP
                                        111 West Washington, Suite 1100
22                                      Chicago, Illinois 60602
                                        *Attorneys for Defendant CNU Online Holdings,*
23                                      *LLC, incorrectly sued as Enova International, Inc.*

24

25

26

27

28

201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595

LEWIS ROCA
ROTHGERBER

19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

Pursuant to Nev.R.Civ. Rule 5(b) and E.D.C.R. 8.05, I certify that I am an employee of Lewis Roca Rothgerber LLP, and that on this day, I caused a true and correct copy of the foregoing:  **CNU ONLINE HOLDINGS, LLC'S, INCORRECTLY SUED AS ENOVA INTERNATIONAL, INC., MOTION FOR SUMMARY JUDGMENT** to be served via the Court's E-Filing System CM/ECF, on all interested parties in the above-referenced matter.  The date and time of the electronic service is in place of the date and place of deposit in the mail.

DATED this 24th day of October, 2014.

/s/ *Annette Jaramillo*
an employee of Lewis Roca Rothgerber LLP

201 East Washington Street, Suite 1200
Phoenix, AZ 85004-2595

LEWIS ROCA
ROTHGERBER