Steven Martin Aaron, Esq. (MO Bar No. 41653)
*Admitted Pro Hac Vice*
Gregory T. Wolf, Esq. (MO Bar No. 43717)
*Admitted Pro Hac Vice*
DENTONS US LLP
4520 Main Street, 11th Floor
Kansas City, MO 64111-7700
Telephone: (816) 460-2400
Facsimile: (816) 531-7545
steven.aaron@dentons.com
gregory.wolf@dentons.com

Martin L. Welsh, Esq.
Nevada State Bar No. 8720
LAW OFFICE OF HAYES & WELSH
199 North Arroyo Grande Blvd., Suite 200
Henderson, Nevada 89074
Telephone: (702) 434-3444
Facsimile: (702) 434-3729
mwelsh@lvlaw.com

*Attorneys for Defendant*
*CREDIT PAYMENT SERVICES, INC.*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| FLEMMING KRISTENSEN, individually, and on behalf of a class of similarly situated individuals, <br><br> Plaintiff, <br><br> v. <br><br> CREDIT PAYMENT SERVICES, INC., a Nevada corporation, f/k/a MYCASHNOW.COM INC., ENOVA INTERNATIONAL, INC., an Illinois corporation, PIONEER FINANCIAL SERVICES, INC., a Missouri corporation, LEADPILE LLC, a Delaware limited liability company, and CLICKMEDIA, LLC d/b/a NET1PROMOTIONS LLC, a Georgia limited liability company, <br><br> Defendants. | Case No. 2:12-CV-00528-APG (PAL) <br><br> **CREDIT PAYMENT SERVICES, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

# **TABLE OF CONTENTS**

**TABLE OF CONTENTS** ................................................................................ i

**TABLE OF AUTHORITIES** ...................................................................... ii

**INDEX OF EXHIBITS** ............................................................................... iv

**INTRODUCTION** ........................................................................................ 1

**STATEMENT OF UNCONTROVERTED FACTS** .................................... 2

**I.      SUMMARY JUDGMENT STANDARD** .......................................... 6

**ARGUMENT** ................................................................................................ 7

**II.     THE CLASS CANNOT ESTABLISH THE SUBJECT TEXT MESSAGE WAS SENT USING AN ATDS** ........................................................................ 7

**III.    THE CLASS' VICARIOUS LIABILITY THEORIES CANNOT WITHSTAND SUMMARY JUDGMENT** ............................................................................ 9

       **A.**      No Formal Agency Relationship Existed Between CPS and AC Referral. ................................................................. 10

       **B.**      AC Referral Did Not Act with the Apparent Authority of CPS ....... 11

       **C.**      CPS Did Not Ratify the Conduct of AC Referral. ............................. 14

**CONCLUSION** .......................................................................................... 15

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Anderson v. Liberty Lobby, Inc.*,
5
    477 U.S. 242 (1986)........................................................................................................7

6

*Avio, Inc. v. Alfoccino, Inc.*,
    2:10-cv-10221, 2014 WL 1870108 (E.D. Mich. May 9, 2014)............................14, 15

7

*Batzel v. Smith*,
8
    333 F. 3d 1018 (9th Cir. 2003) ......................................................................................14

9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................................6, 7, 9

10

*Dominguez v. Yahoo!, Inc.*,
11
    No. No. 13-1887, 2014 WL 1096051 (E.D. Pa. March 20, 2014)..................................8

12

*Gragg v. Orange Cab Col, Inc.*,
13
    995 F. Supp.2d 1189 (W.D. Wash. 2014) ..................................................................8, 9

14

*Griffith v. Consumer Portfolio Serv., Inc.*,
    838 F. Supp.2d 723 (N.D. Ill. 2011)..............................................................................8

15

*In the Matter of the Joint Petition Filed by DISH Network, LLC, the United States of*
16
    *Am., and the States of Cal., Ill., N.C., and Ohio for Declaratory Ruling*
    *Concerning the Tel. Consumer Prot. Act (TCPA) Rules*,
17
    28 F.C.C. Rcd. 6574 (2013)........................................................................11, 12, 13

18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)........................................................................................................6

19

20

*Mey v. Pinnacle Security, LLC*, 2012 WL 4009718 (N.D. W. Va. Sept. 12, 2012) ........................11

21

*Meyer v. Portfolio Recovery Associates, LLC*,
    707 F.3d 1036 (9th Cir. 2012) ..................................................................................8, 9

22

*Mimms v. Arrow Fin. Servs.*,
23
    132 S. Ct. 740 (2012)......................................................................................................1

24

*NLRB v. Dist. Council of Iron Workers of Cal. & Vicinity*,
    124 F.3d 1094 (9th Cir.1997) ......................................................................................12

25

26

*O'Banion v. Select Portfolio Servs., Inc.*,
    No. 1:09-cv-00249, 2011 WL 5572625 (D. Idaho Nov. 16, 2011)................................9

27

28

*Palm Beach Golf Center—Boca, Inc. v. Sarris*,
    981 F. Supp.2d 1239 (S.D. Fla. 2013) ...................................................................14

*In re Rules & Regulations Implementing the TCPA*,
    18 FCC Rcd 14014 (FCC 2003) ..........................................................................7

*Satterfield v. Simon & Schuster, Inc.*,
    569 F.3d 946 (9th Cir. 2009) ................................................................................7

*Smith v. State Farm Mut. Auto. Ins. Co.*,
    No. 13 C 2018, 2013 WL 5346430 (N.D. Ill. Sept. 23, 2013) ...................................12

*Thomas v. Taco Bell Corp.*,
    879 F. Supp. 2d 1079 (C.D. Cal. 2012) ................................................................10

*Thomas v. Taco Bell Corp.*,
    2014 WL 2959160 (9th Cir. July 2, 2014)...........................................10, 11, 12, 14

*Uesco Industries, Inc. v. Poolman of Wisconsin, Inc.*,
    993 N.E.2d 97 (Il. App. 2013), *appeal denied* 996 N.E.2d 24 (Ill. 2013), *cert.*
    *denied* 134 S. Ct. 1323 (2014) .............................................................................15

**STATUTES**

47 U.S.C. § 227...................................................................................................*passim*

**RULES**

Fed. R. Civ. P. 56.....................................................................................................6, 7

**OTHER AUTHORITIES**

Restatement (Second) of Agency § 265 cmt. a (1958) ...............................................12

iii

# INDEX OF EXHIBITS

EXHIBIT A        Declaration of Gregory T. Wolf in Support of Credit Payment Services, Inc.'s Motion for Summary Judgment and Memorandum in Support, dated October 24, 2014

EXHIBIT 1        Defendant Credit Payment Services, Inc.'s Responses to Plaintiff Flemming Kristensen's First Set of Interrogatories, dated December 12, 2012, Interrogatory 11

EXHIBIT 2        Credit Payment Services, Inc.'s Amended and Supplemental Answers to First Interrogatories from Plaintiff, dated June 3, 2014, Interrogatory No. 7

EXHIBIT 3        Leadpile Lead Buyer Agreement, dated August 13, 2009 (LEAD000001-4)

EXHIBIT 4        Credit Payment Services, Inc.'s Amended Answers to Second Interrogatories from Plaintiff, dated July 21, 2014, Interrogatory 17, 18

EXHIBIT 5        Excerpts from Deposition Transcript of Michael Ferry, taken January 10, 2014

                 63:11-64:10,
                 67:16-68:9,
                 78:4-11,
                 89:16-22

EXHIBIT 6        Excerpts from Deposition Transcript of James Gee, taken January 23, 2014

                 23:10-24:2,            124:10-12
                 30:8-20,              125:3-126:2,
                 31:2-10,              125:3-125:22,
                 53:3-24,              130:17-22,
                 56:6-20,              130:23-131:3,
                 56:25-57:14;          131:7-9,
                 68:2-14,              131:10-18,
                 69:4-12               149:24-150:3,
                 69:13-18;             150:9-151:5,
                 70:3-11,              164:7-165:4
                 70:12-20,             165:14-18
                 88:21-89:9,           188:21-189:3,
                 124:5-22,             188:21-189:16

EXHIBIT 7        June 28, 2011 "Smart Credit Solution" Publishing Agreement between Click Media and AC Referral (Depo. Exhibit 9)

83242590\V-1

EXHIBIT 8        December 22, 2011 "Alliance Capital" Publishing Agreement between Click Media and AC Referral (Depo. Exhibit 31)

EXHIBIT 9        December 6, 2011 text message (330-564-6316)  (Depo. Exhibit 34)

EXHIBIT 10       Declaration of Michael Ferry, dated May 3, 2014

EXHIBIT 11       Excerpts from Deposition Testimony of Flemming Kristensen, taken January 21, 2014

                 73:1-9
                 102:12-23
                 126:23-127:2

EXHIBIT 12       Credit Payment Services, Inc.'s Amended Responses to Plaintiff's First Request for Admission from Plaintiff, dated July 21, 2014, Request 1, 11, 17, 21-22

EXHIBIT 13       Analysis performed by Shawn Davis (Depo. Exhibit 27)

EXHIBIT 14       Declaration of Lisa Snow, dated July 23, 2014

ii

83242590\V-1

COMES NOW Defendant Credit Payment Services, ("CPS"), by and through its undersigned counsel and hereby submits these Suggestions in Support of its Motion for Summary Judgment.

## **INTRODUCTION**

The Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*. ("TCPA") was enacted to protect against "the proliferation of intrusive, nuisance calls." *Mimms v. Arrow Fin. Servs.,* 132 S. Ct. 740, 744 (2012). The TCPA does not prohibit the transmission of all text message marketing to mobile devices, rather, the TCPA only prohibits transmission of text messages that violate its particular scriptures. *Id.*

Here, Plaintiff seeks relief on his behalf, and on behalf of a certified class of "[a]ll individuals who were sent a text message from telephone numbers '330-564-6316,' '808-989-5389,' and '209-200-0084,' from December 5, 2011 through January 11, 2012." Evidence gathered in discovery has demonstrated that the text messages at issue in this suit were not transmitted through an "automatic telephone dialing system" ("ATDS") or a "predictive dialer," as is required for TCPA liability.

Further problematic, the Class does not seek relief from the proper entities. The Class has not sued the entity that sent the complained-of text message. Nor has the Class sued the entity that provided their phone numbers to the entity that sent the text message. Instead, the Class has sued five entities that are one, two, and even three steps removed from the transmission of the message. In addition to being several layers removed, these entities did not control, contribute, or even know of the text message's existence. The Class's only tenuous connection to CPS is the purposefully convoluted and confused allegation that CPS worked with several other non-parties in a confined and seamless conspiracy. The evidence produced in this dispute has completely debunked this myth.

CPS is entitled to summary judgment on the Class' claims for TCPA violations.   CPS offers undisputed evidence that the text messages at issue in this case were not sent through an ATDS or a predictive dialer, as required for TCPA liability. Furthermore, even if the Class can demonstrate that the text messages were sent through an ATDS or a predictive dialer, the Class cannot demonstrate that CPS is vicariously liable for the transmission of such messages.   The Court should therefore grant summary judgment in CPS' favor on all claims.

## STATEMENT OF UNCONTROVERTED FACTS

1.   CPS  has never hired any party to transmit unsolicited text messages on its behalf. *See,* Defendant CPS's Responses to Plaintiff Flemming Kristensen's First Set of Interrogatories, dated December 12, 2012, Interrogatory 11 (Exhibit 1 to the Declaration of Gregory T. Wolf (the "Wolf Decl."), attached hereto as Exhibit A[1]); CPS' Answer to First Amended Complaint, ECF 38, ¶ 27.

2.   CPS was not aware any text message had been sent to the Class until it was served with this suit.  Exhibit 2, CPS' Amended and Supplemental Answers to First Interrogatories from Plaintiff, dated June 3, 2014, Interrogatory 7.

3.   CPS contracted with Defendant LeadPile ("LeadPile") to receive "leads" regarding potential customers who may be interested in loan products CPS serviced.  Exhibit 3, Leadpile Lead Buyer Agreement, dated August 13, 2009 (LEAD000001-4).

4.   CPS was not aware LeadPile obtained leads through SMS text messages. Exhibit 4, CPS Amended Answers to Second Interrogatories from Plaintiff, dated July 21, 2014, Interrogatory 17.

---

[1] Hereafter exhibit references to exhibits attached in support of this Memorandum in Support of Motion for Summary Judgment refer to exhibits attached to the Wolf Decl., attached hereto as Exhibit A.

83242590\V-1

1    5.    CPS contractually required all vendors, including LeadPile, to comply with all

2    laws, including the TCPA.   Exhibit 4, CPS' Amended Answers to Plaintiff's Second

3    Interrogatories, dated July 21, 2014, Interrogatory 18.

4    6.    Defendant ClickMedia ("ClickMedia) contracted with non-party AC Referral

5    Systems LLC ("AC Referral") to send unsolicited text messages to the Class.   Decl. of James Gee,

6    ECF 113-1, Exhibit C, ¶ 3.

7    7.    AC Referral and the party from whom it received the phone numbers, 360 Data

8    Management, believed that all consumers associated with the phone numbers had opted-in and

9    consented to receiving text messages, which they confirmed by comparing the numbers to

10   suppression lists.   Excerpts from Deposition Transcript of Michael Ferry, taken January 10, 2014

11   ("Ferry Depo."), 63:11-64:10, 67:16-68:9, 78:4-11, 89:16-22 (Exhibit 5); Excerpts from

12   Deposition Transcript of James Gee, taken January 23, 2014 ("Gee Depo."), 23:10-24:2, 53:3-24,

13   88:21-89:9 (Exhibit 6).

14   8.    The contracts between AC Referral and ClickMedia obligated AC Referral to

15   comply with the TCPA.   Exhibit 7, June 28, 2011 "Smart Credit Solution" Publishing Agreement

16   between Click Media and AC Referral (Depo. Exhibit 9); Exhibit 8, December 22, 2011 "Alliance

17   Capital" Publishing Agreement between Click Media and AC Referral (Depo. Exhibit 31).

18   9.    In December 2011, AC Referral texted the Class.   Exhibit 6, Gee Depo.,

19   125:3125:22; Exhibit 9, December 6, 2011 text message (330-564-6316) (Depo. Exhibit 34).

20   10.    Other than the dollar amount included in the text message, which was provided by

21   Click Media, AC Referral alone controlled the content of the text messages; no other party had the

22   ability to review or approve the content of the text messages before they were transmitted. Exhibit

23   6, Gee Depo., 69:13-18; 188:21-189:3.

83242590\V-1

3

11.     ClickMedia had no control over the transmission of the text message sent to the Class.  Exhibit 6, Gee Depo., 188:21-189:16.

12.     Neither LeadPile nor CPS have ever conducted business with AC Referral.  Exhibit 6, Gee Depo., 70:3-11.

13.     Prior to the initiation of the instant action AC Referral was wholly unfamiliar with LeadPile and CPS.  Exhibit 6, Gee Depo., 70:12-20.

14.     AC Referral used a computer software program called "Data Doctor" to transmit the text message to the Class.  Exhibit 6, Gee Depo., 30:8-20.

15.     Data Doctor is a computer software program that, when connected to a cellular phone via USB cable, can transmit text messages. Exhibit 10, Declaration of Michael Ferry dated May 3, 2014 ("Ferry Decl."), ¶ 5.

16.     In order to transmit text messages using the Data Doctor system as it existed in 2011 and 2012, the system operator at AC Referral had to manually key in the phone number to send the text message, or cut the phone number from a Word document, or other file, and paste it into the text box. Exhibit 10, Ferry Decl., ¶ 8; Exhibit 6, Gee Depo., 31:8-20, 56:6-20, 131:10-18.

17.     The system operator at AC Referral then had to hit "send" in order for any text message to be transmitted using the Data Doctor program. Exhibit 6, Gee Depo., 149:24-150:3.

18.     The system operator also had to monitor the Data Doctor program to correct for anomalies or other errors that may occur during the transmission process. Exhibit 6, Gee Depo., 150:9-151:5.

19.     In 2011 and 2012, the Data Doctor program did not have the ability to produce numbers sequentially.  Exhibit 2, Decl. of M. Ferry, ¶ 10; Exhibit 6, Gee Depo., 130:23-131:3.

20.     In 2011 and 2012, the Data Doctor program did not have the ability to produce numbers randomly.  Exhibit 6, Gee Depo. 130:17-22.

21.     In 2011 and 2012, the Data Doctor program did not have the ability to store lists of phone numbers to which it could later recall in order to transmit text messages to those numbers. Exhibit 10, Ferry Decl., ¶ 13; Exhibit 6, Gee Depo., 56:25-57:14; 131:7-9.

22.     The text message sent to the Class by AC Referral stated: "Do You Need up to $5000 Today? Easy Quick and All Online at: www.lend5k.com 24 Month Repay, all Cred. Ok Reply Stop 2 End."  Decl. of James Gee, ECF 113-1, Exhibit C, ¶¶ 10-11; Exhibit 9,  (Depo. Ex. 34).

23.     The Lend5k.com website domain was owned, operated, and controlled solely by AC Referral.  Decl. of James Gee, ECF 113-1, Exhibit C, ¶¶ 6, 10.

24.     If a consumer clicked on the Lend5k.com link in the text message, they would be transferred to another website, which may have been owned by ClickMedia.  Exhibit 6, Gee Depo., 68:2-14, 124:5-22, 125:3-126:2, 165:14-18.

25.     Plaintiff did not click on the link and has never visited Lend5K.com.  Exhibit 11, Excerpts from Deposition Testimony of Flemming Kristensen, taken January 21, 2014 ("Kristensen Depo."), 73:1-9, 102:12-23, and 126:23-127:2.

26.     CPS was not even aware that ClickMedia's website existed at the time the text messages were sent to the Class.  Exhibit 12, CPS Amended Responses to Plaintiff's First Request for Admission from Plaintiff, dated July 21, 2014, Request 21-22.

27.     At least 3,370 Class members somehow made their way to a Click Media operated website after receiving the text message, where they entered their personal consumer information to apply for a loan.  Decl. of Shawn C. Davis, ECF. 113-3, ¶ 26.

28.     At least 212 members of the putative class were ultimately sent to LeadPile's marketplace where their "lead" was purchased by a lender (although not necessarily CPS, Enova or Pioneer).  *See* Exhibit 13, analysis performed by Shawn Davis  (Depo. Ex. 27).

83242590\V-1

29.     Of the 212 Class members who were sent to LeadPile's marketplace, only 64 leads were ultimately sold to various lenders.  Exhibit 14, Declaration of Lisa C. Snow dated May 23, 2014 ("Snow Decl."), ¶ 24.

30.     Only four of those leads were purchased by CPS.  Exhibit 14, Snow Decl., ¶ 23.

31.     CPS was not aware that the information it received from LeadPile had been collected by ClickMedia.  Exhibit 12, CPS Amended Responses to Plaintiff's First Request for Admission from Plaintiff, dated July 21, 2014, Request 11, 17.

## I.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no undisputed facts and the movant is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); Fed. R. Civ. P. 56(a).  The moving party bears the burden of informing the court of the basis for its motion and identifying the portions of the record that demonstrate the absence of a genuine issue of material fact.  *Celotex,* 477 U.S. at 323.  In cases where the nonmoving party bears the burden of proof at trial, as the Class does here, the moving party is entitled to judgment as a matter of law if it can demonstrate that the non-moving party "failed to make a sufficient showing on an essential element of [its] case with respect to which [the non-moving party] has the burden of proof."  *See id.* at 323-324.

Once the moving party has met its initial burden, the party opposing a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  If a party opposing summary judgment "fails to properly address another party's assertion of fact," the Court may "grant summary judgment if the motion and supporting materials - including the facts considered undisputed - show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3). Therefore, the non-moving party "may not rest upon mere allegations or denials in pleadings, but

must set forth specific facts showing that there exists a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).   Far from a disfavored procedural shortcut, summary judgment is an integral part of federal procedure.   *Celotex,* 477 U.S. at 323.

**ARGUMENT**

**II.     THE CLASS CANNOT ESTABLISH THE SUBJECT TEXT MESSAGE WAS SENT USING AN ATDS**

Section 227(b)(1)(A) of the TCPA bars the use of an "automatic telephone dialing system" ("ATDS") to make calls (without prior consent) to certain telephone lines and numbers.   In this case, the Class alleges they received unsolicited text messages on their cellular phones.   Courts have concluded that a text message is a "call" as defined by the TCPA.   See, e.g., *Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 954 (9th Cir. 2009).

The TCPA defines an ATDS as equipment that has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial those numbers.   47 U.S.C. § 227(a)(1).

In 2003, the Federal Communications Commission ("FCC"), the federal agency tasked with interpreting and enforcing the TCPA (47 U.S.C. § 227(b)(2)), expanded the definition of ATDS to include "predictive dialers."   *See In re Rules & Regulations Implementing the TCPA*, 18 FCC Rcd 14014 (FCC 2003).   Predictive dialers are automated systems that call telephone numbers stored in databases.   *Id*. at 14091.   Thus, though predictive dialers do not technically "store or produce telephone numbers to be called, using a random or sequential number generator," as required by Section 227(a)(1) of the TCPA, the FCC nonetheless concluded use of predictive dialers fell under purview of the TCPA.   The FCC noted, and the Ninth Circuit has agreed, that the hallmark feature of an ATDS, whether it is an ATDS as defined by statute, or a predictive dialer as defined by the FCC, is that it has "the capacity to dial numbers without human intervention."   *Id*. at 14092; *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, 1043

83242590\V-1

(9th Cir. 2012).  A device that cannot store or produce, then dial telephone numbers that have been randomly or sequentially generated; or, a device that requires human intervention in order to place a call, is clearly not an ATDS under the TCPA.

The Class fails to demonstrate that AC Referral used an ATDS to transmit the subject text messages. AC Referral did not use equipment that operates as a random or sequential number generator to send text message to the class members.  A random or sequential number generator refers to the ability to randomly, or sequentially, string together 10 numeric digits to produce phone numbers.  See, e.g., *Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp.2d 723, 725 (N.D. Ill. 2011); *Dominguez v. Yahoo!, Inc.*, No. No. 13-1887, 2014 WL 1096051 (E.D. Pa. March 20, 2014).   The uncontroverted evidence demonstrates that the Data Doctor program did not randomly, or sequentially generate phone numbers.  Statement of Uncontroverted Facts ("SUF") ¶¶ 19, 20.  As such, there is no genuine, dispute of the fact that the Data Doctor program is not an ATDS as defined by the TCPA.  Likewise, there is no genuine, disputed material fact that the Data Doctor program operated as a predictive dialer when it sent the text message to class members. Instead, the text sent to the class members was sent by a live person.  SUF ¶¶ 16, 17, 18.

In this manner, AC Referral's actions are like the "human interaction" used  in *Gragg v. Orange Cab Col, Inc.*, 995 F. Supp.2d 1189, 1191 (W.D. Wash. 2014).   In *Gragg*, the defendant operated a taxicab dispatch center; after dispatch received a request for a taxi pick up, it would send a text message notification to its customers.   995 F. Supp.2d at 1191.   The system that sent the text messages required an operator to press "enter" to transmit automatically created notifications. *Id*. The Western District of Washington reviewed the actions of the dispatch system and determined it did not constitute an ATDS as defined by the TCPA.  *Id*. at 1194.  Though the *Gragg* court noted the "level of human agency involved in transmitting the text dispatch

notifications" is minimal, nonetheless, it is "essential" to the operation of the system, such that the system cannot be considered an ATDS.  *Id.*

Likewise, here, though, arguably, the human interaction necessary to transmit text messages through Data Doctor may be considered "minimal," it is nonetheless necessary to utilize the program.  The AC Referral operator first had to key in the phone numbers to transmit the messages, then hit "send" in order to transmit a text message through the Data Doctor program. SUF ¶ 17.  After that, the operator has to continue to monitor the program to ensure there were no anomalies with the transmission.  If such errors occurred, the operator had to correct them before the text message would send. SUF ¶ 18.   This is at least equivalent, if not more, than the human agency used to transmit text messages in *Gragg*.  Like in *Gragg*, this Court should conclude the class has failed to demonstrate the text was transmitted by the ATDS.  Demonstrating the text message was sent through an ATDS is an element of the Class claim; therefore, failure to prove this element is fatal to the Class' claim as a whole.  *See, e.g., Meyer*, 707 F.3d at 1043 (use of an ATDS is an element of a TCPA claim); *Celotex*, 477 U.S. at 322 (summary judgment warranted if party cannot establish existence of an element of its claim).

## III.    THE CLASS' VICARIOUS LIABILITY THEORIES CANNOT WITHSTAND SUMMARY JUDGMENT

The Class claims that CPS is vicariously liable for the conduct of AC Referral; however, during the over two years this case has been pending the Class has continuously shifted their basis for making this claim. *See, e.g., O'Banion v. Select Portfolio Servs., Inc.,* No. 1:09-cv-00249, 2011 WL 5572625 (D. Idaho Nov. 16, 2011) (defendants should not be required to respond to continually moving targets).  Regardless of which agency theory the Court applies, the Class' vicarious liability arguments are not supported by the statute, general agency principals, or the facts in this case, and summary judgment in CPS' favor is therefore appropriate.

**A.**     <u>No Formal Agency Relationship Existed Between CPS and AC Referral.</u>

In its initial Class Action Complaint, the Class alleges that CPS "*directed* the mass transmission of wireless spam to the cell phones nationwide of what it hoped were potential customers of its payday loan products." *See Class Action Comp.*, ECF 1, p. 15 (emphasis added).

After it became clear that CPS had no direct connection to AC Referral, the Class backed off this position and amended its complaint to allege that CPS "*caused* the *en masse* transmission of text messages to thousands of consumers' cellular telephone numbers, including Plaintiff's," seemingly relying on classical agency theory. *See* First Am. Comp., ECF 35, ¶ 41 (emphasis added); *see also* Exhibit 12, Plaintiff's Amended Responses to Defendant CPS First Set of Requests for Admission, Request for Admission 1.   CPS  has denied hiring any party to transmit unsolicited text messages on its behalf.  *See* SUF ¶ 1.  Because neither CPS, nor LeadPile, the party from whom it allegedly bought the leads, communicated with AC Referral, let alone had the right to control the manner and means of AC Referral's text message campaign, the Class' agency theory of liability fails.  *See* SUF ¶¶ 1, 4, 12, 13; *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1084-1085 (C.D. Cal. 2012), *aff'd*, No. 12-56458, 2014 WL 2959160 (9th Cir. July 2, 2014) (to succeed on a theory of vicarious liability theory, plaintiff must demonstrate that defendants "controlled or had the right to control [the party who transmitted the text] and, more specifically, the manner and means of the text message campaign they conducted.").

To the extent the Class claims that CPS is vicariously liable for the actions of AC Referral based on CPS' purchase of leads from LeadPile, which it alleges had a contractual relationship with Click Media, this claim also fails because Click Media could not control the content of the text messages or the manner in which the  text messages were sent.  *See* SUF ¶¶ 10, 11.  Control over the content of the text messages and the manner in which they were sent belonged to AC Referral alone, and for this reason summary judgment should be granted in favor of CPS.  *See Mey*

*v. Pinnacle Security, LLC*, 2012 WL 4009718 at *5 (N.D. W. Va. Sept. 12, 2012) (granting summary judgment in favor or defendant where evidence presented suggested that defendant did not have access to the records and/or the calls made by its lead generators, let alone control over the same, and lead generators used by defendant also outsourced lead generation to third parties with whom defendant had no relationship, finding that such facts "strongly indicate that [Defendant] plays a passive role in its interaction with lead generators," and "[Plaintiff] has presented no evidence to suggest that [Defendant] has control over the means and manner by which its lead generators place calls on its behalf.").

## B.   AC Referral Did Not Act with the Apparent Authority of CPS.

After failing to demonstrate that CPS was vicariously liable for the transmission of the text messages under classical agency theory, the Class appears to now be relying on a theory that CPS had apparent authority over the text message campaign and/or ratified AC Referral's conduct. *See* Plf. Mot for Class Certification, ECF 113, p. 16. In making this argument, the Class relies heavily upon a declaratory ruling from the FCC, in which the FCC observed that it does "not believe it appropriate to limit vicarious liability to circumstance of classical agency . . . Principles of apparent authority and ratification may also provide a basis for vicarious seller liability for violations of section 227(b)." *In the Matter of the Joint Petition Filed by DISH Network, LLC, the United States of Am., and the States of Cal., Ill., N.C., and Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C. Rcd. 6574, 6590 n. 124 (2013).

Even assuming apparent authority and ratification may provide a basis for vicarious liability under section 227(b), the Class' claims fail. The Class has failed to demonstrate that apparent authority existed. In *Taco Bell*, the Ninth Circuit held apparent authority "can only 'be established by proof of something said or done by the [alleged principal], on which [the plaintiff] reasonably relied.'" *Taco Bell Corp.*, 2014 WL 2959160 at *2 (citing *NLRB v. Dist. Council of*

83242590\V-1

*Iron Workers of Cal. & Vicinity*, 124 F.3d 1094, 1099 (9th Cir.1997); and Restatement (Second) of Agency § 265 cmt. a (1958) ("Apparent authority exists only as to those to whom the principal has manifested that an agent is authorized. There is, therefore, tort liability only if such a manifestation and its execution by the apparent agent results in harm.")).

Here, the text message the Class received only identified a web address – lend5k.com. SUF ¶ 22.  After clicking on the hyperlink in the text message, a Class member would have been redirected to a website that may have been operated by Click Media; however there is no way to determine what the Class members saw as Plaintiff did not click on the hyperlink and the website is no longer maintained by AC Referral.  Exhibit 6, Gee. Depo., 69:4-12, 124:10-12, 164:7-1654, SUF ¶¶ 23, 26.  At least 3,370 Class members somehow made their way to a Click Media operated website after receiving the text message, where they entered their personal consumer information to apply for a loan.  SUF ¶ 27.  At least 212 of those Class members were ultimately sent to LeadPile's marketplace, where "leads" for 64 of the Class members were purchased by a lender (although not necessarily CPS, Enova or Pioneer).[2]  CPS only purchased four of the "leads."  SUF ¶¶ 28-30.

To prevail, the Class would need to demonstrate that those Class Members who followed the lend5k.com hyperlink, or at least those four for whom CPS purchased leads, reasonably believed that AC Referral was acting with the authority of CPS, and that such belief was traceable to a manifestation of CPS, or its agents.  *See Smith v. State Farm Mut. Auto. Ins. Co.*, No. 13 C 2018, 2013 WL 5346430 at *5 (N.D. Ill. Sept. 23, 2013) citing *In re DISH Network, LLC*, 28 F.C.C. Rcd. at 6586 ("Apparent authority holds a principal accountable for the results of third-

---

[2] The discrepancy between the numbers for Click Media and LeadPile further demonstrates that Click Media was not acting as an agent for LeadPile or CPS.  Rather, Click Media was selling a product—lead data—a fraction of which was bought by LeadPile, and then sold to various parties including CPS.

party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal.").

This could be accomplished with evidence that CPS, or its alleged upstream agents, allowed AC Referral access to its customer databases, authority to use its trade name, trademark or service mark, or that CPS, or its alleged upstream agents, wrote or reviewed the content of the text message, or that CPS knew, or reasonably should have known, that AC Referral was violating the TCPA and CPS failed to take effective steps within its power to force AC Referral to cease that conduct. *See In re DISH Network, LLC*, 28 F.C.C. Rcd. at 6592 (indicating that an apparent authority may be supported by evidence that "seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control…the authority to use the seller's trade name, trademark and service mark ….that the seller approved, wrote or reviewed the outside entity's telemarketing scripts… [or that] the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.").

It is undisputed that CPS was unaware that the text message had been sent until it was served with the instant lawsuit, and it did not contract with or have any contact with AC Referral, let alone allow AC Referral to use CPS' trade name or trademarks, or allow AC Referral access to its internal systems or the customer information, or take any other action which would appear to cloak AC Referral with apparent authority to act on behalf of CPS.  SUF ¶¶ 1, 2, 4, 12, 13, 26. CPS was not even aware that the leads it received included information collected by Click Media until the lawsuit was filed.  SUF ¶ 31.

Summary judgment is appropriate because the Class cannot point to any fact in the record to establish that Plaintiff, or any other member of the Class, believed the party who sent the text

message was acting on CPS' behalf or with CPS' approval.  *See Avio, Inc. v. Alfoccino, Inc.*, 2:10-cv-10221, 2014 WL 1870108 at *12 (E.D. Mich. May 9, 2014) citing *Palm Beach Golf Center—Boca, Inc. v.  Sarris*, 981 F. Supp.2d 1239, 1253 (S.D. Fla. 2013) (granting summary judgment in favor of defendants in TCPA junk fax case, holding that "Apparent agency cannot apply here because there are no record facts establishing that Plaintiff believed [the party who sent the junk fax] *was acting on Defendants' behalf*.").

To the extent the Class claims that CPS is vicariously liable for the actions of AC Referral based on it alleged upstream connection to Click Media, summary judgment is also appropriate because Click Media could not control the content of the text messages or the manner and means of the text message campaign AC Referral conducted, and Click Media's contracts with AC Referral mandated that AC Referral comply with all state and federal laws, including the TCPA. *See* SUF ¶ 8.

**C.    CPS Did Not Ratify the Conduct of AC Referral.**

The Class also appears to assert that CPS is vicariously liable for the transmission of the text messages based on the fact it allegedly ratified the conduct of AC Referral by accepting a monetary benefit from the calls, or by purchasing leads generated by the calls.  *See* Plf. Mot for Class Certification, ECF 113, p. 17.  However, even assuming that CPS may have ratified the actions of AC Referral by accepting a benefit for the four leads it purchased, a "[a] principal-agent relationship is still a requisite, and ratification can have no meaning without it." *Taco Bell Corp.*, 2014 WL 2959160 at *2, citing *Batzel v. Smith*, 333 F. 3d 1018, 1036 (9th Cir. 2003).  Because CPS has no relationship, let alone a principal–agent relationship with AC Referral CPS cannot be held liable for AC Referral's actions. SUF ¶¶ 12, 13.

Additionally, even if the Class could prove an agency relationship existed between AC Referral and CPS (which CPS maintains it cannot do), to attribute liability to CPS, the Class

would need to establish that AC Referral was acting within the scope of its authority when it sent the text messages.  *See Uesco Industries, Inc. v. Poolman of Wisconsin, Inc.*, 993 N.E.2d 97, 112 (Il. App. 2013), *appeal denied* 996 N.E.2d 24 (Ill. 2013), *cert. denied* 134 S. Ct. 1323 (2014) (holding a business could not be held vicariously liable for a violation of the TCPA that occurred when an advertiser exceeded the scope of its authority by sending faxes to recipients outside of the type of recipients that the business had contracted with advertiser to market its services to).  It is undisputed that the contracts in place between AC Referral and ClickMedia during the applicable time frame specifically required AC Referral to comply with all federal, state and local regulations, including but not limited to the TCPA.  SUF ¶ 8.  Likewise, CPS required all vendors with which it contracted, to comply with all federal, state and local regulations.  *See* SUF ¶ 5.  Accordingly, the Class cannot recover on a theory that CPS ratified the actions of AC Referral.  *See Avio*, 2014 WL 1870108 at *13 (granting summary judgment in favor of defendants, holding "[t]he material facts show that Defendants neither hired [the third-party who transmitted the faxes] with the intent of *violating* the TCPA, nor did they know (or reasonably should have known) that [the third-party] was violating the TCPA on their behalf; rather, they hired [the third-party] with the intent of *complying* with the TCPA.").

## **CONCLUSION**

For the foregoing reasons, CPS respectfully requests the Court enter Summary Judgment in its favor and against the Class on all claims asserted  and that the Court grant any other further just relief.

DATED:  October 24, 2014                    DENTONS US LLP

                                            _____/s/ Gregory T. Wolf_____
                                            Steven Martin Aaron, Esq.
                                            (*Pro hac vice*) MO Bar # 41653
                                            Gregory T. Wolf, Esq.
                                            (*Pro hac vice*) MO Bar #43717
                                            4520 Main Street, 11th Floor
                                            Kansas City, MO 64111-7100


                                            LAW OFFICE OF HAYES & WELSH

                                            _____/s/ Martin L. Welsh_____
                                            Martin L. Welsh, Esq.
                                            Nevada State Bar No. 8720
                                            199 North Arroyo Grande Blvd., Suite 200
                                            Henderson, Nevada 89074

                                            *Attorneys for Defendant*
                                            *Credit Payment Services, Inc.*


## CERTIFICATE OF SERVICE

Pursuant to FRCP 5(b), I certify that on October 24, 2014, I caused the above and foregoing document entitled CREDIT PAYMENT SERVICES, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT to be served on all counsel of record through the Court's CM/ECF system.


                                            _____/s/ Gregory T. Wolf_____
                                            An attorney for Credit Payment Services, Inc.

83242590\V-1