1
Chad R. Fears (Nevada Bar No. 6970)
SNELL & WILMER L.L.P.
2
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
3
cfears@swlaw.com
Telephone:  (702) 784-5200
4
Facsimile:   (702) 784-5252

5
Russell S. Jones, Jr.  (*Pro Hac Vice*)
James M. Humphrey, IV (*Pro Hac Vice*)
6
Robert V. Spake, Jr. (*Pro Hac Vice*)
POLSINELLI PC
7
900 W. 48th Place, Suite 900
Kansas City, MO 64112
8
rjones@polsinelli.com
jhumphrey@polsinelli.com
9
rspake@polsinelli.com
Telephone:  (816) 753-1000
10
Facsimile:   (816) 753-1536

11
*Attorneys for Defendant Pioneer Services*

12
**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
13

14
FLEMMING KRISTENSEN,

15
                    Plaintiff,

16
v.

17
CREDIT PAYMENT SERVICES INC., *et al.*,

18
                    Defendants.

19

Case No. 2:12-CV-00528-APG (PAL)

**DEFENDANT PIONEER SERVICES'
<u>FIRST</u> FED. R. CIV. P. 56 MOTION:
MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFF'S CLAIM
FOR RELIEF**

20

21
        Defendant  MidCountry  Bank  (referred  to  herein  as  its  division  "Pioneer  Services"

22
(improperly named "Pioneer Financial Services, Inc." in Plaintiff's First Amended Class Action

23
Complaint)), hereby files this First Federal Rule of Civil Procedure 56 Motion:  Motion for

24
Summary  Judgment  on  Plaintiff's  Claim  for  Relief  ("Motion")  against  plaintiff  Flemming

25
Kristensen.  Pioneer Services specifically requests the Court grant summary judgment in its favor

26
and dismiss plaintiff's claim against Pioneer Services in its entirety.  This Motion is supported by

27
all of the pleadings and papers on file in this case, the following memorandum of points and

28

1    authorities, the exhibits which Pioneer Services is submitting to the Court in an index, and any

2    oral argument the Court may entertain.

3

4           Dated:  October 24, 2014            SNELL & WILMER L.L.P.

5                                               /s/ Chad R. Fears
                                                Chad R. Fears (Nevada Bar No. 6970)
6                                               SNELL & WILMER L.L.P.
                                                3883 Howard Hughes Parkway, Suite 1100
7                                               Las Vegas, NV 89169
                                                cfears@swlaw.com
8                                               Telephone:  (702) 784-5200
                                                Facsimile:   (702) 784-5252
9

10                                              POLSINELLI PC

11                                               /s/ Russell S. Jones, Jr.
                                                Russell S. Jones, Jr. (*Pro Hac Vice*)
12                                              James M. Humphrey, IV (*Pro Hac Vice*)
                                                Robert V. Spake, Jr. (*Pro Hac Vice*)
13                                              POLSINELLI PC
                                                900 W. 48th Place, Suite 900
14                                              Kansas City, MO 64112
                                                rjones@polsinelli.com
15                                              jhumphrey@polsinelli.com
                                                rspake@polsinelli.com
16                                              Telephone:  (816) 753-1000
                                                Facsimile:   (816) 753-1536
17
                                                *Attorneys for Defendant Pioneer Services*
18

19

20

21

22

23

24

25

26

27

28

**Pioneer Services' Motion for**                        **Case No. 12-cv-00528-APG (PAL)**
**Summary Judgment**

47677952.6

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 4

A.    Pioneer Services ................................................................................................ 4

B.    Pioneer Services Did Not Physically Send the Text Messages. ....................... 5

C.    Pioneer Services Did Not Control, Or Have the Right to Control, the Content or
      Distribution of the Text Message Campaign. .................................................... 5

D.    Pioneer Services Did Not Say or Do Anything that Would Have Permitted Plaintiff to
      Reasonably Believe Pioneer Services' Agent Was Behind the Text Messages. ................. 6

E.    Pioneer Services Never Affirmed or Accepted a Benefit from the Text Messages, Nor
      Could It Have Done So Knowingly. ................................................................... 7

F.    Judgment for Pioneer Services Is Appropriate Because No Automatic Telephone Dialing
      System Was Used to Send the Text Messages. ................................................ 11

G.    The Text Messages Were Sent Only to Those Who First Consented to Receive the
      Promotion. ....................................................................................................... 12

H.    Once Plaintiff Received the Text, He Did Little More Than Contact His Lawyer. .......... 13

STANDARD OF REVIEW ........................................................................................... 14

ARGUMENT ................................................................................................................ 15

A.    TCPA .............................................................................................................. 15

B.    Direct Liability ............................................................................................... 16

C.    Vicarious Liability .......................................................................................... 17

D.    Plaintiff Has Not Established that An ATDS Was Used ................................. 22

E.    Plaintiff Has Not Established Consent. ........................................................... 23

CONCLUSION ............................................................................................................. 24

# INTRODUCTION

According to plaintiff's theory of the case, defendants and non-parties jointly orchestrated a text message campaign to simultaneously connect potential payday loan borrowers with payday lenders. More specifically, plaintiff alleges that Defendant ClickMedia directed a third-party (AC Referral Systems LLC) to solicit potential payday loan borrowers ("leads") through a text message promotion. When a lead was generated, ClickMedia sold that lead through Defendant LeadPile LLC to payday lenders. The supposed payday lenders include defendants Credit Payment Services, Inc. ("CPS"), Enova International, Inc., and Pioneer Services. Admitting that Pioneer Services did not send any of the text messages, Plaintiff seeks to hold it and the other defendants vicariously liable for AC Referral's purported violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA"). Plaintiff seeks injunctive relief and potentially over $100 million in statutory damages.

There are only two potential theories of liability under the TCPA – direct liability and vicarious liability.

*Direct Liability*: Only the actual sender of the text messages is directly liable under the TCPA. Because it is undisputed that AC Referral, *not* Pioneer Services, physically sent the text messages, any direct liability theory against Pioneer Services cannot survive summary judgment.

*Vicarious Liability*: Vicarious liability is limited to theories of traditional agency, apparent authority, and ratification; and those theories are further limited by the stringent standards recently set forth by the Ninth Circuit.

Under traditional agency principles, plaintiff must sufficiently establish facts that Pioneer Services controlled or had the right to control the manner and means of AC Referral's text message campaign. But there is no such evidence. AC Referral and others testified that Pioneer Services did *not* control or even contribute to either the content of the text message or the method of distribution. Indeed, Pioneer Services did not even know of the text message campaign or of AC Referral until this lawsuit. Because plaintiff has not (and cannot) sufficiently

**Pioneer Services' Motion for Summary Judgment**                    **Case No. 12-cv-00528-APG (PAL)**

47677952.6

establish that Pioneer Services played any role, let alone a controlling one, in the text message campaign, any traditional agency theory against Pioneer Services cannot survive summary judgment.

To make a case based on apparent authority, plaintiff must prove that Pioneer Services said or did something that could have led plaintiff to reasonably believe Pioneer Services' agent was behind the text message campaign. But there is no evidence that Pioneer Services made any such statement, nor that it took any action towards plaintiff *period*, let alone saying or doing anything that would permit plaintiff to *reasonably* believe that Pioneer Services was acting through its agent. As plaintiff testified, he had never even heard of Pioneer Services until after he filed this lawsuit. Because plaintiff has not (and cannot) sufficiently establish that Pioneer Services said or did anything upon which plaintiff could believe Pioneer Services' agent was behind the text messages, any apparent authority theory against Pioneer Services cannot survive summary judgment.

To make a case based on ratification, plaintiff must prove that Pioneer Services affirmed or accepted a benefit from the text message campaign with full knowledge of all material facts of the campaign. But there is no such evidence. Pioneer Services bought *zero* leads, processed *zero* loan applications, and generated *zero* loans from the text message campaign during the class period. Indeed, of the over 13,000 leads generated by ClickMedia and sold through LeadPile between March 28, 2011 to February 29, 2012 (a date range nearly *ten* times broader than the class period (December 5, 2011 to January 11, 2012)), Pioneer Services purchased *none*. What is more, Pioneer Services *never* made a single loan from a lead generated by ClickMedia and sold through LeadPile – *ever*. Stated another way, Pioneer Services *never* made a cent from this promotion or any lead generated by ClickMedia and sold through LeadPile.

While Pioneer Services *never* made a cent from a ClickMedia lead sold through LeadPile, plaintiff points to a lead purchased in June 2012 – 6 months after he received his text message and 5 months after the class period closed – to try and rope Pioneer Services into the promotion.

**Pioneer Services' Motion for Summary Judgment**                                    **Case No. 12-cv-00528-APG (PAL)**

47677952.6

Indeed, this was plaintiff's hook in naming Pioneer Services in this lawsuit in the first place.  But this effort fails because a simultaneous text message campaign cannot be reconciled with a lead purchased half a year later.  And, even if it could (which it factually cannot), no ClickMedia lead purchased through LeadPile in or after June 2012 resulted in a single loan application or a single loan.

While these facts alone are sufficient for judgment, as discussed above, because Pioneer Services did not contemporaneously know of AC Referral's text message campaign, even had it accepted a benefit, it could not have done so with full knowledge of the material facts.  Even more so, to survive summary judgment, plaintiff must sufficiently establish a prerequisite – the existence of a principal-agent relationship – and plaintiff simply cannot do so.

Aside from Pioneer Services having no role in AC Referral's text message campaign, plaintiff's entire claim must fail against all defendants because plaintiff cannot sufficiently establish facts to support two essential elements of his claim:  use of an automatic telephone dialing system ("ATDS") and consent.  First, AC Referral the company most familiar with the system used to distribute the text messages testified that human intervention was required, and that the system did not otherwise possess the properties of an ATDS.  Second, all non-party discovery indicates that the text message campaign was only sent to those who first opted-in to the promotion.  The only "evidence" against consent is plaintiff's own self-serving, uninvestigated belief that he did not do so.  Given plaintiff's admission that he also received between 15 and 20 other "unsolicited" text message promotions, and given plaintiff's admission that he destroyed his laptop's hard drive shortly before filing this lawsuit, plaintiff should no longer be permitted to advance this incredible claim.  Because plaintiff cannot sufficiently establish facts to support consent, his case cannot survive summary judgment.

## STATEMENT OF FACTS

**A.     Pioneer Services**

1.      Pioneer Services is not a payday lender, nor does it offer payday loans.  Rather, Pioneer Services provides access to installment loans primarily to active-duty and career-retired members of the United States military.  *See* Declaration of Jodi Vickery in Support of Pioneer Services' Opening Brief in Support of Its Motion for Summary Judgment ("Vickery Decl.") ¶¶ 2-4.  Unlike a payday loan (where a single balloon payment is typically due in less than 30 days and, if not repaid, the entire balance of the loan is refinanced), Pioneer Services offers installment loans that are fully amortized and repaid in manageable monthly installments made up of both principal and interest.  *See* Vickery Decl. ¶ 3; *see also* Declaration of Robert V. Spake, Jr. in Support of Pioneer Services' Opening Brief in Support of Its Motion for Summary Judgment ("Spake Decl.") Ex. A (American Financial Services Association:  Traditional Installment vs. Payday Loans) at 1-2.  Because plaintiff is not, nor has he ever been, a member of the United States military (*see* Spake Decl. Ex. B (Deposition of plaintiff Flemming Kristensen ("Kristensen Dep.")) at 138), Pioneer Services did not (nor would it) buy a lead to make him a loan.  *See* Vickery Decl. ¶ 4.

2.      Pioneer Services also provides award-winning online financial education information and tools.  To name a few examples, in 2011, Pioneer Services received an APEX "Grand Award for Writing" for its series on financial education articles.  *See* Spake Decl. Ex. C (www.pioneermilitaryloans.com/pioneer-services/awards).  Also, in 2011, the Kansas City / International Association of Business Communicators recognized Pioneer Services, along with Hallmark, JP Morgan, Cerner, and Sprint, with a "Bronze Quill Award" for the high quality and uniqueness of its Financial PEP Talk podcast series.  *Id.*  And, in 2008 and 2009, the American

**Pioneer Services' Motion for**                              **Case No. 12-cv-00528-APG (PAL)**
**Summary Judgment**

4

Bankers Association recognized Pioneer Services for its financial education materials and for its book – the *Military Spouse Finance Guide:  Financial Advice for the Homefront*.  *Id.*  More than two dozen other awards and recognitions are listed on Pioneer Services' website.  *Id.*

### B.     Pioneer Services Did Not Physically Send the Text Messages.

3.     It is undisputed that Pioneer Services did not physically send the complained-of text messages.  Even plaintiff concedes (as he must) that non-party AC Referral, not Pioneer Services, sent the text messages.  *See, e.g.*, Pl's Mot. for Class Cert. (Dkt. No. 113) at 4 ("AC Referral Systems sent [the] text messages").

### C.     Pioneer Services Did Not Control, Or Have the Right to Control, the Content or Distribution of the Text Message Campaign.

4.     AC Referral drafted the content of the text message campaign and controlled the physical distribution of the text messages.  *See, e.g.*, Spake Decl. Ex. D (AC Referral's / James Gee's Deposition ("AC Referral Dep.") at 69 ("when [AC Referral] drafted a solicitation" no "entity out there, other than AC Referral, ha[d] the ability to review it and approve it before [AC Referral] sent it")).  What is more, AC Referral's corporate representative testified that Pioneer Services did *not* control the content of the text messages, nor did Pioneer Services contribute to that content.  *See* AC Referral Dep. at 132-33; *see also* Vickery Decl. ¶ 5.  Nor did Pioneer Services control the distribution of the text messages.  *See* AC Referral Dep. at 132; *see also* Vickery Decl. ¶ 6.  Indeed, according to AC Referral and Pioneer Services, Pioneer Services did not even know of the text message campaign or AC Referral until this lawsuit.  *See* AC Referral Dep. at 133; Vickery Decl. ¶ 7.  Thus, unsurprisingly, Pioneer Services and AC Referral had *no* relationship, *no* communication(s), and *no* oral or written agreement(s) with one and other.  *See* AC Referral Dep. at 132-33; Vickery Decl. ¶ 8.  These facts are not (and cannot be) disputed.

**Pioneer Services' Motion for**                                       **Case No. 12-cv-00528-APG (PAL)**
**Summary Judgment**

5

5.       Similarly, Pioneer Services had no relationship with the company that provided the list of individuals who received the text message promotion – which the parties agree is either 360 Data Management, LLC or Identity Defender, Inc. (both companies formerly owned and controlled by Michael Ferry, and referred to herein as "360 Data" for ease).  Like AC Referral, 360 Data's corporate representative testified that Pioneer Services did *not* know of 360 Data before this lawsuit, and that 360 Data and Pioneer Services had *no* relationship, *no* communication(s), and *no* oral or written agreement(s) with one and other.  *See* Spake Decl. Ex. E (360 Data's / Michael N. Ferry's Deposition ("360 Data Dep.")) at 94-95; *see also* Vickery Decl. ¶¶ 9-10.  Again, these facts are not (and cannot be) disputed.

6.       Thus there is no evidence that Pioneer Services directed or supervised this text message promotion.  Pioneer Services did not create or develop the text messages.  Pioneer Services played no role in any decision about this promotion's methods of distribution.  Simply put, all of the control over the manner and means of the text message campaign was exercised by third parties, and Pioneer Services had nothing to do with it.

> **D.**   **Pioneer Services Did Not Say or Do Anything that Would Have Permitted Plaintiff to Reasonably Believe Pioneer Services' Agent Was Behind the Text Messages.**

7.       Plaintiff cannot point to a single statement or action by Pioneer Services that could have led him to reasonably believe Pioneer Services' agent was behind the text message. Further, plaintiff cannot point to a single statement or action by Pioneer Services towards him period – because none exist.  Indeed, as plaintiff testified, he had *never* even heard of Pioneer Services before he filed this lawsuit.  *See* Kristensen Dep. at 20-21.

**Pioneer Services' Motion for Summary Judgment**                              **Case No. 12-cv-00528-APG (PAL)**

6

8.      What is more, this is not a case where the text message identified Pioneer Services.  Nor is this a case where plaintiff clicked on the text message link and was directed to a Pioneer Services website.  Here, plaintiff never clicked on the link.  *See* Kristensen Dep. at 73.  But, even if he had, as discussed more below, Pioneer Services did not purchase a single lead generated by ClickMedia and sold through LeadPile during the class period.  Pioneer Services also did not process a single application or generate a single loan from this promotion during the class period.  Therefore, again, plaintiff can point to no statement or action by Pioneer Services, or even a statement or action by an agent of Pioneer Services, upon which he could reasonably believe that Pioneer Services was behind AC Referral's text message campaign.

### E.      Pioneer Services Never Affirmed or Accepted a Benefit from the Text Messages, Nor Could It Have Done So Knowingly.

9.      First, as discussed above, Pioneer Services had no knowledge of the text message campaign or of the third parties who conducted the campaign before being named in this lawsuit.  Therefore, even if Pioneer Services had affirmed or accepted a benefit from the text messages, it could not have done so knowing all material facts.

10.     Second, Pioneer Services never affirmed or accepted a benefit from the text messages in the first place.  Chiefly, as three separate and independent sources confirm, Pioneer Services bought *zero* leads, processed *zero* loan applications, and generated *zero* loans from this promotion during the class period.

11.     First, an expert, retained by CPS, Enova, LeadPile, and Pioneer Services, concluded that "Pioneer purchased *zero* leads" from the text message campaign during the class

**Pioneer Services' Motion for Summary Judgment**                      **Case No. 12-cv-00528-APG (PAL)**

7

period.  *See* Spake Decl. Ex. F (Declaration of Lisa C. Snow ("Snow Decl.") at 6-11 (emphasis added)).

12.     Second, LeadPile produced an excel spreadsheet documenting every lead generated by ClickMedia and sold through LeadPile from March 28, 2011 through February 29, 2012 – a date range *ten* times broader than the class period.  Of the over 13,000 leads listed, Pioneer Services bought *none*.  *See* Spake Decl. Ex. G (LeadPile Excel Spreadsheet containing lead data from ClickMedia (*i.e.*, "thesmartcreditsoultion.securelinkcorp.com") where Pioneer Services is *never* listed as a "Buyer Company").

13.     Third, Pioneer Services maintains "Internet Affiliate - Lead Generator Reports" to monitor its lead generators.  The reports from November 2011 through January 2012, again a time period broader than the class period, show *no* activity for any lead generated by ClickMedia and sold through LeadPile.  *See* Spake Decl. Exs. H-J (ClickMedia is identified by "Custom Variable" number 1284047772106 and appears *nowhere*).  The fact that there was no activity in these reports confirms that Pioneer Services did not purchase a single lead, process a single application, or generate a single loan from the promotion during the class period.  What is more, Pioneer Services' records confirm that it provided *zero* loans to any lead generated by ClickMedia and sold through LeadPile *ever* – regardless of time period.  See Vickery Decl. ¶ 11. These facts are not (and cannot be) disputed.

14.     The only "evidence," documentary or otherwise, plaintiff has identified as supposedly linking Pioneer Services to this text message campaign is a separate LeadPile spreadsheet.  *See* Spake Decl. Ex. K (LeadPile Excel Spreadsheet, March 2011 through October 2012 (LEAD000020 – LEAD000286)).  This spreadsheet documents the leads generated by

**Pioneer Services' Motion for**                                    **Case No. 12-cv-00528-APG (PAL)**
**Summary Judgment**

8

ClickMedia and sold through LeadPile from March 2011 to October 2012 – thus, it is effectively the same as the earlier one, save it extends eight months farther beyond the close of the class period. According to plaintiff, this spreadsheet "revealed that Lender-Defendant" "Pioneer purchased 1,827 leads." Decl. of John C. Ochoa in Supp. of Pl's Mot. for Class Cert. (Dkt. No. 113-1) ¶ 7. This spreadsheet is the same document plaintiff identified as his basis for naming Pioneer Services in the amended complaint in the first place. *See* Spake Decl. Ex. L (Pl's Resp. to Pioneer's First Doc. Req. No. 11).[1]

15.    But Plaintiff's representations and reliance on this document cannot manufacture a fact issue, and certainly not a genuine one, because a review of the document reveals that the first lead Pioneer Services purchased was on June 18, 2012 – more than 6 months *after* plaintiff received his text message and more than 5 months after the class period closed. That substantial temporal gap cannot be reconciled with plaintiff's own repeated position that this promotion was designed to operate "simultaneously" – meaning a consumer could receive a loan within "seconds," but more likely within "minutes." Pl's Opp. to Defs. ClickMedia's and LeadPile's Mots. to Dismiss (Dkt. No. 71) at 5 (citing Compl. ¶ 37); *see also* Pl's Mot. for Class Cert. (Dkt. No. 113) at 5. And, again, even for the leads Pioneer Services purchased after June 18, 2012, *not a single one* resulted in an application or a loan. Stated another way, regardless of time period, Pioneer Services did not make a single cent from any lead generated by ClickMedia and sold through LeadPile.

---

[1] During a meet-and-confer teleconference between Pioneer Services and plaintiff, Pioneer Services "asked for the specific bates number(s) of the LeadPile LLC documents that formed the basis for plaintiff adding Pioneer Services as a party to this action. [Plaintiff] represented that it was any page in which Pioneer Services purchased a lead from LeadPile." *See* Spake Decl. Ex. M (12/16/13 Letter from Pioneer Services to plaintiff) at 4.

16.     The below chart displays the possible points of connection between Pioneer Services and the text message campaign and evidences that there is simply nothing there.

**Pioneer Services Had No Connection with the Text Message Campaign**

| Possible Connection: | Amount of Connection: | Source: |
|---|---|---|
| Knowledge of Texts | None | Vickery Decl. ¶ 7; AC Referral Dep. at 133. |
| Control Over Content of Texts | None | Vickery Decl. ¶ 5; AC Referral Dep. at 132. |
| Contribution to Content of Texts | None | Vickery Decl. ¶ 5; AC Referral Dep. at 132-33. |
| Control Over Distribution of Texts | None | Vickery Decl. ¶ 6; AC Referral Dep. at 132. |
| Knowledge of AC Referral | None | Vickery Decl. ¶ 7; AC Referral Dep. at 133. |
| Relationship with AC Referral | None | Vickery Decl. ¶ 8; AC Referral Dep. at 132-33. |
| Communication(s) with AC Referral | None | Vickery Decl. ¶ 8; AC Referral Dep. at 132-33. |
| Oral or Written Agreement(s) with AC Referral | None | Vickery Decl. ¶ 8; AC Referral Dep. at 132. |
| Knowledge of 360 Data | None | Vickery Decl. ¶ 9; 360 Data Dep. at 94-95. |
| Relationship with 360 Data | None | Vickery Decl. ¶ 10; 360 Data Dep. at 94-95. |
| Communication(s) with 360 Data | None | Vickery Decl. ¶ 10; 360 Data Dep. at 95. |
| Oral or Written Agreement(s) with 360 Data | None | Vickery Decl. ¶ 10; 360 Data Dep. at 94-95. |

**Pioneer Services' Motion for Summary Judgment**                                **Case No. 12-cv-00528-APG (PAL)**

| Leads Purchased from Texts | None | Snow Decl. ¶ 23 ("Pioneer purchased zero leads."); Spake Decl. Ex. G (LeadPile Excel Spreadsheet containing lead data from ClickMedia (*i.e.*, "thesmartcreditsolution.secure-linkcorp.com" from Mar. 28, 2011 to Feb. 29, 2012 (Pioneer Services is never listed as a "Buyer Company" in over 13,000 entries)). |
|---|---|---|
| Applications Processed from Texts | None | Vickery Decl. ¶ 13; Spake Decl. Exs. H-J (Pioneer Services Internet Affiliate – Lead Generator Reports from Nov. 2011 to Jan. 2012). |
| Loans Generated from Texts | None | Vickery Decl. ¶ 14; Spake Decl. Exs. H-J (Pioneer Services Internet Affiliate – Lead Generator Reports from Nov. 2011 to Jan. 2012). |

### F. Judgment for Pioneer Services Is Appropriate Because No Automatic Telephone Dialing System Was Used to Send the Text Messages.

17.     Summary judgment is also appropriate for the separate reason that non-party discovery proves that an ATDS was not used to send the text messages. It is undisputed that AC Referral transmitted the complained-of text messages using Data Doctor, a brand of software provided to AC Referral by Michael Ferry (former owner and operator of 360 Data). *See* AC Referral Dep. at 55, 139 ("Mike [Ferry] provided" the "Data Doctor software"). Because Mr. Gee (the former owner and operator of AC Referral) is the one most familiar with the system used to send the text messages, he is also the most knowledgeable about whether or not this system was an ATDS. According to Mr. Gee:

**Pioneer Services' Motion for Summary Judgment**

**Case No. 12-cv-00528-APG (PAL)**

11

a.  This system required human intervention. Indeed, each time a text message was sent, Mr. Gee had to input phone numbers into the system, type the message, and then physically hit send. Next, Mr. Gee had to monitor the system to identify and resolve system errors, which happened often.

- *See* AC Referral Dep. at 56-57, 131, 150-51 (this system "often time needed human intervention" because it would "lock up" or otherwise not function properly).

b.  This system did not, nor did it have the capacity, to produce phone numbers randomly.

- *See* AC Referral Dep. at 130.

c.  This system did not, nor did it have the capacity, to produce numbers sequentially.

- *See* AC Referral Dep. at 130-31.

d.  This system did not, nor did it have the capacity, to store or produce numbers.

- *See* AC Referral Dep. at 131.

e.  This system did not use, nor did it require, the internet.

- *See* AC Referral Dep. at 131.

These facts establish that no ATDS was used to send the text messages.

### G.  The Text Messages Were Sent Only to Those Who First Consented to Receive the Promotion.

18.  Non-party discovery has revealed that the text messages were sent only to those who first consented to receive the promotion. Indeed, AC Referral's and 360 Data's corporate representatives both testified that the recipients of the text message campaign first consented to receive the promotion. *See* AC Referral Dep. at 23-24; *see also* 360 Data Dep. at 63-64. The companies worked together as follows: AC Referral only sent text messages to a list of individuals provided by 360 Data. *See* AC Referral Dep. at 18. 360 Data only received this information from list owners and data brokers who had detailed opt-in information including, the date of consent, the name of the individual who consented, the individual's IP address, and the website through which consent was obtained. *See* 360 Data Dep. at 143, 63-64.

**Pioneer Services' Motion for Summary Judgment**                    **Case No. 12-cv-00528-APG (PAL)**

12

19.     Additionally, 360 Data independently checked that information against its own suppression lists (*i.e.*, lists of individuals who opted-out of receiving messages) and any suppression lists provided by ClickMedia.  *See* 360 Data Dep. at 67, 69-70, 118.  And, as an added precaution, AC Referral used each list only once.  *See* AC Referral Dep. at 60-61, 105. Therefore, for an individual to receive a second text message, that individual would need to expressly opt-in a second time.

20.     The only "evidence" that consent was not received is plaintiff's self-serving testimony that it was his standard operating procedure to never opt-in to receiving solicitations. *See* Kristensen Dep. at 28.  Yet, by plaintiff's own admission, he has received between 15 and 20 other "unsolicited" text messages regarding different promotions.  *Id.* at 152.  And because plaintiff knowingly destroyed his laptop's hard drive shortly before he filed this lawsuit, at the very least he should no longer be permitted to repeat this uninvestigated and incredible belief.

**H.     Once Plaintiff Received the Text, He Did Little More Than Contact His Lawyer.**

21.     On December 6, 2011, plaintiff received one of the complained-of text messages from AC Referral:  "Do You Need up to $5000 Today?  Easy Quick and All Online at: www.lend5k.com 24 Month Repay, All Cred. Ok Reply STOP 2 End."  Spake Decl. Ex. N (Text Message, Dep. Ex. 18) at 1.  After receiving the text message, plaintiff never clicked on the link (www.lend5k.com), never visited a related website, never applied for or received a related loan, nor did he otherwise participate in the solicitation.  Indeed, plaintiff did little more than reply "stop," before promptly contacting his lawyer.  *See* Kristensen Dep. at 73, 125-26.

**STANDARD OF REVIEW**

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A factual dispute is "genuine" only when there is sufficient evidence for a reasonable trier of fact to resolve the issue in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   And, a fact is "material" only when its resolution might affect the outcome of the lawsuit. *See id.*   The moving party bears the initial burden of demonstrating that there are no genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).   Once this burden has been met, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *See Celotex*, 477 U.S. at 322.   Stated another way, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a sufficient showing to establish the existence of an element essential to [his] case, and on which [he] will bear the burden at trial." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999).

Plaintiff may not simply rely on his pleadings or assertions in his brief to establish an essential element of his case, rather "the burden on [plaintiff] must not be underestimated.   On this point, at least four circuits have held that summary judgment is the 'put up or shut up' moment in a lawsuit, when the nonmoving party must show what evidence it has that would convince a trier of fact to accepts its version of events." *Rush v. Denco Enters., Inc.*, 857 F. Supp. 2d 969, 974 (C.D. Cal. Apr. 24, 2012) (collecting cases from the Second, Third, Sixth, and Seventh Circuits); *see also AllState Prop. and Cas. Ins. Co. v. Mirkia, et al.*, 2014 WL 2801310, at *9 (D. Nev. June 19, 2014) (same).   "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could

**Pioneer Services' Motion for Summary Judgment**                                    **Case No. 12-cv-00528-APG (PAL)**

14

reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the evidence plaintiff presented is "merely colorable" and not "significantly probative," the court should decide the legal issue and grant summary judgment against plaintiff. *Id.* at 249-50.

As here, when a plaintiff cannot show significantly probative facts to establish a vicarious liability theory for his TCPA claim or when a plaintiff cannot establish an essential element of his TCPA claim, summary judgment is the proper time to dismiss the lawsuit. *See, e.g.*, *Thomas v. Taco Bell Corp.*, 2014 WL 2959160, at *1-2 (9th Cir. July 2, 2014) (affirming dismissal of a TCPA claim for failure to establish vicarious liability at the summary judgment phase). Indeed, as Judge Dawson observed when granting plaintiff's motion to amend the complaint to add four new defendants – "addition of the new defendants makes it more difficult for plaintiff to meet his burden in proving an agency relationship between [the entity] who directly sent the text messages" "and the other proposed defendants," and suggested that summary judgment (not a motion to dismiss) would be the proper "procedural posture" for dismissal. *Kristensen v. Credit Payment Servs. Inc.*, 2013 WL 686492, at *2 n.1 (D. Nev. Feb. 22, 2013) (*citing Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1084-86 (C.D. Cal. 2012)). That is exactly what happened.

## ARGUMENT

### A.    TCPA

Under the TCPA: "It shall be unlawful for any person . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii). "There are two potential theories of liability: (1) direct liability; and (2) vicarious liability." *Taco Bell*, 2014 WL 2959160, at *1. There is no "on behalf of" liability. *Kristensen v. Credit Payment Servs., et al.*, 2014 WL 1256035, at *4 (D. Nev. Mar. 26, 2014).

**Pioneer Services' Motion for Summary Judgment**                              **Case No. 12-cv-00528-APG (PAL)**

15

While plaintiff may advance an "on behalf of" liability theory (as he unsuccessfully did when opposing ClickMedia's and LeadPile's motions to dismiss and as his counsel did in *Taco Bell*), it does not exist here.  For example, in *Taco Bell*, plaintiff's counsel (the same as here) advocated for "a broader standard of liability:  that a party can be held liable if a call or text message is made on its 'behalf,' that is, if a party received benefit from the text message." *Taco Bell*, 879 F. Supp. 2d at 1084, *aff'd* 2014 WL 2959160 (9th Cir. July 2, 2014).  But, "[t]he Court disagree[d]."  *Id.* ("a party can be held liable under Section 227(b)(1)(A)(iii) directly if it personally 'makes' a call in the method proscribed by the statute, or vicariously, such as, if it was in an agency relationship with the party that sent the text message"); *see also Freidman v. Massage Envy Franchising, LLC*, 2013 WL 3026641, at *4 (S.D. Cal. June 13, 2013) (holding that an entity that does not directly violate the TCPA and is not an agent of a direct violator is not liable, even if it benefits from an unauthorized text).

Similarly, the FCC rejected the notion that the TCPA is an "on behalf of" liability statute, declaring:  "under our current rules and administrative precedent interpreting and implementing sections 227(b) and 227(c), we do not think that an action taken for the benefit of a seller by a third-party retailer, without more, is sufficient to trigger the liability of a seller under either section 227(c) or section 227(b)."  *In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of Cal., Ill., N.C., & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C.R. 6574, 6593 (2013) (the "2013 FCC Ruling").  Thus, any effort to attempt the same maneuver must fail because it is not the law and because the complained-of text messages were not sent on Pioneer Services behalf anyways.

## B.    Direct Liability

Under the TCPA, direct liability only applies to the actual sender of the text message or, stated another way, the party that physically initiated the text message.  *See Taco Bell*, 879 F.

Supp. 2d at 1084.  As in *Taco Bell*, "[d]irect liability is inapplicable here as the parties do not dispute that the actual sender of the text was [AC Referral], a separate provider of text message based services."  *Id.*; *see also* 2013 FCC Ruling at 6582-83 ("a seller is not directly liable for a violation of the TCPA unless it initiates a call;" and "a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call").  Because plaintiff concedes (as he must) that neither Pioneer Services nor any other Defendant physically sent the complained-of text messages (*see, e.g.*, Pl's Mot. for Class Cert. (Dkt. No. 113) at 4 ("AC Referral Systems sent [the] text messages") and 12 (the issue is whether defendants are "vicarious liable," not directly liable), Pioneer Services is not directly liable under the TCPA, and any direct liability theory against Pioneer Services cannot survive summary judgment.

### C.      Vicarious Liability

While the scope of vicarious liability under the TCPA has been uncertain, the Ninth Circuit recently defined the limitations of the theory under the TCPA.  In unanimously affirming the district court's dismissal of a TCPA vicarious liability theory at summary judgment, the Ninth Circuit adopted the district court's traditional agency reasoning and applied the FCC's "assumption that principles of apparent authority and ratification may provide a basis for vicarious liability."  *Taco Bell*, 2014 WL 2959160, at *2.  Thus, to survive summary judgment on a theory that a company is vicariously liable for an alleged TCPA violation by a third-party vendor, plaintiff must clear the high bar of establishing facts sufficient to meet the stringent standards of traditional agency principles, apparent authority, and ratification, as set forth by the Ninth Circuit and outlined below.

#### 1.      Traditional Agency Theory Not Met

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."

Restatement (Third) Agency § 1.01 (2006). "An essential element of agency is the principal's right to control the agent's actions." Restatement (Third) Agency § 1.01, cmt. f(1) (2006); *see also Taco Bell*, 879 F. Supp. 2d at 1085 ("'Agency means more than mere passive permission; it involves request, instruction, or command.'" (quoting *Klee v. United States*, 53 F.2d 495, 506 (9th Cir. 1931)). In particular, "[t]he power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *Id.* Thus, as the Ninth Circuit held in *Taco Bell*, for plaintiff to survive a motion for summary judgment on a TCPA traditional agency theory, plaintiff must sufficiently establish that Pioneer Services "controlled or had the right to control [AC Referral] and, more specifically, the manner and means of the text message campaign [AC Referral] conducted." *Taco Bell*, 879 F. Supp. 2d at 1084, aff'd 2014 WL 2959160, at *1-2.

In *Taco Bell*, "[t]he text message at issue was sent as part of a promotion conducted by the Chicago Area Taco Bell Local Owners Advertising Association (the 'Chicago Association'), a corporation comprised of Taco Bell store operators in the Chicago area. The Chicago Association consisted of twelve members, one of which was Taco Bell Corp., representing approximately 160 Taco Bell restaurants. In 2005, the Chicago Association and its advertising agency, ESW Partners, LLC ('ESW'), sponsored a local sweepstakes promotion for the Nacho Bell Grande product." *Taco Bell*, 2014 WL 2959160, at *1. The Chicago Association's board of directors, including Taco Bell's appointed director, "voted for the promotion, including the text component." *Taco Bell*, 879 F. Supp. 2d at 1082. "As part of that promotion, ESW hired ipsh!net, Inc. ('Ipsh'), which administered and sent the text message at issue." *Taco Bell*, 2014 WL 2959160, at *1.

The court there held that plaintiff "failed to meet her burden." *Taco Bell*, 879 F. Supp. 2d at 1085. "Specifically, [plaintiff] did not present any evidence to the Court that Taco Bell directed or supervised the manner and means of the text message campaign;" she "presented no evidence to the Court that Taco Bell created or developed the text message;" "[n]or did she

**Pioneer Services' Motion for**                                    **Case No. 12-cv-00528-APG (PAL)**
**Summary Judgment**

18

present any evidence to the Court that Taco Bell played any role in the decision to distribute the message by way of a blast text.  All of this control over the manner and means of the text message campaign was exercised by [third parties], and [plaintiff] has not presented any evidence to the Court demonstrating that Taco Bell controlled the actions of these entities with respect to the campaign.  Taco Bell, simply put, had nothing to do with it." *Id.*

If the evidence against Taco Bell was insufficient for plaintiff to survive summary judgment, then the evidence against Pioneer Services is certainly insufficient.  In *Taco Bell*, a Taco Bell appointed director knew of and voted for the text message promotion.  Here, Pioneer Services did not have close to that level of involvement.  Indeed, plaintiff failed to show any, let alone sufficient, evidence that Pioneer Services controlled, or had the right to control, the content or distribution of the text message campaign.  AC Referral, not Pioneer Services, did these things.  This ends the analysis, and any traditional agency theory against Pioneer Services cannot survive summary judgment.

2.   <u>Apparent Authority Theory Not Met</u>

"Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal."   Restatement (Third) of Agency § 2.03 cmt. c (2006).  Accordingly, as the Ninth Circuit held in *Taco Bell*, to survive summary judgment plaintiff must prove facts that Pioneer Services said or did something "'on which [plaintiff] reasonably relied.'"  *Taco Bell*, 2014 WL 2959160, at *2 (quoting *NLRB v. Dist. Council of Iron Workers of Cal. & Vicinity*, 124 F.3d 1094, 1099 (9th Cir. 1997)); *see also* Restatement (Third) of Agency § 3.03 cmt. b (2006) ("Apparent authority is present only when a third party's belief is traceable to manifestations of the principal."); Restatement (Third) of Agency § 3.03 (2006) ("Apparent authority, as defined in § 2.03, is created by a person's manifestation that another has authority to act . . . .").

Any apparent authority theory against Pioneer Services fails on several separate and independent grounds.  First, plaintiff can point to *no* statement or action by Pioneer Services that could have led him to reasonably believe Pioneer Services' agent sent the text messages.  As plaintiff testified, he had *never* even heard of Pioneer Services before filing this lawsuit.  *See* Kristensen Dep. at 20-21.  Plaintiff's total unawareness of Pioneer Services or any Pioneer Services' statement or action is alone sufficient to end the apparent authority analysis.  Thus, as in *Taco Bell*, "[a]pparent authority is inapplicable because it can only 'be established by proof of something said or done by the [alleged principal], on which [the plaintiff] reasonably relied,'" and that is simply not here.  *Taco Bell*, 2014 WL 2959160, at *2.

Additional facts emphasize how far apart this situation is from a plausibly viable apparent authority theory.  For example, this is not a case where plaintiff had any contact with or knowledge of Pioneer Services before the text message, or vice versa.  This is not a case where the text message identified Pioneer Services.  This is not a case where plaintiff had any post-text message contact with or knowledge of Pioneer Services, or vice versa.  Rather, this is a case where plaintiff received a text message, and aside from replying stop, did little more than contact his lawyer.  Therefore, it comes as no surprise that plaintiff first learned of Pioneer Services after he filed this lawsuit.

### 3.  Ratification Theory Not Met

To make a case based on ratification, plaintiff must first establish the prerequisite existence of a "'principal-agent relationship,'" as "'ratification can have no meaning without it.'" *Taco Bell*, 2014 WL 2959160, at *2 (quoting *Batzel v. Smith*, 333 F.3d 1018, 1036 (9th Cir. 2003)).  In addition to the prerequisite relationship, "[r]atification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority."  Restatement (Third) of Agency § 4.01(1) (2006); *see also* Restatement (Third) of Agency § 4.01 cmt. d (2006) (ratification includes "knowing acceptance of the benefit of a transaction").  And, even "[a] person [who] has ratified is not bound by the ratification if it was

**Pioneer Services' Motion for Summary Judgment**                    **Case No. 12-cv-00528-APG (PAL)**

20

47677952.6

made without knowledge of material facts about the act of the agent or other actor." Restatement (Third) of Agency § 4.06 cmt. b (2006).  Therefore, plaintiff must sufficiently establish facts for both the prerequisite and the underlying theory itself to survive summary judgment.

Any ratification theory against Pioneer Services fails on three separate and independent grounds.  First, as discussed above, because plaintiff cannot sufficiently establish facts supporting his actual or apparent authority theories, he cannot sufficiently establish a principal-agent relationship between Pioneer Services and any third party.  Because ratification can have no meaning without this relationship, similar to *Taco Bell*, the failure to establish this prerequisite ends the analysis, and plaintiff cannot survive summary judgment.  *See Taco Bell*, 2014 WL 2959160, at *2.

Second, "[t]he burden of establishing that a ratification was made with knowledge is on the party attempting to establish that ratification occurred."  Restatement (Third) of Agency § 4.06 cmt. b (2006).  Here, because Pioneer Services did not know of the text message campaign or of AC Referral before being named in this lawsuit, even if Pioneer Services had affirmed or accepted a benefit from the text messages (which it did not), it could not have done so knowing all material facts.

Third, plaintiff has not established that Pioneer Services affirmed or accepted a benefit from the text messages in the first place.  As discussed above, Pioneer Services bought *zero* leads, processed *zero* loan applications, and generated *zero* loans from this promotion during the class period.  This lack of post-text message involvement is confirmed by an expert, LeadPile records, and Pioneer Services records.  And, any lead(s) Pioneer Services purchased more than 6 months after plaintiff received his text message and more than 5 months after the class period closed is not enough for plaintiff to prove that Pioneer Services accepted the benefits of the promotion, particularly because any such lead purchased after the close of the class period resulted in *zero* loan applications and generated *zero* loans.  Indeed, Pioneer Services *never* made a cent from any lead generated by ClickMedia and sold through LeadPile *ever*.

**Pioneer Services' Motion for**                                   **Case No. 12-cv-00528-APG (PAL)**
**Summary Judgment**

21

47677952.6

Here, because plaintiff cannot meet the high bar of establishing Pioneer Services is vicariously liable for the complained-of third-party text message campaign, any vicarious liability theory against Pioneer Services must be dismissed in its entirety.

**D.    Plaintiff Has Not Established that An ATDS Was Used.**

A text message violates the TCPA *only* if it was made using an ATDS. Thus, for plaintiff to prevail, he must establish sufficient facts to show that the text messages were sent by an ATDS. "[E]quipment is an ATDS" if it "store[s], produce[s], or call[s] randomly or sequentially generated telephone numbers," or if it has "the capacity to do" so. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009); *see also* 47 U.S.C. § 227(a)(1) (defining an ATDS as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.").

Not only has plaintiff failed to establish that an ATDS was used (an essential element of his case), the record shows that an ATDS was *not* used. First, because plaintiff has not presented significantly probative evidence, or any evidence for that matter, that an ATDS was used, the Court should grant summary judgment against plaintiff.

Second, plaintiff has not presented such evidence, because an ATDS was not used. Indeed, Mr. Gee (former owner and operator of AC Referral) testified that the system used to transmit the text messages required human intervention and did not otherwise meet the definition of an ATDS.

1. This system required human intervention. Indeed, each time a text message was sent, Mr. Gee had to input phone numbers into the system, type the message, and then physically hit send. Next, Mr. Gee had to monitor the system to identify and resolve system errors, which happened often. *See* AC Referral Dep. at 56-57, 131, 150-51.

2. This system did not, nor did it have the capacity, to produce phone numbers randomly. *See* AC Referral Dep. at 130.

3. This system did not, nor did it have the capacity, to produce numbers sequentially. *See* AC Referral Dep. at 130-31.

**Pioneer Services' Motion for**                                              **Case No. 12-cv-00528-APG (PAL)**
**Summary Judgment**

22

47677952.6

4. This system did not, nor did it have the capacity, to store or produce numbers. *See* AC Referral Dep. at 131.

5. This system did not use, nor did it require, the internet. *See* AC Referral Dep. at 131.

Because the man who best knows this system testified that the system did not have the properties of an ATDS, plaintiff's entire TCPA claim should be dismissed.

### E. Plaintiff Has Not Established Consent.

Another essential element of plaintiff's TCPA claim is consent. Non-party discovery has already unearthed convincing evidence that the recipients of the text messages consented to receive them. Indeed, AC Referral's and 360 Data's corporate representatives testified that the recipients of the complained-of text messages first consented to receive the promotion. AC Referral only sent text messages to a list of individuals provided by 360 Data. 360 Data only received this information from list owners and data brokers who had detailed opt-in information including, the date of consent, the name of the individual, the individual's IP address, and the website through which consent was obtained. And, 360 Data and AC Referral took independent precautions, for example, checking information against suppression lists and using each list only once.

Conversely, plaintiff's uninvestigated, self-serving claim that he never consented to receive a single solicitation is unreliable and cannot create a genuine dispute for the trier of fact. Especially, when by his own admission, plaintiff has received between 15 and 20 other "unsolicited" text messages regarding different promotions. And, given Plaintiff's spoliation of his laptop's hard drive shortly before he filed this lawsuit, plaintiff's claim should be dismissed or, at the least, plaintiff should no longer be permitted to repeat this incredible claim. Further, courts may consider the effects of an adverse inference instruction when ruling on a summary judgment motion. *See United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) ("To determine if the district court erred in dismissing [plaintiff's] action on summary judgment, we must first resolve whether [plaintiff] posits a successful spoliation argument.

**Pioneer Services' Motion for**                                    **Case No. 12-cv-00528-APG (PAL)**
**Summary Judgment**

23

Showing evidence of spoliation of the claim documents by the defendants would allow [plaintiff] to argue to the jury adverse inferences of fraud that might be sufficient to defeat summary judgment.").

## CONCLUSION

If plaintiff could defeat summary judgment on his factual showing, then every company that contracts with a third-party vendor that in turn conducts unrelated business with unrelated parties in a way that allegedly violates the TCPA must litigate vicarious liability theories at trial. This is not the law.  Because plaintiff concedes that Pioneer Services is not directly liable, and because plaintiff has failed to establish any, let alone sufficient, facts to demonstrate any vicarious liability theory against Pioneer Services, plaintiff has not "put up" enough evidence to survive summary judgment.  Accordingly, the Court should grant Pioneer Services' motion for summary judgment and dismiss plaintiff's claim against Pioneer Services in its entirety. Separately, plaintiff has not "put up" enough facts that an ATDS was used or that the recipients did not consent to the promotion, and plaintiff's entire case cannot survive summary judgment.

Dated:  October 24, 2014                Respectfully submitted,

                                         /s/ Chad R. Fears
                                        Chad R. Fears (Nevada Bar No. 6970)
                                        SNELL & WILMER L.L.P.
                                        3883 Howard Hughes Parkway, Suite 1100
                                        Las Vegas, NV 89169
                                        cfears@swlaw.com
                                        Telephone:  (702) 784-5200
                                        Facsimile:  (702) 784-5252

**Pioneer Services' Motion for**                    **Case No. 12-cv-00528-APG (PAL)**
**Summary Judgment**

24

47677952.6

1

2           _____/s/ Russell S. Jones, Jr._____
            Russell S. Jones, Jr. (*Pro Hac Vice*)
            James M. Humphrey, IV (*Pro Hac Vice*)
3           Robert V. Spake, Jr. (*Pro Hac Vice*)
            POLSINELLI PC
4           900 W. 48th Place, Suite 900
            Kansas City, MO 64112
5           rjones@polsinelli.com
            jhumphrey@polsinelli.com
6           rspake@polsinelli.com
            Telephone:  (816) 753-1000
7           Facsimile:   (816) 753-1536

8           *Attorneys for Defendant Pioneer Services*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   **Pioneer Services' Motion for**                **Case No. 12-cv-00528-APG (PAL)**
     **Summary Judgment**
28                                    25

## CERTIFICATE OF SERVICE

I, the undersigned, declare under penalty of perjury, that I am over the age of eighteen (18) years, and I am not a party to, nor interested in, this action.  On October 24, 2014, I caused to be served a true and correct copy of the foregoing **DEFENDANT PIONEER SERVICES' FIRST FED. R. CIV. P. 56 MOTION:  MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR RELIEF** by the method indicated:

☐      **BY FAX:**  by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m. pursuant to EDCR Rule 7.26(a).  A printed transmission record is attached to the file copy of this document(s).

☐      **BY E-MAIL:**  by transmitting via e-mail the document(s) listed above to the e-mail addresses set forth below and/or included on the Court's Service List for the above-referenced case.

☐      **BY U.S. MAIL:**  by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Las Vegas, Nevada addressed as set forth below.

☐      **BY OVERNIGHT MAIL:**  by causing document(s) to be picked up by an overnight delivery service company for delivery to the addressee(s) on the next business day.

☐      **BY PERSONAL DELIVERY:**  by causing personal delivery via messenger service of the document(s) listed above to the person(s) at the address(es) set forth below.

☒      **BY ELECTRONIC SUBMISSION:**  submitted to the above-entitled Court for electronic filing and service upon the Court's Service List for the above-referenced case.

/s/ Julia L. Melnar
_____
An Employee of Snell & Wilmer

**Pioneer Services' Motion for Summary Judgment**

Case No. 12-cv-00528-APG (PAL)

26

47677952.6