1  Ryan W. Mitchem (TN #022196)
   Michael K. Alston (TN #013697)
2  K. Chris Collins (TN #029109)
3  HUSCH BLACKWELL LLP
   736 Georgia Avenue, Suite 300
4  Chattanooga, Tennessee 37402
   Telephone: (423) 755-2663
5
6  Patricia Lee (NV #8287)
   Joseph R. Ganley (NV #5643)
7  HUTCHISON & STEFFEN
   Peccole Professional Park
8  10080 West Alta Drive, Suite 200
   Las Vegas, Nevada 89145
9  Telephone: (702) 385-2500
   Facsimile: (702) 385-2086
10

11 *Attorneys for Defendant LeadPile LLC*

12
                 **IN THE UNITED STATES DISTRICT COURT**
13                       **DISTRICT OF NEVADA**

14

15 FLEMMING KRISTENSEN, individually,  )   Case No. 2:12-CV-00528-APG (PAL)
   and on behalf of a class of similarly   )
16 situated individuals,                    )   <u>JURY DEMANDED</u>
                                            )
17                    Plaintiff,            )   **LEADPILE LLC'S MOTION FOR**
                                            )   **SUMMARY JUDGMENT;**
18         v.                               )   **MEMORANDUM OF POINTS AND**
                                            )   **AUTHORITIES**
19 CREDIT PAYMENT SERVICES, INC.,          )
   a Nevada corporation, f/k/a             )
20 MYCASHNOW.COM INC., ENOVA               )   Judge:  Hon. Andrew P. Gordon
   INTERNATIONAL, INC., an Illinois        )
21 corporation, PIONEER FINANCIAL          )   Magistrate:  Hon. Peggy A. Leen
   SERVICES, INC., a Missouri corporation, )
22 LEADPILE LLC, a Delaware limited        )
   liability company, and CLICKMEDIA, LLC )
23 d/b/a NET1PROMOTIONS LLC, a             )
   Georgia limited liability company,      )
24                                          )
25                    Defendants.           )
                                            )
26                                          )

27

28

1

Defendant LeadPile LLC ("LeadPile"), by and through counsel, pursuant to Fed. R. Civ. P. 56 and Local Rule 56-1, hereby moves for summary judgment in its favor.  No genuine issue of material fact exists, and LeadPile is entitled to judgment as a matter of law.

Despite the fact that this case has already been pending for over two and half years, Plaintiff cannot present any admissible evidence to support his claim against LeadPile. Indeed, the evidence that has been obtained confirms that LeadPile is neither directly nor vicariously liable under the TCPA and that the Text Message was not sent using an automatic telephone dialing system or "ATDS," as defined by the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* (the "TCPA").  In fact, if not for Plaintiff's spoliation, the evidence against Plaintiff's claim may have been even stronger.[1]  Notwithstanding, LeadPile is entitled to judgment as a matter of law.

This Motion is supported by the accompanying Memorandum of Points and Authorities, the Declaration of K. Chris Collins (the "Collins Decl."), filed concurrently herewith, the pleadings and evidence on file in this action, and on such other and further matters as may be presented at or before the hearing of this matter.  Additionally, LeadPile incorporates herein all arguments, allegations of fact, and recitations of legal authority set forth in the Motion(s) for Summary Judgment, and the supporting briefs for each, filed by Credit Payment Services, Inc., f/k/a MyCashNow.com, Inc., Enova International, Inc., and Pioneer Financial Services, Inc., as if fully set forth herein.

---

[1] The issue of Plaintiff's spoliation of evidence is fully addressed in LeadPile's Motion for Terminating Sanctions or, Alternatively, Evidentiary Sanctions for Intentional Spoliation of Evidence, filed concurrently herewith.

1

**HUSCH BLACKWELL LLP**

2

3     DATED:  October 24, 2014          By:     *s/K. Chris Collins*
                                                 Ryan W. Mitchem (TN #022196)
4                                                Michael K. Alston (TN #013697)
                                                 K. Chris Collins (TN #029109)
5                                                736 Georgia Avenue, Suite 300
                                                 Chattanooga, Tennessee 37402
6

7                                                Patricia Lee (NV #8287)
                                                 Joseph R. Ganley (NV #5643)
8                                                Peccole Professional Park
                                                 10080 West Alta Drive, Suite 200
9                                                Las Vegas, Nevada 89145

10                                               *Attorneys for Defendant LeadPile LLC*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I. __INTRODUCTION__

Plaintiff Flemming Kristensen ("Plaintiff") alleges that, on December 6, 2011, he received a single unauthorized text message (the "Text Message") on his cellular telephone ("cellphone") in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* (the "TCPA"). The content of the Text Message was as follows:

> Do You Need up to $5000
> Today? Easy Quick and All
> Online at:
> www.lend5k.com 24
> Month Repay, All Cred. Ok
> Reply STOP 2 End

On March 29, 2012, Plaintiff initiated this lawsuit against a single defendant, Credit Payment Services Inc. ("CPS"), alleging a violation of the TCPA. LeadPile was not named as a defendant in the original complaint. On March 8, 2013, nearly a full year after filing the original complaint, Plaintiff brought LeadPile into this case. Now, Plaintiff seeks relief on his own behalf, and on behalf of a certified class of "[a]ll individuals who were sent a text message from telephone numbers '330-564-6316,' '808-989-5389,' and '209-200-0084,' from December 5, 2011 through January 11, 2012." Despite admitting that LeadPile did not transmit the Text Message, or any other text messages, Plaintiff seeks to hold LeadPile liable for almost $150 million in statutory damages.

To be clear, this case is not about direct liability under the TCPA. Only the actual sender of the Text Message can be directly liable under the TCPA. In this case, it is uncontroverted that AC Referral Systems LLC ("AC Referral") is the company that sent the Text Message. Because LeadPile did not send the Text Message, any theory of LeadPile's direct liability cannot survive summary judgment.

No, this case revolves around Plaintiff's claim that LeadPile and the other defendants are vicariously liable under the TCPA for the transmission of the Text Message, which

4

Plaintiff claims was done on each of the defendants' behalf.  "On behalf of" liability is not a valid theory on which Plaintiff can base his claim of vicarious liability.  Instead, Plaintiff is limited to the theories established under the federal common law:  (1) traditional agency, (2) apparent authority, and (3) ratification; and those theories are further limited by the rigorous standards recently established by the Ninth Circuit.  Plaintiff's claim for vicarious liability cannot survive summary judgment because Plaintiff cannot sufficiently establish facts to meet the requirements of any of these three theories.

Plaintiff cannot make a case based on traditional agency because Plaintiff cannot sufficiently establish facts that LeadPile controlled or had the right to control the manner and means of AC Referral's text message transmissions.  In fact, the record of available evidence contains testimony from AC Referral stating that LeadPile *never* controlled or even contributed to either the content of any text message or the method of transmission.  LeadPile did not even know of the Text Message until it was made a party to this lawsuit.

Likewise, Plaintiff cannot make a case based on apparent authority because Plaintiff cannot show that LeadPile said or did anything that could have led Plaintiff to reasonably believe that a LeadPile agent was behind the text message campaign.  Not only is there no evidence of any statements or actions of LeadPile relative to the Text Message, but the Text Message was for a loan, and LeadPile is not engaged in the lending industry.

Finally, Plaintiff cannot make a case based on ratification because, as established above, there is no principal-agent relationship, which is a requisite for ratification.  Additionally, even if a principal-agent relationship did exist (which it clearly did not and in which case any unauthorized text message would have been outside of the scope of AC Referral's services), ratification still cannot be established because LeadPile did not contemporaneously know of AC Referral's text message campaign, much less the true nature

thereof.  Therefore, even if a benefit was accepted, it could not have been *knowingly* accepted because LeadPile did not have full knowledge of the material facts.  In order for ratification to apply, LeadPile must have knowingly accepted the benefit of an otherwise unauthorized action.

Notwithstanding the glaring inadequacies of Plaintiff's claim of vicarious liability, Plaintiff's claim fails against all of the defendants because Plaintiff cannot establish two of the three essential elements of his TCPA claim – (1) that the Text Message was sent using an automatic telephone dialing system ("ATDS"); and (2) that the Text Message was sent without Plaintiff's consent .

AC Referral, the company that manually transmitted the Text Message and is clearly in the best position to inform the Court of the system it used to do so, testified that the system it used ("Data Doctor") was neither an ATDS, as defined under the TCPA, nor a predictive dialer, and that human intervention was required in order for any text messages to be transmitted.

Further, Plaintiff cannot sufficiently establish facts to support his contention that he did not consent to receive the Text Message.  All available evidence shows that AC Referral only sent text messages to consumers who had previously opted-in to one of its promotions.  According to AC Referral's testimony, this consent would have been provided online.  The only evidence that Plaintiff has offered to "refute" AC Referral's testimony is a self-serving affidavit in which Plaintiff states his personal belief that he has never, under any circumstances, opted-in to a promotion while online.  This is truly a bold claim.  The reliability of such a claim, based on its general scope alone, even without any other evidence to the contrary, has to be questioned.  Nevertheless, there is evidence to the contrary.

Plaintiff admitted to receiving between 15 and 20 other unauthorized text messages through completely unrelated promotions. For a consumer who never opts-in to a promotion, that number seems rather high. Then, there is the most troubling aspect of Plaintiff's argument regarding his consent. It has become clear that Plaintiff spoliated relevant evidence that could have been pivotal to disproving Plaintiff's theory regarding his consent. What is worse, Plaintiff spoliation occurred almost immediately after retaining his current counsel and after they had an opportunity to review some of the spoliated evidence. Because Plaintiff cannot sufficiently establish facts to show that the Text Message was sent using an ATDS or to support his theory regarding his consent, his case cannot survive summary judgment.

## II. STATEMENT OF UNDISPUTED FACTS

1. LeadPile operated a marketplace for lead generation in which businesses that acquired leads could sell their leads to buyers and buyers that needed leads could purchase them. [*See, e.g.,* LeadPile Lead Buyer Agreement, dated August 13, 2009 (LEAD000001-4) (Exhibit 1 to the Declaration of K. Chris Collins (the "Collins Decl."), attached hereto as Exhibit A[2]).]

2. Defendant ClickMedia ("ClickMedia") contracted with non-party AC Referral to send unsolicited text messages to the class. [Dkt. No. 113-1, Decl. of James Gee, Exhibit C, at ¶ 3.]

3. AC Referral and the party from whom it received the phone numbers, 360 Data Management, believed that all consumers associated with the phone numbers had opted-in and consented to receive text messages, which they confirmed by comparing the would-be

---

[2] References to exhibits attached in support of this Memorandum of Points and Authorities refers to exhibits attached to the Collins Decl. Hereinafter, exhibits attached hereto will be identified with "Ex. ___" Further, LeadPile is attaching only the pages of deposition transcripts that are referenced herein. Complete copies will be made available upon request.

recipient phone numbers to suppression lists.  [Ex. 2, Excerpts from Deposition Transcript of Michael Ferry, taken January 10, 2014 ("Ferry Depo."), 63:11-64:10, 67:16-68:9, 78:4-11, 89:16-22; Ex. 3, Excerpts from Deposition Transcript of James Gee, taken January 23, 2014 ("Gee Depo."), 23:10-24:2, 53:3-24, 88:21-89:9.]

4.      The contracts between AC Referral and ClickMedia obligated AC Referral to comply with the TCPA.  [Ex. 4, "Smart Credit Solution" Publishing Agreement between Click Media and AC Referral, dated June 28, 2011 (Depo. Exhibit 9); Ex. 5, "Alliance Capital" Publishing Agreement between Click Media and AC Referral, dated December 22, 2011 (Depo. Exhibit 31).]

5.      In December 2011, AC Referral, not LeadPile, texted the class.  [Ex. 3, Gee Depo., 125:3125:22; Ex. 6, December 6, 2011 text message (330-564-6316) (Depo. Exhibit 34).  *See also* Dkt. No. 113, Pl's Mot. for Class Cert., at p. 4 ("AC Referral Systems sent [the] text messages").]

6.      Other than the dollar amount included in the text message, which was provided by Click Media, AC Referral alone controlled the content of the text messages; no other party had the ability to review or approve the content of the text messages before they were transmitted. [Ex. 3, Gee Depo., 69:13-18; 188:21-189:3.]

7.      ClickMedia had no control over the transmission of the text message sent to the Class.  [Ex. 3, Gee Depo., 188:21-189:16.]

8.      LeadPile never conducted business with AC Referral.  [Ex. 3, Gee Depo., 70:3-11.]

9.      Prior to the initiation of the instant action AC Referral was wholly unfamiliar with LeadPile.  [Ex. 3, Gee Depo., 70:12-20.]

8

10.     LeadPile never conducted business with 360 Data.  [Ex. 2, Ferry Depo., 76:2-21.]

11.     AC Referral used a computer software program called "Data Doctor" to transmit the text message to the Class.  [Ex. 3, Gee Depo., 30:8-20.]

12.     Data Doctor is a computer software program that, when connected to a cellular phone via USB cable, can transmit text messages. [Dkt. No. 237-1, Declaration of Gregory T. Wolf in Support of CPS's Motion for Summary Judgment ("Wolf Decl."), Exhibit 9, Declaration of Michael Ferry, dated May 3, 2014 ("Ferry Decl."), at ¶ 5.]

13.     In order to transmit text messages using the Data Doctor system as it existed in 2011 and 2012, the system operator at AC Referral had to manually key in the phone number to send the text message, or cut the phone number from a Word document, or other file, and paste it into the text box.  [Dkt. No. 237-1, Wolf. Decl., Exhibit 9, Ferry Decl., at ¶ 8; Ex. 3, Gee Depo., 31:8-20, 56:6-20, 131:10-18.]

14.     The system operator at AC Referral then had to hit "send" in order for any text message to be transmitted using the Data Doctor program. [Ex. 3, Gee Depo., 149:24-150:3.]

15.     The system operator also had to monitor the Data Doctor program to correct for anomalies or other errors that may occur during the transmission process. [Ex. 3, Gee Depo., 150:9-151:5.]

16.     In 2011 and 2012, the Data Doctor program did not have the ability to produce numbers sequentially.  [Dkt. No. 237-1, Wolf. Decl., Exhibit 9, Ferry Decl., at ¶ 10; Ex. 3, Gee Depo., 130:23-131:3.]

17.     In 2011 and 2012, the Data Doctor program did not have the ability to produce numbers randomly.  [Ex. 3, Gee Depo. 130:17-22.]

18. In 2011 and 2012, the Data Doctor program did not have the ability to store lists of phone numbers to which it could later recall in order to transmit text messages to those numbers. [Dkt. No. 237-1, Wolf. Decl., Exhibit 9, Ferry Decl., at ¶ 13; Ex. 3, Gee Depo., 56:25-57:14; 131:7-9.]

19. The text message sent to the Class by AC Referral stated: "Do You Need up to $5000 Today? Easy Quick and All Online at: www.lend5k.com 24 Month Repay, all Cred. Ok Reply Stop 2 End." [Dkt. No. 113-1, Decl. of James Gee, Exhibit C, at ¶¶ 10-11.]

20. The Lend5k.com website domain was owned, operated, and controlled solely by AC Referral. [Dkt. No. 113-1, Decl. of James Gee, Exhibit C, at ¶¶ 6, 10.]

21. If a consumer clicked on the Lend5k.com link in the text message, they would be transferred to another website, which may have been owned by ClickMedia. [Ex. 3, Gee Depo., 68:2-14, 124:5-22, 125:3-126:2, 165:14-18.]

22. Plaintiff did not click on the link and has never visited Lend5K.com. [Ex. 8, Excerpts from Deposition Testimony of Flemming Kristensen, taken January 21, 2014 ("Kristensen Depo."), 73:1-9, 102:12-23, and 126:23-127:2.]

23. Plaintiff replied "STOP" and promptly contacted his lawyer. [Ex. 8, Kristensen Depo., 73:2-9; 125:22-24; 126:1-24.]

24. At least 3,370 Class members somehow made their way to a Click Media operated website after receiving the text message, where they entered their personal consumer information to apply for a loan. [Dkt. No. 113-3, Decl. of Shawn C. Davis, at ¶ 26.]

25. At least 212 members of the putative class were ultimately sent to LeadPile's marketplace where their "lead" was purchased by a lender (although not necessarily CPS, Enova or Pioneer). [*See* Ex. 9, Analysis of Shawn C. Davis.]

26.     Of the 212 Class members who were sent to LeadPile's marketplace, only 64 leads were ultimately sold to various lenders.  [Ex. 10, Declaration of Lisa C. Snow, dated May 23, 2014 ("Snow Decl."), at ¶ 24.]

27.     Only four of those leads were purchased by CPS.  [Ex. 10, Snow Decl., at ¶ 23.]

28.     The recipients of the text messages sent by AC Referral consented to receive them.  [Ex. 3, Gee Depo., 23:14-25, 24:1-21; Ex. 2, Ferry Depo., 63:11-25, 64:1-20.]

29.     AC Referral only sent text messages to a list of individuals provided by 360 Data.  [Ex. 3, Gee Depo., 18:16-21.]

30.     360 Data only received the information it provided to AC Referral from list owners and data brokers who had detailed opt-in information including, the date of consent, the name of the individual who consented, the individual's IP address, and the website through which consent was obtained.  [Ex. 2, Ferry Depo., 63:11-25, 64:1-20, 143:21-25.]

31.     360 Data independently checked the information it received by comparing it to suppression lists it maintained on its own and any suppression lists provided by ClickMedia. [Ex. 2, Ferry Depo., 67:13-25, 69:13-25, 70:1-25; 71:1-25; 72:1-16.]

32.     AC Referral only used each suppression list as a precaution to make sure an individual had to opt-in a second time in order to receive a second text message.  [Ex. 3, Gee Depo., 60:21-25, 61:1-11.]

33.     The only evidence indicating that Plaintiff did not consent to receive the text message is Plaintiff's own self-serving testimony stating that his standard operating procedure is to never opt-in to receiving solicitation.  [Ex. 8, Kristensen Depo., 27:11-24, 28:1-24.]

34.    However, at the same time, Plaintiff admitted to putting down contact information in certain situations.  [Ex. 8, Kristensen Depo., 28:22-24, 29:1-21, 32:17-24, 33:1-8.]

35.    He further admitted that there is the possibility he could consent and not know he's consenting.  [Ex. 8, Kristensen Depo., 28:1-21.]

36.    To that end, despite testifying that he never consents, Plaintiff admitted to having received between 15 and 20 other "unsolicited" text messages regarding different promotions.  [Ex. 8, Kristensen Depo. 152:13-15.]

37.    Additional evidence from Plaintiff is unavailable by virtue of Plaintiff having spoliated the relevant evidence by, among other things, destroying his laptop's hard drive shortly after retaining his current counsel.  [Ex. 8, Kristensen Depo. 167:8-19.]

### III. <u>LEGAL STANDARD</u>

Summary judgment is appropriate if, viewing the evidence in the light most favorable to the non-moving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 846 (9th Cir. 2012); *see also Gragg v. Orange Cab Co., Inc.*, 995 F. Supp. 2d 1189, 1192 (W.D. Wash. 2014).

In determining summary judgment, a court uses a burden-shifting scheme.  A moving party bears the initial burden of showing there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  It can do so by negating an essential element of the non-moving party's case, or by showing that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case, and on which the party will bear the burden of proof at trial.  *Id.*  The burden then shifts to the non-moving party to show that there is a genuine issue for trial.  *Id.*

On a motion for summary judgment, parties may produce evidence in a form that would be inadmissible at trial, as long as the requirements of Federal Rule of Civil Procedure 56 are met. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). Where material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence, a party is permitted to object. Fed. R. Civ. P. 56(c)(2). Affidavits or declarations used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4).

Lastly, "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "mere existence of a scintilla of evidence" will be insufficient to raise a genuine issue of material fact. *Id.* at 252. Parties may not rely on conclusory or speculative testimony, and "uncorroborated and self-serving testimony" will not create a "genuine issue" of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *Anheuser Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 345 (9th Cir. 1995). "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008).

## IV.  <u>ARGUMENT</u>

**A.  The Telephone Consumer Protection Act**

"The three elements of a TCPA claim are:  (1) the defendant called a cellular telephone number; (2) using an ATDS system; (3) without the recipient's prior express consent." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012). "There are two potential theories of liability:  (1) direct liability; and (2) vicarious liability." *Thomas v. Taco Bell Corp.*, 2014 WL 2959160, at *1-2 (9th Cir. July 2, 2014). "On behalf

1  of' liability is no longer a viable theory of liability.  *Kristensen v. Credit Payment Servs., et*
2  *al.*, 2014 WL 1256035, at *4 (D. Nev. Mar. 26, 2014).

3  **B.  LeadPile Cannot Be Held Directly Liable for a Violation of the TCPA[3]**

4
5       Only the maker of an unlawful call or sender of an unlawful text message can be held directly
6  liable under the TCPA.  *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1084 (C.D. Cal. 2012).
7  Here, it is uncontested that AC Referral, not LeadPile, was the sender of the Text Message.  Therefore,
8  LeadPile cannot be held directly liable for any purported violation of the TCPA.  Accordingly, the
9  Court should dispose of any claim of direct liability against LeadPile by granting summary judgment
10 on such claims in LeadPile's favor.

11 **C.  LeadPile Cannot Be Held Vicariously Liable for a Violation of the TCPA[4]**

12      Plaintiff's entire case rests on the theory of vicarious liability.  The TCPA is silent as
13 to vicarious liability.  However, the Ninth Circuit recently adopted the view that a party can
14 be vicariously liable under the TCPA if an agency relationship, as defined by federal common
15 law, is established between a defendant and a third-party caller.  *See Gomez v. Campbell-*
16 *Ewald Co.*, No. 13-55486, 2014 WL 4654478, at *5 (9th Cir. Sept. 19, 2014) (citations
17 omitted).  The Ninth Circuit relied on a 2013 FCC Order, which found that a third-party may
18 be liable under the TCPA for acts of another under the established agency principles of formal
19 agency, apparent authority, and ratification.  *In the Matter of the Joint Petition Filed by Dish*
20 *Network, LLC, the United States of Am., & the States of Cal., Ill., N.C., & Ohio for*

21
22
23 _____
24
25 [3] LeadPile incorporates herein all arguments, allegations of fact, and recitations of legal authority set forth in the
   Motion(s) for Summary Judgment, and the supporting briefs for each, filed by Credit Payment Services, Inc.,
26 f/k/a MyCashNow.com, Inc., Enova International, Inc., and Pioneer Financial Services, Inc., to the extent they
   relate to the issue of direct liability, as if fully set forth herein.
27
28 [4] LeadPile incorporates herein all arguments, allegations of fact, and recitations of legal authority set forth in the
   Motion(s) for Summary Judgment, and the supporting briefs for each, filed by Credit Payment Services, Inc.,
   f/k/a MyCashNow.com, Inc., Enova International, Inc., and Pioneer Financial Services, Inc., to the extent they
   relate to the issue of vicarious liability, as if fully set forth herein.

*Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules,* 28 F.C.C.R. 6574, 6586-87 (2013) ("2013 FCC Ruling").

In evaluating whether a defendant can be vicariously liable under the federal common law of agency, courts look to the Restatement of Agency.  *See Doe I v. Unocal Corp.*, 395 F.3d 932, 972 (9th Cir. 2002) ("The general principles of the federal common law of agency have been formulated largely based on the Restatement of Agency."); *see also Kristensen v. Credit Payment Services*, No. 2:12-CV-528-APG, 2014 WL 1256035, at *8 (D. Nev. Mar. 26, 2014) (citing Restatement (Third) of Agency regarding vicarious liability under the TCPA).

As demonstrated below, LeadPile cannot be held vicariously liable for another entity's violation of the TCPA under any of the established theories of vicarious liability – formal agency, apparent authority, or ratification.

1.  There Is No Formal Agency Relationship Between LeadPile and AC Referral or 360 Data.

Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.  Restatement (Third) Of Agency § 1.01 (2006).  An agent is one who "act[s] on the principal's behalf and subject to the principal's control." *United States v. Bonds*, 608 F.3d 495, 506 (9th Cir. 2010), citing Restatement (Third) Of Agency § 1.01.

In *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079 (C.D. Cal. 2012) *aff'd*, 12-56458, 2014 WL 2959160 (9th Cir. July 2, 2014), the district court found that to succeed on a vicarious liability theory, a plaintiff must demonstrate that the entities directly involved in sending the text message acted as an agent of Taco Bell, *i.e.*, that Taco Bell "controlled or had the right to control them and, more specifically, the manner and means of the text message campaign they conducted." *Id.* at 1084-85, citing *United States v. Bonds,* 608 F.3d 495, 506

15

(9th Cir. 2010); *Klee v. United States,* 53 F.2d 58, 61 (9th Cir.1931) ("Agency means more than mere passive permission; it involves request, instruction, or command.").  The court in *Taco Bell* found that the plaintiff failed to meet that burden and granted summary judgment in favor of the defendant, Taco Bell Corp.  In particular, the court thought the following facts were conclusive of the issue:  (1) the plaintiff did not present any evidence that Taco Bell "directed or supervised the manner and means of the text message campaign" that was conducted by the other entities; (2) the plaintiff did not present any evidence that Taco Bell "created or developed the text message"; and (3) the plaintiff did not present any evidence that Taco Bell "played any role in the decision to distribute the message by way of a blast text." *Taco Bell*, 879 F. Supp. 2d at 1085.

The circumstances and available evidence in this case track that found to be case-dispositive in *Taco Bell*.  Here, like in *Taco Bell*, Plaintiff cannot present any evidence that LeadPile "directed or supervised the manner and means of the text message campaign" conducted by AC Referral.  Neither can Plaintiff present any evidence that LeadPile "created or developed" the Text Message.  Lastly, Plaintiff cannot present any evidence that LeadPile "played any role in the decision to distribute the [Text Message] by way of a blast text." Indeed, the facts here do not even rise to the level of "mere approval and funds administration," which would still be insufficient to raise a question of fact as to agency.  *See Thomas*, 879 F. Supp. 2d at 1086 ("knowledge, approval, and fund administration do not amount to controlling the manner and means of the text message campaign").

Courts in other districts are in accord. *See, e.g., Keating v. Peterson's Nelnet, LLC*, No. 1:11 CV 1775, 2014 WL 1891369, at *5 (N.D. Ohio May 12, 2014) (stating that "a plaintiff must show that the actual caller…acted as an agent of the defendant and that the defendant controlled or had the right to control them and the manner and means of the text

1   messaging campaign they conducted"); *Mey v. Pinnacle Security, LLC,* No. No. 5:11 CV 47,

2   2012 WL 4009718, at *5 (N.D. W. Va. Sept. 12, 2012) (granting summary judgment in favor

3   of the defendant, Pinnacle, because the plaintiff "presented no evidence to suggest that

4   Pinnacle ha[d] control over the means and manner by which its lead generators place[d]

5   calls").

6

7           Evidence of LeadPile's clear lack of control over Click Media and AC Referral can be

8   found in the lead data, which was broken down by Lisa Snow, an expert witness retained by

9   the defendants in this matter, makes it clear that AC Referral ran the promotions, and

10  LeadPile had no say as to which leads were directed to its marketplace.  Indeed, of tens of

11  thousands of text message recipients, at least 3,370 class members somehow made it to a

12  Click Media-operated website.  Of those, only 212 class members made it to LeadPile's

13  website.  If LeadPile were able to exercise so much control as to direct the content of a text

14  message or the manner in which it is transmitted, one would think that LeadPile would use

15  that control to direct a larger percentage of leads to its marketplace.  Not only does this data

16  support a finding that LeadPile did not have any actual authority over any of the other

17  defendants or non-parties to this case, but it also raises significant questions as to the

18  appropriateness of the class as a whole.

19

20          Nevertheless, the undisputed facts of this case are similar to those found in *Keating*

21  and *Mey*.  Here, as in both *Keating* and *Mey*, LeadPile did not have the requisite control over

22  AC Referral, the entity that sent the Text Message.  Accordingly, Plaintiff cannot establish a

23  formal agency relationship between LeadPile and AC Referral.

24          2.   Absent An Agency Relationship, There Is No Actual Authority.

25          "Actual authority consists of powers which a principal directly confers upon an agent,

26  as well as those the principal causes or permits the agent to believe he or she possess . . . . "

*In re Fresh & Process Potatoes Antitrust Litig.,* 834 F. Supp. 2d 1141, 1167–68 (D. Idaho 2011), citing 2A C.J.S. *Agency* § 133; Restatement (Third) of Agency § 2.01 (2006).  *See also Keating v. Peterson's Nelnet, LLC,* No. 1:11 CV 1775, 2014 WL 1891369, at *5 (N.D. Ohio May 12, 2014) ("A principal may be vicariously liable for an agent's tortious conduct if the agent had actual authority from the principal for the conduct.") (citing *Jones v. Federated Fin. Reserve Corp.,* 144 F.3d 961, 965 (6th Cir. 1998)).  If actual authority consists of powers a principal confers upon its agent, then the existence of an agency relationship is obviously a prerequisite to a finding of actual authority.  Stated another way, where, as here, there is no agency relationship, and therefore neither a principal nor an agent, there can be no actual authority conferred by a principal upon its agent.  There is no agency relationship between LeadPile and AC Referral.  Therefore, LeadPile could not have conferred actual authority upon AC Referral.

   3. <u>There Is No Apparent Authority.</u>

   Apparent authority focuses on third parties.  It arises when a third party reasonably believes that the putative agent had authority to act on behalf of the principal and that belief can be traced to the principal's own manifestations.  *In re Fresh & Process Potatoes Antitrust Litig.,* 834 F.Supp.2d 1141, 1167–68 (D. Idaho 2011) (citing 2A C.J.S. *Agency* § 133; Restatement (Third) of Agency § 2.01 (2006)); *see also Palm Beach Golf Ctr.–Boca, Inc. v. Sarris,* No. 12-80178, 2013 WL 5972173, at *10 (S.D. Fla. 2013) ("The Restatement forthrightly provides that '[a]pparent authority is not present when a third party [Plaintiff] believes that an interaction is with an actor who is a principal.'") (quoting Restatement (Third) of Agency § 2.03(f)) (alteration in original).  Apparent authority can only "be established by proof of something said or done by the [alleged principal], on which [the

plaintiff] reasonably relied."  *NLRB v. Dist. Council of Iron Workers of Cal. & Vicinity*, 124 F.3d 1094, 1099 (9th Cir. 1997).

Here, there is no evidence that LeadPile said or did anything on which Plaintiff reasonably relied.   And there are no facts that could lead a reasonable juror to find that Plaintiff believed any entity was acting on LeadPile's behalf.  *See Avio, Inc.*, 2014 WL 1870108, at **12-13 (rejecting plaintiff's argument regarding apparent agency because there were no facts establishing that the plaintiff believed that the entity that actually sent the faxes "was acting on" the defendants' behalf).  Indeed, the Text Message does not identify LeadPile and Plaintiff did not click on the website identified in the Text Message.  In fact, Plaintiff admits that he has no independent knowledge or understanding as to why amended his complaint, which included LeadPile as a defendant for the first time.

Moreover, the content of the Text Message further demonstrates Plaintiff had no basis to believe that the Text Message was sent on LeadPile's behalf.  First, the Text Message, which AC Referral drafted and sent, contained a link to  www.Lend5k.com.  The purpose of www.Lend5k.com was to be a forwarding domain that could be attached to any offer.  It is undisputed that AC Referral purchased, used and controlled www.Lend5k.com.  Mr. Gee never gave anyone else permission to use www.Lend5k.com.

Second, the text contained loan terms.  LeadPile does not offer loans of any kind. This, coupled with the fact that LeadPile has no connection to the website link contained in the Text Message, clearly establishes that LeadPile had nothing to do with the Text Message and did not say or do anything on which Plaintiff relied.  Thus, Plaintiff's theory of vicarious liability by virtue of apparent authority fails.

1

        4.   <u>There Is No Ratification.</u>

2

        The 2013 FCC Ruling recognized that an agency relationship could arise by

3

ratification.   28 F.C.C.R. at 6587.   "[A] seller may be liable for the acts of another under

4

traditional agency principles if it ratifies those acts by knowingly accepting their benefits."

5

*Id.*, citing Restatement (Third) of Agency § 4.01.   "A person ratifies an act by (a) manifesting

6

assent that the act shall affect the person's legal relations, or (b) conduct that justifies a

7

reasonable assumption that the person so consents."   Restatement (Third) of Agency §

8

4.01(b).

9

        First, there can be no ratification here because, as shown above, there is no principal-

10

agent relationship between LeadPile and AC Referral.   "Although a principal is liable when it

11

ratifies an originally unauthorized tort, the principal-agent relationship is still a requisite, and

12

ratification can have no meaning without it."   *Batzel v. Smith,* 333 F.3d 1018, 1036 (9th Cir.

13

2003) (footnote omitted).

14

        Additionally, even if a principal-agent relationship did exist (which it clearly did not

15

and in which case any unauthorized text message would have been outside of the scope of AC

16

Referral's services), ratification still cannot be established because LeadPile did not

17

contemporaneously know of AC Referral's text message campaign, much less the true nature

18

thereof.   Therefore, even if a benefit was accepted, it could not have been *knowingly* accepted

19

because LeadPile did not have full knowledge of the material facts.   In order for ratification to

20

apply, LeadPile must have knowingly accepted the benefit of an otherwise unauthorized

21

action.

22

23

24

25

26

27

28

**D. Plaintiff Cannot Establish That The Equipment AC Referral Used to Send the Text Message Was Not an ATDS Under the TCPA[5]**

In order for Plaintiff to prevail in this case, he must establish that AC Referral sent the Text Message using an ATDS. *Meyer*, 707 F.3d at 1043.  In order for a system to qualify as an ATDS system, it must either have "the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers," 47 U.S.C. § 227(a)(1), or is a predictive dialer with the capacity to dial telephone numbers from a list without human intervention.  *In the Matter of Rules & Regulations Implementing the TCPA of 1991*, 23 F.C.C.R. 559, 566 ¶ 14 (Jan. 4, 2008) ("2008 FCC Ruling").  "[T]he capacity to dial numbers without human intervention is the most significant feature of an ATDS."  *In the Matter of Rules & Regulations Implementing the TCPA of 1991*, 18 F.C.C.R. 14014, 14092 (June 26, 2003) ("2003 FCC Ruling"); *Meyer*, 707 F.3d at 1043.

1. AC Referral's Equipment Lacked "the Capacity to Store or Produce Telephone Numbers to be Called, Using a Random or Sequential Number Generator"

"When evaluating the issue of whether equipment is an ATDS, the statute's clear language mandates that the focus must be on whether the equipment has the *capacity* 'to store or produce telephone numbers to be called, using a random or sequential number generator.'" *Gragg v. Orange Cab Co. Inc.*, 995 F. Supp. 2d 1189, 1192 (W.D. Wash. 2014) (quoting *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009).  Thus, "a system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it." *Id.*  However, in determining whether equipment is an ATDS, it is imperative that the Court look at whether the system's present,

---

[5] LeadPile incorporates herein all arguments, allegations of fact, and recitations of legal authority set forth in the Motion(s) for Summary Judgment, and the supporting briefs for each, filed by Credit Payment Services, Inc., f/k/a MyCashNow, Inc., Enova International, Inc., and Pioneer Financial Services, Inc., to the extent they relate to the issue of whether AC Referral used an ATDS to transmit the Text Message, as if fully set forth herein.

not potential, capacity allows it to store, produce, or call randomly or sequentially generated telephone numbers. *Gragg*, 995 F. Supp. 2d at 1193.

In *Gragg*, a consumer brought action against Orange Cab Company, Inc. ("Orange Cab"), alleging violations of the Telephone Consumer Protection Act. *Id.* at 1189. Orange Cab moved for summary judgment on the grounds that the text messaging system it used to communicate its cab dispatches to customers ("TaxiMagic") was not an ATDS. *Id.* at 1190. In opposition to Orange Cab's motion, the plaintiff urged the court to rule that the modem utilized by Orange Cab to operate TaxiMagic was the "system" as envisioned by the court in *Satterfield*. *Id.* at 1192. Under the plaintiff's interpretation, because the modem had "the ability to both store multiple telephone numbers in an address book and transmit a mass text message to those numbers, it would be an ATDS under the TCPA." *Id.* The court declined to adopt the plaintiff's interpretation of "system" stating that to do so would lead to an absurd result:

> Adopting plaintiff's broad interpretation that any technology with the potential capacity to store or produce and call telephone numbers using a random number generator constitutes an ATDS would capture many of contemporary society's most common technological devices within the statutory definition.

*Id.* at 1192-93 (citing *Hunt v. 21st Mortg. Corp.*, No. 2:12-cv-2697, 2013 WL 5230061, at *4 (N.D. Ala. Sept. 17, 2013). The court in *Hunt* similarly noted that an interpretation based on a system's <u>potential</u> capacity would subject all iPhone owners to the rules and regulations of the TCPA. *Hunt*, 2013 WL 5230061, at *4.

In order for AC Referral's system to constitute an ATDS, it must, at the time the Text Message was transmitted, the actual capacity to "store, produce, or call randomly or sequentially generated telephone numbers." *Satterfield*, 569 F.3d at 951. Plaintiff is unable to produce any evidence that AC Referral's system has the capacity to randomly or sequentially generate telephone number to be stored, produced, or called. "'Random number

generation' means random sequences of 10 digits, and 'sequential number generation' means (for example) (111) 111-1111, (111) 111-1112, and so on."  *Gragg*, 995 F. Supp. 2d at 1193 (quoting *Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723, 725 (N.D. Ill. 2011)).  As Mr. Gee testified at his deposition, AC Referral's equipment did not randomly, or sequentially, generate phone numbers:

> Q.   Next I would like to ask you about the transmission of text messages, specifically the software and hardware that you would work with to transmit the text messages.
>
> Did the hardware and software produce phone numbers randomly?
>
> A.   No.
>
> Q.   Did it have the capacity to produce numbers randomly?
>
> A.   No.
>
> Q.   Did the hardware and software produce numbers sequentially?
>
> A.   No.
>
> Q.   Did it have the capacity to produce phone numbers sequentially?
>
> A.   No.
>
> Q.   Did the software and hardware store or produce phone numbers?
>
> A.   No.
>
> Q.   Did it have the capacity to store or produce phone numbers?
>
> A.   No.
>
> Q.   What level of human intervention was involved with the software and hardware?
>
> A.   No number could be entered through the software unless it was human intervention and a human added the file, the numbers, into the software.

Q.      So a human had to go in –

A.      A human had to add the information in.

[Collins Decl., Ex. 3, Gee Dep., at 130:13-25; 131:1-18.]   In this manner, the "human interaction" required in order for AC Referral's equipment to transmit any text messages is equal to, if not in excess of, that required by the TaxiMagic system discussed in *Gragg*. *Gragg*, 995 F. Supp. 2d at 1191 (finding that the TaxiMagic system did not constitute an ATDS under the TCPA).

Plaintiff can provide no evidence that the equipment AC Referral used to transmit the Text Message had the capacity, at the time the Text Message was transmitted, to "autonomously randomly or sequentially generate numbers to be dialed as required to fulfill the statutory definition of an ATDS."   *Gragg*, 995 F. Supp. 2d at 1193.   Moreover, the testimony of James Gee directly refutes any position to the contrary.   The Court should therefore find that the equipment AC Referral used to transmit the Text Message does not constitute an ATDS under the statute.

2.   AC Referral's Equipment Was Not a Predictive Dialer

In its 2008 FCC Ruling, the FCC acknowledged that the teleservices industry was changing which required the FCC to rule that predictive dialers are also subject to the TCPA's restriction on autodialers.   "2008 FCC Ruling" at 566 ¶ 14.   The "basic function of [a predictive dialer] … [is] the capacity to dial [lists of] numbers without human intervention." *Id.*; *see also Soppet v. Enhanced Recovery Co.*, 679 F.3d 637, 638-39 (7th Cir. 2012) (noting that an essential characteristic of a predictive dialer is the ability to work autonomously).

The equipment AC Referral used to transmit the Text Message does not operate as a predictive dialer.   In order for AC Referral's equipment to transmit a text message, an operator must first key in the phone numbers to which the text messages will be transmitted.

The operator must then hit "send" before any text message will be transmitted through the equipment. Even then, the operator's intervention was still required. After the operator would press send, he or she would have to monitor the program to ensure that no errors in transmission occurred. If an error occurred, the operator had to intervene and correct the error before the text message would be sent. This level of required intervention surpasses that for the TaxiMagic system discussed in *Gragg*. *Gragg*, 995 F. Supp. 2d at 1191.

AC Referral's equipment was clearly not autonomous. Therefore, as Mr. Gee's testimony confirms, the equipment did not constitute a predictive dialer:

> Q.    What level of human intervention was involved with the software and hardware?
>
> A.    No number could be entered through the software unless it was human intervention and a human added the file, the numbers, into the software.
>
> Q.    So a human had to go in –
>
> A.    A human had to add the information in.
>
> Q.    Was predictive dialing used?
>
> A.    I don't know what that is.
>
> Q.    Any sort of algorithms used?
>
> A.    No.
>
> Q.    Was the internet used?
>
> A.    No.

[Collins Decl., Ex. 3, Gee Dep. 131:10-24.]

Because the use of an ATDS to transmit the Text Message is an essential element of Plaintiff's TCPA claim, his inability to prove that element is fatal to his claims. *See Meyer*, 707 F.3d at 1043 (stating that the use of an ATDS is an essential element of a TCPA claim); *see also, Celotex*, 477 U.S. at 322 (stating that summary judgment is warranted where a party

cannot establish an essential element of his claim).  Therefore, summary judgment should be granted in favor of LeadPile.

**E.  Plaintiff Cannot Establish That The Text Message Was Sent Without His Consent[6]**

The third essential element of Plaintiff's claim is that the Text Message was sent without his consent to receive it.  Non-party discovery has already unearthed reliable and convincing testimony stating that a vast majority, if not all, of the recipients of AC Referral's text messages consented to receive them.  Indeed, representatives of both AC Referral and 360 Data testified that the recipients of any text messages first consented to receive the promotion.  AC Referral only sent text messages to individuals who appeared on a list provided by 360 Data.  360 Data only received the information on that list from list owners and data brokers who had detailed opt-in information including, the date of consent, the name of the individual, the individual's IP address, and the website through which consent was obtained.  Moreover, 360 Data and AC Referral took independent precautions, including checking information against suppression lists and using each potential recipient list only once.

The only evidence Plaintiff has offered to refute this testimony is his own uninvestigated, self-serving claim that he has never, under any circumstances, consented to receiving a single solicitation.  This is patently unreliable and, in the face of the evidence to the contrary, should not be permitted to create a genuine factual dispute.  Furthermore, Plaintiff has admitted to receiving between 15 and 20 promotional text messages.  For a

---

[6] LeadPile incorporates herein all arguments, allegations of fact, and recitations of legal authority set forth in the Motion(s) for Summary Judgment, and the supporting briefs for each, filed by Credit Payment Services, Inc., f/k/a MyCashNow.com, Inc., Enova International, Inc., and Pioneer Financial Services, Inc., to the extent they relate to the issue of Plaintiff's consent to receive the Text Message, as if fully set forth herein.

consumer who never opts-in to a promotion, that number seems rather high.  Then, there is the most troubling aspect of Plaintiff's argument regarding his consent.

It has become clear that Plaintiff spoliated relevant evidence that could have been pivotal to disproving Plaintiff's theory regarding his consent.  What is worse, Plaintiff's spoliation occurred almost immediately after retaining his current counsel and after they had an opportunity to review some of the spoliated evidence.  Plaintiff, by virtue of his egregious conduct in willfully spoliating relevant evidence he was under a duty to preserve, should no longer be permitted to defend the issue of consent, especially as it is based on nothing more than his unsubstantiated, self-serving testimony.

Further, should the Court decide to address LeadPile's Motion for Terminating Sanctions, or, Alternatively, Motion for Adverse Inference for Plaintiff's Spoliation, filed concurrently herewith, then it should also take note that courts are permitted to consider the effects of an adverse inference instruction when ruling on a motion for summary judgment. *See United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) ("To determine if the district court erred in dismissing [Plaintiff's] action on summary judgment, we must first resolve whether [Plaintiff] posits a successful spoliation argument.  Showing evidence of spoliation of the claim documents by the [Plaintiff] would allow [Defendants] to argue to the jury adverse inferences or fraud that might be sufficient to defeat summary judgment.").

## V.  <u>CONCLUSION</u>

Plaintiff cannot establish essential elements of his TCPA claim.  First, he cannot establish that LeadPile is either directly or vicariously liable for any violation of the TCPA.  Second, he cannot establish that an ATDS was used to transmit the Text Message.  Finally, he cannot establish enough facts regarding his consent to refute the evidence LeadPile has

already compiled.  Further, Plaintiff has engaged in willful spoliation of relevant documents that were potentially pivotal to the issue of his consent.  For that reason alone, this case should be dismissed, or, at the very least, an adverse inference instruction should be given regarding the would-be effect of that evidence.  Most importantly, however, the public policy considerations here are immense.  To find that Plaintiff's scant evidentiary support can defeat LeadPile's summary judgment motion would be tantamount to stating that any company that outsources certain business activities to a third-party that, through its normal business operations that are either wholly or in part entirely unrelated to the services which it was contracted to perform violated some law, such as the TCPA, that contracting company can be forced to endure over two and half years of painstaking liability revolving around nothing more than a bold assertion of vicarious liability.  That is an inequitable result, and it would be no different here.

Accordingly, LeadPile requests that this Court grant its Motion for Summary Judgment and dismiss Plaintiff's claim against LeadPile in its entirety.


Respectfully submitted,

DATED:  October 24, 2014                **HUSCH BLACKWELL LLP**


By:     */s/K. Chris Collins*
       Ryan W. Mitchem (TN #022196)
       Michael K. Alston (TN #013697)
       K. Chris Collins (TN #029109)
       736 Georgia Avenue, Suite 300
       Chattanooga, Tennessee 37402

       Patricia Lee (NV #8287)
       Joseph R. Ganley (NV #5643)
       Peccole Professional Park
       10080 West Alta Drive, Suite 200
       Las Vegas, Nevada 89145

       *Attorneys for Defendant LeadPile LLC*

1

## <u>CERTIFICATE OF SERVICE</u>

2

Pursuant to FRCP 5(b), I certify that on this 24th day of October, 2014, I caused the

3

above and foregoing document entitled **LEADPILE'S MOTION FOR TERMINATING**

4

5

**SANCTIONS   OR,   ALTERNATIVELY,   EVIDENTIARY   SANCTIONS   FOR**

6

**INTENTIONAL   SPOLIATION    OF EVIDENCE; MEMORANDUM   OF POINTS**

7

**AND AUTHORITIES** to be served as follows:

8

9

    [   ]    by placing same to be deposited for mailing in the United States Mail, in
                  a sealed envelope upon which first class postage was prepaid in Las Vegas,

10

                  Nevada; and/or

11

    [ X ]    Pursuant to Fed. R. Civ. P. 5(b) and Section IV of District of Nevada

12

                  Electronic Filing Procedures, to be served **via electronic service**; or

13

    [   ]    to be sent via e-mail;

14

15

    [   ]    to be sent via facsimile; and/or

16

    [   ]    to be hand-delivered

17

to all attorneys of record according to the Court's CM/ECF system.

18

19

20

                                   *s/K. Chris Collins*

21

22

23

24

25

26

27

28