John Benedict, Esq. (Nevada Bar No. 005581)
LAW OFFICES OF JOHN BENEDICT
2190 E. Pebble Road, Suite 260
Las Vegas, Nevada 89123
Telephone: (702) 333-3770
Facsimile: (702) 361-3685
Email: john.benedict.esq@gmail.com

Ryan D. Andrews (*pro hac vice*)
randrews@edelson.com
Rafey S. Balabanian (*pro hac vice*)
rbalabanian@edelson.com
John C. Ochoa (*pro hac vice*)
jochoa@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiff Flemming Kristensen and the Class*

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| FLEMMING KRISTENSEN, individually and on behalf of a class of similarly situated individuals, <br><br> Plaintiff, <br><br> v. <br><br> CREDIT PAYMENT SERVICES INC., a Nevada corporation, f/k/a MYCASHNOW.COM INC., ENOVA INTERNATIONAL, INC., an Illinois corporation, PIONEER FINANCIAL SERVICES, INC., a Missouri corporation, LEADPILE LLC, a Delaware limited liability company, and CLICKMEDIA LLC d/b/a NET1PROMOTIONS LLC, a Georgia limited liability company, <br><br> Defendants. | Case No. 2:12-CV-00528-APG-PAL <br><br> CLASS ACTION <br><br> **PLAINTIFF'S PARTIAL CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** <br><br> Hon. Andrew P. Gordon <br><br> Magistrate: Hon. Peggy A. Leen |

1    Plaintiff FLEMMING KRISTENSEN, by and through his undersigned counsel, files this

2    *Partial Consolidated Response to Defendants' Motions for Summary Judgment* pursuant to Federal

3    Rule of Civil Procedure 56.

4

5

6    Dated:  November 17, 2014          Respectfully submitted,

7                                      FLEMMING KRISTENSEN, individually and on
                                       behalf of a Class of similarly situated individuals

8                                      By: s/ John C. Ochoa
9                                          One of Plaintiff's Attorneys

10                                     John Benedict, Esq. (Nevada Bar No. 005581)
                                       LAW OFFICES OF JOHN BENEDICT
11                                     2190 E. Pebble Road, Suite 260
                                       Las Vegas, Nevada 89123
12                                     Telephone: (702) 333-3770
                                       Facsimile: (702) 361-3685
13                                     Email: john.benedict.esq@gmail.com

14                                     Ryan D. Andrews (*pro hac vice*)
15                                     randrews@edelson.com
                                       Rafey S. Balabanian (*pro hac vice*)
16                                     rbalabanian@edelson.com
                                       John C. Ochoa (*pro hac vice*)
17                                     jochoa@edelson.com
                                       EDELSON PC
18                                     350 North LaSalle Street, Suite 1300
                                       Chicago, Illinois 60654
19                                     Tel: 312.589.6370
                                       Fax: 312.589.6378
20

21

22                                     *Counsel for Plaintiff Flemming Kristensen
                                       and the Class*

23

24

25

26

27

28

# TABLE OF CONTENTS

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................................ 2

LEGAL STANDARD ............................................................................................................ 5

ARGUMENT ......................................................................................................................... 6

I.      THE EQUIPMENT USED TO SEND THE TEXT MESSAGES WAS AN ATDS. ........... 6

      A.    The FCC Has Repeatedly Ruled that Equipment that Dials a List of Numbers Is an ATDS. ....................................................................................................................... 7

      B.    The TCPA's Text, Legislative History, and Interpretative Case Law all Support the FCC's Rulings. ..................................................................................................... 9

            1.    The FCC's rulings are consistent with the TCPA's language. ..................... 9

            2.    The congressional intent underpinning the TCPA supports the FCC's rulings. ................................................................................................................ 11

            3.    Case law supports the FCC's rulings. ........................................................... 11

      C.    This Court Must Defer to the FCC's Rulings. ........................................................ 13

      D.    Even if Equipment Must Have the Capacity to Generate Random or Sequential Numbers, the Equipment Here Had that Capacity. ................................................. 14

II.     CLASS MEMBERS DID NOT CONSENT TO RECEIVE THE TEXT MESSAGES...... 17

CONCLUSION ................................................................................................................... 19

# TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Barnhart v. Thomas*,
    540 U.S. 20 (2003)................................................................................................. 10

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................................... 6, 19

*Decker v. Nw. Envtl. Def. Ctr.*,
    133 S. Ct. 1326 (2013)........................................................................................ 10

*Duncan v. Walker*,
    533 U.S. 167 (2001)........................................................................................... 10

*Mims v. Arrow Fin. Servs. LLC*,
    132 S. Ct. 740 (2012.......................................................................................... 11

*United States v. Mead Corp.*,
    533 U.S. 218 (2001)........................................................................................... 14


**United States Court of Appeals Cases**

*CD Design, Ltd. v. Prism Bus. Media, Inc.*,
    606 F.3d 443 (7th Cir. 2010) ............................................................................ 13

*Gomez v. Campbell-Ewald Co.*,
    768 F.3d 871 (9th Cir. 2014) ............................................................................ 14

*Grant v. Capital Mgmt. Servs., L.P.*,
    449 Fed. App'x 598 (9th Cir. 2011) ................................................................. 17

*Kassbaum v. Steppenwolf Prods., Inc.*,
    236 F.3d 487 (9th Cir. 2000) .............................................................................. 6

*Kennedy v. Applause, Inc.*,
    90 F.3d 1477 (9th Cir. 1996) ............................................................................. 9

*Meyer v. Portfolio Recovery Assocs., LLC*,
    707 F.3d 1036 (9th Cir. 2012) .......................................................................... 12

*Satterfield v. Simon & Schuster, Inc.*,
    569 F.3d 946 (9th Cir. 2009) ...................................................................... passim

*United States v. Bari,*
   599 F.3d 176 (2d Cir. 2010)............................................................................................. 16

*Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.,*
   401 F.3d 876 (8th Cir. 2005) ......................................................................................... 16

**United States District Court Cases**

*Baird v. Sabre, Inc.,*
   995 F. Supp. 2d 1100 (C.D. Cal. 2014) ......................................................................... 14

*Bates v. Dollar Loan Ctr., LLC,*
   No. 2:13-CV-1731-KJD-CWH, 2014 WL 3516260 (D. Nev. July 15, 2014).................... 11

*Breslow v. Wells Fargo Bank, N.A.,*
   857 F. Supp. 2d 1316 (S.D. Fla. 2012) .......................................................................... 16

*Brewington v. State Farm Mut. Auto. Ins. Co.,*
   No. 3:13-CV-0400-LRH-VPC, 2014 WL 4569507 (D. Nev. Sept. 16, 2014) ..................... 5

*Fields v. Mobile Messengers Am., Inc.,*
   12-cv-05160, 2013 WL 6774076 (N.D. Cal. Dec. 23, 2013) ............................................ 12

*Gragg v. Orange Cab Co.,*
   995 F. Supp. 2d 1189 (W.D. Wash. 2014)........................................................................ 12

*In re Jiffy Lube Int'l Inc., Text Spam Litig.,*
   847 F. Supp. 2d 1253 (S.D. Cal. 2012).......................................................................... 11

*Jacobs v. Clark Cnty. Sch. Dist.,*
   373 F. Supp. 2d 1162 (D. Nev. 2005)............................................................................... 5

*Lansmont Corp. v. SPX Corp.,*
   No. 5:10-cv-05860 EJD, 2012 WL 6096674 (N.D. Cal. Dec. 7, 2012)............................... 9

*Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC,*
   No. 13 C 4664, 2014 WL 3368893 (N.D. Ill. July 8, 2014) ............................................ 15

*Martin v. Bureau of Collection Recovery,*
   No. 10 C 7725, 2011 WL 2311869 (N.D. Ill. June 13, 2011) ............................................ 19

*Moriarity v. Nationstar Mortg., LLC,*
   No. 1:13-cv-0855 AWI SMS, 2014 WL 801021 (N.D. Cal. Feb. 27, 2014)...................... 13

*Ray v. Continental Western Ins. Co.,*
   920 F. Supp. 1094 (D. Nev. 1996)................................................................................... 5

*Ryabyschuk v. Citibank (S.D.) N.A.*,
  No. 11-cv-1236-IEG (WVG), 2011 WL 5976239 (S.D. Cal. Nov. 28, 2011)................... 18

*Sterk v. Path, Inc.*,
  No. 13 C 2330, 2014 WL 2443785 (N.D. Ill. May 30, 2014) ............................... 12

*Toth v. Stephens and Michaels Assocs., Inc.*,
  No. 2:13-cv-00372-GMN-VCF, 2014 WL 5687418 (D. Nev. Nov. 4, 2014) ................... 17

*Vonslochteren v. Lee*,
  No. 3:12-cv-00663-MMD, 2014 WL 4064032 (D. Nev. Aug. 14, 2014) ........................... 5

*Wilderness Watch, Inc. v. Bureau of Land Mgmt.*,
  799 F. Supp. 2d 1172 (D. Nev. 2011) .................................................... 14


**Statutory Provisions & Rules**

28 U.S.C. § 2342 ........................................................................ 13

47 U.S.C. § 227 .................................................................... 6, 9, 17

Fed. R. Evid. 201 ....................................................................... 15


**Other Authorities**

David Kandie, *How to Generate One Million Random Phone Numbers Using Excel*, (June 24,
  2012),
  http://kipkanist.blogspot.com/2012/06/how-to-generate-one-million-random.html .......... 15

Dictionary.com,
  http://dictionary.reference.com/browse/voice (last visited Nov. 11, 2014)...................... 17

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,
  18 F.C.C. Rcd. 14041 (2003).................................................. 7, 8, 16, 17

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,
  23 F.C.C. Rcd. 559 (2008) ............................................................ 8

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,
  27 F.C.C. Rcd. 15391 (2012) .......................................................... 8

Microsoft Office Support, Move or copy a formula, *available at*
  http://office.microsoft.com/en-us/excel-help/move-or-copy-a-formula-
  HP010342704.aspx (last visited Nov. 13, 2014) .......................................... 15

National Park Service-Lake Mead National Recreation Area, *Threats Research and Monitoring on the Invasive Species Sahara Mustard (*Brassica tournefortii*), available at* http://www.clarkcountynv.gov/Depts/dcp/Documents/Library/dcp%20reports/2012/Sahara_Mustard_Control_Research_2005-NPS-532_final_rpt.pdf (last visited Nov. 13, 2014) ............................................................................................................... 15

S. Rep. 102-178 (1991).............................................................................................................. 11

UNLV Graduate & Professional Student Association, *Scholarship Application*, *available at* http://www.unlv.edu/sites/default/files/24/GPSA-ScholarshipApp.pdf (last visited Nov. 13, 2014) ............................................................................................................... 15

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2  Through a series of inter-related agency relationships, AC Referral Systems LLC ("AC

3 Referral") sent the following text message advertisement to millions of cellular phones—including

4 those belonging to Plaintiff Flemming Kristensen ("Plaintiff") and the certified class of nearly

5 100,000 consumers—encouraging them to apply for short-term "payday" loans:

6       Do You Need up to $5000

7      Today? Easy Quick and All Online
        at: www.lend5k.com
       24 Month Repay, All Cred. Ok

8        Reply STOP 2 End

9 (Declaration of James Gee ("Gee Decl.") ¶ 10, a true and accurate copy of which is attached hereto

10 as Exhibit 2.) The text messages were sent as part of a spam text message marketing campaign to

11 generate customers for various payday lenders, including Defendants Credit Payment Services,

12 Inc. ("CPS"), Enova International, Inc. ("Enova"), and Pioneer Financial Services, Inc.

13 ("Pioneer"). Sending this text message spam violated the Telephone Consumer Protection Act

14 ("TCPA"), 47 U.S.C. § 227, and Plaintiff, on behalf of a now-certified class of recipients of the

15 text messages, filed suit against CPS, Enova, Pioneer, and two middlemen companies that

16 facilitated the spam marketing campaign for the lenders, LeadPile LLC ("LeadPile") and

17 Net1Promotions LLC d/b/a Click Media ("Click Media") (collectively, "Defendants").

18  Four of the Defendants (all but Click Media) have separately moved for summary

19 judgment, claiming through a series of repetitive arguments: (1) that AC Referral did not use an

20 automatic telephone dialing system ("ATDS") as that term is defined in the TCPA, despite the fact

21 that the equipment automatically transmitted text messages at a rate of 3,000 to 9,000 *per day* from

22 a stored list of numbers, (2) that class members actually consented to receive the text messages

23 despite this Court having already rejected that argument, and (3) that Defendants are not liable for

24 AC Referral's sending of the text messages despite the existence of outstanding discovery on this

25 issue. While a motion to compel and other discovery remain outstanding with respect to the

26 question of Defendants' vicarious liability, and Plaintiff is thus unable to fully respond on that

27

28

issue,[1] the undisputed evidence establishes that Defendants are not entitled to summary judgment on whether an ATDS was used and their affirmative defense of consent. To the contrary, and as explained more fully below, the undisputed evidence shows that AC Referral *did* use an ATDS to make text message calls to cellular phones, and that class members *did not* consent to receive the text messages. Consequently, not only should Defendants' motions for summary judgment be denied, but summary judgment on these two issues should be entered in favor of Plaintiff.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

To obtain customers for their respective online, payday loan businesses, short-term lenders CPS, Enova, and Pioneer obtained qualified customers, or "leads," through LeadPile. (Deposition Transcript of Eugen Ilie ("Ilie Dep."), at 153:21-23, 28:25-29:3, 51:1-3, a true and accurate copy of which is attached as Exhibit A to the Declaration of John C. Ochoa ("Ochoa Decl."), which is attached hereto as Exhibit 1.) LeadPile coordinated the purchase of these leads through an online marketplace it hosted that connected lead sellers (such as Click Media) to lead buyers (such as the lender Defendants). (Ilie Dep. 21:9-18.) To generate these leads, Click Media entered into an agreement with AC Referral. (Gee Decl. ¶ 3). Pursuant to this agreement, AC Referral began transmitting text message advertisements to consumers directing them to websites controlled by Click Media that contained what appeared to be loan applications. (Gee Decl. ¶ 5; Ochoa Decl. Ex. B.)

To send the text messages, AC Referral used a hardware and software system consisting of (1) a Netbook laptop running a Microsoft Windows operating system, (2) computer software, including a program called "Data Doctor," Microsoft Sync, and Microsoft Excel, and (3) a cellular telephone with a T-Mobile SIM card. (Deposition Transcript of James Gee ("Gee Dep.") at 144:13-145:13; 152:2-153:23, a true and accurate copy of which attached to the Ochoa Decl. as Exhibit C). The cellular telephone was connected to the Netbook computer using a USB cable. (Gee Decl. ¶ 8.)

---

[1]     Accordingly, Plaintiff has concurrently filed a motion pursuant to Fed. R. Civ. P. 56(d).

AC Referral received lists of cell phone numbers from a company called 360 Data Management LLC ("360 Data"), which were provided in a Microsoft Excel spreadsheet. (Gee Decl. ¶ 9; Gee Dep. at 51:14-19.) These Excel lists of phone numbers were stored on the Netbook until AC Referral was ready to send text messages to those numbers. (Gee Dep. 117:24 – 118:6; 121:5-24.) James Gee, the principal and sole employee of AC Referral, testified that his normal practice would be to cut and paste the list of cell phone numbers into the Data Doctor software on the laptop. (Gee Dep. at 141:23-142:2.) He would cut and paste the entire list at once; he did not input each individual number into Data Doctor one by one. (Gee Dep. at 150:4-8.) After he pasted the list of numbers into Data Doctor, he would type a single text message into Data Doctor to be sent to every number on the list, and then press send. (Gee Dep. at 30:10-20, 149:8-14; 157:18-25.) Gee did not need to press the send button repeatedly to send the text message to each individual number; once he pressed send, the equipment would begin sending out the text messages to each number on the list automatically. (Gee Dep. at 149:20-150:3.) While Gee testified that occasionally he would check on the equipment to make sure it was still running, if no errors occurred the equipment would continue to send the text message to the list of numbers automatically without any further human intervention. (Gee Dep. at 150:9-152:1.) In his deposition, Gee summarized the process as follows:

> [Y]ou take the phone numbers and paste them into the one box [in the Data Doctor software], and you put the message into the other box, and then you hit the send button.

(Gee Dep. at 56:10-12.)

AC Referral used this equipment to send identical, prewritten text messages to cell phone numbers, including those belonging to Plaintiff and the Class, at a rate of 3,000 – 9,000 *per day*. (Ochoa Decl. ¶ 7; Gee Decl. ¶ 10.) While Gee stated that "[i]t was [his] understanding that the individuals who owned these cellular telephone numbers 'opted-in' to receive such text messages," (Gee Decl. ¶ 9), when asked how he knew that the individuals had consented to receive such messages, he testified that he assumed they had because that was what Michael Ferry, his contact at 360 Data who provided the cell phone lists, had told him. Specifically, Gee testified as follows:

> Q:     [H]ow do you know the people on the lists that Mr. Ferry provided to you were people who had opted in?

> A:     I had a very trusting relationship with Mike, and I know that was the case, and we never really had any complaints about it, so I assume, of course—he said these people opted in, and I said, okay, they opted in, and so I took his word for it.

> Q:     Just so I'm clear, your sole understanding of whether these people on these lists you got from him had opted in came from Mr. Ferry, correct?

> A:     That's correct.

(Gee Dep. at 24:3-16). Gee further testified that he didn't do anything himself to make sure that people on the phone lists had consented to receive text messages:

> Q: … I just want to make sure I'm clear. You didn't do anything yourself to check to make sure that people on the list you got from Mr. Ferry had opted in?

> A:     No.

(*Id.* at 24:17-21).

Ferry likewise did not personally obtain or confirm consent from the people on the phone lists he provided to Gee. He testified as follows:

> Q:     Do you have any … protocols or compliance programs in place to ensure that you, in fact, make sure that numbers you send on are proper numbers?

> A:     No, besides the fact that if someone ever complained, right, it's – you know, you can get into a lot of trouble.

> *          *          *

> Q:     [D]id you personally obtain opting [sic] information from consumers?

> A:     Did I obtain it --

> Q:     Yeah.

> A:     -- or did I get it?

> Q:     I'm asking if you obtained it.

> A:     No.

(Deposition Transcript of Michael Ferry ("Ferry Dep.") at 87:12-17, 115:12-18, a true and accurate copy of which is attached to the Ochoa Decl. as Exhibit D.)

On May 13, 2014, LeadPile issued a document subpoena to the Selling Source, which was Ferry's claimed "source" of the cellular telephone numbers that he gave to Gee for texting. (*See* Selling Source Subpoena, a true and accurate copy of which is attached to the Ochoa Decl. as

Exhibit 1-G.) According to Ferry, this is where the so-called "opt-in" information was obtained. (Ferry Dep. 103:23 – 104:2.) LeadPile's subpoena came up empty, as Selling Source did not produce anything, let alone information to corroborate Ferry's unfounded testimony that "opt-in" information was obtained from Plaintiff or any other class member to receive payday loan text messages. (Ochoa Decl. ¶ 8.) As such, Defendants have no credible evidence about where, when, or how any class member consented or what the language of the claimed consent was. In contrast, Plaintiff repeatedly testified that he never "opted in" or provided consent to receive any type of text message advertisements, including the text message here. (Deposition Transcript of Flemming Kristensen ("Kristensen Dep.") at 27:11-28:3, 44:4-7, a true and accurate copy of which is attached to the Ochoa Decl. as Exhibit E; Dkt. 113-2 ¶ 3.)

**LEGAL STANDARD**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jacobs v. Clark Cnty. Sch. Dist.*, 373 F. Supp. 2d 1162, 1169 (D. Nev. 2005) *aff'd*, 526 F.3d 419 (9th Cir. 2008). "To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact." *Brewington v. State Farm Mut. Auto. Ins. Co.*, No. 3:13-CV-0400-LRH-VPC, 2014 WL 4569507, *2 (D. Nev. Sept. 16, 2014). "When reasonable minds could differ on the material facts at issue … summary judgment is not appropriate." *Vonslochteren v. Lee*, No. 3:12-cv-00663-MMD, 2014 WL 4064032, at *1 (D. Nev. Aug. 14, 2014). In deciding a motion for summary judgment, the evidence must be read in the light most favorable to the non-moving party. *Ray v. Continental Western Ins. Co.*, 920 F. Supp. 1094, 1097 (D. Nev. 1996). Under Ninth Circuit and Supreme Court precedent, the Court may also grant summary judgment to the non-moving party if the record reveals no genuine

1  dispute of material fact. *Kassbaum v. Steppenwolf Prods., Inc.*, 236 F.3d 487, 494-95 (9th Cir.

2  2000); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).[2]

3  **ARGUMENT**

4  Under the TCPA it is unlawful "to make any call (other than a call made … with the prior

5  express consent of the called party) using any [ATDS] or an artificial or prerecorded voice … to

6  any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

7  Here it is undisputed that AC Referral sent text messages to consumers' cell phones, which

8  constitute "call[s]" covered by the TCPA. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946,

9  951-52 (9th Cir. 2009). In addition, as explained below, the undisputed evidence establishes that

10  the equipment used to send the text messages was an ATDS. Further, there is absolutely no

11  evidence that the Plaintiff or any class member consented to receive the text messages; in fact,

12  Plaintiff's testimony regarding his lack of consent has gone un-rebutted. Thus, because AC

13  Referral made calls for Defendants to class members' cell phones using an ATDS without their

14  consent, a violation of the TCPA has been established. Consequently, Defendants' motions for

15  summary judgment should be denied, and summary judgment should be granted in favor of

16  Plaintiff, leaving only the issue of Defendants' vicarious liability to be decided when they have

17  finally complied with their obligations to produce relevant evidence.

18  **I.      THE EQUIPMENT USED TO SEND THE TEXT MESSAGES WAS AN ATDS.**

19  The TCPA defines an ATDS as "equipment which has the capacity … to store or produce

20  telephone numbers to be called, using a random or sequential number generator; and … to dial

21  such numbers." 47 U.S.C. § 227(a)(1). Here, the undisputed facts establish that the equipment used

22  by AC Referral stored cell phone numbers to be called and dialed those numbers without any other

23  action. Specifically, James Gee testified that he copied and pasted stored lists of numbers from

24  Excel spreadsheets into the Data Doctor software on his laptop, and used a cell phone attached to

25  that laptop to send text messages to the numbers on those lists. Further, the undisputed evidence

26  _____

[2]      Plaintiff also intends to affirmatively move for summary judgment on all issues in a single
27  consolidated motion once Defendants have fully complied with their discovery obligations. *See*
dkt. 232.

28

shows that those text messages were sent at a rate of up to more than 9,000 per day. (Ochoa Decl. ¶ 7.) The FCC has repeatedly ruled that equipment such as this, which automatically dials a list of numbers without human intervention, falls within the statutory definition of ATDS even if the numbers are programmed into the equipment rather than randomly or sequentially generated. The FCC's orders are consistent with both the text and the legislative intent of the TCPA, and numerous courts have likewise held that such equipment constitutes an ATDS. Further, under any applicable principle of agency deference, these FCC rulings must be followed. In any event, even if random or sequential number generation capacity is required to constitute an ATDS, the equipment here undisputedly had that capacity.

A.    **The FCC Has Repeatedly Ruled that Equipment that Dials a List of Numbers Is an ATDS.**

In 2003 the FCC addressed whether equipment that, like the equipment used by AC Referral here, contains "hardware [that], when paired with certain software, has the capacity to store or produce numbers and dial those numbers" fell within the statutory definition of ATDS, even if the equipment used a list of numbers entered into it, rather than randomly or sequentially generated numbers. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C. Rcd. 14041, 14091-93 (2003) ("2003 FCC Order") . The FCC held that such equipment "falls within the meaning and statutory definition of [ATDS] and the intent of Congress." *Id.* at 14093. The equipment here is no different.

The FCC recognized that while "[i]n the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily … the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective." *Id.* at 14092. "The basic function of such equipment, however," stated the FCC, "has not changed—the capacity to dial numbers without human intervention." *Id.* (emphasis removed). The FCC noted that by enacting the TCPA, "Congress was attempting to alleviate a particular problem—an increasing number of automated and prerecorded calls to [among others, cell phone numbers]," and that to exclude autodialing equipment from the statutory definition of ATDS "simply because it relies on a given set of numbers would lead to an unintended result." *Id.* No

such unintended result was required, however, because "[t]he statutory definition of [ATDS] contemplates autodialing equipment that *either* stores *or* produces numbers." *Id.* at 14091-92 (emphasis added). Indeed, the purpose of the "store or produce" language in the statutory definition of ATDS was "to ensure that the prohibition on autodialed calls not be circumvented" by, for example, pairing an autodialer with a database of numbers rather than having the autodialer generate the numbers randomly or sequentially. *Id.* at 14092-93. That is exactly what the equipment used by AC Referral here does, and it thus clearly falls within the FCC's interpretation of ATDS.

While one Defendant argues that the equipment used here is not an ATDS because it did not randomly or sequentially generate phone numbers (dkt. 237, CPS Summary Judgment Br., at 7-9), that argument was expressly rejected by the FCC in 2008. Specifically, an industry trade group had argued to the FCC "that [equipment] meets the definition of autodialer only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists," exactly the argument CPS makes here. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 F.C.C. Rcd. 559, 566-67 (2008) ("2008 Order"). The FCC rejected that argument, finding that the industry trade group "raise[d] no new information … that warrant[ed] reconsideration of [the 2003 Order]." *Id.*

Finally, in 2012, the FCC once again reiterated that the definition of ATDS "covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated *or come from calling lists*." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 F.C.C. Rcd. 15391, 15392 n.5 (2012) ("2012 Order") (emphasis modified). The FCC went on to state that "[it] has, for example, concluded that the scope of [the ATDS] definition encompasses hardware that … has the capacity to store or produce numbers and dial those numbers at random, in sequential order, *or from a database of numbers*." *Id.* (emphasis added, internal quotations omitted).

Thus, under the FCC's repeated rulings, the equipment at issue here—which undisputedly dials lists of numbers without human intervention—falls within the TCPA's statutory definition of

an ATDS.

**B.     The TCPA's Text, Legislative History, and Interpretative Case Law all Support the FCC's Rulings.**

The FCC's repeated orders that that the statutory definition of ATDS encompasses equipment that dials numbers from a list rather than randomly or sequentially generated numbers is consistent with the TCPA's text and legislative history. Not surprisingly then, the overwhelming majority of courts throughout the country have likewise held that such equipment constitutes an ATDS.

**1.     The FCC's rulings are consistent with the TCPA's language.**

As noted above, the TCPA defines an ATDS as "equipment which has the capacity … to store or produce telephone numbers to be called, using a random or sequential number generator; and … to dial such numbers." 47 U.S.C. § 227(a)(1). Because the statutory definition uses the disjunctive "or," equipment need not "produce" numbers to be dialed if it can "store" a list of numbers to be dialed. Here, the undisputed facts establish that the equipment used by AC Referral stored numbers to be dialed because Gee received an electronic file containing a list of numbers to be called that he stored on his Netbook until he cut and pasted them into the Data Doctor software, which then interfaced with a cellular telephone via USB cable so the numbers could be dialed without any further human assistance. Thus each individual number was stored in the equipment (*i.e.*, the Netbook computer), from the time the list was pasted into the Data Doctor software to the time the equipment dialed the number, regardless of whether the Data Doctor software kept a log of all the cell phone numbers the system called.[3]

Further, where equipment stores a list of numbers to be called, it need not use a random or

---

[3]     While Gee, in his deposition, answered "[n]o" to the question "[d]id [the equipment] store or produce phone numbers," (Gee Dep. at 131:4-6), that conclusory statement cannot defeat summary judgment where it conflicts with Gee's specific testimony regarding the equipment, which clearly establishes that it *does* indeed store the telephone numbers. *See Lansmont Corp. v. SPX Corp.*, No. 5:10-cv-05860 EJD, 2012 WL 6096674, *4 (N.D. Cal. Dec. 7, 2012) (holding that internally inconsistent deposition testimony did not create an issue of material fact where deponent's answer to question was "self-serving, vague, and contrary to the remaining evidence") (citing *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)).

1  sequential number generator because the statutory phrase "using a random or sequential number

2  generator" modifies only the term "produce" and not the term "store." Indeed, it is nonsensical to

3  talk about storing numbers using a number generator. A "generator" is "something that produces

4  something," Merriam-Webster, http://www.merriam-webster.com/dictionary/generator (last visited

5  Nov. 10, 2014), meaning that a "random or sequential number generator" is something that

6  produces random or sequential numbers. Thus, while equipment can use a random or sequential

7  number generator to "produce" numbers, it makes no sense to talk about using a number generator

8  to "store" numbers.

9      In addition, aside from being nonsensical, reading "using a random or sequential number

10 generator" to modify "store," would also render the term "store" superfluous. *See Duncan v.*

11 *Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and

12 word of a statute … We are thus reluctan[t] to treat statutory terms as surplusage….") (internal

13 quotations and citations omitted). Any equipment using a random or sequential number generator

14 to store numbers would fall within the "produce" prong of the statutory definition because a

15 random or sequential number generator must "generate" (*i.e.* "produce") the number before storing

16 it.

17     Finally, reading "using a random a sequential number generator" to modify only

18 "produce," and not "store," is consistent with the last-antecedent canon of construction, in which

19 "a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it

20 immediately follows." *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1343 (2013) (internal

21 quotations omitted). The Supreme Court has explained the cannon with an example: a teenager

22 warned by his parents that he will be punished if he "throw[s] a party or engage[s] in any other

23 activity that damages the house" will be punished if he throws a party, even if there is no damage

24 to the house. *Barnhart v. Thomas*, 540 U.S. 20, 27 (2003). Likewise, the equipment used here is an

25 ATDS because it stored (and dialed) a list of numbers to be called without human intervention,

26 even if the equipment did not randomly or sequentially generate that list.

27     Consequently the text of the TCPA supports the FCC's repeated rulings that equipment is

28 an ATDS when it—like the equipment here—automatically dials numbers from a list.

### 2. The congressional intent underpinning the TCPA supports the FCC's rulings.

The legislative intent behind the TCPA likewise supports the FCC's rulings that read the statutory definition of ATDS as including equipment like the autodialer at issue here. In enacting the TCPA, "the government sought to generally protect consumers' privacy and reduce the volume of telephone solicitations." *In re Jiffy Lube Int'l Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1261 (S.D. Cal. 2012)*; see also Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740, 744 (2012) (noting that in enacting the TCPA, Congress determined that "[u]nrestricted telemarketing" can be "an intrusive invasion of privacy"). Indeed, Congress noted that autodialers at the time could dial as many as 1,000 telephone numbers each day, allowing telemarketers to call more than *seven million Americans every day*. S. Rep. 102-178, at 2 (1991), *reprinted in* 1991 U.S.C.C.A.N 1968, at 1969. Congress's main concern, and the problem they sought to alleviate through the TCPA, was the sheer volume of calls triggered by the growth of autodialers, which could dial multiple numbers in a short period of time without human intervention.

To solve this problem, Congress did not intend to draw an arbitrary line based on the inner workings of autodialers; it simply wanted to slow down the onslaught of calls plaguing Americans. And given that Congress enacted the TCPA in response to autodialers that could make 1,000 calls per day, it seems clear that they would be appalled by the equipment at issue here, which could make over 9,000 text message calls per day. That dwarfs the 1,000-call-per-day machines that originally motivated Congress to act, and it is thus hard to believe that Congress intended *not* to include the autodialer here within the prohibitions of the TCPA.

### 3. Case law supports the FCC's rulings.

In light of the FCC orders, plain language, and legislative history, it is not surprising that courts in this district and elsewhere have held that equipment that automatically dials a list of numbers falls within the statutory definition of an ATDS. *See, e.g., Bates v. Dollar Loan Ctr., LLC*, No. 2:13-CV-1731-KJD-CWH, 2014 WL 3516260, at *2 (D. Nev. July 15, 2014) (holding that equipment that dialed a daily "pool" of numbers into which defendants could add numbers was an ATDS); *Fields v. Mobile Messengers Am., Inc.*, 12-cv-05160, 2013 WL 6774076, at *3

1    (N.D. Cal. Dec. 23, 2013) (holding that equipment could be an ATDS where it "receives numbers

2    from a computer database … and then dials those numbers without human intervention") (internal

3    quotations omitted); *Sterk v. Path, Inc.*, No. 13 C 2330, 2014 WL 2443785, at *4 (N.D. Ill. May

4    30, 2014) (holding that equipment was an ATDS where it "acquire[d] a stored list of phone

5    numbers … [and] then use[d] automated equipment to make calls from that list").

6         Two opinions from the Ninth Circuit further support this position. First, in *Satterfield*, the

7    court found that a disputed issue of fact about whether the equipment at issue "stored telephone

8    numbers to be called and subsequently dialed those numbers automatically without human

9    intervention" was sufficient to preclude summary judgment in defendant's favor and remanded to

10   the district court to decide whether the defendant had used an ATDS. *Satterfield*, 569 F.3d at 951.

11   More recently, the Ninth Circuit held in a preliminary injunction proceeding that a TCPA plaintiff

12   was likely to succeed in establishing that defendant had used an ATDS, even though the autodialer

13   at issue did not use a random or sequential number generator. *Meyer v. Portfolio Recovery Assocs.,*

14   *LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).

15        Defendants cite *Gragg v. Orange Cab Co.*, 995 F. Supp. 2d 1189 (W.D. Wash. 2014) to

16   argue that there was sufficient human intervention here to render the equipment not an ATDS. But

17   unlike here (and the FCC orders) where a human simply programs or cuts and pastes a list of

18   numbers into an autodialer before pressing go and the machine then calls or texts all the numbers

19   on the list, *Gragg* involved a taxi dispatching text messaging system where a human dispatcher

20   had to input *a single* customer's number and another, separate, human driver had to accept the fare

21   *prior to each individual text message being sent*. Here, in contrast, Gee did not have to input each

22   individual number prior to sending each individual text message; once he cut and pasted the list of

23   numbers into the Data Doctor software and pressed send, the equipment would automatically send

24   out the messages. (Gee Dep. at 149:8-152:1; Gee Decl. ¶ 8.) Defendants argue that because the

25   equipment would sometimes stop working and Gee would have to restart it, that means the

26   equipment did not operate automatically without human intervention. But that argument is

27   ridiculous. Gee testified that when the equipment worked as intended without error, it would

28   indeed call the numbers on the list without further intervention. (Gee Dep. at 151:22-152:1.) The

1    T-Mobile call detail records reflecting the text message transmissions to Plaintiff and the class bear

2    this out—they show that AC Referral's equipment transmitted text messages at a rate of 3,000-

3    9,000 text messages per day. (Ochoa Decl. ¶ 7.) The fact that an ATDS does not work flawlessly

4    and sometimes shuts down does not mean it not an ATDS. Nor is it the case—as Defendants

5    suggest—that Gee's initial cutting and pasting the list of numbers into the equipment and pressing

6    send constitutes human intervention sufficient to render the equipment not an ATDS. Under that

7    view, in order to be an ATDS, equipment must essentially be sentient and, on its own, choose to

8    start dialing numbers and decide which numbers to dial. That incredible proposition is the stuff of

9    science fiction novels, not the TCPA or the FCC's orders interpreting it.

10           **C.      This Court Must Defer to the FCC's Rulings.**

11           While the statutory text, legislative intent, and interpretive case law all support the FCC's

12   rulings that equipment is an ATDS when it—like here—dials a list of numbers without human

13   intervention, principles of administrative law further require that this court defer to those rulings.

14           The Administrative Orders Review Act, also known as the Hobbs Act, grants federal

15   appellate courts exclusive jurisdiction to determine the validity of final FCC orders. 28 U.S.C.

16   § 2342(1). And because ignoring an order is equivalent to determining that it is invalid, district

17   courts may not ignore—*i.e.*, they are bound to follow and apply—FCC orders. *See CE Design, Ltd.*

18   *v. Prism Bus. Media, Inc.*, 606 F.3d 443, 448-49 (7th Cir. 2010). *See also US West Commc'ns, Inc.*

19   *v. Hamilton*, 224 F.3d 1049, 1055 (9th Cir. 2000) ("[A]lthough we doubt the soundness of the

20   FCC's interpretation of [the Telecommunications Act], we are not at liberty to review that

21   interpretation. We are required by the Hobbs Act to apply [the FCC's interpretation]."); *Moriarity*

22   *v. Nationstar Mortg., LLC*, No. 1:13-cv-0855 AWI SMS, 2014 WL 801021, at *4 (N.D. Cal. Feb.

23   27, 2014) ("Courts of this circuit have recognized that the FCC's pronouncement [interpreting a

24   statutory term in the TCPA] … [is] immune from challenge in federal district court pursuant to the

25   Hobbs Act….").

26           Further, even if the Hobbs Act did not require following the FCC orders here, they would

nevertheless be entitled to *Chevron* deference.[4] Under *Chevron* deference, a court must defer to an agency's reasonable interpretation of a statute that is silent or ambiguous with respect to the issue at hand. *See Satterfield*, 569 F.3d at 952; *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 878 (9th Cir. 2014). While, as discussed above, the TCPA's statutory definition of ATDS clearly encompasses the autodialer used here, to the extent the statute could be deemed silent or ambiguous on the point, the FCC's interpretation set out in the three declaratory orders is reasonable. Thus, even if not subject to the Hobbs Act, the FCC's interpretation of the statutory definition of ATDS must be given *Chevron* deference.

Finally, going one step further, even if *Chevron* deference did not apply, the FCC Orders would still be entitled to *Skidmore* deference. *See Satterfield*, 569 F.3d at 952-53; (Dkt. 164 at 6-7). "Under *Skidmore*, a court will consider an agency's decision based on 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Wilderness Watch, Inc. v. Bureau of Land Mgmt.*, 799 F. Supp. 2d 1172, 1178 (D. Nev. 2011) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001)). Here, for the reasons discussed above, the FCC's orders interpreting the definition of ATDS are persuasive in their own right, and thus entitled to deference.

### D.   Even if Equipment Must Have the Capacity to Generate Random or Sequential Numbers, the Equipment Here Had that Capacity.

While, as discussed above, equipment that automatically dials a list of numbers need not have the capacity to generate random or sequential numbers in order to be an ATDS, equipment possessing such capacity is undoubtedly an ATDS, and the equipment used here had it. Gee testified that the equipment he used to send the text messages had Microsoft Excel software installed on it. (Gee Dep. at 145:11-13.) Indeed, the lists of numbers Gee received from 360 Data

---

[4]    The Ninth Circuit in *Satterfield*, without discussing the Hobbs Act, applied *Chevron* deference to the FCC's interpretation of various terms in the TCPA. 569 F.3d at 952-54. As one district court has pointed out, however, even if the Ninth Circuit in *Satterfield* disagreed with the FCC's interpretation, "[it] had no power to reject the FCC rule…." *Baird v. Sabre, Inc.*, 995 F. Supp. 2d 1100, 1104 (C.D. Cal. 2014) (citing Hobbs Act).

1   Management were usually supplied in an Excel spreadsheet. (*Id.* at 51:6-52:9.)

2       Microsoft Excel contains a built-in function that provides for the easy generation of random

3   telephone numbers. The "RANDBETWEEN" function of Excel generates random integers

4   between any two numbers. *See* Microsoft Office Support, RANDBETWEEN, *available at*

5   http://office.microsoft.com/en-us/excel-help/randbetween-HP005209230.aspx (last visited Nov.

6   11, 2014). Thus, for example, typing the formula "=Randbetween(1000000000, 9999999999)" into

7   a cell in an Excel spreadsheet will generate a random ten-digit phone number. Applying that

8   formula to multiple cells—which can be done through a simple clicking and dragging, *see*

9   Microsoft Office Support, Move or copy a formula, *available at* http://office.microsoft.com/en-

10  us/excel-help/move-or-copy-a-formula-HP010342704.aspx (last visited Nov. 13, 2014)—generates

11  a different random ten-digit phone number in each of the selected cells. Microsoft Excel software

12  thus has the present capacity to generate as many random ten-digit phone numbers as desired. *See*

13  *generally* David Kandie, *How to Generate One Million Random Phone Numbers Using Excel*,

14  (June 24, 2012), http://kipkanist.blogspot.com/2012/06/how-to-generate-one-million-

15  random.html.[5]

16  _____

    [5]     This Court can take judicial notice of Excel's random number generation capability. Under
17  Fed. R. Evid. 201(b), this Court "may judicially notice a fact that is not subject to reasonable
    dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can
18  be accurately and readily determined from sources whose accuracy cannot reasonably be
    questioned." That Excel can generate random numbers is generally known within the District of
19  Nevada. *See, e.g.,* National Park Service-Lake Mead National Recreation Area, *Threats Research
    and Monitoring on the Invasive Species Sahara Mustard (*Brassica tournefortii*)*, at 7, *available at*
20  http://www.clarkcountynv.gov/Depts/dcp/Documents/Library/dcp%20reports/2012/Sahara_Mustar
    d_Control_Research_2005-NPS-532_final_rpt.pdf (last visited Nov. 13, 2014) (using Excel's
21  random number generator in vegetation experiment); UNLV Graduate & Professional Student
    Association, *Scholarship Application*, at 1, *available at*
22  http://www.unlv.edu/sites/default/files/24/GPSA-ScholarshipApp.pdf (last visited Nov. 13, 2014)
    (noting that scholarship recipients will be selected using Excel's random number generator). In
23  addition, Excel's random number generation capability can be accurately and readily determined
    from sources whose accuracy cannot reasonably be questioned, namely Microsoft's technical
24  support web pages, Nevada state government agency publications available online, and/or by
    simply using Excel. *See, e.g., Leveyfilm, Inc. v. Fox Sports Interactive Media, LLC*, No. 13 C
25  4664, 2014 WL 3368893, at *2 (N.D. Ill. July 8, 2014) (taking judicial notice of websites
    accessible from "well-known, non-party web browsers").
26

27

28

1    Because the Netbook laptop used by AC Referral had Microsoft Excel installed on it, it had

2    the capacity to generate random telephone numbers. That it did not actually use the random

3    number generation functionality of Excel is irrelevant. As the Ninth Circuit has made clear, it is

4    only the *capacity* to do so that matters. *See Satterfield*, 569 F.3d at 951 ("[A] system need not

5    actually store, produce, or call randomly generated telephone numbers, it need only have the

6    capacity to do it.").

7    Gee's testimony that the hardware and software he worked with did not have the capacity

8    to produce random or sequential numbers (Gee Dep. 130:13 – 131:6) does not create a genuine

9    issue of material fact for two reasons: First, Gee testified that he had "very limited" knowledge of

10   how Excel worked, so it is not surprising that he wouldn't know that Excel has the present capacity

11   to generate random numbers. (Gee Dep. 145:17-24.) Second, knowledge is not a prerequisite for

12   violating the TCPA—rather, it is a strict liability statute, with knowledge only coming into play

13   when determining if treble damages are warranted. *Breslow v. Wells Fargo Bank, N.A.*, 857 F.

14   Supp. 2d 1316, 1318 (S.D. Fla. 2012) *aff'd,* 755 F.3d 1265 (11th Cir. 2014); *Universal*

15   *Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*, 401 F.3d 876, 882 (8th Cir. 2005) (noting

16   that intent is not a prerequisite to liability under the TCPA).[6]

---

17   Similarly, courts may take judicial notice of "matters of common knowledge" and "facts

18   capable of verification" *United States v. Bari*, 599 F.3d 176, 180 (2d Cir. 2010). This Court may

19   easily type the formula "=Randbetween(1000000000, 9999999999)" into Microsoft Excel and
     confirm its number-generating capability. In addition, typing "Randbetween" into any Internet
     search engine will return hundreds of web pages explaining Microsoft Excel's number generation

20   capabilities.

21   [6]    Defendants also rely on the Declaration of Michael Ferry (dkt. 237-1, Ex. 10) to argue that

22   the Data Doctor software could not randomly or sequentially generate numbers, and that it "isn't

23   an ATDS." (*See id.* ¶¶ 6-10.) Assuming the Court doesn't exclude this Declaration outright due to
     Defendant's Rule 37(c) violations in producing it for the first time in their summary judgment

24   motions, it is irrelevant because Ferry only discusses the functionality of the Data Doctor software
     alone, and makes no statements as to the totality of the equipment AC Referral was using. The

25   definition of ATDS under the TCPA and controlling regulations is "*hardware [that], when paired*
     *with certain software*, has the capacity to store or produce numbers and dial those numbers." 2003

26   FCC Order at 14091-93 (emphasis added). Moreover, Ferry's testimony about the Data Doctor
     software not being able to store numbers is unremarkable—software does not "store" anything as it

27   is the computer on which it is placed or run that stores the information necessary for it use.

28

---

1    Consequently, even if random or sequential number generation capacity is required for

2    equipment to fall within the TCPA's statutory definition of ATDS (which, as discussed above it is

3    not), the equipment used by AC Referral here most certainly had it.[7]

4    **II.    CLASS MEMBERS DID NOT CONSENT TO RECEIVE THE TEXT MESSAGES.**

5    Two of the Defendants, Pioneer and LeadPile, parrot their previously rejected argument

6    that Plaintiff—and every other class member—consented to receiving the text messages at issue.

7    (Dkt. 239 at 26-27; Dkt. 240 at 26-27.) While the TCPA exempts from its prohibitions calls "made

8    with the prior express consent of the called party," 47 U.S.C. § 227(b)(1)(A), consent is an

9    affirmative defense on which Defendants bear the burden of proof. *Grant v. Capital Mgmt. Servs.,*

10   *L.P.*, 449 Fed. App'x 598, 600 n.1 (9th Cir. 2011) ("'[E]xpress consent' is not an element of a

11   TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the defendant

12   bears the burden of proof."); *Toth v. Stephens and Michaels Assocs., Inc.*, No. 2:13-cv-00372-

13   GMN-VCF, 2014 WL 5687418, *4 (D. Nev. Nov. 4, 2014) (same). Despite the Court's statement

14   that this argument was a loser absent additional evidence, Defendants simply again point to the

---

15   [7]    Even if the autodialer used here did not fall within the statutory definition of an ATDS, AC

16   Referral's conduct would *still* have violated the TCPA. The TCPA makes it unlawful to make any
     call to a cell phone "using any [ATDS] *or an artificial or prerecorded voice*." 47 U.S.C.

17   § 227(b)(1)(A) (emphasis added). While the TCPA refers to an artificial or prerecorded "voice,"
     that term is not limited to verbal communications. *See, e.g.,* Dictionary.com,

18   http://dictionary.reference.com/browse/voice (last visited Nov. 11, 2014) (defining "voice" as,
     among other things, "expression in spoken or written words, or by other means"). Indeed, in an

19   order clarifying that the TCPA applies to text messages, the FCC treated the words "voice" and
     "message" as interchangeable. 2003 FCC Order at 14115 ("[U]nder the TCPA, it is unlawful to

20   make any call using an [ATDS] or an artificial or prerecorded *message* to any wireless telephone
     number.") (emphasis added). In enacting the TCPA, Congress sought to regulate all solicitations to

21   cell phones that did not involve a live telemarketer, hence the prohibition on both calls from an
     ATDS *and* calls using an artificial or prerecorded message. *See id.* ("Congress found that

22   automated or prerecorded telephone calls were a greater nuisance and invasion of privacy than live
     solicitation calls."). Thus, whether or not the autodialer used to send them falls within the statutory

23   definition of ATDS, the sending of these prewritten text messages violates the TCPA's

24   proscription against making a call to a cell phone "using … an artificial or prerecorded voice." 47
     U.S.C. § 227(b)(1)(A). Consequently, AC Referral's conduct violated the TCPA *even if no ATDS*

25   *was used*, and, for that reason alone, summary judgment should be granted in Plaintiff's favor on
     that issue.

26

27

28

1  same rejected testimony.[8] (*See* dkt. 164 at 17) ("If, as it appears, Defendants can provide no

2  evidence of consent, Defendants will probably lose on this issue regardless of who carries the

3  burden at trial."). This argument fails for the same reason it did before.

4  　　　As the Ninth Circuit has explained, "[e]xpress consent is consent that is clearly and

5  unmistakably stated." *Satterfield*, 569 F.3d at 955. Here, despite the fact that "[defendants] are in

6  the best position to have records kept in the usual course of business showing such consent,"

7  *Ryabyschuk v. Citibank (S.D.) N.A.*, No. 11-cv-1236-IEG (WVG), 2011 WL 5976239, *5 (S.D.

8  Cal. Nov. 28, 2011) (internal quotations omitted), Pioneer and LeadPile cite absolutely no

9  documentary evidence to support their assertion that class members consented to receive the text

10 messages at issue, let alone consent that is clearly and unmistakably stated. Indeed, the only

11 evidence to which they point is the testimony of Gee and Ferry (dkt. 239 at 26; dkt. 240 at 26),

12 which this Court has already rejected. In so doing, this Court stated:

13 　　　　　[Defendants'] reliance on James Gee (of AC Referral Systems) and Michael
14 　　　　　Ferry (of 360 Data Management and Absolute ROI) is misplaced, as neither has
　　　　　personal knowledge whether Kristensen or the other purported class members
15 　　　　　consented when they visited one of "hundreds" of websites that Defendants
　　　　　allege were the original sources of the cell phone numbers. (Dkt. 164, at pg. 17.)

16 The Court went on to describe Ferry and Gee's testimony as "unfounded"[9] (dkt. 164 at pg. 17, lns.

17 18-19) and found that "Defendants have not submitted any evidence of express consent" (*id.* at pg.

18 17, ln. 9).

19 　　　Defendants thus point to *no* evidence suggesting that class members consented to receive

20 the text messages, and have completely failed to satisfy their burden on their asserted consent

21 _____

22 [8]　　While CPS (though not Pioneer or LeadPile) attached to its motion for summary judgment
a declaration from Ferry dated May 3, 2014, obtained nearly five months after his deposition (dkt.
23 237-1), that declaration essentially reiterates Ferry's unfounded deposition testimony regarding
purported consent, and is inadmissible here in any event, as it was never produced during
24 discovery. (*See* Plaintiff's Objections and Motion to Strike Evidence Submitted in Support of
CPS's Motion for Summary Judgment, filed concurrently herewith.)
25 [9]　　Consistent with the Court's earlier finding, Plaintiff has objected and moved to strike the
portions of the Ferry and Gee testimony that lack foundation.
26

27

28

defense.[10] This failure to produce any evidence supporting an affirmative defense on which Defendants have the burden means that not only do Pioneer and LeadPile's motions for summary judgment fail on the issue of consent, but also that summary judgment on that issue should be granted in favor of Plaintiff.[11] As the Supreme Court has explained, in order to prevail on a motion for summary judgment, a party with the burden of persuasion on an issue—such as Defendants with the affirmative defense of consent here—must support its motion "with credible evidence." *Celotex*, 477 U.S. at 331. Likewise, to defeat an opponent's motion for summary judgment, the party with the burden needs to "muster sufficient evidence to make out its claim." *Id*. Because Pioneer and LeadPile have not supported their own motions with credible evidence of consent, nor has *any* Defendant mustered sufficient—indeed, any—evidence to make out their affirmative defense, Pioneer and LeadPile's motions must be denied, and summary judgment entered in Plaintiff's favor. *See id*. at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").[12]

## CONCLUSION

Because the undisputed evidence establishes that AC Referral used an ATDS, and there is absolutely no evidence that any class member consented to receive the text messages at issue (indeed, Plaintiff has expressly and repeatedly stated under oath to the contrary), Plaintiff respectfully requests that this Court enter an order (1) denying Defendants' Motions for Summary

---

[10]    As one district court noted in similar circumstances, "[i]f defendant does not have documents or other information which substantiates the defense [of prior express consent] it is difficult to fathom why it interposed that defense in the first place." *Martin v. Bureau of Collection Recovery*, No. 10 C 7725, 2011 WL 2311869, at *4 (N.D. Ill. June 13, 2011) (internal quotations omitted).

[11]    Further, Plaintiff has stated under oath that he did not consent to receive the text message at issue.  (Dkt. 113-2 ¶ 3; Kristensen Dep. 27:11-28:3, 44:4-7.)

[12]    Having completely failed to produce any evidence of consent, Pioneer and LeadPile make the unsupported assertion that evidence of Plaintiff's consent was contained on his laptop hard drive, which he has since replaced. That issue is currently before the court on a spoliation motion, and will be fully addressed by Plaintiff in that briefing.

Judgment as it relates to ATDS and Defendant's affirmative defense of "prior express consent" (2)

granting partial summary judgment in Plaintiff's favor that an ATDS was used to transmit the text

message at issue to the cell phone of the class without their prior express consent, and (3) awarding

such other and further relief as this Court deems reasonable and just.

Dated:  November 17, 2014                          Respectfully submitted,

                                                   FLEMMING KRISTENSEN, individually and on
                                                   behalf of a class of similarly situated individuals

                                                   By: /s/ John C. Ochoa
                                                       One of Plaintiff's Attorneys

                                                   John Benedict, Esq. (Nevada Bar No. 005581)
                                                   LAW OFFICES OF JOHN BENEDICT
                                                   2190 E. Pebble Road, Suite 260
                                                   Las Vegas, Nevada 89123
                                                   Telephone: (702) 333-3770
                                                   Facsimile: (702) 361-3685
                                                   Email: john.benedict.esq@gmail.com

                                                   Ryan D. Andrews (*pro hac vice*)
                                                   randrews@edelson.com
                                                   Rafey S. Balabanian
                                                   rbalabanian@edelson.com
                                                   John C. Ochoa (*pro hac vice*)
                                                   jochoa@edelson.com
                                                   EDELSON PC
                                                   350 North LaSalle Street, Suite 1300
                                                   Chicago, Illinois 60654
                                                   Tel: 312.589.6370
                                                   Fax: 312.589.6378

                                                   *Attorneys for Plaintiff and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2014, I electronically filed the foregoing *Partial Consolidated Response to Defendants' Motions for Summary Judgment* with the Clerk of the Court using the CM/ECF system. Notice of this filing is sent to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.


Dated:  November 17, 2014          By:     /s/  John C. Ochoa
                                           John C. Ochoa