Ryan W. Mitchem (TN #022196)
Michael K. Alston (TN #013697)
K. Chris Collins (TN #029109)
HUSCH BLACKWELL LLP
736 Georgia Avenue, Suite 300
Chattanooga, Tennessee 37402
Telephone: (423) 755-2663

Patricia Lee (NV #8287)
Joseph R. Ganley (NV #5643)
HUTCHISON & STEFFEN
Peccole Professional Park
10080 West Alta Drive, Suite 200
Las Vegas, Nevada 89145
Telephone: (702) 385-2500
Facsimile: (702) 385-2086

*Attorneys for Defendant LeadPile LLC*

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| FLEMMING KRISTENSEN, individually, and on behalf of a class of similarly situated individuals, <br><br> Plaintiff, <br> v. <br><br> CREDIT PAYMENT SERVICES, INC., a Nevada corporation, f/k/a MYCASHNOW.COM INC., ENOVA INTERNATIONAL, INC., an Illinois corporation, PIONEER FINANCIAL SERVICES, INC., a Missouri corporation, LEADPILE LLC, a Delaware limited liability company, and CLICKMEDIA, LLC d/b/a NET1PROMOTIONS LLC, a Georgia limited liability company, <br><br> Defendants. | Case No. 2:12-CV-00528-APG (PAL) <br><br> **LEADPILE LLC'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br><br> Judge: Hon. Andrew P. Gordon <br><br> Magistrate: Hon. Peggy A. Leen |

COMES NOW Defendant LeadPile LLC ("LeadPile"), by and through the undersigned counsel, and for its Reply in Support of Motion for Summary Judgment, states as follows:

## INTRODUCTION

Plaintiff offers no evidence that LeadPile sent the subject text message, or even knew of its existence prior to the initiation of this suit.  Even now, Plaintiff still cannot present a single piece of evidence that shows that LeadPile is vicariously liable for the transmission of the text message.  Additionally, Plaintiff cannot establish that the text message was sent using an automatic telephone dialing system ("ATDS"), an essential element of his claim.  Plaintiff's Response to LeadPile's Motion for Summary Judgment does nothing to dispute this.  For these reasons, and as explained in greater detail below, LeadPile is entitled to judgment as a matter of law on all claims pending against it.

## RESPONSE TO PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS

1. To obtain customers for their respective online, payday loan businesses, short-term lenders CPS, Enova, and Pioneer obtained qualified customers, or "leads," through LeadPile. (Deposition Transcript of Eugen Ilie ("Ilie Dep."), at 153:21-23, 28:25-29:3, 51:1-3.

**Response:** Undisputed.

2. LeadPile coordinated the purchase of these leads through an online marketplace it hosted that connected lead sellers (such as Click Media) to lead buyers (such as the lender Defendants). (Ilie Dep. 21:9-18.)

**Response:** Undisputed.

3. To generate these leads, Click Media entered into an agreement with AC Referral. ("Gee Decl."), ¶ 3).

**Response:** Undisputed.

4.      Pursuant to this agreement, AC Referral began transmitting text message advertisements to consumers directing them to websites controlled by Click Media that contained what appeared to be loan applications. (Gee Decl. ¶ 5.)

**Response:**  Undisputed.

5.      To send the text messages, AC Referral used a hardware and software system consisting of (1) a Netbook laptop running a Microsoft Windows operating system, (2) computer software, including a program called "Data Doctor," Microsoft Sync, and Microsoft Excel, and (3) a cellular telephone with a T-Mobile SIM card. (Deposition Transcript of James Gee ("Gee Dep.") at 144:13-145:13; 152:2-153:23).

**Response:**  Undisputed.

6.      The cellular telephone was connected to the Netbook computer using a USB cable. (Gee Decl. ¶ 8.)

**Response:**  Undisputed.

7.      AC Referral received lists of cell phone numbers from a company called 360 Data Management LLC ("360 Data"), which were provided in a Microsoft Excel spreadsheet. (Gee Decl. ¶ 9; Gee Dep. at 51:14-19.)

**Response:**  Undisputed.

8.      These Excel lists of phone numbers were stored on the Netbook until AC Referral was ready to send text messages to those numbers. (Gee Dep. 117:24-118:6; 121:5-24.)

**Response:**  Undisputed.

9. James Gee, the principal and sole employee of AC Referral, testified that his normal practice would be to cut and paste the list of cell phone numbers into the Data Doctor software on the laptop. (Gee Dep. at 141:23-142:2.)

**Response:**  Undisputed.

10. He would cut and paste the entire list at once; he did not input each individual number into Data Doctor one by one. (Gee Dep. at 150:4-8.)

**Response:**  Undisputed.

11. After he pasted the list of numbers into Data Doctor, he would type a single text message into Data Doctor to be sent to every number on the list, and then press send. (Gee Dep. at 30:10-20, 149:8-14; 157:18-25.)

**Response:**  Undisputed.

12. Gee did not need to press the send button repeatedly to send the text message to each individual number; once he pressed send, the equipment would begin sending out the text messages to each number on the list automatically. (Gee Dep. at 149:20-150:3.)

**Response:**  Undisputed.

13. While Gee testified that occasionally he would check on the equipment to make sure it was still running, if no errors occurred the equipment would continue to send the text message to the list of numbers automatically without any further human intervention. (Gee Dep. at 150:9-152:1.)

**Response:**  Undisputed.

14. In his deposition, Gee summarized the process as follows:

> [Y]ou take the phone numbers and paste them into the one box [in the Data Doctor software], and you put the message into the other box, and then you hit the send button.

(Gee Dep. at 56:10-12.)

4

**Response:**  Undisputed.

15.  AC Referral used this equipment to send identical, prewritten text messages to cell phone numbers, including those belonging to Plaintiff and the Class, at a rate of 3,000 – 9,000 per day. (Ochoa Decl. ¶ 7; Gee Decl. ¶ 10.)

**Response:**  Undisputed.

16.  While Gee stated that "[i]t was [his] understanding that the individuals who owned these cellular telephone numbers 'opted-in' to receive such text messages," (Gee Decl. ¶ 9), when asked how he knew that the individuals had consented to receive such messages, he testified that he assumed they had because that was what Michael Ferry, his contact at 360 Data who provided the cell phone lists, had told him.

**Response:**  Undisputed.

17.  Specifically, Gee testified as follows:

Q:   [H]ow do you know the people on the lists that Mr. Ferry provided to you were people who had opted in?

A:   I had a very trusting relationship with Mike, and I know that was the case, and we never really had any complaints about it, so I assume, of course—he said these people opted in, and I said, okay, they opted in, and so I took his word for it.

Q:   Just so I'm clear, your sole understanding of whether these people on these lists you got from him had opted in came from Mr. Ferry, correct?

A:   That's correct.

(Gee Dep. at 24:3-16).

**Response:**  Undisputed.

18.  Gee further testified that he didn't do anything himself to make sure that people on the phone lists had consented to receive text messages:

Q: ... I just want to make sure I'm clear. You didn't do anything yourself to check to make sure that people on the list you got from Mr. Ferry had opted in?

5

    A: No.

(*Id.* at 24:17-21).

    Q:    Do you have any ... protocols or compliance programs in place to ensure that you, in fact, make sure that numbers you send on are proper numbers?

    A:    No, besides the fact that if someone ever complained, right, it's – you know, you can get into a lot of trouble.

*    *    *

    Q:    [D]id you personally obtain opting [sic] information from consumers?

    A:    Did I obtain it --

    Q:    Yeah.

    A:    -- or did I get it?

    Q:    I'm asking if you obtained it.

    A:    No.

**Response:**  Undisputed.

    19.    On May 13, 2014, LeadPile issued a document subpoena to the Selling Source, which was Ferry's claimed "source" of the cellular telephone numbers that he gave to Gee for texting. (*See* Selling Source Subpoena).

**Response:**  Undisputed.

    20.    According to Ferry, this is where the so-called "opt-in" information was obtained. (Ferry Dep. 103:23 – 104:2.).

**Response:**  Undisputed.

    21.    LeadPile's subpoena came up empty, as Selling Source did not produce anything, let alone information to corroborate Ferry's unfounded testimony that "opt-in"

information was obtained from Plaintiff or any other class member to receive payday loan text messages. (Ochoa Decl. ¶ 8.)

**Response:** Disputed to the extent Plaintiff describes Ferry's sworn testimony as "unfounded." The testimony speaks for itself. Also disputed to the extent Plaintiff fails to state that no documents were produced because the documents that did exist were all destroyed pursuant to the Selling Source's document retention policy.

22.     As such, Defendants have no credible evidence about where, when, or how any class member consented or what the language of the claimed consent was.

**Response**: Disputed to the extent Plaintiff describes sworn testimony from Ferry and Gee as not "credible." Ferry and Gee both testified as to their standard operating procedures and business processed, specifically that web-based activity was the sole means through which their companies received consent to text a consumer and the steps they followed with each text message to ensure they complied with applicable law, including the TCPA. (Collins Decl., Exhibit 2, Excerpts from Deposition Transcript of James Gee, taken January 23, 2014 ("Gee Depo.") at 23-24; 60-61; 105 Exhibit 1, Ferry Dep. 63-64; 67, 69-70, 118, 143.)

23.     In contrast, Plaintiff repeatedly testified that he never "opted in" or provided consent to receive any type of text message advertisements, including the text message here. (Deposition Transcript of Flemming Kristensen ("Kristensen Dep.") at 27:11-28:3, 44:4-7.)

**Response:** Disputed to the extent Plaintiff characterizes his own testimony as being "in contrast" to the previous statements regarding the credibility of two non-parties to this lawsuit having zero interest in the outcome. Plaintiff received between 15 and 20 other "unsolicited" text messages regarding different promotions. (Collins Decl.,

7

Exhibit 3 Excerpts from Deposition Transcript of Flemming Kristensen taken January 21, 2014 ("Flemming Depo.") at 152.) Also, because Kristensen knowingly destroyed his laptop's hard drive shortly before he filed suit, and because he "wiped" his iPhone after receiving the text message, Defendants were not able to collect discovery regarding Kristensen's consent from his electronic devices. (*See* LeadPile's Motion for Terminating Sanctions, Or, Alternatively, Evidentiary Sanctions for Intentional Spoliation of Evidence; Memorandum of Points and Authorities, Dkt. 241).

## ARGUMENT

### I. Plaintiff Cannot Establish that the Text Message Was Sent Using an ATDS

An essential element of Plaintiff's claim is that the text message was sent using an Automatic Telephone Dialing System ("ATDS"). The TCPA provides the following definition for guidance:

> (1) The term "automatic telephone dialing system" means equipment which has the capacity—
>
> (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and
>
> (B) to dial such numbers.

47 U.S.C. § 227(a)(1).

#### A. The Software AC Referral Used to Send the Text Message Was Not an ATDS

Plaintiff fails to controvert the following undisputed facts regarding Data Doctor, the software AC Referral used to transmit text messages:

1. Data Doctor lacked the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers. LeadPile's Statement of Undisputed Facts ("LeadPile's SUF") ¶¶ 16-18.

2. Data Doctor could not, on its own, generate phone numbers in any way. LeadPile's SUF ¶¶ 16-17.

3. Data Doctor was merely a software application customers could use to send text messages to specific telephone numbers manually inputted into the system. LeadPile's SUF ¶¶ 12-13.

Because these facts remain uncontroverted, there are no material issues of fact as to whether the text message was sent using an ATDS. Further, Plaintiff is without evidence upon which he can sustain his burden of proof. Because the use of an ATDS is an essential element of Plaintiff's claim, his failure to prove this element is fatal to Plaintiff's claim as a whole. *See, e.g., Meyer v. Portfolio Recovery Associates, LLC,* 707 F.3d 1036, 1043 (9th Cir. 2012) (finding that the use of an ATDS is an essential element of a TCPA claim).

B. <u>Plaintiff's Desperate Reliance on the FCC is Misplaced as the TCPA's Definition of an ATDS is "Clear and Unambiguous"</u>

In a desperate attempt to avoid summary judgment on this issue, Plaintiff argues that the Court must defer to rulings from the Federal Communications Commission (the "FCC") providing that "equipment is an ATDS when it … dials a list of numbers without human intervention." (Dkt. 266, p. 13). Plaintiff's argument is erroneous. The Ninth Circuit found that the definition of an ATDS, as provided in the TCPA, is "clear and unambiguous." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009). As such, the Court's analysis "begins" and "ends" with this statutory text. *Id.* Deference to FCC rulings is only appropriate where a statute is silent or ambiguous. *Marks v. Crunch San Diego, LLC*, No. 14-cv-348, 2014 WL 5422976, at *2 (S.D. Cal. Oct. 23, 2014).

Attempts to broaden the definition of an ATDS beyond the terms of the TCPA, like Plaintiff's attempt here, have consistently been rejected by other federal courts. *See, e.g., Dominguez v. Yahoo! Inc.,* No. 13-1887, 2014 WL 1096051, *4-5 (E.D. Pa. March 20, 2014) (finding that the statutory requirements of an ATDS "require more than simply that the system store telephone numbers and send messages to those numbers without human

9

intervention"); *Marks*, 2014 WL 5422976, *4 (stating that the "FCC has no authority to modify or definitively interpret" the ATDS definition found in the TCPA).

Plaintiff urges the Court to find that Data Doctor is an ATDS because it was operated on a computer system containing Microsoft Excel. Not surprisingly, Plaintiff cites no supporting authority. Federal district courts have soundly refused to broaden the definition of an ATDS to such an extreme. For example, in *Dominguez v. Yahoo!, Inc.,* the Court determined that a system that could store cellular numbers, queue those numbers for texting, and then text those numbers without human intervention still did not necessarily qualify as an ATDS. 8 F. Supp.3d 637, 643 (E.D. Pa. 2014). The Court found that, the other factors notwithstanding, it could not determine whether a system was an ATDS under the TCPA until it resolved "the crux of the issue, which is whether the system has the capacity 'to use a random or sequential number generator to store or produce telephone numbers and then send a text message to those numbers." *Id. See also Gragg v. Orange Cab Co., Inc.,* 995 F. Supp.2d 1189, 1191 (W.D. Wash. 2014) (finding that the requirement of even "minimal" human intervention means that a system does not qualify as an ATDS). There is no dispute that there was at least minimal human intervention used to transmit the text message in this case. LeadPile SUF ¶¶ 13-18.

Additionally, if the Court determines that the system AC Referral used to transmit text messages constitutes an ATDS, it will risk establishing a dangerous precedent other federal courts have consciously avoided. *See De Los Santos v. Millward Brown, Inc.,* No. 13-80670, 2014 WL 2938605 (S.D. Fla. June 30, 2014) ("[A]s of yet, no court, nor this one, will interpret the TCPA so broadly" as to include virtually every computer and smart phone). Indeed, if the process used by AC Referral constitutes an ATDS, then nearly every call placed

or text message sent would violate the TCPA. Smartphones, such as Blackberries, Samsung Galaxies and iPhones, can store numbers electronically and then dial those numbers with minimal human interaction (*i.e.,* the touch of a single button). Even desktop telephones now have the ability to store phone numbers and then dial them at the push of a button. There is no reason to such a precedent. Instead, the Court should grant summary judgment in LeadPile's favor on all Class claims.

## II. LeadPile is Entitled to Summary Judgment Because Plaintiff Cannot Establish that an Agency Relationship of Any Kind Existed Between LeadPile and AC Referral

### A. Plaintiff's Rule 56(d) Response Should be Denied

Rather than respond to the substance of LeadPile's argument that Plaintiff's vicarious liability theories cannot withstand summary judgment, Plaintiff instead filed a Rule 56(d) Response (Dkt. 262) ("Plaintiff's 56(d) Response) claiming that he is unable to adequately respond to LeadPile and CPS's motions for summary judgment until he obtains additional documents in discovery.

To obtain 56(d) relief, Plaintiff must establish that "the continuance is needed to obtain facts essential to preclude summary judgment." *See Soule v. High Rock Holding, LLC*, 514 B.R. 626, 630-31 (D. Nev. 2014) (quoting *McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869, 885 (9th Cir.1994)). Specifically, Plaintiff must: (1) set forth in affidavit form the specific facts he hopes to elicit from further discovery; (2) establish that the facts he seeks exist; and (3) demonstrate that the facts he seeks are essential to oppose summary judgment. *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir.2008). Plaintiff's 56(d) Response does not satisfy these requirements. Further, Plaintiff has wholly failed to otherwise respond to LeadPile's Motion for Summary Judgment. Therefore, LeadPile should be granted summary judgment on the issue of vicarious liability.

*See Harlow v. MTC Fin. Inc*., 865 F. Supp. 2d 1095, 1098 (D. Nev. 2012) (citing *Family Home & Fin. Ctr., Inc.*, 525 F.3d at 827) ("If the nonmovant does not satisfy these requirements, the Court may rule on summary judgment without granting additional discovery.").

Plaintiff thoroughly describes his outstanding discovery requests, but he failed to establish that the facts he sought exist and are essential to oppose summary judgment. For example, Plaintiff argues that he should be granted Rule 56(d) relief on the basis that his outstanding motion to compel includes requests that would reveal facts bearing "on CPS's alter-ego relationship with Co-Defendant LeadPile LLC." [Plaintiff's Rule 56(d) Response, Dkt 262, pp. 11, 13-14.][1] However, Plaintiff fails to establish that facts regarding the alleged alter-ego relationship between CPS and LeadPile actually exist. His support is comprised solely of statements made by CPS's sole shareholder and various state-issued cease-and-desist orders, none of which link CPS to LeadPile. [*Id.* (citing Plaintiff's Motion to Compel, Dkt. 199, pp. 6-10; Plaintiff's Reply in Support of Motion to Compel, Dkt 222, at pp. 4-5.] It's an even larger leap to how facts regarding the alleged alter-ego relationship are essential to oppose summary judgment. After all, even if Plaintiff could establish evidence of an alter-ego relationship, which he cannot, there is still a tremendous void between either of those entities and the transmitter of the text message, AC Referral. To withstand summary judgment on this issue, Plaintiff must establish facts, not theories, connecting LeadPile to the actions of AC Referral. This cannot be done. Therefore, Plaintiff fails to satisfy the requirements for Rule 56(d) relief.

---

[1] Notably, the Court only ordered CPS to supplement its response to two of these requests, RFP Nos. 64 and 83. [*See* Order (Mot. Compel – Dkt #199), Dkt. 272, p. 9-10.]

Plaintiff also argues he should be granted Rule 56(d) relief on the basis that his outstanding motion to compel includes requests relating to a "ratification" theory of liability. [Plaintiff's Rule 56(d) Response, Dkt 262, p. 12.] The Court only ordered CPS to supplement its response to RFP No. 75, which seeks "Documents Identifying policies, procedures, and protocols You had in place to ensure that the Leads You purchased from LeadPile were not generated in violation of the TCPA." Again, Plaintiff has not established that any such responsive documents exist that have not already been produced, and Plaintiff has in no way demonstrated how this information is essential to its opposition to LeadPile's Motion for Summary Judgment. Even if Plaintiff could prove an agency relationship existed between AC Referral and LeadPile, which he cannot, he would still have to establish that AC Referral was acting within the scope of its authority when it sent the text messages. *See Uesco Industries, Inc. v. Poolman of Wisconsin, Inc.*, 993 N.E.2d 97, 112 (Il. App. 2013), *appeal denied* 996 N.E.2d 24 (Ill. 2013), *cert. denied* 134 S. Ct. 1323 (2014) (holding a business could not be held vicariously liable for a violation of the TCPA that occurred when an advertiser exceeded the scope of its authority by sending faxes to recipients outside of the type of recipients to which business had contracted with advertiser to market its services). To that end, It is undisputed that the contracts in place between AC Referral and Click Media during the applicable time frame specifically required AC Referral to comply with all federal, state and local regulations, including but not limited to the TCPA. LeadPile SUF ¶ 4. Accordingly, if the text message violated the TCPA, then AC Referral could not have been acting within the scope of its authority. As such, Plaintiff cannot possibly recover against LeadPile on a theory of ratification. *Avio, Inc. v. Alfoccino, Inc.*, 2:10-cv-10221, 2014 WL 1870108 at *13 (E.D. Mich. May 9, 2014).

13

Because Plaintiff cannot possibly recover against LeadPile on a theory of ratification, he cannot now argue that facts allegedly pertaining to that are somehow essential to oppose summary judgment.

### B. No Agency Relationship, Formal or Otherwise, Existed between LeadPile and AC Referral.

In addition to failing to satisfy the requirements for Rule 56(d) relief, Plaintiff's response to LeadPile's Motion for Summary Judgment wholly fails to respond to LeadPile's arguments regarding vicarious liability, including formal agency, apparent agency, and ratification. Plaintiff's only substantive response was that LeadPile may be liable on an alter-ego theory (which has been addressed above) and on a sub-agency theory. These theories of recovery appeared for the first time in Plaintiff's Motion to Compel (Dkt. 199), and neither theory was plead in either Plaintiff's Class Action Complaint (Dkt. 1) or First Amended Class Action Complaint (Dkt. 35), or its Motion for Class Certification (Dkt. 113). Because Plaintiff has failed to plead these theories, Plaintiff should not now be allowed to invoke them in opposition to LeadPile's motion for summary judgment. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1291-92 (9th Cir. 2000) citing *Klein v. Boeing Co.*, 847 F. Supp. 838, 844 (W.D.Wash.1994) ("Klein never asserted this claim prior to his opposition to Boeing's motion for summary judgment, nor has he moved to amend his complaint to add such a claim. Thus, this claim is not properly before the court."); *see also Patel v. City of Long Beach*, 564 Fed. Appx. 881, 882 (9th Cir. 2014) citing *Coleman*, 232 F.3d at 1292–93 ("[A] plaintiff cannot raise a new theory for the first time in opposition to summary judgment ….")

Regardless, as noted above in Section II. A., Plaintiff cannot win on any agency theory, including alter-ego and sub-agency, because he cannot demonstrate that an actual or apparent agency relationship existed between LeadPile and AC Referral, and because

LeadPile, by virtue of AC Referral's contract prohibiting unlawful acts, could not have possibly ratified a violation of the TCPA.

### III. The Court Should Deny Plaintiff's Untimely Motion for Summary Judgment

Plaintiff seeks summary judgment on the issue of whether an ATDS was used to transmit the subject text message.[2] (Dkt. 266, p. 2). As discussed more fully above, Plaintiff's request on this point should be denied because there are no material issues of fact, and LeadPile is entitled to judgment as a matter of law. Under the plain language of the TCPA, Data Doctor is not an ATDS and, as a result, LeadPile should prevail on this point as a matter of law.

### IV. A Motion for Spoliation Sanctions, Filed by Defendants LeadPile and Credit Payment Services, Inc., is Currently Pending Before the Court and Seeks Terminating Sanctions, or Alternatively, Evidentiary Sanctions, Which May Be Considered by this Court on Summary Judgment

On October 24, 2014, LeadPile filed its Motion for Terminating Sanctions, or Alternatively, Evidentiary Sanctions for Intentional Spoliation of Evidence (Dkt. 241) (the "Spoliation Motion"). CPS filed its Joinder to the Spoliation Motion on November 5, 2014 (Dkt. 249).

The Spoliation Motion, which is set to be heard on January 6, 2015, seeks the dismissal of this case for Plaintiff's egregious actions in destroying his hard drive, "wiping" his iPhone of all information except the numerous unsolicited text messages he chose to save for another day, and continuing to permit the automatic deletion of e-mails from his multiple e-mail accounts, all of which occurred after he retained counsel for this litigation. As an alternative, the

---

[2] On December 3, 2014, the Court granted the Class's Motion to Reset its Dispositive Motion Deadline to some time after January 6, 2015. (Dkt. 280). In doing so, it appears the Court was not aware that the Class had already moved for Summary Judgment in Dkt. 266. The Class should not be allowed to file an additional dispositive motion.

15

Spoliation Motion seeks evidentiary sanctions in the form of an adverse inference instruction on the issue of consent. Given Plaintiff's disproportionate reliance on the lack of evidence of consent as proof that there was none provided, LeadPile and CPS have argued that anything less than an adverse inference instruction would permit Plaintiff to profit from what is, on its face, egregious conduct. Indeed, such a result could bolster the already common trend of spoliation issues in TCPA cases. That being said, because these arguments are set forth fully in the Spoliation Motion, and are again addressed in CPS and LeadPile's response to Plaintiff's baseless Rule 11 Motion (Dkt. 261), LeadPile will forego a full recitation of them here.

Nevertheless, should CPS and LeadPile be granted evidentiary relief, this Court would be permitted by Ninth Circuit law to consider the effects of any adverse inference instruction when ruling on LeadPile and CPS's motions for summary judgment. *See United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) ("Showing evidence of spoliation … would allow [Defendants] to argue to the jury adverse inferences or fraud that might be sufficient to defeat summary judgment."). To that end, Plaintiff would likely fail to present any additional evidence that would enable him to rebut the adverse inference, and LeadPile and CPS would be entitled to summary judgment.

Outside of receiving the minimum relief sought in its Spoliation Motion, LeadPile admits that there is a genuine dispute of material fact as to whether Plaintiff consented to receive the text message. Not surprisingly, Plaintiff disagrees and continues to argue that the only admissible evidence on the issue of consent is his own self-serving testimony. Therefore, he argues that LeadPile fails to meet its evidentiary burden and that he is entitled to judgment as a matter of law on the issue of consent. Plaintiff's argument is erroneous.

First, one cannot ignore the irony of Plaintiff arguing lack of evidence of consent when he, the only party to this lawsuit having any actual connection to the text message, destroyed numerous repositories of such evidence. Plaintiff even goes so far as to argue that "[defendants] are in the best position to have records kept in the usual course of business showing such consent." The case Plaintiff relies on for this broad proposition is *Ryabyschuk v. Citibank (S.D.) N.A.*, No. 11-cv-1236-IEG (WVG), 2011 WL 5976239, *5 (S.D. Cal. Nov. 28, 2011). Plaintiff's reliance is misplaced. *Ryabyschuk* is a TCPA case relating to debtors and creditors. In fact, the quote Plaintiff utilizes here, if unaltered, actually states, "The ***creditors*** are in the best position to have records kept in the usual course of business showing such consent, such as purchase agreements, sales slips, and credit applications." *Id* (emphasis added).

The facts of *Ryabyschuk* are a far cry from the circumstances of this case. In *Ryabyschuk*, the plaintiff filed suit against the company (his creditor) that sent him the text message. Here, Plaintiff specifically chose not to file suit against the company that sent him the text message (AC Referral). Nor did he sue the company who gave AC Referral his contact information to use (360 Data Management). Instead, Plaintiff chose five companies that were levels removed from the transmission of the text message and had no involvement with it whatsoever. As a result, a Defendant like LeadPile, or any other Defendant for that matter, was never "in the best position to have records kept in the usual course of business" because no Defendant had any involvement whatsoever with the transmission of the text message. Plaintiff is the only party with any reason to have had evidence of consent. Unfortunately for Defendants, he destroyed any he may have had.

Second, Plaintiff continues to make the same argument regarding the testimony of Michael Ferry and James Gee – *i.e.,* that this Court ruled that their testimony is wholly inadmissible. Plaintiff's argument is unfounded and based on a gross mischaracterization of the Court's prior ruling. The specific language to which Plaintiff refers comes from the Court's Order Denying Defendants' Motion to Dismiss and Granting Class Certification (Dkt. 164):

> [Defendants'] reliance on James Gee (of AC Referral Systems) and Michael Ferry (of 360 Data Management and Absolute ROI) is misplaced, as neither has ***personal knowledge whether Kristensen, or the other purported class members consented*** when they visited one of "hundreds" of websites that Defendants allege were the original sources of the cell phone numbers.

[Dkt. 164, at 17 (emphasis added).]

Without question, the plain language here states that Mr. Ferry and Mr. Gee were found to lack personal knowledge regarding Plaintiff's consent. LeadPile did not offer testimony for that purpose. Rather, their testimony was offered as it relates to their personal knowledge of their own business processes, procedures, and routines, specifically the manner in which consent would have been provided and their standard operating procedure for complying with the TCPA, as well as other laws, with regard to each text message that was sent.

Mr. Ferry and Mr. Gee's testimony establishes that the sole source of consent to be texted came from consumers' internet-based activity. Additionally, their testimony established their standard business practice of comparing all numbers they received to numbers contained on various "suppression lists," including those they were provided and those they maintained on their own. Again, they did this for every phone number that was to receive a text message. Such testimony is admissible under Rule 406 of the Federal Rules of Evidence:

> Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness.

Fed. R. Evid. 406.

Evidence of habit "is highly probative for the purpose of showing that a person acted in conformity with his habit on a particular occasion." *In re Swine Flu Immunization Products Liability Litigation v. United States*, 533 F. Supp. 567, 574 (D. Colo. 1980) (citing *Reyes v. Missouri Pac. R. Co.*, 589 F.2d 791 (5th Cir. 1979). Moreover, routine business practices, such as those to which Mr. Ferry and Mr. Gee testified, are more probative than routine individual conduct. *See Fritchie v. Alumax Inc.*, 931 F. Supp. 662, 676 (D. Neb. 1996) ("This is…because routine business practices are derived from concerted planning activities driven by economic concerns about efficiency which are of necessity more regimented than individual conduct.") Here, Mr. Ferry and Mr. Gee operated under the procedures they chose in order to avoid significant legal liability – a "necessity."

## **CONCLUSION**

Plaintiff cannot establish essential elements of his TCPA claim. First, he cannot establish that the text message was sent using an ATDS. Second, he cannot establish that LeadPile is either directly or vicariously liable for any violation of the TCPA. There is no relationship between LeadPile and AC Referral, or LeadPile and Click Media, that can be established, and Plaintiff cannot show liability through ratification because any unlawful acts by AC Referral would instantly remove it from within any purported scope of authority. Further, Plaintiff's egregious actions involving the willful spoliation of evidence will be brought before the Court on January 6, 2015. The outcome of that hearing could profoundly affect the issue of consent in this case.

19

For these reasons, LeadPile requests that this Court deny Plaintiff's requested relief, grant LeadPile's Motion for Summary Judgment, and grant such further relief as this Court deems necessary.

Respectfully submitted,

**HUSCH BLACKWELL LLP**

DATED:  December 4, 2014        By:        */s/ K. Chris Collins*
                                    Ryan W. Mitchem (TN #022196)
                                    Michael K. Alston (TN #013697)
                                    K. Chris Collins (TN #029109)
                                    736 Georgia Avenue, Suite 300
                                    Chattanooga, Tennessee 37402

                                    Patricia Lee (NV #8287)
                                    Joseph R. Ganley (NV #5643)
                                    Peccole Professional Park
                                    10080 West Alta Drive, Suite 200
                                    Las Vegas, Nevada 89145

*Attorneys for Defendant LeadPile LLC*

## CERTIFICATE OF SERVICE

Pursuant to FRCP 5(b), I certify that on this 4th day of December, 2014, I caused the above and foregoing document entitled **LEADPILE LLC'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** to be served as follows:

Pursuant to Fed. R. Civ. P. 5(b) and Section IV of District of Nevada Electronic Filing Procedures, to be served **via electronic service**; or to all attorneys of record according to the Court's CM/ECF system.

*s/K. Chris Collins*