John Benedict, Esq.
Nevada Bar No. 005581
Email: john.benedict.esq@gmail.com
LAW OFFICES OF JOHN BENEDICT
2190 E. Pebble Road, Suite 260
Las Vegas, Nevada 89123
Telephone: (702) 333-3770
Facsimile: (702) 361-3685

Ryan D. Andrews (Admitted *Pro Hac Vice*)
randrews@edelson.com
Rafey Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
John C. Ochoa (Admitted *Pro Hac Vice*)
jochoa@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorneys for Plaintiff Flemming Kristensen and the Class*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| FLEMMING KRISTENSEN, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>CREDIT PAYMENT SERVICES INC., a Nevada corporation, f/k/a MYCASHNOW.COM INC., ENOVA INTERNATIONAL, INC., an Illinois corporation, PIONEER FINANCIAL SERVICES, INC., a Missouri corporation, LEADPILE LLC, a Delaware limited liability company, and CLICKMEDIA LLC d/b/a NET1PROMOTIONS LLC, a Georgia limited liability company,<br><br>Defendants. | Case No. 2:12-CV-00528-APG(PAL)<br><br>CLASS ACTION<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' LEADPILE LLC AND CREDIT PAYMENT SERVICES, INC.'S MOTION FOR TERMINATING SANCTIONS**<br><br>Judge: Hon. Andrew P. Gordon<br><br>Magistrate: Hon. Peggy A. Leen |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

THE TCPA AND CONSENT AS AN AFFIRMATIVE DEFENSE ........................2

I.    The FCC and courts alike have established that "prior express consent" is an
      affirmative defense to a TCPA claim ..........................................................2

II.   Defendant CPS always had access to the purported "evidence of consent" it now
      complains Plaintiff destroyed—it just never existed in the first place........................4

BACKGROUND ...................................................................................................5

I.    The District Court rejected Defendants' "consent" and "spoliation" arguments
      once before ..........................................................................................6

II.   The District Court's prior findings were correct and supported by the record
      evidence ...............................................................................................7

      A.    Neither Gee Nor Ferry presented any evidence that anyone in this case
            consented.....................................................................................7

      B.    Documents produced failed to corroborate Gee and Ferry's "unfounded"
            testimony.....................................................................................9

      C.    Discovery conducted after the Court's March 26 Order failed to suggest
            anyone "consented" in this case .......................................................9

            1.    The supposed "source" of the opt-in information in this case had no
                  evidence of consent, nor did it have any evidence of a relationship with
                  Michael Ferry at all. ...........................................................10

            2.    Plaintiff produced significant discovery that failed to suggest he
                  "consented" to receive this text message ..................................10

            3.    Defendants have No evidence suggesting Plaintiff (or anyone else)
                  consented to receive these text messages, or where, when, or how
                  such consent occurred .........................................................12

LEGAL STANDARD ............................................................................................12

ARGUMENT .......................................................................................................13

I.    The full record in this case confirms that Defendant cannot meet even one element to
      prove that Plaintiff "spoliated" relevant evidence ................................................13

II.   Defendants have presented no proof that "temporary internet files," "cookies," and
      "cache files" existed on Plaintiff's laptop hard drive in the first place........................14

III.  Plaintiff was under no duty in February 2012 to preserve ephemeral data on
      his laptop hard drive .................................................................................16

      A.    There were no facts known to Plaintiff in February 2012 that would suggest
            he was under a duty to preserve ephemeral ESI on his laptop........................18

B.    The potential of on-line Consent was not raised or foreseeable until January 2014...................................................................................................................19

C.    Defendants' only basis that Plaintiff had a duty to preserve ephemeral ESI on his laptop in February 2012 arises from testimony obtained in January 2014...................................................................................................................20

IV.    Plaintiff did not destroy any relevant evidence "willfully" or "in bad faith" ...........21

A.    Plaintiff never intentionally deleted any evidence on his laptop hard drive regarding his Internet history........................................................................22

1.    Plaintiff never testified that he wiped his "browser history" .............22

2.    Plaintiff never intentionally destroyed ephemeral ESI on his laptop..................................................................................................23

B.    Plaintiff performed reasonable searches on all of his ESI repositories using search terms supplied by Defendants .......................................................25

C.    Plaintiff testified that only emails in his "spam" folder were deleted through automated processes, and that he did not actively delete any other emails....26

V.    Defendants have failed to establish that Plaintiff's laptop "cache files" and "cookies," and his "spam email" folders contained evidence of consent in the first place..........27

VI.    The only delays in this litigation have been caused by Defendants............................29

CONCLUSION ..................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Agne v. Papa John's Int'l, Inc.,*
    286 F.R.D. 559 (W.D. Wash. 2012) ................................................................. 3

*Akiona v. United States,*
    938 F.2d 158 (9th Cir. 1991) ......................................................................... 17

*Azad v. Goodyear Tire & Rubber Co.,*
    No. 2:11-cv-00290, 2013 WL 593913 (D. Nev. Feb. 14 2013) ........................... 25

*Badger v. Wal-Mart Stores, Inc.,*
    No. 2:11-CV-1609, 2013 WL 3297084 (D. Nev. June 28, 2013) ......................... 21

*Cottle-Banks v. Cox Commc'ns, Inc.,*
    No. 10-cv-2133, 2013 WL 2244333 (S.D. Cal. May 21, 2013) ........................... 30

*Demena v. Smith's Food & Drug Ctrs., Inc.,*
    No. 2:12-CV-00626-MMD, 2012 WL 3962381 (D. Nev. Sept. 10, 2012) ............. 22

*E.I. Du Pont De Nemours & Co. v. Kolon Indus., Inc.,*
    No. 3:09CV58, 2011 WL 1597528 (E.D. Va. Apr. 27, 2011) .............................. 20

*Earle v. Net1Promotions, LLC,*
    Complaint, No. 13-cv-673 (N.D. Ga. Mar. 4, 2013) ......................................... 9

*Erlandson v. Ford Motor Co.,*
    No. 08-cv-11372009 WL 3672898 (D. Or. Oct. 30, 2009) ............................... 25

*Fernandez v. Centric,*
    No. 3:12-CV-00401, 2014 WL 2042148 (D. Nev. May 16, 2014) .................. 13, 14

*Glenn v. Scott Paper Co.,*
    Civ. A. No. 92-cv-1873, 1993 WL 431161 (D.N.J. Oct. 20, 1993) ..................... 30

*Goodman v. Praxair Servs., Inc.,*
    632 F. Supp. 2d 494 (D. Md. 2009) ............................................................... 30

*Grant v. Capital Mgmt. Servs., L.P.,*
    449 F. App'x 598 (9th Cir. 2011) ................................................................... 3

*In re Ethicon, Inc. v. Pelvic Repair Sys. Prod. Liab. Litig.,*
    299 F.R.D. 502 (S.D. W.Va. 2014) ................................................................ 18

*In re Pfizer Inc. Sec. Litig.,*
    288 F.R.D. 297 (S.D.N.Y. 2013) .................................................................. 27

*Klezmer ex rel. Desyatnik v. Buynak,*
    227 F.R.D. 43 (E.D.N.Y. 2005) .................................................................... 26

*Krause v. Nev. Mut. Ins. Co.,*
    No. 2:12-CV-00342-JCM, 2014 WL 496936 (D. Nev. Feb. 6, 2014) .......... 13, 16, 21

*LaJocies v. City of N. Las Vegas,*
    No. 2:08-CV-00606, 2011 WL 1630331 (D. Nev. Apr. 28, 2011) ................. 13, 21

*Leon v. IDX Sys., Corp.*,
   464 F.3d 951 (9th Cir. 2006) ..............................................................................24

*Martin v. Bureau of Collection Recovery*,
   No. 10 C 7725, 2011 WL 2311869 (N.D. Ill. June 13, 2011) ................................3

*Memry Corp. v. Ky. Oil Tech., N.V.*,
   No. C-04-03843, 2007 WL 832937 (N.D. Cal. Mar. 19, 2007) .................29–30

*Navajo Nation v. United States*,
   106 Fed. Cl. 753 (2012) .....................................................................................17

*Okezie v. Prince George's Cnty., Md.*,
   Civ. A. No. DKC-13-0168, 2014 WL 1429183 (D. Md. Apr. 11, 2014) ...........14

*Omogbehin v. Cino*, 485 F. App'x 606 (3d Cir. 2012)....................................................16

*Orbit One Commc'ns, Inc. v. Numerex Corp.*,
   271 F.R.D. 429 (S.D.N.Y. 2010) .......................................................................14

*Payne v. Exxon Corp.*,
   121 F.3d 503 (9th Cir. 1997) .............................................................................22

*People v. Reiss*, No. 269630, 2008 WL 2220555 (Mich. Ct. App. May 29, 2008)................15, 21

*Putscher v. Smith's Food & Drug Ctrs., Inc.*,
   No. 2:13-CV-1509, 2014 WL 2835315 (D. Nev. June 20, 2014)..........................14, 15–16

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
   306 F.3d 99 (2d Cir. 2002).................................................................................27

*Ryabyshchuk v. Citibank (S.D.) N.A.*,
   No. 11-cv-1236, 2011 WL 5976239 (S.D. Cal. Nov. 28, 2011)............................3

*Satterfield v. Simon & Schuster, Inc.*,
   569 F.3d 946 (9th Cir. 2009) .......................................................................... 2-3

*Shakespear v. Wal-Mart Stores, Inc.*,
   No. 2:12-CV-01064, 2013 WL 3270545 (D. Nev. June 26, 2013)....................18

*Travelers Prop. Cas. Co. of Am. v. Cannon & Dunphy, S.C.*,
   997 F. Supp. 2d 937 (E.D. Wis. 2014)...............................................................17

*Treppel v. Biovail Corp.*,
   249 F.R.D. 111 (S.D.N.Y. 2008) .......................................................................27

*U.S. Equal Emp't Opportunity Comm'n S. .C. v. Wedco, Inc.*,
   No. 3:12-CV-00523-RCJ, 2014 WL 4635678 (D. Nev. Sept. 15, 2014)............... 12-13, 21

*United States v. $40,955.00 in U.S. Currency*,
   554 F.3d 752 (9th Cir. 2009) .............................................................................17

*Usavage v. Port Auth. of N.Y. & N.J.*,
   932 F. Supp. 2d 575 (S.D.N.Y. 2013) ..........................................................18, 21

*Woodard v. Ford Motor Co.*,
   No. 1:11-cv-3092, 2013 WL 3024828 (D. Or. June 13, 2013)..........................25

*Yath v. Fairview Clinics, N.P.*,
767 N.W.2d 34 (Minn. Ct. App. 2009) ................................................................... 22

*Zubulake v. UBS Warburg LLC*,
220 F.R.D. 212 (S.D.N.Y. 2003) ........................................................... 18,20- 21

**Other Authorities**

*In the Matter of the Joint Petition Filed by Dish Network, LLC, the U.S. of Am., & the States of Cal., Ill., N.C., & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 FCC Rcd. 6574 (May 9, 2013) .............................................................. 4

1

## INTRODUCTION

2   When Judge Gordon certified the class in this case, he held that the so-called "reliable and

3   convincing" of evidence of consent that forms the basis of LeadPile LLC ("LeadPile") and Credit

4   Payment Services, Inc.'s ("CPS")[1] (together "Defendants") current spoliation motion was

5   "unfounded," and their identical accusations of "spoliation" were baseless. Now, on the eve of

6   summary judgment, Defendants once again advance the same losing arguments, using the same

7   evidence in support, and yet hope for a different result. The only thing that has changed since the

8   Court's March 26 Order granting class certification is that now, Plaintiff has produced hundreds of

9   pages of ESI that didn't show he consented, and when Defendants went to the supposed source of

10  "consent" it too had *no evidence* that showed that Plaintiff or any of the other nearly 100,000 class

11  members consented to receive these text messages, let alone anything that suggested that their

12  phone numbers were harvested online.

13   Faced with the prospect of having no evidence to support their affirmative defense of

14  consent going into summary judgment—because no one consented to receive the spam text

15  messages at issue—LeadPile and CPS resorted to filing a sensationalistic screed seeking

16  terminating sanctions. Specifically, Defendants inform the Court that it can simply skip the

17  requisite "exhaustive review of the record" because it is "so clear" that Plaintiff and his attorneys

18  conspired to destroy "evidence of consent."

19   Once this Court cuts through Defendants' repeated and baseless insinuation[2] that Plaintiff

20  and his attorneys conspired to "destroy" the relevant evidence, LeadPile and CPS's Motion boils

21  down to their complaints about the alleged loss of two categories of evidence: (1) "temporary

22  ---

[1]   Despite not having pleaded an affirmative defense of consent (dkt. 38) or moved for

23  summary judgment on that ground (dkt. 237), CPS has joined in LeadPile's motion (dkt. 249),
which is unsurprising as both are part of Carey V. Brown's payday-loan operation. (*See* 199-2, Ex.

24  J.)
[2]   Defendants have already begun hurriedly backtracking from their outrageous and

25  misleading claims by filing an "Amendment and Supplement" to their Motion clarifying that, in
truth, Plaintiff did not actually conspire with his attorneys to wipe "all relevant data" from his

26  iPhone after receiving it back from his attorneys, (dkt. 259), but regardless, CPS and LeadPile
claim that this statement "doesn't form the basis of their spoliation motion" anyways. (*Id.*)

27  Unfortunately, Defendants' commitment to the duty of candor—which only arose in the face of a
Rule 11 motion filed against them—did not extend to other misstatements in their Motion, which

28  they unequivocally affirmed they would stand by in their Supplemental filing. (Dkt. 259 at 5.)

internet files," "cache files," and "cookies" that Defendants claim resided on Plaintiff's old laptop

hard drive that he replaced in February 2012, and (2) Plaintiff's "spam" emails, which get deleted

by routine operation of his email accounts after 7 days.

Putting aside Defendants' misstatements and omissions from the record—which are

detailed below and have previously been detailed in Plaintiff's Rule 11 Motion for Sanctions—

CPS and LeadPile do not attempt to describe what "evidence of consent" would have existed in

these two repositories. Moreover, they fail to even identify a timeframe during which plaintiff gave

his alleged "consent," the website at which he gave his supposed "consent," or any individuals

and/or entities to whom he gave such "consent." Indeed, Defendants utterly failed to meet their

burden of proof to show that spoliation actually occurred, and in fact, they cannot possibly meet

the burden for the following four reasons:

> (1)    first, Defendants cannot demonstrate that the evidence they claim was "destroyed"
>        ever existed in the first place;
>
> (2)    second, Defendants cannot establish that Plaintiff had a "duty" in February 2012 to
>        preserve the categories of ESI whose loss they now complain about;
>
> (3)    third, Defendants cannot substantiate their allegation that Plaintiff destroyed
>        evidence "willfully," "intentionally" or "in bad faith"; and
>
> (4)    lastly, but most importantly, Defendants cannot support their claim that the
>        "evidence" Plaintiff lost, if any, would have been favorable to their case.

After a thorough review of the record in this case, it becomes apparent that Defendants'

Motion is nothing more than a desperate attempt to avoid the Court examining their liability in this

case on the merits. For the foregoing reasons, and those contained in the Plaintiff's motion for

Rule 11 Sanctions, Plaintiff respectfully requests that this Court deny Defendants' frivolous

Motion in its entirety.

## THE TCPA AND CONSENT AS AN AFFIRMATIVE DFENSE

**I.     The FCC and courts alike have established that "prior express consent" is an
        affirmative defense to a TCPA claim**

The Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), is a consumer

protection statute enacted to ensure the privacy of consumers and to prevent intrusive harassment

by the telemarketing efforts of companies like CPS and LeadPile. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009) ("The TCPA was enacted to protect the privacy interests of residential telephone subscribers . . ."). To that extent, the FCC and courts interpreting the TCPA have consistently determined that the party raising the "prior express consent" defense not only bears the burden of proof, but is also in the best position to demonstrate the existence of such consent as the documents are in that party's possession or control. *Grant v. Capital Mgmt. Servs., L.P.*, 449 F. App'x 598, 600 n.1 (9th Cir. 2011) (noting that the issue of consent in a TCPA claim is an affirmative defense for which the defendant bears the burden of proof); *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 570 (W.D. Wash. 2012) ("Papa John's [the defendant] is in the best position to come forward with evidence of individual consent . . ."); *Ryabyshchuk v. Citibank (S.D.) N.A.*, No. 11-cv-1236, 2011 WL 5976239, at *5 (S.D. Cal. Nov. 28, 2011) (relying on the FCC's 2008 Declaratory Ruling to find that the party transmitting the message, the debt collectors, were "in the best position to have records kept in the usual course of business showing such consent . . .") (internal citations and quotation marks omitted). As such, if a defendant "does not have documents or other information which substantiates the defense [of prior express consent] it is difficult to fathom why it interposed that defense in the first place." *Martin v. Bureau of Collection Recovery*, No. 10 C 7725, 2011 WL 2311869, at *4 (N.D. Ill. June 13, 2011) (internal quotation marks omitted) (collecting authority in TCPA cases finding that defendants or their agents must retain evidence of prior express consent if raised as a defense).

CPS and LeadPile complain that they have been at a "material disadvantage" in this lawsuit because they themselves did not send the spam text messages, and that Plaintiff "sued the wrong party." (Dkt. 241 at 6.) However, this argument does not tell the whole story—CPS received *thousands* of payday loan customers from affiliate marketer Click Media as a result of this text message-marketing scheme, and LeadPile "brokered" the sale of even more. (Dkt. 133-1, ¶ 7.) And LeadPile's claim of being "unaware" of text message marketing prior to this lawsuit is also disingenuous—LeadPile knew as early as 2008 that its affiliates used text message marketing to generate leads. (Declaration of John C. Ochoa ("Ochoa Decl.") ¶ 2.) The actual transmission of text messages in this case, however, was outsourced to judgment-proof third parties so that Defendants could distance themselves from these actions. But this is not how responsible

companies that obtain customers via telemarketing should operate. The Federal Communications

Commission has found that:

> [C]onsistent with the statute's consumer protection goals, potential seller liability
> will give the seller appropriate incentives to ensure that their telemarketers
> comply with our rules. By contrast, allowing the seller to avoid potential liability
> by outsourcing its telemarketing activities to unsupervised third parties would
> leave consumers in many cases without an effective remedy for telemarketing
> intrusions. This would particularly be so if the telemarketers were judgment
> proof, unidentifiable, or located outside the United States, as is often the case.

*In the Matter of the Joint Petition Filed by Dish Network, LLC, the U.S. of Am., & the States of*

*Cal., Ill., N.C., & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA)*

*Rules*, 28 FCC Rcd. 6574 (May 9, 2013). The notion that these Defendants have been at a

"material disadvantage" in this case is only a consequence of their conscious decision to create

layers of insulation between themselves and the dubious marketing methods being used to generate

leads on their behalf.

## II.     Defendant CPS always had access to the purported "evidence of consent" it now complains Plaintiff destroyed—it simply never existed in the first place

And what's more, Defendants' claim of being at an "evidentiary disadvantage" is not even

true. CPS and LeadPile make the claim that "their efforts to prepare a fair defense against

Plaintiff's claims rely entirely upon the discovery process—a process that was hijacked by

Plaintiff's egregious conduct and ultimately rendered unreliable and ineffective." (Dkt. 241 at 6.)

This statement is simply an unsupported hyperbole.

As will be explained in more detail in section III of the Argument Section, Plaintiff

provided CPS with the cellular telephone on which he received the text message at issue at the

very outset of the litigation—before CPS responded to the Complaint and even before Parties held

their Rule 26(f) conference—to allow CPS to investigate the circumstances of the text message

transmission.[3] (Ochoa Decl. ¶ 3, Ex. B.) Although CPS was able to identify its now co-Defendant

Click Media as the party responsible for the transmission of the text messages (which was no

surprise since CPS was buying thousands of leads from Click Media), it apparently was not able to

---

[3]     As explained in greater detail in the Argument Section III, Plaintiff was unaware of the
actual transmitter of the text message when he filed suit, and the pre-suit investigation led directly
to the beneficiary of the spam text message—CPS.

find any evidence of consent from the Plaintiff, the putative Class, or anyone else for that matter. (Ochoa Decl. ¶ 4, Ex. C.) Yet, after its fruitless investigation surrounding Click Media, CPS never asked Plaintiff to produce any documents related to "consent," informed him of any potentiality of raising a consent defense, or even requested that he preserve any of the categories of documents whose loss they now complain about. (Ochoa Decl. ¶¶ 4-5.) Contrary to Defendants' allegations that Plaintiff "hijacked" the discovery process through his "egregious conduct," Plaintiff has been cooperative in the discovery process from the beginning of this case, voluntarily sharing information *pre-discovery* that, according to Defendants, would allow CPS to determine if Plaintiff consented. (Dkt. 241, pgs. 7-8.) Since CPS's investigation proved to be futile and only served to establish that Defendants' records were void of any evidence relating to consent, Defendants now attempt to bury this portion of the record and instead, fabricate a different story for the Court, a story unsupported by anything in the record, to further their own agendas.

As will be shown below, the reason why Defendants were unable to find any evidence of "consent" at the beginning of this case is simple. It is the same reason why none appeared later: no one—not the Plaintiff nor any of the other Class members—ever consented to receive the "payday loan" spam text messages in the first place.

## BACKGROUND

Instead of acknowledging that they are unable to raise consent as an affirmative defense, CPS and LeadPile skip over the facts—and relying solely on the testimony of James Gee and Michael Ferry—make the conclusory allegation that "it is much more likely than not" that Plaintiff "consented" to receive this text message. (Dkt. 241 at 8.) But the testimony on which Defendants rely has already been labeled as "unfounded" and subsequently rejected by Judge Gordon in his March 26 Order granting class certification. In the same vein, Defendants also argued then, on the same evidence they present now, that Plaintiff's alleged "spoliation" renders him an inadequate class representative. Judge Gordon likewise found this argument completely unpersuasive. Not surprisingly, Defendants leave this portion of the record out of their Motion. They also ignore the post-certification discovery that only strengthened Judge Gordon's conclusions—that there is no evidence of express consent anywhere in this case.

## I.   The District Court rejected Defendants' "consent" and "spoliation" arguments once before

This Motion is not the first time that Defendants have argued that they had "reliable and convincing" proof that "everyone consented online" to receive the text messages at issue in this case and that Plaintiff "spoliated" evidence. Defendants already raised both the arguments it raises here—that they have obtained "proof of consent," and that Plaintiff "spoliated evidence," with practically the same record evidence that it now brings before this Court—in opposing Plaintiff's Motion for Class Certification. (*See* Dkt. 148 at 5–6, 8, 19–22.) Judge Gordon, in rejecting these arguments, found Defendants' cries of "spoliation" meritless, and further determined that Defendants presented "no evidence of express consent." (Dkt. 164 at 14, 19.) The Court's findings were correct and need not be disturbed.

Judge Gordon already had an opportunity to review what Defendants claim is "reliable and convincing" evidence of consent and found that it was in fact neither of those things. The Court stated:

> [Defendants'] reliance on James Gee (of AC Referral Systems) and Michael Ferry (of 360 Data Management and Absolute ROI) is misplaced, as neither has personal knowledge whether Kristensen or the other purported class members consented when they visited one of "hundreds" of websites that Defendants allege were the original sources of the cell phone numbers. (Dkt. 164 at 17.)

The Court went on to describe Ferry's and Gee's testimony as "unfounded" (dkt. 164 at 17, ll. 18–19) and found that "Defendants have not submitted any evidence of express consent" (*id.* at 17, l. 9). Far from Defendants' statement that this evidence is "reliable and convincing," the Court held the *exact opposite*—that their testimonies were unreliable as they lacked foundation and unconvincing because Defendants presented *no actual evidence* of express consent. The Court concluded by stating that Defendants would "probably lose" on this issue, regardless of who holds the burden of proving consent at trial. (Dkt. 164 at 17.)

Further, Judge Gordon considered Defendants' dubious claims of "spoliation," along with Plaintiff's counter-arguments. (Dkts. 148, pgs. 19-22; Dkt. 155, pgs. 14-17.) At the time Defendants made this argument, they had the same evidence they now present in this Motion (namely, the testimony of James Gee, Michael Ferry, and Plaintiff), and also raised the exact same arguments they now raise here. (*See* Dkt. 148 at 19–22.) After a careful consideration of these

1   issues, the Court found that Plaintiff would be an adequate class representative, and the alleged

2   "spoliation" and perceived "discovery issues" Defendants raised did not change anything. (Dkt.

3   164 at 14.)

4         In light of the Courts' March 26 Order, Defendants' Motion is nothing more than a

5   repackaged version of the same losing argument that they raised with Judge Gordon seven months

6   ago. Having already failed once, Defendants are now taking a second shot at the same losing

7   theory and asking for a reconsideration of their prior argument. But they present no new evidence,

8   and, in fact, the evidence that has been adduced since the Court's Order has only strengthened

9   Judge Gordon's findings and revealed Defendants' Motion to be nothing more than a desperate

10  move in the face of a likely finding of liability against them.

11  **II.    The District Court's prior findings were correct and supported by the record evidence**

12        The District Court was correct in finding that Defendants have not shown that anyone

13  consented to receive these text messages, as it is amply supported both by the record and by

14  discovery conducted after the Court's ruling.

15  **A.    Neither Gee nor Ferry presented any evidence that anyone in this case
             consented**

16        Although the text spammer hired by Click Media in this case, (AC Referral Systems,)

17  initially testified that he only sent text messages to people who had "opted-in," (Deposition of

18  James Gee ("Gee Dep"), attached to the Ochoa Decl. as Ex. E, 89:12-17), when he was asked how

19  he knew that individuals to whom he had sent text messages "opted-in," he answered that he

20  *assumed* people opted-in because that is what Michael Ferry had told him, and that he "took his

21  word for it." Gee testified as follows:

22

23        Q: And how do you know the people on the lists that Mr. Ferry provided to
          you were people who had opted in?

24        A: I had a very trusting relationship with Mike, and I know that was the
          case, and we never really had any complaints about it, so I assume, of
25        course—he said these people opted in, and I said, okay, they opted in, and so
          I took his word for it.

26
          Q: Just so I'm clear, your sole understanding of whether these people on
27        these lists you got from him had opted in came from Mr. Ferry, correct?

28        A: That's correct.

(Gee Dep. 24:3-11.)

1      Gee also testified that he didn't do anything himself to make sure that individuals on the

2  list had "opted in":

3              Q: Okay. I just want to make sure I'm clear. You didn't do anything yourself
               to check to make sure that people on the list you got from Mr. Ferry had
4              opted in?

5              A: No.

6  (Gee Dep. 24:17-21.)[4]

7      Michael Ferry, the person who supplied James Gee with the telephone numbers to send text

8  messages to, likewise, did not obtain consent from individuals—he was simply a "list broker."

9  (Deposition of Michael Ferry ("Ferry Dep."), attached to the Ochoa Decl. as Ex. F, 115:12-18.) He

10  testified as follows:

11         Q: During that time, did you personally obtain opting (sic) information from consumers?

12         A: Did I obtain it –

13         Q: Yeah

14         A: -- or did I get it?

15         Q: I'm asking if you obtained it.

16         A: No.

17      Ferry was also asked if he had any protocols or compliance programs in place to confirm
18  that numbers he forwarded on were from people who consented. He stated that he did not:
19

20         Q: Do you have any, like, protocols or compliance programs in place to ensure that
           you, in fact, make sure that numbers you send on are proper numbers?
21
22         A: No, besides the fact that if someone ever complained, right, it's – you know, you
           can get into a lot of trouble.

23  (Ferry Dep. 87:12-17.) In addition to not collecting consumers' information himself or having any

24  protocols in place to confirm if anyone consented, Ferry could not identify a single website where

25  phone numbers had been collected. (Ferry Dep. 121:8–17.) Above all else, neither Gee nor Ferry

26  ─────────────
    [4]      Regarding the transmission of emails, Gee testified that he did not use any email software,
27  or send any emails, in connection with the payday loan the text messages that were sent in this
    case. (Gee Dep. 55:19-25. (Q: Just so I'm clear, you did not use any email software with respect to
    the text messages that were sent in this case, correct? A: You are correct. There was no email
28  sent.").

---

1   testified that "opt-in" phone numbers were ever collected in connection with online purchases.

2   **B.   Documents produced by Defendants failed to corroborate Gee and Ferry's**
3        **"unfounded" testimony**

4        Emails produced in discovery showed that on two other occasions, Michael Ferry and

5   James Gee were challenged to produce "opt-in" information for consumers who also complained

6   about receiving unsolicited text messages. (Ochoa Decl. ¶¶ 8-9.) One was from an individual

7   named Daniel Murphy, who also complained about receiving a nearly identical spam text message

8   as the one at issue here. (*Id.*) In response, Gee and Ferry provided what appeared to be registration

9   information containing a "fake" name and zip code. (*Id.*) In light of this, Michael Ferry said that

10   "we may have to settle to some degree." (*Id.*) Incredibly, this is the document that Defendants cite

11   to in their Motion as supposed "proof" that Ferry could obtain evidence of consent upon request.

12   (Dkt. 241 at 8.) In other words, Defendants are relying on "fake" consent evidence supplied by

13   Michael Ferry as proof that the phone numbers he harvested came from people who consented and

14   ask the Court to do the same.

15        The other request was in relation to an individual named Vicky Earle, who sued Click

16   Media regarding receipt of unsolicited payday loan text messages.[5] In response, Ferry again could

17   not produce evidence of consent. (Ochoa Decl. ¶ 9.) Not surprisingly, nothing showing that the

18   Plaintiff or any of the class members consented has ever surfaced.

19   **C.   Discovery conducted after the Court's March 26 Order failed to show, much**
        **less, to even suggest, that anyone actually "consented" in this case**

20        After the District Court found Defendants' testimony concerning consent was unfounded,

21   Defendants conducted follow-up discovery, including discovery on third-parties and Plaintiff.

22   None of these efforts substantiated the unfounded testimony of Michael Ferry and James Gee. In

23   fact, it was just the opposite: the follow-up discovery showed their testimony to be even more

24   unreliable. And documents produced by Plaintiff completely fail to suggest that Plaintiff

25   "consented" to these text messages.

26

27

28

---

[5]   *See* Complaint, *Earle v. Net1Promotions, LLC*, No. 13-cv-673 (N.D. Ga.)

### 1. The supposed "source" of the opt-in information in this case had no evidence of consent, nor did it have any evidence of a relationship with Michael Ferry at all.

On May 13, 2014, LeadPile issued a document subpoena to the Selling Source (formerly known as AbsoluteROI), which according to Michael Ferry, was his "source" for the cellular telephone numbers that he gave to James Gee for texting. (Ochoa Decl. ¶ 10.) LeadPile's subpoena requested not only information related to Plaintiff and the Class, but also general information about Michael Ferry's relationship with this company. (*Id.*, Req. Nos. 1-4.) In its response, the Selling Source did not produce any documents to corroborate Ferry's testimony that it obtained "opt-in" information from consumers. In fact, the Selling Source produced no evidence whatsoever that showed that there was even an ongoing contractual relationship between it and Ferry. (Ochoa Decl. ¶ 11.) Rather than corroborating Michael Ferry's testimony—that he obtained the lists of telephone numbers from the Selling Source—the Selling Source's response confirmed what the District Court had already found—that Ferry's testimony was without any basis in fact or truth. Tellingly, Defendants cannot identify a *single website* where the alleged "consent" was collected or the individuals or entities that collected it.

### 2. Plaintiff produced significant discovery that failed to suggest he "consented" to receive this text message

Defendants Motion misleadingly claims that Plaintiff failed to perform "reasonable searches" on his desktop and laptop concerning consent (dkt. 241 at 19), and that Plaintiff was otherwise uncooperative in the discovery process. This is not true. Defendants misleadingly cite to Plaintiff's deposition testimony to claim that he failed to search for evidence on his computers, but what Defendants omit, critically, is that neither CPS nor LeadPile had even issued discovery requests on Plaintiff concerning "consent" at the time of his deposition. The truth is, after conferring with Co-Defendant Pioneer, Plaintiff searched his laptop, desktop, and five email accounts for evidence and produced hundreds of responsive documents—none of which suggested he gave his "consent" to receive this spam text message.

On December 20, 2014, Defendant Pioneer provided Plaintiff with nearly 40 ESI search terms that it proposed Plaintiff use to search for evidence of "consent." (Collins Decl., dkt. 244, at Ex. J.) Although Plaintiff attempted to confer with Defendant on some of these search terms (because he believed they were overbroad and likely would not yield relevant evidence),

1   Defendant refused, demanding that the search terms be used and responsive documents be

2   produced. (Ochoa Decl. ¶ 12; Collins Decl., dkt. 244, Ex. K, at 3.) Despite the unreasonable

3   demand, Plaintiff obliged, and applied the search terms to his desktop computer, laptop computer,

4   iPhone that received the text message at issue, and five email accounts, including both work and

5   personal email. (Ochoa Decl. ¶ 13.)

6           Plaintiff then began producing documents to Defendants that were responsive to their

7   unilaterally-imposed search terms. (Ochoa Decl. ¶ 14.) The documents produced included both

8   marketing emails[6] as well as personal emails between Plaintiff and his girlfriend that had nothing

9   to do with this case. (*Id.*) These files dated between 2010 and 2014. (Ochoa Decl. ¶ 15.) Plaintiff

10  also produced statements for both his work and personal credit card accounts that spanned a two-

11  month period between approximately October 20, 2011 and December 20, 2011. (*Id.*) This

12  production consisted of *zero* documents related to "payday loans," any of the Defendants, or

13  anyone that was involved in the transmission of the text messages.

14          As Plaintiff informed this Court at the May 29, 2014 hearing on Defendant's motion to

15  extend the discovery schedule, none of these documents spoke to any of the issues in this case.

16  (Ochoa Decl. ¶ 16, Ex. N at pgs. 11-12.) Despite this, Defendants claimed that they wanted to re-

17  depose Plaintiff to ask him about his document production and represented to the Court that these

18  documents were "relevant" to the consent issue.  (*Id.* pgs. 7-8.) Then, inexplicably, Defendants *did*

19  *not even bother* to re-notice Plaintiff's deposition.  (Ochoa Decl. ¶ 17.) This only goes to show that

20  none of Plaintiff's document production was significant enough to warrant a second deposition

21  after all (or maybe perhaps Defendants did not think that they had enough evidence to justify a

22  second deposition). Defendants issued two subpoenas based on Plaintiff's production (one to

23  Quicken Loans and the second, to GoDaddy.com) (Ochoa Decl. ¶ 18), but neither of these

24  subpoenas yielded any relevant information, much less any evidence that he, or anyone else,

---

[6]      Contrary to LeadPile's claim that Plaintiff allowed "marketing emails" to automatically
delete after 7 days, Plaintiff's actual testimony was that "spam" email—and not "marketing"
email—is deleted after a period automatically. (Collins Decl. Ex. D, at 147:1-15.) Furthermore, the
record shows that Plaintiff produced numerous emails in discovery sent from businesses that dated
as far back as September 2010 that were responsive to Defendants' search terms. (Ochoa Decl. Ex.
M.)

1   consented to receive the text messages.

2           **3.**     **Defendants have no evidence that suggests Plaintiff (or anyone else)**
                        **consented to receive these text messages, or identify where, when, or**
3                       **how such supposed consent was given**

4         So far, Defendants' discovery on the "consent" issue has proven to be wholly fruitless,

5   having failed to find even a single shred of evidence to suggest that Plaintiff (or anyone else)

6   "consented" to receive the spam text messages. However, this was to be expected seeing as CPS's

7   pre-answer, pre-discovery investigation using Plaintiff's cellular telephone was equally as

8   unsuccessful in revealing any evidence of "consent." Defendants' efforts on this front have been in

9   vain as it was just a wild goose chase. But Defendants should have known that from the beginning.

10  They could not—and still cannot—name a single website, point to a specific timeframe, or even

11  identify any individuals or entities that were involved in collecting what now seems like fantastical

12  consent. Now, on the eve of summary judgment, finding themselves backed into a corner,

13  Defendants claim that this is all *Plaintiff's* fault. They argue that *he* was the "only source" of

14  proving consent, and they thus offer the conclusory allegation that *he* must have destroyed this

15  now desperately-needed evidence of consent, evidence that Defendants cannot find even a hint of

16  anywhere else. But this complete lack of evidence only goes to support the very conclusion that

17  stands in antithesis to Defendants' allegations: that no such evidence ever existed in the first place.

18  Plaintiff has steadfastly testified that he has never provided his consent to anyone to receive spam

19  text messages, including the one at issue in this case.[7] (Dkt. 113-2; Deposition of Flemming

20  Kristensen ("Kristensen Dep."), attached to the Ochoa Decl. as Ex. Q.) This explains why, now, on

21  the eve of summary judgment—their hour of twilight—Defendants are filing a brief and making a

22  desperate argument for "case-terminating sanctions," claiming they have already obtained "reliable

23  and convincing" evidence of consent, despite an entire record to the contrary.

24                                      **LEGAL STANDARD**

25        "A party moving for spoliation sanctions is not entitled to have the Court agree with broad

26  inferences of spoliation based on nothing more than speculation." *U.S. Equal Emp't Opportunity*

27  *Comm'n v. Wedco, Inc.*, No. 3:12-CV-00523-RCJ, 2014 WL 4635678, at *4 (D. Nev. Sept. 15,

28  ---
    [7]    Judge Gordon found such testimony to be sufficient to rebut Defendants' claim of "prior
    express consent." (Dkt. 164 at 17.)

1   2014). Rather, the party must meet an evidentiary burden—proof by preponderance of the

2   evidence—to obtain sanctions for spoliation. *See Krause v. Nev. Mut. Ins. Co.*, No. 2:12-CV-

3   00342, 2014 WL 496936, at *7 (D. Nev. Feb. 6, 2014) *aff'd*, 2014 WL 3592655 (D. Nev. July 21,

4   2014); *LaJocies v. City of N. Las Vegas*, No. 2:08-CV-00606, 2011 WL 1630331, at *1 (D. Nev.

5   Apr. 28, 2011). First, the moving party must prove that the spoliated evidence existed to begin

6   with. *Fernandez v. Centric*, No. 3:12-CV-00401, 2014 WL 2042148, at *9 (D. Nev. May 16,

7   2014). If the evidence did exist, then the moving party can only obtain an adverse inference

8   sanction upon showing: (1) that the spoliating party had an obligation to preserve the evidence; (2)

9   that the evidence was destroyed or significantly altered with a culpable state of mind; and (3) that

10   the evidence was relevant to the other party's claim in that a reasonable trier of fact could find that

11   it would support that claim. *Krause*, 2014 WL 496936, at *7.

## ARGUMENT

13   **I.      The full record in this case confirms that Defendants cannot even a single element**
14   **necessary to prove that Plaintiff "spoliated" relevant evidence**

15          CPS and LeadPile argue that the Court need not examine the record because proof of

16   Plaintiff's "spoliation" is so clear. But the bulk of Defendants' "evidence" comes in the form of

17   self-serving, accusatory discovery letters that they did not even write and misleading complaints

18   about Plaintiff's document production. But to obtain spoliation sanctions, a party must do more

19   than simply complain about the discovery process: they must meet each of the elements of a

20   spoliation claim.

21          As explained in detail above, Defendants' main problem in seeking "case-terminating

22   spoliation sanctions" is that they have no proof "evidence of consent" ever existed in the first place

23   that Plaintiff could have "destroyed." The District Court already rejected this exact same argument

24   once before, and the result should be no different here. Notwithstanding this gaping hole in

25   Defendants' Motion, they also cannot establish a single element necessary to show that spoliation

26   occurred, which is why they would prefer the Court ignore the record and "take their word for it"

27   on the issue. Unfortunately, we already know from Defendants' "Amendment and Supplement" to

28   the record that this Court should not (and cannot) take Defendants' Motion at face value.

       **First**, the threadbare record Defendants have presented fails to suggest that laptop

computer files related to "cookies" "cache files" and "temporary internet files," even existed in the first place.

**Second**, Defendants don't even try to explain why Plaintiff should have been "on notice" that *any evidence* on his laptop computer or email accounts would be relevant in this case at any time (much less in February 2012), except to say that their eliciting of "unfounded" testimony regarding consent in January 2014 should be transported back in time and imputed on the Plaintiff.

**Third**, Plaintiff's replacement of his laptop hard drive in February 2012 and his simultaneous copying of "all" files from the old hard drive to the new do not constitute a "willful" or "bad faith" destruction of evidence.

**Finally**, in the unlikely event that the Court finds the first three factors met, Defendants cannot meet their burden to show that any evidence lost would have assisted their "prior express consent" defense. As described above, Defendants have put forth nothing even suggesting "evidence of consent" existed in the first place.

**II.     Defendants have presented no proof that "temporary internet files," "cookies," or "cache files" existed on plaintiff's laptop hard drive in the first place**

The first element that Defendants must satisfy is that the evidence they claim Plaintiff "spoliated" (cookies, cache files, and temporary internet files on his old laptop hard drive) existed in the first place. *See Fernandez*, 2014 WL 2042148, at *9. "[F]or sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence *actually existed and was destroyed*." *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 441 (S.D.N.Y. 2010) (internal citations and quotation marks omitted) (emphasis in original). To discharge that burden, Defendants "must at a minimum point to some facts indicating that such [evidence] exists." *Putscher v. Smith's Food & Drug Ctrs., Inc.*, No. 2:13-CV-1509, 2014 WL 2835315, at *7 (D. Nev. June 20, 2014) (quoting *Epstein v. Toys-R-Us*, 277 F. Supp. 2d 1266, 1276–77 (S.D. Fla. 2003)). "A party must prove, not simply believe, that evidence was destroyed or suppressed." *Okezie v. Prince George's Cnty., Md.*, Civ. A. No. DKC-13-0168, 2014 WL 1429183, at *2 (D. Md. Apr. 11, 2014).

Defendants' entire case of spoliation rests on speculative deposition testimony they elicited that Plaintiff "wouldn't have" copied "temporary Internet files," "cookies," and "cache files" from

1   his old laptop hard drive to his new one. But before the Court can even consider whether he

2   "would have" copied these files over, Defendants must first establish that these files even existed

3   in the first instance. Defendants fail to acknowledge that the categories of data they complain

4   about are "ephemeral" files relating to Internet usage that are created by computers automatically

5   (without the knowledge of the computer user) and are deleted or overwritten automatically based

6   on a number of factors, including the storage space on the computer's hard drive, the specific

7   settings on the Internet browser used by the user, and the expiration dates on the data received

8   from websites themselves (if the websites provide data at all). As one court explained, "[t]hese

9   files are created by the Internet Explorer during the normal course of web browsing without any

10   action of the computer user, or unless a sophisticated computer user is involved, without even any

11   knowledge of the computer user." *People v. Reiss*, No. 269630, 2008 WL 2220555, at *9 n.1

12   (Mich. Ct. App. May 29, 2008) (emphasis added). The files consist of "images and graphics" from

13   the websites. *Id.* Defendants did not obtain any evidence (expert or otherwise) on any of these

14   issues despite having the ample opportunity to do so,[8] and as a result, have not presented any

15   actual evidence that these "ephemeral" files existed on his laptop hard drive in the first place.

16        Further, the testimony elicited by Defendants regarding his copying of the old laptop hard

17   drive to the new one doesn't even concern whether these "ephemeral" files existed in the first

18   instance. In fact, Defendants didn't bother to ask him whether these specific files existed. All they

19   asked about with respect to "cookies," "temporary internet files,"[9] and "cache files," was whether

20   he "*would have transferred* these files over to the new hard drive," which he answered "no."

21   (Kristensen Dep. 209:9-11.) (emphasis added)  But such questioning skips the fundamental step of

22   establishing that those files actually existed. As such, it is irrelevant to that issue.

---

23   [8]     In fact, Defendants inexplicably failed to even attempt to re-depose the Plaintiff, even

24   though they stated to this Court at the May 29, 2014 hearing that it was there intention to do so.
    (Ochoa Decl. Ex. N.) In addition, Defendants had ample opportunity to ask Plaintiffs these

25   questions at his deposition, but chose not to.
    [9]     Defense counsel, having failed to speak with a technical consulting expert, incorrectly

26   claims that "temporary internet files" and "cache" files are separate items and that they contain
    actual pieces of data. But that is not so—those terms refer to the same thing and neither is an actual

27   piece of data, but instead, is a file on a computer that contains data. As one Court explained,
    temporary internet files are "a location on your hard drive that stores images and graphics from

28   when you visit . . . and surf the internet." *Reiss*, 2008 WL 2220555, at *9.

---

1    Defendants likewise elicited no testimony that Plaintiff even used his laptop to browse or

2    make purchases on the Internet. Plaintiff testified that he spends between "zero to two hours"

3    browsing the Internet per day (although Defendants did not specify a timeframe or device)

4    (Kristensen Dep. 176:4-22) and stated that he "might have" used his laptop to make online

5    purchases in 2010, although he did testify that he used his desktop computer to make purchases

6    online (Defendants make no argument about this device). (Kristensen Dep. 69:21-23.)

7    Defendants' failure to obtain testimony concerning Plaintiff's Internet usage on his laptop

8    and their sheer speculation that this evidence must have existed is wholly insufficient to meet their

9    burden to show that the evidence existed in the first place. For example, in *Putscher v. Smith Food*

10   *& Drug Centers, Inc.*, the court held that plaintiff had failed to meet its burden in showing that

11   security camera footage of a slip-and-fall existed in the first place when a witness testified, "I

12   believe that some of the cameras do capture some of the footage—on the floor in the produce

13   department." 2014 WL 2835315, at *7; *see also Omogbehin v. Cino*, 485 F. App'x 606, 610 (3d

14   Cir. 2012) ("[The party seeking spoliation sanctions] must provide some proof that what he seeks

15   actually existed, but failed to do so. As a result, the District Court did not abuse its discretion in

16   denying [his] motion."); *Krause v. Nev. Mut. Ins. Co.*, No. 2:12-CV-00342-JCM, 2014 WL

17   496936, at *7 (D. Nev. Feb. 6, 2014) (denying spoliation sanctions and holding that despite

18   "counsel's fervent belief, the claim of destruction of the emails is entirely unsubstantiated.").

19   It is the same in this case. Defendants—despite having the opportunity to do so—failed to

20   establish that the ephemeral data would have even existed in February 2012—if it even existed on

21   his laptop at all. Instead of citing to evidence to support the existence of this evidence, Defendants

22   simply cry "spoliation" enough,[10] in hopes the Court will listen. Defendants cannot meet their

23   burden, and the Court's inquiry can end here.

24   **III.    Plaintiff was under no duty in February 2012 to preserve ephemeral data on his laptop hard drive**

25

26   Even if Defendants have established that ephemeral data existed on Plaintiff's old laptop

27   [10]    Indeed, Defendants' primary basis for alleging that this evidence was "destroyed" are self-
serving, accusatory discovery letters written by co-Defendant Pioneer Financial Services, Inc.,

28   which did not join in this motion, and which, apparently satisfied after Plaintiff's document
production was complete, did not pursue any further discovery or motion practice. (Ochoa Decl. ¶
20.)

1   hard drive in the first instance (which they have not), Defendants' Motion fails for a second reason:

2   Plaintiff was under no duty to preserve ephemeral ESI related to his internet browsing in February

3   2012. As a general matter, the standing orders of several district courts hold that, due to the nature

4   of ephemeral ESI like of the type described in Section II *supra*, litigants are under no duty to

5   preserve this type of ESI unless they are specifically put "on notice" by the opposing party.[11] But

6   in this case, there are more compelling, factual reasons to find no duty existed—there wasn't even

7   a suggestion in this case that Defendants, or anyone else, obtained "consent" for sending the

8   payday loan text messages in this case—much less obtained it online—until January 10, 2014, two

9   years after Plaintiff replaced his hard drive. This was when Michael Ferry of 360 Data

10  Management provided testimony (albeit lacking in foundation) that he thought consent was

11  obtained at websites, although neither Ferry nor Defendants can identify any of these websites.

12  Under well-established law, a duty to preserve only reaches to documents a party believes may be

13  relevant to the litigation at the time it was destroyed. Plaintiff did preserve ESI that, to his

14  knowledge, was relevant to his claim—the unsolicited text message that he received on his cellular

15  telephone. Defendants have presented no evidence whatsoever that Plaintiff had a duty to preserve

16  ephemeral data on his laptop hard drive in February 2012, and as a result cannot maintain a

17  spoliation claim.

18          A duty to preserve particular documents arises only when "a party had some notice that the

19  evidence was potentially relevant" at the time it was destroyed. *United States v. $40,955.00 in U.S.*

20  *Currency*, 554 F.3d 752, 758 (9th Cir. 2009); *see also Akiona v. United States*, 938 F.2d 158, 161

21  (9th Cir. 1991) ("A party should only be penalized for destroying documents if it was wrong to do

22  so, and that requires, at a minimum, some notice that the documents are potentially relevant.").

23  ---
[11]     *See Navajo Nation v. United States*, 106 Fed. Cl. 753, 755 (2012) (excluding these
24  categories of ESI from what needs to be produced); *see also Travelers Prop. Cas. Co. of Am. v.
    Cannon & Dunphy, S.C.*, 997 F. Supp. 2d 937, 946 (E.D. Wis. 2014) (entering standing ESI
25  protocol stating "[t]he following categories of ESI generally are not discoverable in most cases,
    and if any party intends to request the preservation or production of these categories, then that
26  intention should be discussed at the meet and confer or as soon thereafter as practicable: . . . (3)
    on-line access data such as temporary internet files, history, cache, cookies, etc.). In addition, the
27  Seventh Circuit Proposed Standing Order Relating to the Discovery of Electronically Stored
    Information excludes temporary internet files, cache, cookies, etc. from discoverability. *Available*
28  *at* http://www.discoverypilot.com/sites /default/files/StandingOrde8_10.pdf. (last accessed
    November 16, 2014).

1    Even after litigation has started, if a party has no reason to believe that a document is relevant, then

2    it is under no obligation to preserve it. *See Shakespear v. Wal-Mart Stores, Inc.*, No. 2:12-CV-

3    01064, 2013 WL 3270545, at *3 (D. Nev. June 26, 2013); *Zubulake v. UBS Warburg LLC*, 220

4    F.R.D. 212, 217 (S.D.N.Y. 2003) (stating that a litigant is not under a duty to preserve "every

5    shred of paper," even if litigation is reasonably foreseeable). Determining "what" must be

6    preserved is a highly case-specific and fact-dependent inquiry. *In re Ethicon, Inc. v. Pelvic Repair*

7    *Sys. Prod. Liab. Litig.,* 299 F.R.D. 502, 512 (S.D. W.Va. 2014). This duty is judged by the

8    reasonably available information known to the party at the time—facts revealed in future

9    discovery are not applied with hindsight. *Usavage v. Port Auth. of N.Y. & N.J.,* 92 F. Supp. 2d 575,

10   591 (S.D.N.Y. 2013).

11   **A.    There were no facts known to Plaintiff in February 2012 that would suggest he was under a duty to preserve ephemeral ESI on his laptop**

12

13       The genesis of this certified class action is Plaintiff's December 6, 2011, receipt of a spam

14   text message from an unknown phone number ("330-564-6316") on his iPhone advertising

15   "payday loans." (Dkt. 113-2 ¶ 2.) Plaintiff did not recognize the phone number from which the text

16   message was sent and had no idea why he received such a message given that he never requested

17   to receive such a text message from anyone, nor has he ever received (or expressed interest in) a

18   "payday" loan. (*Id.* ¶ 3; Kristensen Dep. 21:15 – 22:8; Kristensen Dep. 44:4-7; 149:3-5.) In fact,

19   the only loan Plaintiff has received in the last 6 years was a mortgage loan from JPMorgan Chase.

20   (Kristensen Dep. 21:15 – 22:18.) And Plaintiff was not alone in this experience—numerous other

21   frustrated consumers have complained about unsolicited text messages advertising spam "payday

22   loan" text messages just like the one received by Plaintiff. (Ochoa Decl. ¶ 21.) In fact, spam

23   "payday loan" text messaging is so prevalent that the New York Times reported on them in April

24   2012 and provided consumers with resources to stop their onslaught.[12]

25       Wanting to determine the source of this spam text message, Plaintiff retained counsel who

26   conducted an investigation that revealed that the Defendant in this case, payday lender CPS, was

27   offering high-interest loans to individuals who "took the bait" and responded to the spam text

28   [12]    (Ochoa Decl. ¶ 22.) ("Do you need up to $1,300 today?" I was recently asked. Except for perhaps Mark Zuckerberg, who doesn't? Unfortunately, this question wasn't asked by a friend; rather, it cam to me in a spam text on my cellphone.").

1    message by applying for a loan at the link contained in the text message. (Ochoa Decl. ¶ 23.)

2        Plaintiff accordingly preserved the spam text message he received on his phone and filed

3    this lawsuit on March 29, 2012 against CPS. (Dkt. 1.) Shortly after filing this lawsuit, on April 24,

4    2012, Plaintiff's counsel was contacted by CPS's attorney David Hutton of Scenic City Legal

5    Group. (Ochoa Decl. ¶ 24.) CPS requested Plaintiff's cell phone number that received the text

6    message so that CPS could conduct an investigation. (*Id.*) Although discovery was not open,

7    Plaintiff obliged and provided CPS with the cell phone number, on the condition that it tell

8    Plaintiff anyone CPS shared the number with. (Ochoa Decl. ¶ 3.) On April 25, 2012, Plaintiff also

9    served a preservation and litigation hold letter on CPS, informing it that CPS, along with its

10   "agents, affiliates, independent contractors, and other actors . . . whether under actual or implied

11   control" had a duty to preserve relevant evidence. (Ochoa Decl. ¶ 25.)

12       CPS never informed Plaintiff at that time of the possibility that he "consented" to receiving

13   the text message at issue in this lawsuit or that the text message was in any way connected to his

14   online activities. Since the only loan Plaintiff ever received prior to his receipt of the spam text

15   message at issue was the loan for his home from JPMorgan Chase, and Plaintiff never expressed

16   any interest in or applied for any sort of payday loan, (Kristensen Dep. 21:15 – 22:8), it was a

17   mystery who sent Plaintiff this text message.

18       Instead of answering the Complaint, CPS moved to dismiss. (*See* Dkts. 12.) CPS had

19   previously identified now co-Defendant Click Media as being involved in the text message

20   transmissions. (Ochoa Decl. ¶ 4, Ex. C.) CPS issued document requests on Plaintiff on July 9,

21   2012, but <u>none</u> of these discovery requests asked Plaintiff for evidence relating to "online

22   consent," or mentioned Plaintiff's online activity in any way. (Ochoa Decl. ¶ 5, Ex. D.)

23       **B.    The potential of online consent was not raised or foreseeable until January
             2014.**

24

25       On March 8, 2013, Plaintiff amended his Complaint to add 4 new Defendants (including

26   Click Media and LeadPile), but none of the Defendants gave Plaintiff any reason to think his

27   online activities had anything to do with the spam text message he received. In fact, none of the

28   new defendants issued any discovery on Plaintiff until seven months later when Defendant Pioneer

     issued document requests on October 17, 2013, which contained a single request seeking evidence

of Plaintiff's "consent" to receive telemarketing calls, texts, or faxes. (Ochoa Decl. ¶ 26, Ex. W.)[13]

Pioneer's request, however, in no way suggested that the "consent" evidence it requested documents about could have possibly occurred online. (*Id.*)

It was not until Michael Ferry's January 10, 2014 deposition where he testified (albeit without any foundation) that the phone numbers he harvested were from individuals who had "opted-in" online—testimony that, as Judge Gordon concluded, was "unfounded."

### C.   Defendants' only basis that plaintiff had a duty to preserve ephemeral ESI on his laptop in February 2012 arises from testimony obtained in January 2014

Defendants' basis for arguing that Plaintiff had a duty to preserve "temporary internet files" is to take the testimony obtained in January 2014 from Michael Ferry—who made the unsupported claim that "everyone consented online"—and go back in time to impute it onto the Plaintiff in February 2012. But as the record makes clear, there was no reason for Plaintiff to have been "on notice" at that time that his online activities had anything to do with this case, and there is no authority that suggests a Plaintiff is under an obligation to preserve ephemeral ESI that he was unaware would even have anything to do with his lawsuit.

The analysis of whether a litigant should know or reasonably believe that certain documents should be preserved is a fact-intensive inquiry, and a party is not under a duty to preserve evidence that it has no reason to reasonably think would be relevant to the action. *E.I. Du Pont De Nemours & Co. v. Kolon Indus., Inc.*, No. 3:09CV58, 2011 WL 1597528, at *13 (E.D. Va. Apr. 27, 2011). Perhaps not surprisingly, Defendants give no explanation of why they believe Plaintiff should have been "on notice" regarding ephemeral ESI in Plaintiff's cache files and spam email folders on his laptop, except to make the blanket claim that Plaintiff should have "reasonably anticipated litigation" when he retained his attorneys in this matter. (Dkt. 241 at 10–11.) But "reasonable anticipation of litigation" is only one half of the puzzle. The other half—critically in this case—is that once litigation is anticipated, is what must be preserved? *Zubulake*, 220 F.R.D. at

---

[13]   And contrary to Defendant's claims that all the defendants have pleaded a "consent" affirmative defense, the two lender Defendants in this case, (CPS and Pioneer) only pleaded that they only send text messages to individuals who consented. (Dkts. 38, 50.) They did <u>not</u> plead that Plaintiff consented to receive this text message (which they denied sending). It was not until LeadPile answered the Complaint on April 16, 2014 that a "consent" affirmative defense was pleaded by LeadPile. (Dkt. 168.)

1   216. Defendants present no explanation whatsoever about why Plaintiff should have believed that

2   his hidden, temporary internet cache files (which are created without the knowledge of the

3   computer user)[14] would have been relevant in February 2012, except for the unfounded testimony

4   of James Gee two years later in January 2014. Applying this evidence with hindsight cannot create

5   a preservation duty when none existed in the first place. *See Usavage*, 932 F. Supp. 2d at 591. As

6   such, Plaintiff had no duty to preserve the evidence in February of 2012.

7   **IV.   Plaintiff did not destroy any relevant evidence "willfully" or "in bad faith"**

8           As discussed above in the Argument § III, *supra*, Plaintiff was under no duty to preserve

9   evidence that he had no reason to think would be relevant in this litigation. A prerequisite to a

10  finding of willfulness is that there is a duty to preserve the evidence--"it goes without saying that a

11  party can only be sanctioned for destroying evidence if it had a duty to preserve it." *Zubulake*, 220

12  F.R.D. at 216. Since Plaintiff was under no duty to preserve the evidence Defendant alleges was

13  destroyed, no sanctions can attach. Defendants, lacking any evidence that "willful" or "bad faith"

14  spoliation of evidence occurred, make outrageous, unsubstantiated claims that there was a

15  "conspiracy" between Plaintiff and his counsel to "destroy" relevant evidence. (Dkt. 241, pgs. 9,

16  14 & 27.) As already noted, Defendants have already retracted most of this sanctionable arguments

17  in the face of a Rule 11 Motion. (Dkt. 259.) As a result, not much is left. Once the actual record is

18  considered (and not mischaracterized), it is clear that there was no "bad faith" destruction of

19  evidence in this case.

20          A party moving for spoliation sanctions not only must show that evidence was destroyed,

21  but that it was destroyed with a culpable state of mind. *Krause*, 2014 WL 496936, at *7; *Badger*,

22  2013 WL 3297084, at *8. The required state of mind varies with the level of sanction requested.

23  *Wedco*, 2014 WL 4635678, at *2; *LaJocies*, 2011 WL 1630331, at *1. For a sanction of dismissal,

24  it is clear that destruction must be "due to willfulness, fault, or bad faith." *Payne v. Exxon Corp.*,

25  121 F.3d 503, 507 (9th Cir. 1997). *Demena v. Smith's Food & Drug Ctrs., Inc.*, No. 2:12-CV-

26  00626-MMD, 2012 WL 3962381, at *2 (D. Nev. Sept. 10, 2012) (declining to impose an adverse

27  inference where moving party provided no evidence that non-moving party "willfully destroyed

28  ---

    [14]   *Reiss*, 2008 WL 2220555, at *9.

1  the evidence with intent to harm"); *Yath v. Fairview Clinics, N.P.*, 767 N.W.2d 34, 41–42 (Minn.

2  Ct. App. 2009) (holding that the district court did not abuse its discretion where it declined to

3  impose sanctions where the defendant deleted the browser history and temporary internet files

4  from her computer because the deletion was arguably standard computer maintenance, therefore,

5  the legitimate reason for the spoliation was plausible despite the suspicious timing).

6      Here, Defendants point to several facts in the record to suggest that Plaintiff's actions were

7  "willful" or "in bad faith." (*See* dkt. 241 at 16–21.) First, Defendants argue that Plaintiff had no

8  "automatic or formal disposal of documents or ESI from his hard drive . . ." so, therefore, he must

9  have intentionally deleted information. (Dkt. 241 at 19, lns. 1–16.) Second, Defendants argue that

10 Plaintiff failed to perform "reasonable searches" on his laptop or desktop. (*Id.* at 19–20.) Third,

11 Defendants claim that Plaintiff failed to turn off the "autodelete" function on his email. (*Id.* at 19–

12 20.) Finally, Defendants complain generally about how Plaintiff "failed to respond" to discovery

13 letters, claiming they went "entirely unanswered." (*Id.* at 21.)

### A.   Plaintiff never intentionally deleted any evidence on his laptop hard drive regarding his Internet history

16     In support of their argument that Plaintiff's destruction of "such ESI" was intentional, they

17 cite to testimony where Plaintiff states that he *did not* actively clear his Internet browser history.

18 From this, they make the inferential leap that this must mean his Internet browser history didn't

19 automatically delete Internet history, and that since it didn't automatically delete, he must have

20 deleted "such ESI" himself.

#### 1.   Plaintiff never testified that he wiped his "browser history"

22     The first problem with this claim is that Defendants aren't even clear what it is they are

23 accusing Plaintiff of destroying. If they are referring to Plaintiff's browser history, he never

24 testified that he deleted this (or that he failed to copy this information over onto his new laptop

25 hard drive (Kristensen Dep. 209:1–11.) The second problem is that Defendants never actually

26 *asked* Plaintiff if any "automatic or formal" document destruction mechanisms existed on his

27 computer or iPhone related to his internet browsing history; rather, Defendants asked Plaintiff

28 whether he "actively" cleared the browser history on his laptop. Plaintiff testified as follows:

1   Q: Do you clear the history on your browser, either on your Internet Explorer or on Apple Safari on your iPad or iPhone?

2                              *        *        *

3   A: I don't do it actively.

4   Q: What about your laptop, when was the last time you went in and cleared the browser history on your laptop?

5   A: Actively went in and cleared?

6   Q: Yes

7   A: Can't remember.

8   Q: Would it have been within the last two years?

9   A: Probably not.

10   Q: Last three years?

11   A: Probably not.

12   (Kristensen Dep. 179:6-16; 180:5-17.)

13   Defendants twist Plaintiff's testimony beyond recognition to make it say what they want,

14   even though it is not entirely clear what the point is that Defendants are trying to make. In the end,

15   Plaintiff testified that he doesn't think he ever deleted his internet browser history, and Defendants

16   have no evidence to the contrary.

17        2.    **Plaintiff never intentionally destroyed ephemeral ESI on his laptop.**

18   Defendants also claim that a month before this case was filed Plaintiff replaced his laptop's

19   hard drive, thereby destroying "evidence relevant to the issue of Plaintiff's consent [that] would be

20   contained within the confines of Plaintiff's browser history, temporary internet files, cache files,

21   and cookies, which Plaintiff admits he did not preserve." (Dkt. 241 9–10.) Yes, Plaintiff replaced

22   his laptop hard drive—which was only one of his computers and one he testified likely didn't

23   contain relevant data anyway[15] in February of 2012, long before he had any reason to think that the

24   text message in the case related in anyway to anything on any computer. But what Defendants

25   leave out is that Plaintiff testified that when he made this replacement, he copied all of the files

26   from his old hard drive to his new one:

27

28   ---
[15] This is because he didn't think he made online purchases using that computer (Kristensen Dep. 71:4 -12.)

1   Q: One follow-up question. Your counsel asked you about the hard drive that you
    changed in early 2012.

2   A: Yes.

3   Q: You said you transferred files.

4   A: Yes.

5   Q: Did you transfer every file that was on the old hard drive to the new hard drive?

6   A: Yes.

7   Q: So is it your understanding – is there any information, to your knowledge, on the
    old hard drive that wouldn't be on the new hard drive?
8

9   A: Well, I mean I'm not that technically savvy, so I'm 100 percent certain that
    everything is transferred. But I transferred all of the files. If there's anything that
    isn't a file, I wouldn't know.
10

11  Q: So when you say file, what do you mean by that?

12  A: Well, if I had a library that – or a folder, I could see the files on the old drive.
    That's the files in the folder I would copy over.

13  (Kristensen Dep. 206:12–207:11.)

14       Plaintiff was then asked about three items on his hard drive: "cookies," "temporary internet

15  files," and "cache files." Plaintiff admitted he is not a technically savvy person, but he testified that

16  he knew, in a "broad sense," what cache and temporary Internet files were. (Kristensen Dep.

17  209:2–8.) So when Plaintiff was asked if he "*would have* transferred these files over to the new

18  hard drive," he answered "no." (Kristensen Dep. 209:9–11) (emphasis added). Based on this

19  testimony, Defendants haven't even established that he intentionally deleted this ephemeral data at

20  all (or even established that he was aware of its existence on his laptop, for that matter).

21       Assuming these files even existed, "willfulness" can only be found when the party was

22  under some duty to preserve the evidence, *see Leon v. IDX Sys., Corp.*, 464 F.3d 951, 959 (9th Cir.

23  2006), and the party took some action (usually egregious) to destroy the evidence. For example, in

24  *Leon*, the court found willful spoliation where the plaintiff, who was embroiled in litigation

25  concerning his termination, intentionally (and by his own admission) deleted evidence of viewing

26  pornography on his company laptop (which would have violated company policy) and wrote a

27  special computer program designed to wipe such information from his hard drive. *Id.* Further,

28  destruction occurred *after* defendants in that case had requested the laptop back, one week before

    he provided it to defendants. *Id.* at 956.

1   As explained in Section III above, Plaintiff had no duty to preserve the evidence

2   Defendants complain about, and even if he did, Plaintiff's actions were not one of an "intentional

3   spoliator." Plaintiff had no reason to think when he was replacing his laptop hard drive that it had

4   anything remotely to do with this lawsuit. This is not a situation where the failure to preserve

5   happened in the face of a discovery request, ESI preservation order, motion to compel, or even a

6   notification from Defendant that these files may be relevant.

7   Although LeadPile and CPS acknowledge that "case dispositive sanctions" are only

8   available in limited circumstances, (dkt. 241 at 17) Defendants claim that they have been awarded

9   in "situations similar to the one presented here." (*Id.*) In support, Defendants cite to three cases

10  that involved lawsuits against tire manufacturers and automobile companies where the plaintiff

11  destroyed or otherwise discarded the defective tires or automobiles at issue prior to filing suit

12  against the defendant. These cases could not be more distinguishable from the situation here. In

13  those cases, it was obvious to the plaintiffs that the very evidence that formed the basis for their

14  lawsuit—the allegedly defective tires and automobiles—would be relevant to their lawsuit alleging

15  defects. *See Azad v. Goodyear Tire & Rubber Co.*, No. 2:11-cv-00290, 2013 WL 593913 (D. Nev.

16  Feb. 14 2013); *Woodard v. Ford Motor Co.*, No. 08-cv-1137, 2013 WL 3024828 (D. Or. June 13,

17  2013); *Erlandson v. Ford Motor Co.*, No. 1:11-cv-3092, 2009 WL 3672898 (D. Or. Oct. 30, 2009).

18  The basis for Kristensen's lawsuit, on the other hand, was not ephemeral "cache files" and

19  "cookies" from his laptop hard drive—it was the receipt of a spam text message to his cellular

20  telephone. Unlike the plaintiffs in *Azad, Woodard,* and *Erlandson,* Plaintiff preserved the text

21  message in question that formed the basis of his lawsuit. He satisfied his duties.

**B.      Plaintiff performed reasonable searches on all of his ESI repositories using
        search terms supplied by Defendants**

22
23  As explained in the Background § II.C.2, *supra,* Plaintiff conducted a significant search of

24  his ESI repositories for "relevant" evidence using approximately 40 search terms provided by

25  Defendants. Defendants' citation to Plaintiff's January 21, 2014 deposition testimony for the claim

26  that Plaintiff did not conduct "reasonable searches" is materially misleading, as neither CPS nor

27  LeadPile had even issued document requests on Plaintiff related to consent (online or otherwise) at

28  the time he was deposed.

1    Additionally, Plaintiff was in the midst of conferring with Pioneer about search terms when

2  his deposition took place. Accordingly, when Defendants asked Plaintiff why he hadn't searched

3  for evidence of consent on his computer, he honestly answered that he never consented to receive

4  this text message, so he wouldn't even know what to look for. (Kristensen Dep. 145:6-12.)

5  Notably, the Defendant who Plaintiff conferred with on his ESI search and discovery responses

6  (Pioneer), and whose discovery letters CPS and LeadPile repeatedly rely on (albeit without

7  attaching or mentioning Plaintiff's responsive correspondence) has not joined in this spoliation at

8  all, and did not raise the issue of Plaintiff's document search and production again after he

9  completed this process.  (Ochoa Decl. ¶ 20.)

10    In the end, its unclear what Plaintiff's search for documents has to do with his supposed

11  "willful" destruction of documents, but, regardless, the record shows that Plaintiff complied with

12  his discovery obligations by conducting reasonable searches for ESI using search terms provided

13  by Defendants.

14    **C.   Plaintiff testified that only emails in his "spam" folder were deleted through automated processes, and that he did not actively delete any other emails**

15

16    Defendants' third argument also stems from a mischaracterization of the record—Plaintiff

17  did not testify that his emails "autodeleted"—rather he testified that only his "spam" emails

18  autodeleted (i.e., the emails in his spam folder). (Kristensen Dep. 147:1-12.) Defendants' claim

19  that he allowed marketing emails to "autodelete" is belied by the record, since Plaintiff produced

20  numerous emails from corporate entities that were responsive to Defendants' search terms. (Ochoa

21  Decl. ¶ 15, Ex. M.) In fact, Plaintiff testified that he took "no extraordinary steps" with his email

22  accounts. (Kristensen Dep. 147:16 – 148:3.)

23    Even more fundamentally, neither CPS nor LeadPile *ever* requested that Plaintiff produce

24  emails *of any kind* in this lawsuit, much less "spam emails." There is no authority that Plaintiff is

25  aware of whereby a party can obtain spoliation sanctions based on evidence that was never even

26  requested by a party in discovery—in fact, court have held the opposite. *See Klezmer ex rel.*

27  *Desyatnik v. Buynak*, 227 F.R.D. 43, 52 (E.D.N.Y. 2005) (collecting authorities where failure to

28  request complained-of spoliated evidence warranted denial of spoliation motion).

    Further, to the extent Plaintiff's "spam" emails from the relevant time period are potentially

1   relevant, they were deleted as a part of the automatic settings on his email accounts before he was

2   under any duty to preserve. In this situation, no sanctions for spoliation would attach.

3   **V.   Defendants Have Failed to Establish that Plaintiff's Laptop "cache files" and**
    **"cookies," and his "spam email" folders contained evidence of consent in the first**
4   **place.**

5       Defendants' motion is also a nonstarter because they cannot point to any "evidence of

6   consent," or other "relevant" evidence, that should have been in Plaintiff's laptop "cache files and

7   "cookies," or in his "spam" email folders, in the first place. The party seeking spoliation sanctions

8   has the burden of showing that "a reasonable trier of fact could find the missing [evidence] would

9   support [their] claims." *In re Pfizer Inc. Sec. Litig.*, 288 F.R.D. 297, 319 (S.D.N.Y. 2013); *see also*

10  *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 122-23 (S.D.N.Y. 2008) ("generalized assertions that

11  missing evidence is relevant is insufficient to establish relevancy."). To make this showing, the

12  party seeking spoliation sanctions must point to "extrinsic evidence tending to demonstrate that

13  missing evidence would have been favorable to the movant." *Residential Funding Corp. v.*

14  *DeGeorge Fin. Corp.*, 306 F.3d 99, 108-09 (2d Cir. 2002).

15      Amazingly, the most Defendants can muster to satisfy this element is the unsupported,

16  blanket statement, "Indeed, it is not difficult to envision numerous respects in which Plaintiff's

17  incoming and outgoing emails, internet browser history, and other relevant ESI for the relevant

18  time period would be relevant to Plaintiff's TCPA claim and the affirmative defense of consent,"

19  and the unsupported testimony of James Gee and Michael Ferry. (Dkt. 241 at 18.) This completely

20  fails to meet their burden of showing that sanctions of any kind are warranted, not to mention

21  "case-terminating sanctions."

22      Defendants have no credible evidence that Plaintiff or any other class member ever

23  consented to receive these text messages. Judge Gordon already rejected the contention that Ferry

24  and Gee's testimony should be given any weight on the issue of consent based on a clear record

25  that these individuals lacked personal knowledge about whether "evidence of consent" was ever

26  obtained. Far from Defendants' statement that they have "reliable and convincing" evidence of

27  consent, Defendants have presented no evidence of consent or that the alleged consent occurred

28  on-line. They have no idea where this "consent" was collected, what it would look like, or whether

    it even existed in the first place. The only testimony in this case that has proper foundation is from

1    Plaintiff, who testified repeatedly that he never consented to receiving this text message (or any

2    other text messages) and that he always "opts-out" of receiving offers and solicitations. As such,

3    Defendants have not presented anything to suggest that Plaintiff would have any "evidence of

4    consent" that he could have destroyed.

5        When Defendants went straight to the source that Ferry testified he obtained the "evidence

6    of consent" from (the Selling Source), they came up empty handed. Not only did the Selling

7    Source fail to produce any evidence of consent as to Plaintiff, they couldn't produce any evidence

8    relating to Michael Ferry at all. (Ochoa Decl. ¶¶ 10-11.) Instead of corroborating Ferry's

9    testimony, this just confirms what Judge Gordon found—that Ferry's testimony is unfounded. In

10    addition, Defendants' follow-up discovery to Plaintiff also yielded no suggestion that he "opted-in"

11    to receive this text message. Defendants issued two subpoenas based on Plaintiff's ESI production,

12    and it yielded no information that those companies had anything to do with spam text messaging.

13    (Ochoa Decl. ¶ 18.) Defendants didn't even both to follow up with any entity identified in

14    Plaintiff's credit card statements (even though Plaintiff testified the only place he would ever

15    provide his cellular telephone number online was in connection with an online purchase.)

16    (Kristensen Dep. 32:19 – 33:8.) And, as explained above, there is no evidence in this case that any

17    of Plaintiff's emails (much less his "spam" emails) are relevant in this case, as James Gee testified

18    he never sent emails in connection with the payday loan campaign. (Gee Dep. 55: 19-25.)

19    Ultimately, Defendants cannot point to *anything* related to consent to receive text messages that

20    should have been on any of Plaintiff's computers, his iPhone, or in any of his email accounts.

21        All of these facts lead to the inescapable conclusion that Plaintiff, in fact, never consented

22    to receiving this text message, and no evidence of his consent (online or otherwise) ever existed.

23    Despite this complete lack of evidence, Defendants believe they are entitled not only to a

24    presumption that the evidence existed in the first place, but also that the supposed "destruction" of

25    this phantom evidence warrants judgment in their favor. This is not a situation where Defendants

26    have presented, for example, a website where they believe Plaintiff consented, or credible

27    testimony or evidence from any source that suggests the companies from whom Plaintiff made

28    online purchases are in any way connected to this case. In short, nothing produced by Plaintiff in

   this case even remotely suggests he "consented" to receive text messages anywhere (much less

1    "online"). Neither Plaintiff nor any member of the class consented to receive the spam at issue and

2    Defendants have produced absolutely nothing suggesting otherwise.

3    **VI.    The only delays in this litigation have been those caused by Defendants**

4           Defendants close out their Motion for spoliation sanctions by claiming that "case-

5    terminating sanctions" are appropriate under the Ninth Circuit's "five-factor test," and then claim

6    that Plaintiff's "spoliation" has caused delays in this case, and that they are prejudiced by such

7    spoliation. Perhaps not surprisingly, none of this is true either. Most of the discovery extensions in

8    this case has been at the behest of the Defendants, and the reasons for their requested discovery

9    extensions have included time for them to comply with their discovery obligations. (*See* Dkts. 123,

10   166, 172, 176 & 209.) And, as the Court is well aware, Plaintiff has had to resort to expensive,

11   lengthy motion practice three times to get Defendants to produce documents, including twice

12   against CPS, which has undoubtedly caused delay in the resolution of this case. (*See* Dkts. 95, 189,

13   199, 232 & 268.)

14          On the other hand, Defendants have not filed a single discovery motion against Plaintiff

15   that has delayed this case or expended any Court resources.[16] In fact, the only delay and

16   expenditure of resources that has resulted from Defendants' spoliation motion is the Rule 11

17   Motion Plaintiff was forced to write to address the material falsehoods in that Motion (which

18   resulted in Defendants retracting some, but not all, of their false statements). (Dkts. 259, 261.)

19          What's worse, Defendants, for unknown reasons, waited until October 25, 2014, to file

20   their ill-informed "spoliation" motion, even though they had all the evidence they now rely on for

21   their Motion by February 2014, which has resulted in significant, frivolous post-discovery motion

22   practice. If any party has "unreasonably delayed," it is Defendants. Courts can deny spoliation

23   motions solely based on the parties' delay in timely prosecuting the motion, as parties are required

24   ───────────────

[16]    Defendants also never filed a motion to compel against Plaintiff seeking his "internet

25   history"—probably because they knew it would be futile. Defendants can't point to a single

     website where consent may have existed—nor can Defendants describe, when, how, or from

26   whom this consent was obtained. Absent something to search for, Defendants clearly have no right

     to go on a fishing trip through months of private web browsing records. *See Memry Corp. v. Ky.*

27   *Oil Tech., N.V.*, No. C-04-03843, 2007 WL 832937, at *3 (N.D. Cal. Mar. 19, 2007) (finding an

     individual's computer contains some of the most sensitive personal information in that person's

28   life, and courts will only allow inspection in "extreme situations.").

1    to file spoliation motions "as soon as reasonably possible after discovery of the facts that underlie

2    [the] motion." *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 506–08 (D. Md. 2009). In

3    fact, Courts have noted that spoliation motions can be denied outright for delays similar to the

4    delays such as the ones by CPS and LeadPile. *See Cottle-Banks v. Cox Commc'ns, Inc.*, No. 10-cv-

5    2133, 2013 WL 2244333, at *16 (S.D. Cal. May 21, 2013) (alternatively denying spoliation motion

6    untimely that was filed nine months after conduct at issue discovered); *Glenn v. Scott Paper Co.*,

7    Civ. A. No. 92-cv-1873, 1993 WL 431161, at *10 n.3 (D.N.J. Oct. 20, 1993) (finding request for

8    spoliation sanctions untimely when brought in conjunction with summary judgment briefing). The

9    *Glenn* court offered a prescient analysis relevant to the situation presented here:

10          Presumably frustrated by a lack of evidence to support his claim, [plaintiff] has
          accused [defendant] of withholding and destroying relevant evidence. The Court

11          takes a grave view of such charges, which warrant sanctions if proven true, or
          alternatively, if proven false and made in bad faith. The Court is struck by the

12          timing of [plaintiff's] accusation—first brought defending a summary judgment
          motion after completion of discovery. At no time did [plaintiff] raise these concerns

13          during the discovery phase or bring them to the attention of the magistrate.
          [Plaintiff] never brought a proper motion to compel, or a motion for sanctions,

14          pursuant to Rule 37 of the Federal Rules of Civil Procedure. Therefore, the Court
          finds it too late in the day for [plaintiff] to raise these discovery issues and does not

15          consider them on the pending motion.

16    *Id.* Likewise in this case, Defendants filed no discovery motions, did not even try to take the

17    follow-up deposition of Plaintiff they argued so stridently for, and, in the case of CPS, didn't even

18    request any evidence from Plaintiff concerning "consent" *at all*. In the end, CPS and LeadPile are

19    just upset because, on the eve of summary judgment, they, too, have no evidence to support their

20    affirmative defense, and their solution was to hastily draft a spoliation motion filled with invective,

21    but short on actual facts.

22                             **CONCLUSION**

23          For the foregoing reasons, Plaintiff respectfully requests, based on the facts and law

24    outlined in this opposition, and in his Motion for Sanctions under Fed. R. Civ. P. 11, that this

25    Court reject Defendants' frivolous motion.

26

27    Dated: December 4, 2014              Respectfully submitted,

28                                FLEMMING KRISTENSEN, individually and on
                              behalf of a class of similarly situated individuals,

1

By: /s/ John C. Ochoa
One of Plaintiff's Attorneys

2

3      John Benedict, Esq.
       LAW OFFICES OF JOHN BENEDICT
4      Nevada Bar No. 005581
       2190 E. Pebble Road, Suite 260
5      Las Vegas, Nevada 89123
       Telephone: (702) 333-3770
6      Facsimile: (702) 361-3685
       john.benedict.esq@gmail.com
7

8      Ryan D. Andrews (Admitted *Pro Hac Vice*)
       randrews@edelson.com
9      Rafey Balabanian (Admitted *Pro Hac Vice*)
       rbalabanian@edelson.com
10     John C. Ochoa (Admitted *Pro Hac Vice*)
       jochoa@edelson.com
11     EDELSON PC
       350 North LaSalle Street, Suite 1300
12     Chicago, Illinois 60654
       Tel: 312.589.6370
13     Fax: 312.589.6378
14

15     *Counsel for Plaintiff Flemming Kristensen and
       the Class*
16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2          I hereby certify that on December 4, 2014, I electronically filed the forgoing *Plaintiff's*

3    *Opposition to Defendants LeadPile LLC and Credit Payment Services, Inc,'s Motion for*

4    *Terminating Sanctions* with the Clerk of the Court using the CM/ECF system. Notice of this filing

5    is sent to all counsel of record by operation of the Court' electronic filing system. Parties may

6    access this filing through the Court's system.

7

8    Dated: December 4, 2014                    By: /s/ John C. Ochoa

9                                                    John C. Ochoa

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28