UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| FLEMMING KRISTENSEN, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>CREDIT PAYMENT SERVICES INC., a Nevada corporation, f/k/a MYCASHNOW.COM INC., ENOVA INTERNATIONAL, INC., an Illinois corporation, PIONEER FINANCIAL SERVICES, INC., a Missouri corporation, LEADPILE LLC, a Delaware limited liability company, and CLICKMEDIA LLC d/b/a NET1PROMOTIONS LLC, a Georgia limited liability company,<br><br>Defendants. | Case No. 2:12-cv-00528-APG-PAL<br><br>**ORDER ON MOTIONS**<br><br>(Dkt. ## 233, 236, 239, 240, 268, 321, 322, 368, 369, 370, 373, 385, 386, 393, 395) |

In this class action, plaintiffs allege that defendants texted payday loan advertisements to almost 100,000 cell phone users, violating the Telephone Consumer Protection Act ("TCPA"). Plaintiffs sued (1) defendant Net1Promotions LLC ("Click Media"), who contracted with the non-party that sent the texts; (2) LeadPile LLC, who helped Click Media sell leads derived from the text campaign; and (3) three lenders who allegedly purchased these leads: Credit Payment Services, Inc.; Enova International, Inc.; and Pioneer Financial Services, Inc. Notably, plaintiffs did not sue the entity that actually sent the texts, AC Referral Systems LLC.

Defendants and plaintiffs moved for summary judgment. Their two primary disputes are: (1) whether defendants are vicariously liable for texts sent by AC Referral, and (2) whether AC Referral's texting equipment falls under the TCPA.

Although plaintiffs provide multiple theories for why defendants should be vicariously liable for AC Referral's texting, plaintiffs fail to create a triable issue under any of them. I

therefore grant summary judgment in favor of defendants. I need not reach the various other issues raised by the parties, including whether AC Referral's equipment falls under the TCPA.

## I. BACKGROUND

Lenders often use outside marketing companies to find new customers. These marketing companies use methods such as texting campaigns to find consumers—also known as "leads"—who may be interested in borrowing money from lenders. Some companies have created a marketplace where lead-sellers can easily find lead-buyers—in other words, a lead store.

In this case, the defendant lenders contacted LeadPile, a popular lead store, about purchasing leads.[1] The lenders entered into a lead-buying agreement with LeadPile.[2] LeadPile in turn contracted with one of its lead-sellers, Click Media, for Click Media to find leads for the lenders.[3]

Click Media, which works with thousands of small companies who specialize in lead generation,[4] ordered the lenders' leads from AC Referral. AC Referral's contract with Click Media obligated AC Referral to comply with the TCPA.[5] AC Referral was not permitted to use ClickMedia's name, brands, or websites in any advertisement. And AC Referral had no contact whatsoever with the other defendants.[6]

To generate the leads, AC Referral purchased lists of potential customers' phone numbers from another company.[7] AC Referral uploaded these numbers into a program called "Data

---

[1] (Dkt. #320-13 at 21.)

[2] (Dkt. 237-1 at 18-20.)

[3] (*Id.*) There is some evidence that LeadPile was leery of Click Media's business practices. (Dkt. #320-13 at 103- 107.) But plaintiffs submit no evidence that LeadPile suspected that Click Media was involved in sending unsolicited text messages with an ATDS.

[4] (Dkt. # 345 at 2.)

[5] (Dkt. # 237-1, at 20-25.)

[6] (Dkt. # 345 at 2.)

[7] Defendants allege that AC Referral ensured that the users of these numbers had all consented to text advertisements.

Doctor," which sent out an advertisement text to all the numbers on the list. Plaintiffs allege that AC Referral sent almost 100,000 cell phone users the following text message:

> DO YOU NEED UP TO $5000 TODAY?
> EASY QUICK AND ALL ONLINE AT:
> WWW.LEND5K.COM
> 24 MONTH REPAY, ALL CREDIT OK
> REPLY STOP TO END[8]

The lend5k.com website domain was owned, operated, and controlled solely by AC Referral.[9] If a user clicked on the lend5k link, the user would land on a generic loan application website controlled by Click Media, called "thesmartcreditsolution.com."[10] If an application was filled out, the user might be redirected to one of the lender's websites.[11] The lenders paid for each lead redirected to their site.

The named plaintiff, Kristensen, did not click on the link www.lend5k.com; he did not visit any related website; he did not apply for or receive a loan; and he did not otherwise engage with any of the defendants until he filed this lawsuit.[12] Plaintiffs contend that AC Referral's texting campaign to almost 100,000 people violated the TCPA. And they argue that the lenders, LeadPile, and Click Media are vicariously liable for what AC Referral did.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

---

[8] (Dkt. # 1 at 4; Dkt. # 35 at 6.)

[9] (Dkt. # 113-1 at 15-20.)

[10] (Dkt. # 321-3 at 1-4.)

[11] (Dkt. # 237-1 at 18-20.)

[12] (Dkt. # 239-4 at 73-77.)

law."[13] For summary judgment purposes, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.[14]

If the moving party demonstrates the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[15] The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."[16] She "must produce specific evidence, through affidavits or admissible discovery material, to show" a sufficient evidentiary basis on which a reasonable fact finder could find in her favor.[17]

A party must support or refute the assertion of a fact with admissible evidence.[18] As the summary judgment procedure is the pretrial functional equivalent of a directed-verdict motion, it requires consideration of the same caliber of evidence that would be admitted at trial.[19] Thus, it is insufficient for a litigant to merely attach a document to a summary judgment motion or opposition without affirmatively demonstrating its authenticity.[20]

////

////

////

////

---

[13] *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)).

[14] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[15] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323.

[16] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted).

[17] *Bhan v. NME Hosps.*, Inc., 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson*, 477 U.S. at 248–49.

[18] Fed. R. Civ. Proc. 56(c)(1); *Orr*, 285 F.3d at 773; *Harris v. Graham Enterprises, Inc.*, 2009 WL 648899, at *2 (D. Ariz. Mar. 10, 2009).

[19] *Anderson*, 477 U.S. at 251 (citing *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11 (1983)).

[20] Plaintiff moves to strike some of defendants' evidence because it was not properly authenticated. (*See* Dkt. #268.) I deny this motion as moot because in determining that defendants are entitled to summary judgment, I have not considered any of the evidence plaintiffs move to strike.

## III. DISCUSSION

The TCPA prohibits companies from using an "Automatic Telephone Dialing System" ("ATDS") to text a cell phone user without the user's prior consent.[21] The Act aims to combat companies who use automated systems to spam unsolicited advertisements to cell phone users (who may have to pay their cell phone carrier for a message they never wanted).

Defendants can be liable under the TCPA either (1) directly, when they actually send a text; or (2) vicariously, when they are liable for a third party's texting under federal common law agency principles.[22] When determining liability under the TCPA, the Ninth Circuit has espoused a "common sense approach."[23]

The parties concede that the defendants can only be liable vicariously because none of them sent the texts. To proceed under a vicarious liability theory, plaintiffs must establish that defendants are liable under one of the principles of federal common law agency, which are primarily derived from the Restatement of Agency.[24] Whether an agency relationship exists is ordinarily a question of fact, but summary judgment is appropriate where the undisputed facts entitle a party to judgment.[25]

Plaintiffs argue defendants are liable under three vicarious liability theories: (1) ratification, (2) apparent authority, and (3) control and benefit.[26]

---

[21] 47 U.S.C. § 227(b)(1)(A)(iii); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953 (9th Cir. 2009) (clarifying that text messages fall under the TCPA).

[22] 2013 FCC Ruling, 28 F.C.C.R. at 6586–87.

[23] *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012).

[24] *Doe I v. Unocal Corp.*, 395 F.3d 932, 972 (9th Cir. 2002), *on reh'g en banc*, 403 F.3d 708 (9th Cir. 2005).

[25] *Nat'l Football Scouting Inc. v. Cont'l Assur. Co.*, 931 F.2d 646, 649 (10th Cir. 1991).

[26] Plaintiffs also conclusorily argue that Click Media should be liable under an actual authority theory. But actual authority generally requires the principal to have control over the means of the agent's actions. *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1086 (C.D. Cal. 2012) *aff'd*, 582 F. App'x 678 (9th Cir. 2014) ("[K]nowledge, approval, and fund administration do not amount to controlling the manner and means of the text message campaign."); Restatement (Third) of Agency § 1.01 (stating one requirement of actual agency is the need for "an understanding between the parties that the principal is to be in control of the undertaking"); *Makaron v. GE Sec. Mfg., Inc.*, No. CV-14-1274-GW AGRX, 2015 WL 3526253, at *6 (C.D.

5

### 1. Ratification

Plaintiffs first argue that defendants ratified AC Referral's texting campaign by knowingly accepting leads from the campaign. "[A] seller may be liable for the acts of another under traditional agency principles if it ratifies those acts by knowingly accepting their benefits."[27] The burden to prove ratification is on the "party attempting to establish that ratification occurred."[28]

The parties dispute whether defendants "knowingly" accepted the leads. A principal "is not bound by a ratification made without knowledge of material facts about the agent's act."[29] The one exception is where the principal chooses "to ratify with awareness that such knowledge [is] lacking."[30] In other words, to be liable under a ratification theory the principal must either (1) have actual knowledge of all material facts about the agent's act or (2) should have known of the actual facts because a reasonable person under the circumstances would have "investigate[d] further."[31] Here, the plaintiffs have no evidence that any of the defendants actually knew material

---

Cal. May 18, 2015) (evidence insufficient to establish actual authority where defendant merely had contract with violators requiring laws to be followed).  Here, other than the mere fact that Click Media may have known that AC Referral used texts to generate leads, it is undisputed that Click Media had almost no input or control regarding the content, means of transmission, or methods used by AC Referral to carry out its texting campaign. (*See* Dkt. # 237-1.) Other than the most basic parameters contained in their insertion orders (e.g. AC Referral had to comply with relevant laws), Click Media did not control the instrumentalities, tools, or offices of AC Referral. *Id.* Plaintiffs' actual authority argument thus fails.

[27] *Id.* (citing Restatement (Third) of Agency § 4.01).

[28] Restatement (Third) Of Agency § 4.06.

[29] Restatement (Third) Of Agency § 4.01 cmt. b.

[30] *Id.*

[31] *Id.; see also Avio, Inc. v. Alfoccino, Inc.*, 18 F.Supp.3d 882 (E.D. Mich., 2014) (holding that unless the principal has "full knowledge of the necessary facts and circumstances to demonstrate [its] intent to adopt [the purported agent's] illegal conduct," ratification cannot take place).

facts about AC Referral's use of an ATSD to send unsolicited messages.[32] This leaves only the theory that defendants "should have known" of the material facts.[33]

The Third Restatement makes clear that a principal must be alerted to some sort of red flag or suspicious fact before it will be charged with constructive knowledge of an agent's acts. The Restatement provides an example of a ratification under this "should have known" standard, involving a manufacturer who receives a letter from a purchaser. The purchaser writes: "We have, as you know, recently increased our order because of the impressive assurances made by [your agent] about your new return policy and improved product quality."[34] The manufacturer, who has not made any sort of policy change, fears that his agent made false statements to the purchaser.[35] But the manufacturer does not ask either the agent or purchaser what statements were made. This is a valid ratification because the manufacturer was willfully blind to an obvious red flag about its agent's communications to the purchaser.

Plaintiffs argue that defendants should have known AC Referral was generating leads by using an ATDS to send unsolicited texts, but plaintiffs have not provided any evidence indicating why the defendants should have known of the material facts. As to the defendant lenders, plaintiffs merely rely on the lenders' general knowledge that lead-generators use texting in this industry. But this cannot be enough, especially given that not all texting is prohibited. Ratification requires the lenders to at least know of a red flag that would put them on notice of AC Referral's unsolicited texting campaign. Plaintiffs have failed to provide any evidence that

---

[32] In their reply, plaintiffs argue for the first time that LeadPile and CPS had actual knowledge of AC Referral's improper texting because they received notice of this lawsuit in March 2012. But plaintiffs ignore the fact that the class period in this case only extends to January 2012; there remains no evidence that CPS and Leadpile had actual knowledge of improper texting relevant to the class in this case. (Dkt. # 295-1.)

[33] Plaintiffs seem to argue that defendants' knowledge that AC Referral used texts somehow constitutes actual knowledge of AC Referral's unsolicited texting. But knowing that AC Referral uses texts does not equate to knowing all of the facts material to the alleged agent's acts—that AC Referral used an ATDS to send unsolicited texts.

[34] Restatement (Third) Of Agency § 4.06.

[35] *Id.*

the lenders should have been aware of AC Referral's acts. Indeed, the lenders and AC Referral never even interacted with each other.

Plaintiffs have similarly failed to establish that either Click Media or LeadPile should have known AC Referral was using an ATDS to send unsolicited texts. Although both of these companies may have known AC Referral used texts to generate leads, neither had sufficient information to put them on notice that an ATDS was being used to send unsolicited texts.

Plaintiffs' only evidence that any defendant was aware of any sort of red flag was that LeadPile expressed some suspicion about Click Media and that Click Media did not fill out a generic form LeadPile sent to all of its lead generators. But plaintiffs' evidence is unhelpful for three reasons. First, there is no indication that LeadPile was suspicious or had reason to be suspicious about Click Media's *lead generation* methods. The parties' evidence indicates only that LeadPile was suspicious about whether Click Media was trying to sell leads without giving LeadPile its share. Second, there is no evidence that Click Media knew that an ATSD was being used to send unsolicited text messages. So even if LeadPile had investigated Click Media further, it would not have necessarily discovered AC Referral was using an ATSD to send unsolicited texts. Finally, LeadPile had no contractual relationship with AC Referral, so it is not clear that LeadPile could have discovered additional information even if it tried.

Ultimately, plaintiffs' theory of ratification is that defendants consciously remained ignorant of AC Referral's illicit texting practices. But to be consciously ignorant a defendant must fail to investigate after becoming aware of specific reasons to be suspicious. Plaintiffs' theory that defendants are strictly liable anytime they do not affirmatively seek out additional facts about a marketer would read the vicarious liability analysis out of the TCPA. Anyone who received a lead and knew a text was involved would be strictly liable.

Neither Congress nor the FCC has created strict liability for this situation. In fact, the opposite is true: the FCC has emphasized that vicarious liability applies only if common law principles of agency are satisfied. Plaintiffs have not cited any other legal authority suggesting that defendants should be held liable merely because they knew leads might be generated using

texts. And plaintiffs have not created a triable issue about whether defendants accepted any leads knowing the material facts about AC Referral's texting methods.

### 2. Apparent authority

Plaintiffs next argue that the lenders are also liable under an apparent authority theory.[36] Apparent authority arises when a third party reasonably believes that an agent had authority to act on behalf of the principal and that belief can be traced to the principal's own manifestations.[37] Apparent authority "cannot be established merely by showing that [the alleged agent] claimed authority or purported to exercise it."[38]  And "[t]he fact that one party performs a service that facilitates the other's business does not constitute such a manifestation."[39]  Rather, apparent authority is established only "by proof of something said or done by the alleged principal."[40]

Plaintiffs note that the Restatement explains the principal's manifestation need not be directly made to the third party, and that "in some settings, the principal's acts speak so loudly that explicit verbal communication is unnecessary."[41]  But the Restatement and case law repeatedly emphasize that the principal must make some outward manifestation from which reasonable third parties could trace their belief that the agent has authority to act on the principal's behalf.[42]

---

[36] Plaintiffs do not make an apparent authority argument against Click Media or LeadPile.

[37] *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1167–68 (D. Idaho 2011) (citing 2A C.J.S. *Agency* § 133; Restatement (Third) of Agency § 2.01 (2006)).

[38] *NLRB v. Dist. Council of Iron Workers of Cal. & Vicinity*, 124 F.3d 1094, 1099 (9th Cir. 1997).

[39] Restatement (Third) of Agency § 3.03.

[40] *Id.*; *see also* Restatement (Third) of Agency § 2.03.

[41] Restatement (Third) of Agency § 3.03.

[42] *Lushe v. Verengo, Inc.*, Case No. CV–13–7632, 2015 U.S. Dist. LEXIS 16961 * 8–9 (C.D.Cal. Feb. 2, 2015); *Makaron v. GE Sec. Mfg., Inc.*, No. CV-14-1274-GW AGRX, 2015 WL 3526253, at *8 (C.D. Cal. May 18, 2015); *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1301 (D. Nev. 2014) ("It is well-established that apparent authority must derive from the statements or actions of the alleged principal, not the alleged agent.").

9

The Restatement provides an example of the type of situation that might lead to apparent authority even when a principal did not directly communicate with a third party—confirming that the principal's outward manifestations must be at least visible to third parties. In the example, the principal and third party have been negotiating a contract.[43] The third party schedules a meeting to finalize terms and asks the principal to send a representative with the authority to act on its behalf.[44] The representative who then appears is cloaked with apparent authority because the principal made the outward manifestation of sending her in response to a request for an agent.[45]

The FCC also provides examples of evidence that might be relevant in finding apparent authority:

> (1) access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information;
>
> (2) the ability by the outside sales entity to enter consumer information into the seller's sales or customer systems;
>
> (3) the authority to use the seller's trade name, trademark and service mark;
>
> (4) that the seller approved, wrote or reviewed the outside entity's telemarketing scripts; and
>
> (5) if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.[46]

Here, plaintiffs have not created a triable issue that any of the defendant lenders is liable under an apparent authority theory. Plaintiffs argue that the lenders manifested their assent to the agency relationship because (1) they hired LeadPile and Click Media to generate leads, (2) they

---

[43] *See* comments to Restatement (Third) of Agency § 3.03.

[44] *Id.*

[45] *Id.*

[46] *In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of Am., & the States of California, Illinois. N. Carolina, & Ohio for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, 28 F.C.C. Rcd. 6574, 6586 (2013) ("Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal.").

paid these companies to redirect leads to their websites, (3) they facilitated the transfer of text leads by creating mobile versions of their websites,[47] and (4) they provided some specification about what types of leads they would buy. But none of these acts was an outward manifestation to the text recipients—either directly or indirectly—that LeadPile, Click Media, or AC Referral were the lenders' authorized agents. While plaintiffs are correct that the lenders need not have directly communicated with third parties, the lenders must have made some manifestation that was visible to the third parties.

Plaintiffs also vaguely argue that the lenders somehow outwardly manifested authority by hiring the marketers in the first place, citing to the Restatement's proposition that placing a person in a defined position or giving them visible authority over a project may constitute a manifestation of authority. But the lenders did not employ these marketers, they did not put them in a defined position, and they did not place them in charge of their marketing.[48] They merely purchased leads from them. The Restatement makes clear that this is not enough: "[t]he fact that one party performs a service that facilitates the other's business does not constitute [an apparent authority] manifestation."[49]

Looking to the FCC's factors confirms there is no apparent authority here. No evidence shows the marketers had access to detailed information about the lenders' customer or other information; there is no evidence that the marketers could enter customer information into the lender's sales or customer systems; there is no evidence the markets could use the seller's trade name, trademark and service mark; there is no evidence that the lenders approved, wrote, or reviewed the texts; and there is no evidence the lenders knew or should have known the marketers were violating the TCPA.[50]

---

[47] I fail to see how creating mobile versions of their websites is a relevant manifestation.

[48] *Makaron v. GE Sec. Mfg., Inc.*, No. CV-14-1274-GW AGRX, 2015 WL 3526253, at *9 (C.D. Cal. May 18, 2015) (explaining that merely hiring a company to do a service does not equate to a manifestation by placing them in a defined position or in charge of an activity).

[49] Restatement (Third) of Agency § 3.03.

[50] Plaintiffs make an offhand argument that defendants also created apparent authority by maintaining their silence. But the Restatement makes clear that this theory requires extenuating

11

The purpose of the apparent authority theory is to hold principals liable when they make some outward manifestation that would lead reasonable third parties to believe the principal authorized the agent. Without this outward manifestation, no apparent authority can exist. Courts have found apparent authority lacking in situations where much more manifestation of authority was present than here.[51] Therefore, plaintiffs cannot move forward on this theory.

### 3. Control and benefit

Finally, plaintiffs try to reach defendants through a novel theory of vicarious liability referred to as "control and benefit" liability. This doctrine was created to hold entities liable when they directly benefit from copyright infringement but "declin[e] to exercise a right to stop or limit it."[52]

Plaintiffs provide no authority suggesting that the control and benefit theory should apply in TCPA cases. As I noted in a prior order, courts in this circuit apply traditional agency principles to claims under 47 U.S.C. § 227(b).[53] The Ninth Circuit has confirmed that "Congress intended to apply the traditional standards of vicarious liability" to TCPA claims.[54] The FCC has similarly explained that traditional federal common law agency principles apply to TCPA claims.[55] Even if I am not foreclosed from expanding vicarious liability for TCPA claims beyond

---

circumstances to give special meaning to a defendant's silence. The Restatement provides an example where the third party has observed prior interactions between the agent and the principal, and a subsequent act or representation by the agent is reasonably believed to be authorized because it conforms to the prior pattern observed by the third party. Restatement (Third) § 1.03 cmt. b; see also *Scientific Holding Co. v. Plessey Inc.*, 510 F.2d 15, 25 (2d Cir.1974). Plaintiffs have provided no circumstances that would allow reasonable third parties to treat the defendant lenders' silence as a manifestation of agency authority.

[51] *See, e.g., Makaron v. GE Sec. Mfg., Inc.*, No. CV-14-1274-GW AGRX, 2015 WL 3526253, at *9 (C.D. Cal. May 18, 2015) (rejecting apparent authority argument despite that purported agents had authority to use principal's trade name).

[52] *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007) (quotation omitted).

[53] *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1300 (D. Nev. 2014).

[54] *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 877 (9th Cir. 2014).

[55] 2013 FCC Ruling, 28 F.C.C.R. at 6586–87.

traditional agency theories, plaintiffs have provided no compelling reason to adopt the control and benefit test when determining vicarious liability under the TCPA.

But even if I entertained this theory of liability, plaintiffs have not created a triable issue that any of the defendants could be liable under it. The control and benefit test requires that a defendant have "both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so."[56] It is meant to place liability on entities that have the ability to curb harmful activity. Merely having the contractual right to stop receiving benefits of the infringement is not enough; the defendant must have direct legal and practical control over the infringing activity itself. For example, in the seminal control and benefit case *Perfect 10, Inc. v. Amazon.com, Inc.*, the Ninth Circuit held that Google could not be liable for copyright infringement occurring on third-party websites because there was no evidence Google could practically or legally control what these third parties did on their websites. This was true even though Google benefited from the infringement by increased business and could stop benefiting by terminating its advertisement contracts with the infringers.

Here, there is no evidence that any of the defendants had either the legal or practical ability to control whether AC Referral sent out unsolicited texts. The defendants apparently have no control over AC Referral or how it conducts its business. There is no evidence that AC Referral sends out texts only for Click Media and that Click Media has the practical ability to stop AC Referral from sending unsolicited texts. At best, defendants could have declined to order leads from AC Referral, but the case law emphasizes that having the right to stop receiving benefits is not enough to create liability. There must be practical and legal control over the third party's infringement.

### IV. CONCLUSION.

IT IS HEREBY ORDERED THAT plaintiffs' motion for summary judgment **(Dkt. # 321) is DENIED.**

---

[56] *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007).

traditional agency theories, plaintiffs have provided no compelling reason to adopt the control and benefit test when determining vicarious liability under the TCPA.

But even if I entertained this theory of liability, plaintiffs have not created a triable issue that any of the defendants could be liable under it. The control and benefit test requires that a defendant have "both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so."[56] It is meant to place liability on entities that have the ability to curb harmful activity. Merely having the contractual right to stop receiving benefits of the infringement is not enough; the defendant must have direct legal and practical control over the infringing activity itself. For example, in the seminal control and benefit case *Perfect 10, Inc. v. Amazon.com, Inc.*, the Ninth Circuit held that Google could not be liable for copyright infringement occurring on third-party websites because there was no evidence Google could practically or legally control what these third parties did on their websites. This was true even though Google benefited from the infringement by increased business and could stop benefiting by terminating its advertisement contracts with the infringers.

Here, there is no evidence that any of the defendants had either the legal or practical ability to control whether AC Referral sent out unsolicited texts. The defendants apparently have no control over AC Referral or how it conducts its business. There is no evidence that AC Referral sends out texts only for Click Media and that Click Media has the practical ability to stop AC Referral from sending unsolicited texts. At best, defendants could have declined to order leads from AC Referral, but the case law emphasizes that having the right to stop receiving benefits is not enough to create liability. There must be practical and legal control over the third party's infringement.

### IV. CONCLUSION.

IT IS HEREBY ORDERED THAT plaintiffs' motion for summary judgment **(Dkt. # 321) is DENIED.**

---

[56] *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007).

IT IS FURTHER ORDERED THAT defendants' motions for summary judgment **(Dkt. ## 233, 236, 239, 240) are GRANTED. The Clerk shall enter judgment in favor of defendants.**

IT IS FURTHER ORDERED THAT defendants' various motions for hearing **(Dkt. ## 368, 369, 370, 373, 395) are DENIED.**[57]

IT IS FURTHER ORDERED THAT the Objections to Magistrate's Order filed by defendants Credit Payment Services, Inc. **(Dkt. ## 322, 386) are OVERRULED and DENIED AS MOOT.**

IT IS FURTHER ORDERED THAT plaintiff's motion to strike defendants' reply brief in support of their objections **(Dkt. #385) is DENIED AS MOOT.**

IT IS FURTHER ORDERED THAT plaintiff's motion to file an oversized brief **(Dkt. #393) is GRANTED.**

IT IS FURTHER ORDERED THAT plaintiff's motion to strike defendants' evidence **(Dkt. #268) is DENIED AS MOOT.**

DATED THIS 20th day of July, 2015.

Andrew P. Gordon
United States District Judge

---

[57] After filing their initial motions, defendants filed these additional motions requesting hearings. These hearing requests do not require any response, meaning they are improperly submitted as "motions." Moreover, the motions are inappropriate as their filing appears to be intended only to serve as reminders to the court of the pending motions, motivated by the defendants' impatience in waiting for a decision. I take this opportunity to remind counsel that Local Rule 7–6 outlines the proper mechanism by which parties may bring pending matters to the court's attention, in order to verify that a pending motion has not been miscategorized or otherwise "fallen through the cracks." Counsel should not file unnecessary and inappropriate repetitive motions for hearings that waste already overburdened judicial resources, as it is only adding to the problem of the court's crowded docket, not assisting it.